| | |
|---|---|
| James H.M. Sprayregen, P.C. | Gabor Balassa (*pro hac vice* pending) |
| Paul M. Basta, P.C. | Ryan Blaine Bennett (*pro hac vice* pending) |
| Jonathan S. Henes, P.C. | A. Katrine Jakola (*pro hac vice* pending) |
| Christopher Marcus, P.C. | Whitney L. Becker (*pro hac vice* pending) |
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 601 Lexington Avenue | 300 North LaSalle |
| New York, New York 10022 | Chicago, Illinois 60654 |
| Telephone:    (212) 446-4800 | Telephone:   (312) 862-2000 |
| Facsimile:    (212) 446-4900 | Facsimile:   (312) 862-2200 |

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SABINE OIL & GAS CORPORATION, *et al.*,[1] | Case No. 15-[_____] (___) |
| Debtors. | (Joint Administration Requested) |
| SABINE OIL & GAS CORPORATION (*f/k/a* FOREST OIL CORPORATION), | |
| Plaintiff, | Adv. Pro. No. 15-[____] |
| v. | |
| WILMINGTON TRUST, N.A. | **COMPLAINT** |
| Defendant | |

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Sabine Oil & Gas Corporation (4900); Giant Gas Gathering LLC (3438); Sabine Bear Paw Basin LLC (2656); Sabine East Texas Basin LLC (8931); Sabine Mid-Continent Gathering LLC (6085); Sabine Mid-Continent LLC (6939); Sabine Oil & Gas Finance Corp. (2567); Sabine South Texas Gathering LLC (1749); Sabine South Texas LLC (5616); and Sabine Williston Basin LLC (4440).  The location of Debtor Sabine Oil & Gas Corporation's corporate headquarters and the Debtors' service address is:  1415 Louisiana, Suite 1600, Houston, Texas 77002.

## TABLE OF CONTENTS

NATURE OF THE ACTION............................................................................................3

THE PARTIES..............................................................................................................3

I.     The Plaintiff ......................................................................................................3

II.    The Defendant ..................................................................................................4

JURISDICTION AND VENUE......................................................................................4

FACTUAL BACKGROUND ..........................................................................................5

I.     FOREST OIL AND SABINE O&G PURSUE A business COMBINATION...............5

     A.    Forest Oil Was an Established and Publicly-Listed Oil and Gas Company.............5

     B.    Sabine O&G Was a Privately Held Oil and Gas Company. ....................................6

     C.    Forest Oil Considers Strategic Alternatives to Independence. ................................7

     D.    Forest Oil and Sabine O&G Explore a Possible Merger. ........................................8

II.    FOREST OIL AND SABINE O&G AGREE TO MERGE THEIR BUSINESSES. ...........................................................................................................8

     A.    The May 2014 Merger Agreement. ........................................................................8

     B.    The Amended Merger Agreement. .......................................................................10

III.   THE OUTLOOK FOR THE COMBINED COMPANY WEAKENS........................12

     A.    The Merger Is Delayed. .......................................................................................12

     B.    Plummeting Oil Prices Weaken the Financial Outlook for Forest Oil and Sabine O&G.........................................................................................................12

     C.    Sabine O&G's Financing Challenges. .................................................................14

     D.    Sabine O&G Reconsiders the Deal.......................................................................16

     E.    The December 16, 2014 Business Combination Closes. .......................................18

     F.    The Company Is Formed Through A Series of Integrated Steps............................20

     G.    As A Result Of The Business Combination, Forest Oil Assumed Substantial Debt and Lien Obligations of Sabine O&G. ........................................22

1

H.  At the Time of the Business Combination, Forest Oil and Sabine O&G Were Insolvent. ......................................................................................................24

I.  Forest Oil's Creditors Did Not Receive Reasonably Equivalent Value in the Business Combination.......................................................................................25

J.  The Business Combination Benefitted Sabine O&G's Second Lien Holders. ..................................................................................................................26

K.  The Company Received Reasonably Equivalent Value for the Upsizing of Its First and Second Lien Loan Facilities. ............................................................27

IV.  **THE COMPANY'S RESTRUCTURING AND PURSUIT OF THESE CLAIMS**............................................................................................................**27**

**COUNT I — CONSTRUCTIVE FRAUDULENT TRANSFER** ..............................................**29**

**PRAYER FOR RELIEF**..............................................................................................**30**

Plaintiff, Debtor Sabine Oil & Gas Corporation (the "Company"), formerly known as Forest Oil Corporation ("Forest Oil"), by and through its undersigned counsel, based upon information and belief, and as a result of its investigation to date, alleges as follows:

## NATURE OF THE ACTION

1.      This action involves a fraudulent transfer that occurred as part of a December 2014 business combination between Sabine Oil & Gas LLC ("Sabine O&G") and Forest Oil, as well as related entities (the "Business Combination").  At the time, Forest Oil was insolvent from a balance-sheet standpoint.   Simultaneous with the Business Combination, Forest Oil's unencumbered assets were pledged to secure debt that Sabine O&G had previously incurred and that was under-secured.  Forest Oil and its creditors did not receive reasonably equivalent value in exchange for that pledge.  Rather, by effectively transferring the value of the pledged assets from Forest Oil's creditors (pre-transaction) to Sabine O&G's creditors, the Business Combination impaired Forest Oil's unsecured creditors.

## THE PARTIES

### I.      THE PLAINTIFF

2.      The Company is a New York corporation with its principal place of business in Houston, Texas.  The Company is an independent energy company engaged in the acquisition, production, exploration, and development of onshore oil and natural gas properties in the United States.  The Company's current operations are principally located in the Cotton Valley Sand and Haynesville Shale formations in East Texas, the Eagle Ford Shale formation in South Texas, and the Granite Wash formation in the Texas Panhandle.

3.      The Company was formerly known as Forest Oil.  Forest Oil changed its name to Sabine Oil & Gas Corporation as a result of the December 2014 Business Combination.

4.       On July 15, 2015, shortly before filing this Complaint, the Company and its

Debtor affiliates[2] filed a voluntary petition for relief under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").

5.       The Company brings this adversary proceeding to pursue a constructive

fraudulent transfer claim against Defendant Wilmington Trust, N.A. ("Defendant" or

"Wilmington Trust") on behalf of, and for the benefit of, the Company's estate.

## II.    THE DEFENDANT

6.       Defendant Wilmington Trust is a Delaware corporation with its principal place of

business in Delaware.  Wilmington Trust is the administrative agent under the Second Lien Loan

(as defined below) and holder of the liens granted pursuant thereto (the "Second Liens").

7.       Wilmington Trust is a transferee of the Second Liens within the meaning of

section 550(a) of the Bankruptcy Code.

## JURISDICTION AND VENUE

8.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334 because the claims asserted in this adversary proceeding arise in the above-

captioned chapter 11 cases.

9.       Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§

1408 and 1409.

10.      This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C.

§ 157(b)(2)(A).  In the event that this or any other appropriate Court finds any part of this

adversary proceeding to be "non-core,"  Plaintiff consents to the entry of final orders and

---

[2]     The Debtors in these chapter 11 cases include:  Sabine Oil & Gas Corporation; Giant Gas Gathering LLC;
Sabine Bear Paw Basin LLC; Sabine East Texas Basin LLC; Sabine Mid-Continent Gathering LLC; Sabine
Mid-Continent LLC; Sabine Oil & Gas Finance Corp.; Sabine South Texas Gathering LLC; Sabine South Texas
LLC; and Sabine Williston Basin LLC.

judgements by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure. Plaintiff also consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

## I.  FOREST OIL AND SABINE O&G PURSUE A BUSINESS COMBINATION.

### A.  Forest Oil Was an Established and Publicly-Listed Oil and Gas Company.

11.    Forest Oil was an oil and gas company engaged in the acquisition, exploration, development, and production of oil, natural gas, and natural gas liquids, primarily in North America. Forest Oil was founded in 1916 in Pennsylvania and was incorporated in New York in 1924. Forest Oil became a publicly-held company in 1969.

12.    In recent years, Forest Oil had focused its operations on the development of oil and natural gas assets within operational areas located in the Eagle Ford in South Texas; the Ark-La-Tex region of Arkansas, Louisiana, and East Texas; and the Permian Basin in West Texas.

13.    Forest Oil's business was capital intensive. On June 30, 2011, to finance its operations, Forest Oil entered into a reserve-based lending facility (commonly referred to as an "RBL"), the Third Amended and Restated Credit Agreement, pursuant to which the loans and other obligations thereunder were secured primarily by Forest Oil's oil and gas reserves.

14.    Forest Oil entered into a First Amendment to the Third Amended and Restated Credit Agreement on September 12, 2013 and a Second Amendment to the Third Amended and Restated Credit Agreement on March 31, 2014 (together, with the Amended and Restated Credit Agreement, the "Forest Oil RBL"). Under the Second Amendment to the Third Amended and Restated Credit Agreement, the aggregate lender commitment was $500 million, and the borrowing base was set at $300 million. The Forest Oil RBL was secured by a first priority lien

on Forest Oil's oil and gas reserves representing at least 75% of the estimated future oil and gas revenues from Forest Oil's proved oil and gas reserves evaluated in the most recently completed reserve report, net of estimated direct expenses, discounted at an annual discount rate of nine percent ("PV-9").

15.     Forest Oil also financed its capital needs by issuing two tranches of bonds.  First, on June 6, 2007, Forest Oil issued $750 million in 7.25 percent senior unsecured notes due 2019 (the "2019 Notes").  The 2019 Notes were issued under and are governed by an indenture dated June 6, 2007 between Forest Oil and U.S. Bank National Association, as the initial indenture trustee (the "2019 Notes Indenture").  On May 22, 2008, Forest Oil issued an additional $250 million in principal of the 2019 Notes.

16.     Then, on September 17, 2012, Forest Oil issued $500 million in 7.5 percent senior unsecured notes due 2020 (the "2020 Notes").  The 2020 Notes were issued under and were governed by an indenture dated September 17, 2012 between Forest Oil and U.S. Bank National Association, as the initial indenture trustee (the "2020 Notes Indenture").

17.     In a November 2013 tender offer, Forest Oil purchased $422.1 million of the aggregate principal in the 2019 Notes, and $277.9 million of the aggregate principal of the 2020 Notes.  Thus, after November 2013, the principal remaining on the 2019 Notes was $577.9 million and the principal remaining on the 2020 notes was approximately $222.1 million, totaling approximately $800 million of unsecured bonds (together, the "Forest Notes").

**B.     Sabine O&G Was a Privately Held Oil and Gas Company.**

18.     Sabine O&G was an independent energy company engaged in the acquisition, production, exploration and development of onshore oil and natural gas properties in the United States.  Founded as a Delaware limited liability company in 2007, Sabine O&G subsequently

established three core operating areas in the Eagle Ford Shale, in East Texas, and in the Anadarko Basin.

19.     To finance its capital-intensive business, in April 2009, Sabine O&G (then known as NFR Energy LLC) entered into a reserve-based loan with an initial borrowing base of $225 million that was periodically adjusted (the "Sabine O&G RBL").

20.     The credit agreement for the Sabine O&G RBL provided that the facility was guaranteed and secured by at least 90% of the PV-9 value of Sabine O&G's oil and gas properties evaluated in the most recently completed reserve report.

21.     As of November 12, 2014, the borrowing base under the Sabine O&G RBL was $750 million.

22.     On December 14, 2012, Sabine O&G entered into a $500 million second lien term loan agreement with Bank of America, N.A. as the original administrative agent and other parties. Later, on January 23, 2013, Sabine O&G obtained $150 million of additional funding pursuant to the First Amendment to the Second Lien Loan (together, the "Second Lien Loan"). These agreements made a total of $650 million available to Sabine O&G.

23.     In February 2010, Sabine O&G (then known as NFR Energy LLC) and Sabine Oil & Gas Finance Corporation (then known as NFR Energy Finance Corporation) co-issued $200 million in 9.75 percent senior unsecured notes due 2017 (the "2017 Notes"). An additional $150 million in aggregate principal amount of 2017 Notes issued in April 2010. Thereafter, the aggregate principal amount of the 2017 Notes was $350 million.

**C.     Forest Oil Considers Strategic Alternatives to Independence.**

24.     In 2012, Forest Oil's management and Board of Directors began to evaluate strategic alternatives to independence, including the sale of Forest Oil to a strategic or financial

acquirer, a merger with another public or non-public industry participant, a substantial debt or equity investment from a private equity firm, or the sale of significant assets.

25.     In May 2013, Forest Oil hired J.P. Morgan as Forest Oil's financial advisor in connection with its exploration of strategic alternatives.

### D.     Forest Oil and Sabine O&G Explore a Possible Merger.

26.     In December 2013, Patrick R. McDonald, Forest Oil's Chief Executive Officer, learned that Sabine O&G was in the process of exploring strategic alternatives, including potentially becoming a publicly listed company.

27.     In January 2014, Mr. McDonald met with David Sambrooks, Sabine O&G's Chief Executive Officer, to discuss their respective businesses, and potential benefits and challenges of combining Forest Oil and Sabine O&G.

28.     Over the next several months, Forest Oil, Sabine O&G and their advisors met several times to discuss a possible combination of the companies.  The parties negotiated terms of a potential merger and engaged in reciprocal due diligence as each company evaluated a potential deal.

29.     During this process, Forest Oil was advised by its financial advisor, J.P. Morgan, and Forest Oil's outside counsel, Wachtell, Lipton, Rosen & Katz ("Wachtell").  Sabine O&G was advised by its financial advisors, and its outside counsel Vinson & Elkins LLP ("V&E").

## II.     FOREST OIL AND SABINE O&G AGREE TO MERGE THEIR BUSINESSES.

### A.     The May 2014 Merger Agreement.

30.     On May 5, 2014, Forest Oil entered into an Agreement and Plan of Merger (the "Merger Agreement") with Sabine O&G; Sabine Oil & Gas Holdings II LLC, the sole member of Sabine O&G; Sabine Oil & Gas Holdings LLC ("Sabine Holdings"), the sole member of Sabine Oil & Gas Holdings II LLC; Sabine Investor Holdings LLC ("Sabine Investor

Holdings"), a related investment entity; New Forest Oil Inc., a wholly-owned subsidiary of Forest Oil ("Holdco"); and Forest Oil Merger Sub Inc., a wholly-owned subsidiary of Holdco.

31.     The Merger Agreement provided for the merger of Forest Oil and Sabine O&G through multiple steps.   Specifically, the Merger Agreement contemplated that, among other things, Forest Oil and Sabine Holdings would combine to form a new subsidiary of Holdco, in a transaction in which Sabine Investor Holdings and the shareholders of Forest Oil would receive stock in Holdco.

32.     Upon the closing of the contemplated merger, the former Forest Oil shareholders would own approximately 26.5% of the outstanding Holdco common stock and Sabine Investor Holdings would own approximately 73.5% of that stock.   Holdco would then be renamed "Sabine Oil & Gas Corporation."

33.     Among the various conditions to the effectiveness of the contemplated merger, the Merger Agreement between Forest Oil and Sabine O&G required approval by two-thirds of the outstanding Forest Oil common shares.

34.     The indentures governing Forest Oil's existing 2019 and 2020 Notes contained change of control provisions that entitled noteholders of the 2019 and 2020 Notes to receive 101 percent of the principal amount of the notes plus accrued interest.   The May 2014 deal structure, if consummated, would have triggered these change of control provisions.

35.     The boards of directors of Forest Oil and Sabine O&G approved the Merger Agreement.

36.     In May 2014, Sabine O&G obtained a signed commitment letter ("Commitment Letter") from Wells Fargo Bank, N.A., WF Investment Holdings LLC, and Wells Fargo Securities LLC (together "Wells Fargo"), and Barclays Bank PLC ("Barclays"), whereby the

banks committed to provide funding for a post-merger first lien RBL and for a bridge loan that would finance any redemption payments on the 2019 Notes and 2020 Notes ("Bridge Loan").

**B.      The Amended Merger Agreement.**

37.      In early June 2014, Forest Oil and Sabine O&G began hearing from market participants that certain hedge funds were "shorting," or acquiring credit default swaps with respect to, Forest Oil's bonds.  The short positions were expected to increase in value if, among other things, the merger did not close.

38.      Upon information and belief, Forest Oil and Sabine O&G representatives learned that those hedge funds were simultaneously buying Forest Oil's common shares for the purpose of voting them against the merger, in order to defeat the merger and thereby increase the value of their short position on the Forest Oil bonds.

39.      Because the Merger Agreement required that two-thirds of all outstanding Forest Oil shares affirmatively support the transaction as then contemplated, Forest Oil and Sabine O&G were concerned that the hedge funds would succeed in acquiring a blocking position.

40.      Accordingly, Forest Oil and Sabine O&G agreed to restructure the combination in such a way that reduced the shareholder approval requirement from two-thirds to fifty percent, thereby mitigating the likelihood that the hedge funds would acquire a blocking voting position.

41.      In June and early July 2014, Forest Oil and Sabine O&G negotiated the form of an amended and restated merger agreement and revised transaction documents.

42.      On July 9, 2014, Forest Oil, Sabine Investor Holdings, Sabine Holdings, Sabine Oil & Gas Holdings II LLC, Sabine O&G, and FR XI Onshore AIV, LLC ("AIV Holdings"), a shareholder of Sabine O&G, entered into an Amended and Restated Agreement and Plan of Merger (the "Amended Merger Agreement").  The Amended Merger Agreement amended and restated the May 2014 Merger Agreement.

43.     The Amended Merger Agreement revised the structure of the transaction but did not change its economic terms.  Instead of merging Forest Oil and Sabine Holdings under a new holding company, the Amended Merger Agreement provided that Sabine Holdings would become a subsidiary of Forest Oil and would then merge into Forest Oil.

44.     In particular, under the Amended Merger Agreement, Sabine Investor Holdings and AIV Holdings would contribute all of their equity interests in Sabine Holdings to Forest Oil, with Sabine Holdings becoming a wholly-owned subsidiary of Forest Oil.  In exchange, Sabine Investor Holdings and AIV Holdings would receive shares of Forest Oil stock.  Sabine Holdings, Sabine Oil & Gas Holdings II LLC, and Sabine O&G would then merge with Forest Oil.[3]

45.     Forest Oil's pre-existing shareholders would then own common shares representing approximately a 26.5% economic interest and approximately 20% of the total voting power in Forest Oil, while Sabine Investor Holdings and AIV Holdings would own shares representing approximately 73.5% of the economic interest and 80% of the total voting power in Forest Oil.

46.     The transaction contemplated by the Amended Merger Agreement was still expected to result in a change of control, as defined in Forest Oil's existing bond indentures.  Accordingly, Forest Oil would be obligated to make a change of control offer for each series of its outstanding notes at a price of 101 percent of the outstanding principal amount, plus accrued and unpaid interest.

47.     The boards of directors of Forest Oil and Sabine O&G approved the Amended Merger Agreement.

---

[3]     FR NFR PI, Inc., and FR NFR Holdings, Inc., entities that held equity interests in Sabine Holdings, would also merge with Forest Oil as a result of the contemplated transaction.

11

### III.     THE OUTLOOK FOR THE COMBINED COMPANY WEAKENS.

#### A.     The Merger Is Delayed.

48.     In the summer of 2014, the Public Company Accounting Oversight Board ("PCAOB") inspected Ernst & Young LLP's ("Ernst & Young") audit of Forest Oil's 2013 year-end financial statements.

49.     As the PCAOB was completing its inspection, management consulted with Ernst & Young and concluded that Forest Oil's controls did not adequately compensate for certain internal control deficiencies at Forest Oil.  Accordingly, in August and September 2014, Ernst & Young performed additional testing of Forest's internal controls over financial reporting for past audit years.  During this period, the business combination was on hold.

#### B.     Plummeting Oil Prices Weaken the Financial Outlook for Forest Oil and Sabine O&G.

50.     During the delay in closing the merger, oil prices plummeted, adversely affecting Forest Oil, Sabine O&G, and the economics of the July 2014 Amended Merger Agreement.

51.     In July 2014, the average price of West Texas Intermediate ("WTI") crude—the underlying commodity of the New York Mercantile Exchange's oil futures contracts—was approximately $103 per barrel.  By September 2014, the price had declined to $93 per barrel.

52.     Oil prices continued to drop, with WTI crude falling to less than $69 per barrel in late November 2014.

53.     By mid-December 2014, WTI crude fell below $55 for the first time in five years. From July 2014 to mid-December 2014, the price of crude oil fell by nearly 50%.

54.     The price of natural gas likewise declined precipitously in the second half of 2014.  For instance, from the end of September to mid-December 2014, the prices of propane,

butane, isobutane and natural gas all declined by 40% or more. The price of a mixed barrel of natural gas liquids on the Gulf Coast also declined by about 45% over the same period.

55.     As a result of the drop in oil and natural gas prices, Forest Oil and Sabine O&G's financial performances deteriorated markedly in the second half of 2014.

56.     <u>Forest Oil's Performance</u>.  While Forest Oil reported a modest net loss of $21 million for the three months ending March 31, 2014, the corporation publicly reported recognized net losses of $106 million for the three months ending September 30, 2014.

57.     On October 1, 2014, Forest Oil publicly disclosed that its financial-statement auditor, Ernst & Young, had issued a going-concern qualification.  This qualification stated, in part, "there presently exists substantial doubt about Forest's ability to continue as a going concern through December 31, 2014."

58.     Moreover, by the beginning of December 2014, Forest Oil had missed its forecasted EBITDA projections by approximately 30%.

59.     <u>Sabine O&G's Performance.</u>  Price deterioration in the oil and gas market also adversely affected Sabine O&G's performance.

60.     During the second quarter of 2014, Sabine O&G outperformed its March 2014 forecast.  Its performance, however, changed markedly in the third quarter of 2014.  In that quarter alone, Sabine O&G reported EBITDA that was 18% below projections for the quarter, and oil sales that were 21% below projections.

61.     In part due to Sabine O&G's lagging performance, the business' financial projections prepared in the last quarter of 2014 indicated that Sabine O&G, as a standalone entity, would exceed the allowable debt-to-EBITDA ratio under the Sabine O&G RBL in early 2015.  Sabine O&G therefore faced the likely prospect of having to negotiate a waiver or

amendment to the debt-to-EBITDA covenant, or face a potential default and acceleration of its existing RBL.

62.      NYSE Delisting.    Forest Oil's and Sabine O&G's deteriorating financial performance also had implications for the combined company's status as a publicly listed company on the New York Stock Exchange ("NYSE").

63.      When the Amended Merger Agreement between the companies was signed in July 2014, Sabine O&G viewed Forest Oil's public listing on the NYSE as a significant expected benefit to the combined company.  But, as 2014 progressed, it became increasingly clear that the combined company would not be listed on the NYSE, because its financial condition would not satisfy the exchange's listing standards for a new company.

**C.      Sabine O&G's Financing Challenges.**

64.      Due in part to the companies' deteriorating financial conditions, Sabine O&G faced significant challenges in securing a workable capital structure for the combined company.

65.       In September 2014, Sabine O&G ran updated financial forecast models for the combined company, incorporating the terms of the financing outlined in the Commitment Letter that Sabine O&G had received from Wells Fargo and Barclays for a post-merger RBL and Bridge Loan.

66.      Sabine O&G's updated financial models projected that the combined company would breach its debt-to-EBITDA covenant in the post-combination first lien RBL as early as the first quarter of 2015, with covenant violations in each successive quarter of 2015 and into 2016.

67.      On September 12, 2014, Sabine O&G shared the financial models showing the projected covenant violation with Forest Oil.  Sabine O&G also notified Forest Oil that it planned to ask the first lien lenders to modify the covenant calculation in the anticipated  post-

combination first lien RBL, so the combined company could avoid a covenant breach and default shortly after the merger closed.

68.    Within a few days, on September 15, 2014, Sabine O&G provided its financial models to Wells Fargo and Barclays, expressing a need to modify covenants on the first lien RBL for the post-combination company.

69.    Wells Fargo and Barclays, the lead lenders on the post-combination first lien RBL, were also lenders on the contemplated Bridge Loan that would finance any redemption payments to Forest Oil bondholders upon a change of control at Forest Oil.  When Sabine O&G raised the need to modify the first lien RBL debt covenant, the lenders stated they were having difficulty finding additional lenders who were willing to participate in the syndication of the Bridge Loan facility.  Thus, the lenders stated they would also explore with Sabine O&G potential modifications to the structure of the contemplated Bridge Loan.

70.    In late November 2014, the lenders' counsel circulated revised drafts of term sheets for revised Bridge Loan terms.  The lenders proposed downsizing the Bridge Loan from $850 million to $780 million, changing the loan from an unsecured bridge to a secured bridge, and increasing the interest rate. The proposed Bridge Loan terms would also allow the Bridge Loan lenders to demand third and fourth lien notes to replace the Bridge Loan as early as January 20, 2015.

71.    Sabine O&G did not accept the lenders' first revised Bridge Loan proposal.

72.    On November 26, 2014, shortly after the lenders' Bridge Loan proposal, Sabine O&G updated its financial models to show how the combined company would perform under the lenders' proposed financing.  Three versions of the financial models—one anticipating Forest Oil's sale of its Arkoma assets, one without an Arkoma assets sale, and one with a Forest Oil sale

of Arkoma assets and a Sabine O&G asset sale of Granite Wash assets—were provided to Wells Fargo and Barclays, as well as to five other banks in the lending group, for their evaluation.

73.     In early December, Sabine O&G calculated that the terms of the revised financing terms it expected to obtain from the lenders would increase annual interest costs of the previously committed financing by at least $31 million for 2015 and at least $34 million for 2016, not taking into account the associated increased financing fees.

74.     Given these significant additional financing costs, along with the companies' deteriorating financial performances, and the expected covenant violations of the combined business, Sabine O&G questioned the potential benefits of the business combination—both to Sabine O&G and to Forest Oil—under the agreed-upon merger structure.

**D.     Sabine O&G Reconsiders the Deal.**

75.     On November 30, 2014, the two companies' CEOs—Mr. Sambrooks and Mr. McDonald—spoke by telephone concerning the business combination.   Mr. Sambrooks stated that, given the terms of the financing then available, the combined company might face insolvency after the closing.   He also stated that both companies would be better off on a standalone basis and recommended that the parties not proceed with the business combination. At the same time, Mr. Sambrooks stated that Sabine O&G was willing to explore alternative deal structures that might address these challenges.

76.     On December 2, 2014, Mr. Sambrooks sent a letter to Forest Oil's board of directors reiterating many of the points he had raised in his November 30 telephone call with Mr. McDonald.   The letter stated, in part, "it has become clear that a combination of our two companies is no longer in the best interests of the shareholders of either company."   And the letter stated that the combined company would be in a diminished position with respect to equity capitalization, debt financing, and liquidity.

77.     In the December 2 letter, Mr. Sambrooks explained that if the business combination went forward, the combined company would be in serious danger of breaching its leverage covenant in the post-combination first lien RBL, in the first quarter of 2015.  That would mean the first lien lenders could prevent the company from drawing on the revolver and could also accelerate the amounts due under the revolver, triggering an event of default under the other financing arrangements.

78.     Mr. Sambrooks also wrote in the December 2 letter that Sabine O&G had to renegotiate the terms of the committed financing due to the prospect of the leverage covenant default on the post-combination first lien RBL. The likely renegotiated financing terms would substantially increase the Company's projected annual cash interest costs in 2015 and 2016. Because the Company was already expected to be cash flow negative through 2019, the additional interest costs, along with reduced EBITDA projections for Forest Oil and larger than anticipated costs associated with the combination, would strain the combined company's ability to fund operations.

79.     Mr. Sambrooks closed his letter by expressing Sabine O&G's hope that, given the change in circumstances, Forest Oil would agree to terminate the Amended Merger Agreement.

80.     If Sabine O&G had unilaterally refused to close the business combination, then Forest Oil could have potentially commenced litigation seeking to compel Sabine O&G to close the transaction or attempt to recover damages.

81.     On December 5, 2014, the Forest Oil board convened for a special telephonic meeting to discuss Mr. Sambrooks' December 2 letter and the additional financial information received from Sabine O&G on the subsequent teleconference.  During the call, the Forest Oil

board decided to proceed with the transaction in some form, rather than terminate the transaction entirely.

**E.      The December 16, 2014 Business Combination Closes.**

(i)      **Forest Oil and Sabine O&G Consider Potential Solutions.**

82.      On December 7, 2014, Mr. Sambrooks wrote another letter to Forest Oil, reiterating Sabine O&G's concerns about a merger under the July 2014 terms, and expressing a willingness to work with Forest Oil to find an alternative solution.

83.      In Mr. Sambrooks' December 7, 2014 letter to Forest Oil, Sabine O&G proposed revising the deal structure from a business combination to a joint operating agreement, under which Sabine O&G would serve as the operator of the Forest Oil properties.  Mr. Sambrooks stated that the proposed alternative structure would permit both companies to avoid the significant financing and transaction cost burdens that would be imposed under the existing deal structure.

84.      In support of his position that the parties should consider alternative approaches, Mr. Sambrooks sent additional financial models to Forest Oil showing again that, under the terms of the lenders' existing commitments, the combined company would breach its current first lien debt covenants in the first quarter of 2015.

85.      In the evening of December 7, 2014, after a Forest Oil board meeting, Mr. McDonald sent a letter to Sabine O&G stating that Forest Oil was willing to explore alternative deal structures, so long as Sabine O&G would agree to close the business combination under the terms of the July 2014 Amended Merger Agreement if a mutually agreeable alternative could not be reached.

86.      The next day, on December 8, 2014, Mr. Sambrooks responded to Mr. McDonald's December 7, 2014 letter, agreeing that the parties should work together in good

faith to explore mutually acceptable alternatives.   The discussion between the companies of specific alternative deal structures began promptly:   On December 8, 2014, Mr. McDonald notified Sabine O&G that Forest Oil and its advisors had identified a potential alternative deal structure.

87.   On the morning of December 9, 2014, Forest Oil and its advisors presented the framework of an alternative transaction structure whereby Sabine O&G's equity holders would hold a 73.5% economic interest in the combined company, but would be issued less than 50% of the company's voting stock.   Because Sabine O&G equity holders would own less than half of the voting stock of the combined company, the transaction would not trigger the change of control provision in the 2019 and 2020 Notes.

88.   As the Bridge Loan was intended to cover the cost of repurchasing Forest Oil bonds following a change of control under the indentures, with the newly proposed deal structure, the Bridge Loan would no longer be necessary.

89.   Later in the evening of December 9, 2014, Mr. Sambrooks sent a draft term sheet to Mr. McDonald, reflecting the revised deal structure that Forest Oil and its advisors had proposed earlier in the day.   In his email, Mr. Sambrooks stated that Sabine O&G was prepared to proceed with formalizing an agreement based on Forest Oil's proposed structure.

90.   The next day, on December 10, 2014, Mr. Sambrooks emailed Mr. McDonald, requesting that Forest Oil provide a responsive term sheet as early as possible that day, so that Sabine O&G could notify its lenders of the proposed revised structure and "allow us to bring our banks over the wall."

91.     Over the next few days, Forest Oil's advisors and Sabine O&G's advisors exchanged proposed term sheets and negotiated the final terms for the proposed alternative deal structure.  Sabine O&G also advised its lending group of the revised deal structure.

92.     By the conclusion of those negotiations, the lender group agreed to a less demanding debt-to-EBITDA covenant than the one in the previous version of the first lien RBL. According to Sabine O&G's projections, this modification would allow the Company to avoid breaching its covenant for first quarter of 2015.

93.     On December 15, 2014, Forest Oil closed a sale of its Arkoma Basin assets, which yielded cash proceeds of approximately $185 million.

94.     By December 16, 2014, Forest Oil and Sabine O&G agreed to a revised deal structure that provided Sabine O&G's equity holders a majority economic interest in the combined company, with less than half of the voting stock, and provided Forest Oil shareholders with a 26.5% economic interest and approximately 60% of the total voting stock.  The parties proceeded with closing the Business Combination on that basis.

**F.     The Company Is Formed Through A Series of Integrated Steps.**

95.     The December 16, 2014 Business Combination was effectuated through a series of interlocking steps.

96.     Upon the approval of the Business Combination by the Forest Oil board on December 16, both Sabine O&G and Forest Oil executed Amendment No. 1 to the Merger Agreement, providing for the revised deal structure.  Other agreements, including a Second Amended and Restated Stockholder's Agreement and a Second Amended and Restated Registration Rights Agreement, were also executed.

97.     A Certificate of Amendment then authorized Forest Oil to increase the number of its common shares, and to create new Series A Non-Voting Equity-Equivalent Preferred Shares.

98.     Sabine Investor Holdings LLC then contributed to Forest Oil all of its equity interests in Sabine Oil & Gas Holdings LLC.  Similarly, FR XI Onshore AIV, LLC contributed to Forest Oil all of the equity interest in two other holding companies, FR NFR Holdings Inc. and FR NFR PI Inc.

99.     In exchange for those equity contributions, Forest Oil granted Sabine Investor Holdings LLC and FR XI Onshore AIV, LLC shares of Forest Oil stock, representing, in all, approximately a 73.5% economic interest in the new company and 40% of the total voting power.  Then, immediately following the closing of those transactions, FR XI Onshore AIV, LLC contributed all its common shares and Series A preferred shares to Sabine Investor Holdings LLC.

100.    Consequently, Forest Oil became the sole shareholder of FR NFR PI Inc. and FR NFR Holdings Inc.  And Forest Oil, FR NFR PI Inc. and FR NFR Holdings Inc. became the sole members of Sabine Oil & Gas Holdings LLC.

101.    At the same time, Forest Oil and FR NFR PI, Inc. and FR NFR Holdings Inc. executed and delivered, and Forest Oil approved and adopted, the "Contributed Corporations Merger Agreement," pursuant to which the NFR entities were merged with and into Forest Oil. FR NFR PI, Inc. and FR NFR Holdings Inc. therefore ceased to exist, and Forest Oil was the sole member of Sabine Oil & Gas Holdings LLC.

102.    Then, Sabine Oil & Gas Holdings LLC, Sabine Oil & Gas Holdings II LLC, and Sabine Oil & Gas LLC merged with and into Forest Oil.  Thus, Forest Oil was the entity that survived the Business Combination, referred to herein as the Company.

103.    Forest Oil's pre-combination common stockholders continued to hold Forest Oil common stock, which, immediately following closing represented a 26.5% economic interest in the Company and 60% of the total voting power of the Company.

**G.    As A Result Of The Business Combination, Forest Oil Assumed Substantial Debt and Lien Obligations of Sabine O&G.**

104.    Following the closing of the Business Combination on December 16, 2014, the Company's capital structure consisted primarily of (a) an Amended and Restated First Lien Revolving Credit Agreement; (b) an Amended Second Lien Loan; (c) senior unsecured notes due 2017 (issued by NFR Energy LLC[4] and NFR Energy Finance Corp.[5]); (d) senior unsecured notes due 2019 (issued by Forest Oil); and (e) senior unsecured notes due 2020 (issued by Forest Oil).

105.    The First Lien Revolving Credit Agreement.  On December 16, 2014, Forest Oil terminated its prior first lien Credit Agreement (the Forest Oil RBL).  At the time of that termination, Forest Oil had borrowed $105 million against the facility.

106.    On December 16, 2014, the Company amended and restated Sabine O&G's RBL. The Second Amended and Restated Credit Agreement (the "First Lien RBL") provided for an initial borrowing base of $1 billion.

107.    The First Lien RBL, as amended, provided that all obligations and guarantees would be secured by a lien on at least 80% of the PV-9 of the borrowing base properties evaluated in the most recent reserve report delivered to the First Lien RBL's administrative agent, as well as a pledge of all of the capital stock of the Company's restricted subsidiaries.

108.    The Sabine O&G subsidiaries—Sabine Bear Paw Basin LLC, Sabine East Texas Basin LLC, Sabine Mid-Continent LLC, Sabine Oil & Gas Finance Corp., Sabine South Texas

---

[4]    NFR Energy LLC later became known as Sabine O&G.

[5]    NFR Energy Finance Corp. later became known as Sabine Oil and Gas Finance Corp.

LLC, Sabine Williston Basin LLC, Giant Gas Gathering LLC, Redrock Drilling LLC, Sabine Mid-Continent Gathering LLC, and Sabine South Texas Gathering LLC—had been guarantors under the First Amended and Restated Sabine O&G RBL and remained guarantors under the amended First Lien RBL.

109.    Under the First Lien RBL, the Company increased its borrowings to $750.8 million.  The proceeds of the facility were used to refinance borrowings under the prior Forest Oil RBL ($105 million).  The increased facility was also used to pay for both Forest Oil's and Sabine O&G's Business Combination transaction costs, including legal fees and lenders fees.

110.    The First Lien RBL expressly stated that the agreement was not a novation of Sabine O&G's RBL, and all of the obligations and liabilities under the Sabine O&G RBL remained valid and enforceable.

111.    <u>The Second Lien Loan.</u>   Just prior to the consummation of the Business Combination on December 16, 2014, Sabine O&G entered into a Second Amendment to the Second Lien Loan to provide for $50 million of incremental debt, above the $650 million of debt already issued to Sabine O&G.  This Amendment did not replace Sabine O&G's Second Lien Loan; rather, the Amendment stated that all of the obligations under the First Amendment to the Second Lien Loan remained valid and enforceable, and were not impaired or limited by the execution of an amendment to the term loan.

112.    Under the amendment to Sabine O&G's Second Lien Loan, all obligations and guarantees would be secured by a lien on at least 80% of the PV-9 of the borrowing base properties evaluated in the most recent reserve report delivered to the administrative agent, as well as a pledge of all of the capital stock of the Company's restricted subsidiaries.  These obligations were second priority liens to the liens securing the First Lien RBL.

113.    When Sabine O&G entered into the Second Amendment to the Second Lien Loan, the Sabine O&G Second Lien Loan was under-secured by hundreds of millions of dollars.

114.    On December 16, 2014, at the time of the Business Combination, Forest Oil executed an assumption agreement, unconditionally assuming all the obligations of Sabine O&G under the Second Lien Loan and its amendments.

115.    The Sabine O&G Senior Notes Due 2017.    At the time of the Business Combination, $350 million in principal remained outstanding on Sabine O&G's 2017 Notes.

116.    At the time of the Business Combination, the Company signed the Fifth Supplemental Indenture, under which the Company unconditionally assumed all Sabine O&G's obligations under the 2017 Notes.

117.    The Forest Oil Senior Notes Due 2019 and 2020.    At the time of the Business Combination, Forest Oil had approximately $800 million in principal outstanding on its 2019 and 2020 Notes (collectively the "Forest Notes").

118.    Also, the Sabine O&G's subsidiaries signed a First Supplemental Indenture to the 2019 and 2020 Forest Notes, under which the Sabine O&G subsidiaries guaranteed Forest Oil's obligations under the 2019 and 2020 Notes.  The Sabine O&G subsidiaries, however, did not have nearly enough unencumbered assets to make good on that guarantee.

**H.      At the Time of the Business Combination, Forest Oil and Sabine O&G Were Insolvent.**

119.    At all relevant times, the vast majority of Forest Oil's assets were comprised of its oil and gas assets.

120.    Due in large part to declining oil prices and low natural-gas prices, the fair market value of Forest Oil's assets immediately before the Business Combination was hundreds of

millions of dollars less than the company's liabilities.  In other words, when Forest Oil went forward with the Business Combination, the company was insolvent on a balance-sheet basis.

121.    Declining oil prices and low natural gas prices likewise rendered Sabine O&G insolvent on a balance-sheet basis.  As of December 16, 2014 (immediately before the Business Combination occurred), the fair market value of Sabine O&G's assets was hundreds of millions of dollars less than that company's total liabilities.

122.    Not surprisingly, the combination of the insolvent companies produced a Company that was also insolvent on a balance-sheet basis.  As of December 16, 2014, immediately after the Business Combination closed, the fair market value of the combined company's assets was more than $500 million dollars less than the combined company's total liabilities.

I.      **Forest Oil's Creditors Did Not Receive Reasonably Equivalent Value in the Business Combination.**

123.    Before the Business Combination, certain of Forest Oil's oil and gas assets were pledged to secure the $105 million drawn against the Forest Oil RBL, fully securing that Forest Oil credit facility.  Beyond that, Forest Oil also had hundreds of millions of dollars in assets, the value of which was available to the Forest Oil Bondholders and Forest Oil's other creditors.

124.    Thus, although Forest Oil was insolvent at the time, the company had sufficient assets to allow substantial recovery by Forest Oil creditors.  The Business Combination, however, changed that.

125.    Through a series of interrelated transactions, hundreds of millions of dollars of Forest Oil's unencumbered assets were pledged as collateral to secure Sabine O&G's pre-existing under-secured second lien debt, as well as the upsizing of the First Lien RBL and Second Lien Loan facilities.  The secured lenders then perfected their security interests in the

Forest Oil assets.  Thus, the Business Combination transferred value from Forest Oil's unsecured creditors to Sabine O&G's Second Lien Loan facility.

126.     Forest Oil and its creditors did not receive reasonably equivalent value for the pledge of its assets to, and imposition of liens by, Sabine O&G's secured creditors. Consequently, the transactions that occurred simultaneously on December 16, 2014, including the pledge of Forest Oil's unsecured assets, impaired Forest Oil and its creditors.

**J.     The Business Combination Benefitted Sabine O&G's Second Lien Holders.**

127.     In the Business Combination, Forest Oil's unencumbered assets were pledged as security on Sabine O&G's first lien and second lien debt.  Sabine O&G's Second Lien Loan facility, however, received the value of that transfer.  That is because the $619 million that Sabine O&G had drawn on the Sabine O&G RBL before the Business Combination was fully secured by the assets of Sabine O&G and its subsidiaries at the time of the Business Combination.  By contrast, immediately before the Business Combination, Sabine O&G's Second Lien Loan, totaling $650 million, was under-secured by hundreds of millions of dollars.

128.     Through the Business Combination, Forest Oil assumed Sabine O&G's preexisting, under-secured second lien debt, and Forest Oil's unencumbered assets were pledged to secure that under-secured debt, benefitting the Sabine O&G Second Lien Loan facility at the expense of Forest Oil's unsecured creditors.

129.     Thus, by virtue of the Business Combination, Forest Oil's unsecured creditors were deprived of the value of the unencumbered assets that became pledged to secure an obligation that another company, Sabine O&G, had incurred years earlier.  Simply put, the integrated series of transactions that occurred on December 16, 2014, among Forest Oil, Sabine O&G, certain affiliates of Sabine O&G, and the Forest Oil and Sabine O&G lenders, conferred on Sabine O&G's Second Lien Loan facility hundreds of millions of dollars of value that, pre-

transaction, had been available to Forest Oil's creditors, while Forest Oil did not receive reasonably equivalent value in return.

### K.   The Company Received Reasonably Equivalent Value for the Upsizing of Its First and Second Lien Loan Facilities.

130.   In the Business Combination, Sabine O&G's First Lien RBL was amended, and the Company then drew an additional $131 million on that facility, bringing the total drawn on the facility to $750 million.

131.   Unlike the Sabine O&G Second Lien Loan deficiency—which represented an obligation that Sabine O&G had incurred pre-transaction, when it was an entirely distinct and independent entity from Forest Oil—the upsizing of the First Lien RBL represented a new obligation that the Company incurred in the Business Combination, for which the Company received an offsetting benefit—$131 million.

132.   In the Business Combination, the total amount of the second lien debt was also increased—from $650 million to $700 million.  When the Company incurred that additional $50 million obligation, it simultaneously received an offsetting benefit of $50 million cash.

## IV.   THE COMPANY'S RESTRUCTURING AND PURSUIT OF THESE CLAIMS.

133.   In March 2015, the Company reported in its 2014 year-end audited financial statements that the dramatic decline in oil and gas prices adversely affected the Company's "financial position, financial results, cash flow, access to capital and ability to grow."  The Company noted that due to its substantial liquidity concerns, it may be unable to continue as a going concern.

134.   That same month, the Company publicly announced that it was evaluating strategic alternatives to its capital structure.  As part of that process, the Company began to

assess potential claims that certain stakeholders may seek to assert in connection with any chapter 11 filing.

135.    The Company also learned that Forest Oil's 2019 and 2020 bondholders and Sabine O&G's 2017 bondholders might demand that the Company pursue claims, or seek standing to pursue claims themselves, against other creditor groups, in the event the Company filed for bankruptcy protection.

136.    To evaluate those potential legal claims, the Company's Board of Directors approved the formation of a special committee (the "Independent Directors Committee") comprised of two independent directors, Thomas Chewning and Jonathan Foster, who were not involved in the Business Combination.  Neither Mr. Chewning nor Mr. Foster served as directors of, or had any other involvement with, the Company or its predecessor entities before the Business Combination.

137.    Neither Mr. Chewning nor Mr. Foster holds, nor has previously held, any officer position at, or been employed by, the Company, its predecessors, or its subsidiaries.

138.    On May 15, 2015, the Company's Board of Directors authorized the Independent Directors Committee to conduct and oversee an investigation related to potential claims and causes of action that the Company or certain of its stakeholder may possess.

139.    Then, on June 10, 2015, the Company's Board of Directors approved an expansion of the Independent Directors Committee's authority to decide which claims, if any, the Company should assert related to the Business Combination.

140.    Mr. Chewning and Mr. Foster were assisted in their assessment of potential claims by the Company's legal and financial advisors.

141.    On June 11, 2015, the Independent Directors Committee concluded that it would be in the best interest of the Company and its stakeholders to pursue a constructive fraudulent transfer claim to avoid liens that were imposed on Forest Oil's assets to secure Sabine O&G's preexisting Second Lien Loan debt in the December 16, 2014 transactions.

142.    On July 13, 2015, the Independent Directors Committee authorized the filing of this Adversary Complaint contemporaneous with the filing of the Company's chapter 11 petition.

143.    The Independent Directors Committee and its advisors are in the process of evaluating other potential claims that may be asserted on behalf of the Company.   Once the investigation of those claims has been completed, the Independent Directors Committee will determine if the Company should pursue additional claims and, if so, which claims.

## COUNT I — CONSTRUCTIVE FRAUDULENT TRANSFER
### Bankruptcy Code Sections 544, 548, 550 and 551 and Applicable State Law

144.    The Company restates and re-alleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

145.    On December 16, 2014, Forest Oil, Sabine O&G, and other entities engaged in a series of transactions that had the effect of conveying to Sabine O&G's Second Lien Loan facility hundreds of millions of dollars of value that had previously been available to Forest Oil's creditors.

146.    In those transactions, unsecured Forest Oil assets were pledged as collateral to Sabine O&G's Second Lien Loan facility to secure Sabine O&G's under-secured Second Lien Loan debt that was incurred years before the Business Combination.  These transactions deprived Forest Oil's creditors of substantial value associated with the Forest Oil assets.  The transactions, by contrast, benefitted Sabine O&G's Second Lien Loan holders by providing Forest Oil's material and previously unencumbered assets as enhanced collateral.

29

147.     Forest Oil and its creditors did not receive assets or other benefits of reasonably equivalent value or fair consideration in exchange for the transfer of value from Forest Oil to the Second Lien Lenders, or its assumption of obligations for Sabine O&G's Second Lien Loan debt.

148.     At the time it entered into the Business Combination and its related transactions, Forest Oil was insolvent, and it remained insolvent as a result of those transactions.

149.     The transfer of value to the Second Lien Loan through the pledge of Forest Oil assets to secure the preexisting deficiency on Sabine O&G's Second Lien Loan, was a constructive fraudulent transfer as to Forest Oil creditors.

150.     The liens imposed on Forest Oil's assets to secure the $650 million in preexisting Sabine O&G debt under the Second Lien Loan should be avoided, and should be preserved for the benefit of the Company's estate.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, the Company requests that judgment be entered in its favor against the Second Lien Administrative Agent as follows:

1.     Finding that the series of transactions on December 16, 2014 effectuated a constructive fraudulent transfer of property from Forest Oil to the Sabine O&G Second Lien facility;

2.     Avoiding the Sabine O&G Second Lien Loan facility's liens on Forest Oil property that addressed the deficiency under the Sabine O&G Second Lien Loan facility existing before the Business Combination;

3.     Preserving the avoided liens, and collateral securing those liens, for the benefit of the Company's estate; and

4.     Providing for such other relief as justice and equity may require.

Dated:  July 15, 2015

New York, New York

Respectfully submitted,

_/s/ Gabor Balassa_

Gabor Balassa, P.C. (_pro hac vice_ pending)
Ryan Blaine Bennett (_pro hac vice_ pending)
A. Katrine Jakola (_pro hac vice_ pending)
Whitney L. Becker (_pro hac vice_ pending)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

James H.M. Sprayregen, P.C.
Paul M. Basta, P.C.
Jonathan S. Henes, P.C.
Christopher Marcus, P.C.
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

_Proposed Counsel to the Debtors and Debtors in Possession_