Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    In re:                        :
                                   :    Chapter 11
5                                  :
     SABINE OIL & GAS CORPORATION  :    Case No. 15-11835
6                                  :
              Debtors.             :
7    _____ :
                                   :
8                                  :
     SABINE OIL & GAS CORPORATION, :
9                                  :
              Plaintiff,           :
10                                 :
         v.                        :    Adv. Proc. No.
11                                 :    15-01126-scc
     WILMINGTON TRUST, N.A.        :
12                                 :
              Defendants.          :
13   _____ :

14

15                                 United States Bankruptcy Court

16                                 One Bowling Green

17                                 New York, New York 10004

18                                 October 15, 2015

19                                 10:01 AM - 2:56 PM

20

21   B E F O R E :

22   HON SHELLEY C. CHAPMAN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:   KAREN

1   HEARING re Doc #216 Application to Employ Blackstone

2   Advisory Partners L.P. as Investment Banker

3

4   HEARING re Doc #369 Debtors' Supplemental Motion for Entry

5   of an Amended Final Order Authorizing Payment of (I)

6   Operating Expenses, (II) Joint Interest Billings, (III)

7   Shipper and Warehousemen Claims, and (IV) Section 503(b)(9)

8   Claims

9

10  HEARING re Doc #341 Application to Employ Deloitte & Touche

11  LLP as Independent Auditor and Accounting Services Provider

12

13  HEARING re Doc #370 Application to Employ BB Genesis Land &

14  Mineral Resources, L.P., D/B/A Genesis Land & Mineral

15  Resources as Land Due Diligence Contractor

16

17  HEARING re Adversary proceeding: 15-01126-scc Sabine Oil &

18  Gas Corporation v. Wilmington Trust, N.A.

19  Motion to Dismiss

20

21

22

23

24

Transcribed by:  Sonya Ledanski Hyde

25

```
1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS, LLP

4         Attorney for the Debtors

5         300 North LaSalle

6         Chicago, IL 60654

7

8    BY:  CHRISTOPHER MARCUS

9         KATIE JAKOLA

10        CRISTINE PIRRO

11        GABOR BALASSA

12        WHITNEY L. BECKER

13

14   PAUL, WEISS, RIFKIN, WHARTON & GARRISON, LLP.

15        Attorney for the Defendant, Wilmington Trust, N.A.

16        1285 Avenue of the Americas

17        New York, NY 10019-6064

18

19   BY:  MOSES SILVERMAN

20        KAREN KING

21        KYLE KIMPLER

22        KELLIE CAIRNS

23        BRIAN S. HERMANN

24

25
```

Page 4

1   WILLKIE FARR & GALLAGHER, LLP

2         Attorney for Wells Fargo, First Lien Agent

3         787 Seventh Avenue

4         New York, NY 10019-6099

5

6   BY:  MARGOT SCHONHOLTZ

7

8   ROPES & GRAY

9         Attorney for the Official Committee of Unsecured

10        Creditors

11        1211 Avenue of the Americas

12        New York, NY 10036-8704

13

14  BY:  KEITH H. WOFFORD

15        ANDREW G. DEVORE

16        C. THOMAS BROWN

17        BRIAN F. SHAUGHNESSY

18

19  AKIN GUMP STRAUSS HAUER & FELD LLP

20        Attorney for the Bank of New York

21        One Bryant Park

22        New York, NY 10036-6745

23

24  BY:  PHILIP C. DUBLIN

25

Page 5

1   BROWN RUDNICK

2        Attorney for the Ad Hoc Committee of Forest Oil

3        Noteholders & Forest Oil Noteholders Trustees

4        7 Times Square

5        New York, NY 10036

6

7   BY:  DANIEL J. SAVAL

8

9   O'MELVENY & MYERS, LLP.

10        Times Square Tower

11        7 Times Square

12        New York, NY 10036

13

14   BY:  MOSHE MANDEL

15

16   UNITED STATES DEPARTMENT OF JUSTIC

17        Attorney for the United States Trustee

18        33 Whitehall Street

19        Suite 2100

20        New York, NY 10004

21

22   BY:  PAUL SCHWARTZBERG

23

24

25

```
 1   LATHAM & WATKINS, LLP

 2        Attorneys for Creditor, HPIP Gonzalez Holdings LLC

 3        811 Main Street, Suite 3700

 4        Houston, TX 770022

 5

 6   BY:  JEFFREY S. MUÑOZ (TELEPHONICALLY)

 7

 8   BRACEWELL & GIULIANI, LLP

 9        Attorney for Creditor, Cheniere Energy, Inc.

10        711 Louisiana Street, Suite 2300

11        Houston, TX 77002

12

13   BY:  WILLIAM A. WOOD, III (TELEPHONICALLY)

14

15   ALSO PRESENT TELEPHONICALLY:

16   ANA ALFONSO

17   PENELOPE JENSEN

18   STEPHEN J. BLAUNER

19   ZELIJKA BOSNER

20   HAL CANDLAND

21   SCHUYLER CARROLL

22   JILL DINERMAN

23   DAVID M. DUNN

24   SHARI DWOSKIN

25   RYAN ECKERT
```

```
 1  DAVID M. EPSTEIN

 2  JOSEPH FEIL

 3  ROBERT GAYDA

 4  MARC GLOGOFF

 5  THOMAS MURPHY

 6  JOHN F. HIGGINS

 7  JASON HOMLER

 8  DONALD HUEBNER

 9  DANIEL LANIGAN

10  MICHAEL MARCZAK

11  MATTHEW OCKWOOD

12  IAN T. PECK

13  DEBORAH M. PERRY

14  MATTHEW S. RYDER

15  JONATHAN SATRAN

16  JASON B. SANJANA

17  RAVI K. SONI

18  SAM STRINGER

19  JOSEPH TAEID

20  RAY WALLANDER

21  DAVID LUKKES

22  DIANE MEYERS

23  ALEXANDRA SCHWARZMAN

24  BRYAN HIGH

25
```

1                          P R O C E E D I N G S

2              THE COURT:  How is everyone?  Smile, Mr. Marcus.

3     It's not that bad.

4              Okay, I have your revised agenda and I understand

5     that a number of matters have been adjourned or settled, so

6     I'm ready when you are.

7              MR. MARCUS:  Your Honor, for the record,

8     Christopher Marcus from Kirkland for the Debtors.  I believe

9     the first item on the agenda is the --

10             THE COURT:  Okay, I guess my question is, did you

11    want to go through the rest of the agenda and then we'll

12    have the arguments on the Motion to Dismiss?

13             MR. MARCUS:  I leave it to Your Honor.  We were

14    prepared to go in the order of the agenda but if you'd like

15    to hear the uncontested --

16             THE COURT:  I think I'd like to hear the

17    uncontested matters first.  Let's get those out of the way

18    and then we can get rolling on the Motions to Dismiss.

19             MR. MARCUS:  Very good, Your Honor.  Ms. Pirro is

20    going to handle the uncontested matters for us.

21             THE COURT:  Very good.

22             MS. PIRRO:  Good morning, Your Honor.

23             THE COURT:  Good morning.

24             MS. PIRRO:  For the record, Cristine Pirro of

25    Kirkland & Ellis on behalf of the Debtors.

Page 9

1          The first uncontested matter that the Debtors have

2     on the agenda is the supplemental lienholders motion.  So,

3     in part because of the inherent delay associated with the

4     joint-interest billing process, the Debtor has received

5     several invoices after entry of the final order that they

6     didn't anticipate.

7          Accordingly, we've exhausted our DIP cap and are

8     seeking approval of an increase in the cap of $3.2 million

9     to allow payment of undisputed, pre-petition amounts.

10         However, we're also seeking to lower the operating

11    expense cap to entirely offset that.  We received no

12    objections and there are no changes to our proposed order.

13         THE COURT:  Okay.  Does anyone else wish to be

14    heard with respect to the supplemental lienholders motion

15    and the relief requested?

16         All right, very well, that'll be granted.

17         MS. PIRRO:  Thank you, Your Honor.  Next up on the

18    agenda is the Deloitte retention application.  This is the

19    application to authorize and approve the employment and

20    retention of Deloitte as our independent auditor and

21    accounting services and this is going to be nunc pro tunc to

22    the petition date under 327, 330 and 331.

23         We received no objections and there have been no

24    changes to the proposed order.

25         THE COURT:  All right.  Mr. Schwartzberg, I can

1    see you back there in your customary position.

2              MR. SCHWARTZBERG:  I have no objection, Your

3    Honor.

4              THE COURT:  Very good.  All right, the Deloitte

5    retention application will be granted.

6              MS. PIRRO:  Thank you, Your Honor.  The only other

7    motion that the Debtors had that was previously on the

8    agenda is the contract rejection motion but as you know, we

9    have adjourned that to the next hearing to try to

10    (indiscernible).

11              THE COURT:  Okay.  So that's adjourned to, is it

12    November 10th?

13              MS. PIRRO:  November 10th, correct.

14              THE COURT:  All right.  I would ask that -- and

15    you did file a reply yesterday.  I would just ask, as you

16    always do, that you keep us informed as to whether or not

17    any or all of that settles.

18              MS. PIRRO:  Will do.

19              THE COURT:  All right, thank you.

20              MS. PIRRO:  Thank you.

21              THE COURT:  So we also have the two Committee

22    retention applications, yes?

23              MR. DEVORE:  Good morning, Your Honor.

24              THE COURT:  Good morning.

25              MR. DEVORE:  Andrew Devore from Ropes & Gray on

1    behalf of the Committee.

2              There's actually three retention applications up

3    for hearing today.  Blackstone, also known as -- better

4    known as PJT --

5              THE COURT:  Yes, right.

6              MR. DEVORE:  -- and then the two that were never

7    objected to, Porter Hedges LLP., and Genesis.  If Your Honor

8    would like, I can start off with Blackstone or we can go to

9    the uncontested.

10             THE COURT:  Sure.  So I've received with respect

11   to, and it's going to be a habit that dies hard to stop

12   calling them Blackstone, but why don't we try?  So PJT

13   Partners.

14             MR. DEVORE:  Correct.

15             THE COURT:  PJT.  All right.  So my understanding

16   is that, based on subsequent negotiations, there is now a

17   revised engagement letter and a wholly consensual retention?

18             MR. DEVORE:  Correct, Your Honor, and I can walk

19   the Court through the changes --

20             THE COURT:  Okay.

21             MR. DEVORE:  -- from the version that was filed on

22   Monday, if that would be helpful.

23             THE COURT:  Sure.

24             MR. DEVORE:  So, prior to Monday's response, PJT

25   had agreed to certain concessions that resolved the second

 1    lien agent's objection, and yesterday evening, PJT reached

 2    resolution with the first lien agent, and the concessions

 3    and changes from the version that was filed on Monday most

 4    notably include reducing the $1.25 million dollar

 5    discretionary fee to $650,000.

 6              THE COURT:  Right, but that's a -- it doesn't

 7    shift back into the overall fee.  It was a reduction of the

 8    $600,000 in the overall fee.

 9              MR. DEVORE:  Correct.  So there is a $3 million

10    dollar restructuring fee that's been approved under 328, and

11    then a discretionary fee of $650,000 that's also being

12    grouped under 328, but it will only be awarded if, at the

13    end of the case, based on the case outcome, the Committee

14    determines to award that fee.

15              THE COURT:  Okay, so previously though, there was

16    a component of the discretionary fee that was subject to,

17    also to review by the secured lenders and the U.S. Trustee.

18    Is that now out?

19              MR. DEVORE:  So, the $1.25 million dollar

20    discretionary fee was to be subject to 330 review by the

21    lenders.  In exchange for the reduction down to $650,000,

22    there was no longer a 330 review and that is 328 reviewed.

23              THE COURT:  And so there's no longer a 330 review

24    including by me?

25              MR. DEVORE:  There is -- U.S. -- as is customary,

1    the U.S. Trustee retains 330 review on (indiscernible).

2          THE COURT:  Okay.  And is there any -- and the

3    standard, because this has arisen before, the standard as

4    I'm looking at it now is the Committee's sole discretion.

5          MR. DEVORE:  Correct.

6          THE COURT:  Okay.  All right, so there was that

7    change and then I think there was also a change with respect

8    to the crediting against -- of the monthlies.

9          MR. DEVORE:  Right, instead of -- so the $150,000

10   monthly fee was to be credited at 50 percent after six

11   months and now it's to be credited after four months.

12         THE COURT:  After four months, okay.  All right.

13         MR. DEVORE:  So with those changes, unless Your

14   Honor has any questions, we have asked that the application

15   be approved.

16         THE COURT:  All right.  The only thing -- I'll

17   grant the application.  The only thing that I will say

18   though is that I do expect that the advisors will keep an

19   eye on what each other is doing and that there not be

20   duplication about this.

21         MR. DEVORE:  We most certainly agree.

22         THE COURT:  Because I will, at the end of the day,

23   be looking at that, and that's going to particularly come

24   into play when there's a plan and when there's plan

25   negotiations, and I think it's going to be a challenge to

1   not duplicate efforts, to a certain extent, but I'm going to

2   expect that that be done.

3            MR. DEVORE:  Yeah, no, the Committee is committed

4   to ensuring that there's no duplication and the

5   professionals are as well.

6            THE COURT:  Okay.  All right.  Does anyone else

7   wish to be heard with respect to the approval of the

8   retention by the Committee of PJT Partners?  All right, so

9   we'll enter that as well.

10           With respect to the other two retentions, the

11  Porter Hedges and the BD Genesis, again, as a general

12  matter, I have no concerns but I am concerned, not in the

13  sense of worry, but I'm concerned with the number of

14  professionals that are now going to have input.

15           It's understandable because it's complicated.  But

16  I do expect that everybody will be appropriately careful in

17  their tasks, keeping their time, not duplicating efforts.  I

18  think everybody knows.

19           MR. DEVORE:  Yeah, no, the Committee and its

20  professionals are certainly aware of this and part of the

21  reason for retaining Genesis in addition to Porter & Hedges

22  is to promote the efficiency and reduction of cost.

23           Genesis is much cheaper than sending a law firm

24  out to the recording offices, so that is why there is an

25  additional professional.

1              THE COURT:  Excellent.  All right, and that's --

2      you know, that's actually something that was, in a sense,

3      contemplated by the AVI at reform commission, so to the

4      extent that that is a money-saving measure, that's a good

5      thing.

6              Mr. Schwartzberg, anything from you on these two

7      applications?

8              MR. SCHWARTZBERG:  I have nothing, Your Honor.

9              THE COURT:  All right, so those will be approved

10     as well.  Very good.  Okay.

11             MR. DEVORE:  Thank you, Your Honor.

12             THE COURT:  Thank you.  All right, so except for

13     the Motion to Dismiss, everything else has been taken care

14     of, and we can talk about all the discovery matters toward

15     the end of the hearing, all right?  So we can get started on

16     the Motion to Dismiss.

17             MOSES SILVERMAN:  Your Honor, may I set up --

18             THE COURT:  Yes, go ahead.  I should have noted at

19     the outset that there are a couple of thousand parties on

20     the phone.  I'm not going to take the time to identify them.

21     It appears that everybody is in listen-only mode, so.

22             It does appear that someone is on a live line.  If

23     everyone could put their phones on mute, I would appreciate

24     it.

25             Okay, so before we get started, there's probably a

Page 16

1    little bit of concern or discomfort about exactly what it is

2    that I'm doing today, since there were various requests in

3    various directions about what to do today.

4          They included doing nothing, they included hearing

5    it and in the event that there was a ruling that it be

6    without prejudice, et cetera.  And my thinking is that I

7    just -- I'd like to a) move the case along, b) not prejudice

8    any of the ongoing investigations, c) ultimately be

9    efficient and d) become smarter on what the issues are and

10   how the parties see the issues.

11         The papers were very clear and very well done, but

12   for me, the issues often come alive when I hear counsel

13   argue and talk about the transactions.  I have these nice,

14   multicolored diagrams from, I think, the first day that have

15   been helpful to me.

16         So if -- I appreciate your indulging me and I just

17   would ask that nobody read too much into anything that I

18   might have to say, and as always, I'm going to try to say

19   not too much but I usually fail, so.

20         MOSES SILVERMAN:  Your Honor, I'm Moses Silverman,

21   Paul, Weis, Rifkind, Wharton & Garrison.

22         THE COURT:  How are you?

23         MOSES SILVERMAN:  Well, Your Honor.  I appreciate

24   appearing before you for the first time, and we appreciate

25   your hearing this motion promptly, and I guess I don't need

Page 17

```
 1    to say don't be shy.  We welcome your questions.

 2              THE COURT:  I'm not shy.

 3              MOSES SILVERMAN:  So, please, interrupt and I have

 4    my bankruptcy colleagues here who undoubtedly will need to

 5    assist me with some real tough ones, but Your Honor, we

 6    represent Wilmington Trust, a successor, administrative

 7    agent of the second lien Creditor agreement and we are

 8    moving to dismiss the adversary proceeding, which was

 9    brought to set aside as a constructed (indiscernible) liens

10    that were granted in January 2015 to secure $700 billion

11    dollars in previous issued debt.  Yes?

12              THE COURT:  I'm going to ask one final time.

13    Whoever is on the phone on a live line, put your phone on

14    mute or I'm going to ask the operator to disconnect you.

15    Thank you.

16              I'm sorry, go ahead, Mr. Silverman.

17              MOSES SILVERMAN:  Yes, Your Honor.  There is no

18    challenge to the claim itself.  There is no question that

19    $700 million dollars in value cash money was given to the

20    Debtor and its predecessors. As Your Honor can see in our

21    papers, we have two main grounds for a motion.  We'll just

22    mention them and then I think it might be helpful to discuss

23    the facts and try to untangle some of the names.

24              THE COURT:  Sure.

25              MOSES SILVERMAN:  As Your Honor knows, our first
```

1     argument is that the liens were given for antecedent debt

2     and that is under the definition of value, sufficient, and

3     there is a long line of cases that -- in this district, that

4     have adopted a per se rule that a lien given for antecedent

5     debt is not fraudulent conveyance.

6              THE COURT:  And it doesn't matter that there is

7     not a strict identity between, I'll call it the pre-

8     combination borrower and the post-combination borrower?

9              MOSES SILVERMAN:  There is a strict identity, Your

10    Honor, because as we will discuss, the Debtor is the post-

11    combination combined company, and they were the ones that

12    gave the liens that are being challenged, and I will try to

13    make that clear as we go through the facts.

14             THE COURT:  Right, but you have to track the debt

15    from its birth, so to speak, right?

16             MOSES SILVERMAN:  Exactly, and that's important

17    because that is -- those dates of the debt are what in part

18    makes it an antecedent debt.

19             THE COURT:  Okay.

20             MOSES SILVERMAN:  And our second point, which will

21    get into as I say, part of a provision because the liens

22    were given in connection with securities benefits, and I

23    will address that secondly.  But I thought it would be

24    helpful to go through the facts that are in the complaint,

25    that are in the Debtor's brief, and that are in the

1   documents relied on, which are part of our -- we put into

2   the record with our declaration.  And I hope to clarify some

3   of the confusion that's caused by the fact that some of the

4   same names are used for different companies --

5              THE COURT:  Sure.

6              MOSES SILVERMAN:  -- and so, companies have

7   different names --

8              THE COURT:  Right.

9              MOSES SILVERMAN:  -- so I know Your Honor has the

10  chart, but the facts really, once you sort out the names,

11  aren't that complicated.

12             THE COURT:  Right.

13             MOSES SILVERMAN:  And --

14             THE COURT:  You just have to keep straight Forest,

15  old Sabine and new Sabine, more or less.

16             MOSES SILVERMAN:  That's more or less it.  So I

17  think that when the facts are clear, our arguments become

18  very clear.  So I would like to review five documents, the

19  second lien credit agreement, the merger agreement as

20  rendered, the assumption agreement, the second amendment to

21  the credit agreement and the deeds of trust.

22             So let me start with the second lien credit

23  agreement which, as Your Honor pointed out, goes back to

24  December of 2012, and is with Sabine Oil & Gas, LLC., which

25  as Your Honor said is called Legacy Sabine in our papers.

1              The original loan in December is for $500,000

2     million dollars, that's Exhibit D to our declaration, and in

3     January 2013, it was amended to -- increased to $650,000

4     million dollars.  That's Exhibit E, and the complaint

5     acknowledges that that $650,000 million dollars was

6     received, and that's in Paragraph 111 of the complaint, and

7     it was received by Legacy Sabine, which, my friends in their

8     papers called Sabine O&G.  We chose not to use that because

9     the current company is also Sabine O&G so we've been calling

10    it Legacy Sabine.

11              THE COURT:  Legacy Sabine, okay.

12              MOSES SILVERMAN:  There are a couple of provisions

13    of the loan documents that I would just like to call to the

14    Court's attention.  First is the security provisions, and

15    that's in Section 8.11 of Exhibit D, and that provides that,

16    as a second priority lien, on 90 percent of the oil and gas

17    properties.  And there is a provision called the Additional

18    Collateral Provision, which provides as follows:

19              If a reserve report shows that less than 90

20    percent of the assets are under lien, then the company has

21    the obligation to put more on the lien to reach the 90

22    percent.  That 90 percent subsequently is reduced to 80

23    percent.

24              THE COURT:  Right.

25              MOSES SILVERMAN:  But this is a concept that I

1   understand is common in oil and gas industries, I'm not sure

2   what other industries have it, where it's not -- the loan

3   agreement isn't on one particular asset because assets come

4   in and go out, so it's on 90 percent or then 80 percent and

5   it's an obligation of the agreement.

6          I'd also like to point out the negative covenance,

7   in Sections 9.14 and 9.15 of Exhibit D.  I think these are

8   reasonably typical but they're important here.  They provide

9   that the borrower, Legacy Sabine, cannot merge unless the

10  surviving company assumes all the obligations of the

11  borrower, and is substituted as the borrower under the

12  credit agreement.

13         This is obviously important, certainly the way

14  things worked out, because you have to have a borrower who's

15  obligated to repay the loan.  And if, in the event of a

16  merger, as happened here, if the original borrower no longer

17  exists, the lender has to know that someone else is in its

18  place and is obligated on the loan.

19         THE COURT:  So, pause there for a second because -

20  -

21         MOSES SILVERMAN:  Yes.

22         THE COURT:  -- isn't it the case that plaintiffs

23  are going to say, "Exactly right,"

24         MOSES SILVERMAN:  Yes.

25         THE COURT:  -- they're going to say, "That's

1    exactly right, and that demonstrates why you have to

2    collapse all these transactions because they indeed had to,

3    they knew about that covenant, they had to comply with that

4    covenant, so therefore, the merger and the subsequent

5    granting of the liens on the collateral that comes over with

6    the merger is all part of one transaction, and the mere fact

7    that they complied with the covenant doesn't mean that the

8    transaction is okay from a fraudulent transfer standpoint."

9    So my fundamental point is --

10              MOSES SILVERMAN:  Sure.

11              THE COURT:  -- can you flip -- won't they flip

12   that fact against you?

13              MOSES SILVERMAN:  I don't believe so.  First of

14   all, let me flip that fact against them because keep that in

15   mind when we talk about safe harbor and they'll try to say

16   that these are --

17              THE COURT:  Yes, I will rem --

18              MOSES SILVERMAN:  These are inter-related, but not

19   linked.  So let's just -- we'll get to that.

20              THE COURT:  Okay.

21              MOSES SILVERMAN:  But here, Your Honor, frankly,

22   it doesn't matter because, as Your Honor pointed out, this

23   debt is from 2012 and 2013.  When a company merges, under

24   New York law, it assumes all of the obligations.  And under

25   the Allegheny case, it tells us that it assumes them as of

Page 23

1    the date of the original obligations.  Now, if you collapse

2    the transaction or not -- I planned to get to this later,

3    but let me say it now, if you collapse the transaction, it's

4    still antecedent debt from December of 2012 and January of

5    2013.  Or at most, or least, or whichever, it's present

6    debt.  So it is given a lien for either antecedent or

7    present debt.

8             In fact, as we'll get to when we discuss the Deeds

9    of Trust, the liens were given two months later, and that's

10   clearly for antecedent debt and they were given by the

11   combined company.

12            So, whether you collapse it or not, you are still

13   given liens for present and antecedent debt, and it's a very

14   important point, that when you have a merger, the new

15   company has to assume the obligations of the companies

16   merged into it, otherwise this would be the greatest device

17   in the world to end all liabilities if you could merge and

18   say, "Well," you know.

19            THE COURT:  Sure would.

20            MOSES SILVERMAN:  Yeah.  But --

21            THE COURT:  It'd be a magic wand.

22            MOSES SILVERMAN:  Well, it might, but they'd

23   accuse us of cleansing them.  That would be Mr. Clean.  But

24   -- so, whether you collapse it or not, and I'd like to cover

25   that in a little detail, but let me just walk us through

 1    these (indiscernible) --

 2              THE COURT:  Sure, and you're going to track what

 3    happens to the Forest debt?

 4              MOSES SILVERMAN:  Absolutely, the Forest debt,

 5    okay.

 6              THE COURT:  Right?  I mean, pre-merger, there's

 7    the old Forest credit facility.

 8              MOSES SILVERMAN:  Let me get to (indiscernible)

 9              THE COURT:  I'll let you get to it when you want.

10              MOSES SILVERMAN:  Right, no, no, no, absolutely,

11    but just to finish on the merger agreement --

12              THE COURT:  Okay.

13              MOSES SILVERMAN:  -- I'm sorry, on the credit

14    agreement --

15              THE COURT:  Right.

16              MOSES SILVERMAN:  -- the last provisions to flag

17    for the Court are also standard.  The default provisions in

18    10.01(d) and 10.02(a) that provide that, if the borrower,

19    which became the combined company, does not comply with the

20    additional collateral provisions, it's an event of default

21    and the lenders can accelerate.

22              So, let me turn to the merger agreement and the

23    merger itself, and first, Your Honor, I don't have that

24    chart with you.  We thought of making a chart but it was so

25    simple that, for what we need, that we don't need all of the

```
 1    elaborate things.

 2           THE COURT:  Okay.

 3           MOSES SILVERMAN:  So let me just talk about the

 4    structure of the Sabine entities at the time -- just before

 5    the merger.

 6           THE COURT:  Pre-combination.

 7           MOSES SILVERMAN:  Just before the merger.

 8           THE COURT:  Okay.

 9           MOSES SILVERMAN:  The ultimate parent is Sabine

10    Investor Holding, LLC.

11           THE COURT:  Right.

12           MOSES SILVERMAN:  It owns an intermediate holding

13    company called Sabine Oil & Gas Holdings, LLC.  And that

14    intermediate holding company owns Sabine Oil & Gas, LLC.,

15    which is what we've been calling New Sabine, which is the

16    operating company they call Sabine O&G and it's the original

17    borrower under the credit agreement.  So, just to be clear,

18    Legacy Sabine, Sabine O&G, Plaintiff, Debtor, all the same

19    company.  Okay.

20           The merger agreement, as amended, are exhibits F

21    and G to our moving declaration, and what happens in the

22    merger is that, Investor holding, the ultimate parent,

23    transfers its equity in the intermediate holding company to

24    Forest Oil, in exchange for securities of Forest Oil.

25           So now, Forest Oil owns the intermediate holding
```

1   company, which means it owns Legacy Sabine.  That's step

2   one, and that's described in complaint Paragraph 98 and 99

3   and in Sections 1.1(a)1 of Exhibit F and 2.1 in Exhibit G.

4   First, simple step.

5          Second, Sabine Oil & Gas Holdings and its

6   subsidiary, Legacy Sabine, is merged into Forest Oil, and

7   that's complaint Paragraph 101 and 102 and Section 1.1(c) of

8   the merger agreement.

9          Then, the Forest Oil and Sabine entities merge

10  into a single entity, and they file a Certificate of Merger

11  with New York State.  That's Exhibit H in our moving papers.

12  And at that time, Legacy Sabine no longer exists as a

13  separate entity.  It is now part of Forest Oil.

14         And just to confuse names a little bit, three days

15  later, Forest Oil changes its name to Sabine Oil & Gas

16  Corporation, as opposed to LLC, and that's what we've been

17  calling New Sabine.  They call it the combined company, good

18  term, but those are the same thing.  That is the merged

19  entity.

20         At the time of the merger, December 2014, there's

21  also an Assumption Agreement, which is Exhibit C to our

22  papers, and the recitals A and B1 say specifically that

23  Forest Oil, and this gets a little confusing with the names

24  because it's still Forest Oil at the time but it becomes New

25  Sabine three days later, or combined company three days

1   later, but Forest Oil specifically says that it is the

2   successor to Legacy Sabine under the credit agreement, and

3   it unconditionally assumes all obligations and to be bound

4   by the loan documents.

5           So, in December of 2014, Forest Oil, which then --

6   which is the company that is New Sabine, the merged company,

7   assumes all those obligations.

8           To go briefly to the second amendment to the

9   second lien credit agreement, which is also done in December

10   at the same time, it amends the loan agreement to add

11   another $50 million dollars in debt.

12          THE COURT:  Right.

13          MOSES SILVERMAN:  That is not challenged in this

14   proceeding.  The Debtor says that in Page 14 of its

15   opposition and acknowledges that Paragraph 132 of the

16   complaint that it received that money.  So there's now $700

17   million dollars that has been lent, pursuant to the second

18   amendment.

19          THE COURT:  Okay.  Now, you're also going to talk

20   about what happens to what I call the old Forest credit

21   agreement, which pre-merger, there was $105- out and then,

22   pre-merger, the old Sabine credit facility, there was $619-

23   out and stuff happened, right?

24          MOSES SILVERMAN:  Stuff happens.  (Indiscernible).

25   I think Bush got in trouble for that.

1           THE COURT:  He did, and this is a much more benign

2     context to use that phrase.

3           MOSES SILVERMAN:  But yes, and what happened is

4     that all of the debt -- I've been focusing on the debt at

5     issue in this case --

6           THE COURT:  Right.

7           MOSES SILVERMAN:  -- but all of the debt of the

8     companies that are merged together --

9           THE COURT:  Right.

10          MOSES SILVERMAN:  -- are now the debt of the

11    merged company.

12          THE COURT:  Right, but the old Forest credit

13    facility goes away.  It gets -- essentially gets paid down

14    and the amount outstanding, it them morphs, if you will,

15    into what's now called the RBL credit facility, right?

16          MOSES SILVERMAN:  Well, there is that, Your Honor.

17    I think there were multiple levels of debt at the Forest Oil

18    level, but there was a lien --

19          THE COURT:  Well, not the bonds.  We'll talk about

20    the bonds later.

21          MOSES SILVERMAN:  Right, but there was a -- and I

22    don't have the details here myself but there was a

23    renegotiation of the RBLs.  They have the first lien, we're

24    behind them, that's what we want.  But that's not an issue

25    that we're fighting with this -- in this proceeding.  We're

Page 29

1    fighting the validity of our liens.  If there isn't enough

2    money to pay the RBLs, we're out of luck.

3              THE COURT:  Right.

4              MOSES SILVERMAN:  We get that, but there --

5              THE COURT:  I guess the focus of my question, and

6    I'm not trying to be obtuse or tricky in any way, the focus

7    of my question is the whole concept at the heart of this

8    action that the unsecured Creditors of Forest, putting to

9    one side whether you believe that's an appropriate

10   perspective or characterization, whether they're worse off

11   as a result --

12             MOSES SILVERMAN:  They may be.

13             THE COURT:  -- of the combination.

14             MOSES SILVERMAN:  They may be.

15             THE COURT:  Because before the combination, they

16   were -- there were these un-liened assets at Forest, right?

17             MOSES SILVERMAN:  Yeah.

18             THE COURT:  And there was a credit facility --

19             MOSES SILVERMAN:  Right.

20             THE COURT:  -- secured credit facility, right?

21             MOSES SILVERMAN:  Above them.

22             THE COURT:  Above them?

23             MOSES SILVERMAN:  Yeah.

24             THE COURT:  Right, with $105 million dollars.

25             MOSES SILVERMAN:  We're talking about the

1    unsecured Creditors, of course.

2            THE COURT:  That's right.

3            MOSES SILVERMAN:  Right.

4            THE COURT:  Right.

5            MOSES SILVERMAN:  There is no question that if the

6    facts pleaded are true, the unsecured Creditors of Forest

7    Oil may not like this transaction.  The merger may not have

8    been in their best interest.  I don't know what the true

9    facts are but accepting the facts pleaded, yeah, I could see

10   why they're not happy with it.

11           But the fact that one Creditor is preferred over

12   another Creditor is not a fraudulent transfer.  The

13   Appellate Division said that in Ultramar, and it's -- it's

14   on Page 11 of our reply brief that it's quoted by the Second

15   Circuit, I think, in the Sharp case that says just that.

16           So the fact that the Forest Oil unsecured

17   Creditors are hurt by this merger, assuming the truth of the

18   facts, doesn't mean there was a fraudulent transfer, and --

19   but let me just finish going through the facts, Your Honor -

20   -

21           THE COURT:  Sure, go ahead, go ahead, yes.

22           MOSES SILVERMAN:  -- and I've -- but I do

23   appreciate these questions.  The last document I just wanted

24   to go over is the Deeds of Trust, which are Exhibits L

25   through Q of our moving papers.

 1              Two months after the closing, these liens were

 2       signed by New Sabine and filed in the relevant Texas

 3       counties.  There are the liens, the only liens, that are at

 4       issue in this action.  The liens that were signed and filed

 5       two months after the closing by New Sabine.  These were

 6       given by New Sabine to pledge New Sabine's assets, to secure

 7       New Sabine's obligation, as the obligor and borrower under

 8       the credit agreement.

 9              So, let me turn to our (indiscernible)

10              THE COURT:  And somewhere in there it went from 90

11       percent to 80 percent, right?

12              MOSES SILVERMAN:  Yeah, I think what happened --

13       my friends will throw pencils at me if I get it wrong, but I

14       think what happened is the RBL agreement, the new RBL

15       agreement became 80 percent and that triggered 80 percent in

16       the (indiscernible).

17              THE COURT:  Yes, they're nodding their heads, you

18       got that right.

19              MOSES SILVERMAN:  Okay, so let me turn to the

20       first argument, that the liens were given for antecedent

21       debt.  The first key fact, which is undisputed, is that the

22       combined company assumed the obligations.  That's not in

23       dispute.  They said that in their opposition on Page 4, they

24       said that in their complaint at Paragraph 114, and indeed

25       they have to say that for two reasons.  One, the assumption

1    agreement says that, two, the BCL, New York Business

2    Corporation Law, Section 906(b)3 says: "the surviving

3    corporation shall assume and be liable for all the

4    liabilities, obligations and penalties of each of the

5    constituent entities," and that's critical, because

6    otherwise, what happens to the workers?  What happens to the

7    contracting parties?  These obligations don't go away in a

8    merger.  They, as a matter of law and belt and suspenders,

9    the assumption agreement, made them the obligations of New

10   Sabine.

11         So they concede that.  They concede the $700

12   million dollars in value was paid and they don't challenge

13   the claim and indeed they can't, and they do not contest the

14   fact that two months later, New Sabine issued -- granted

15   liens on its assets to support its debt.  Now, they say it

16   should be collapsed and let me come to that in a minute, but

17   just to get the basic principles out, to have a fraudulent

18   transfer under 548(a)1(b), you need two things.

19         You need the Debtor receiving less than equivalent

20   value and you need insolvency or variants on insolvency.

21         Let me just put insolvency to the side because

22   they pleaded insolvency.  This is a Motion to Dismiss, we'd

23   have to accept that as true.  I should say parenthetically

24   that if we ever get to litigate this, and I don't think we

25   should have to, but Your Honor will decide that, that will

Page 33

1    be hotly contested because they gave us solvency

2    certificates -- or not us, I mean, they provided solvency

3    certificates in connection with the merger, both Legacy

4    Forest and Legacy Sabine, but in their complaint they say

5    that's not true, they were insolvent.  We have to accept

6    that for the purposes of this motion, so we turn to the

7    question of reasonably equivalent value.

8              And here, we're also helped by the language of the

9    code because value is defined in 548(d)2(a) as: "Securing of

10   a present or antecedent debt of the Debtor."  A present or

11   antecedent debt of the Debtor.  And no matter how you look

12   at it, collapsed or sequential, these liens were given to

13   secure an antecedent debt of the combined company.  And they

14   acknowledge that.

15             There is also a long list of cases, which we cite

16   at Page 15 and 16 of our moving brief, for the proposition

17   that there is a per se rule that liens given to secure

18   present or antecedent debt are reasonable equivalent value

19   in a -- and preclude a constructive fraudulent conveyance

20   claim.  The cases include AppliedTheory by Judge Gerber,

21   Kaplan Breslaw Ash by Judge Gerber, M. Silverman Laces,

22   Judge Chin in the District Court, Market XT Holdings, Judge

23   Gropper, Sharp in the Second Circuit, and if I make this

24   quote one, Judge Buchwald, and affirming Judge Gerber in

25   AppliedTheory, said 330 B.R. 363, she called it the "per se

Page 34

1   rule consistently applied in this District," and she

2   described it this way: "provides that a Debtor's grant of

3   security interest in its assets to a lender who has

4   previously given the Debtor a cash loan may not be

5   considered a fraudulent conveyance."  That's exactly what we

6   have here, okay?

7          So, what does the Debtor say in response?  First,

8   the Debtor very helpfully, to us, we think, admits the key

9   elements of our claim.  It admits that it unconditionally

10  assumed this obligation, so this is now an obligation of New

11  Sabine.  It doesn't dispute that it had the obligation under

12  the agreement to grant additional collateral up to 80

13  percent.  It doesn't dispute that the challenged liens were

14  given to secure the debt that it agrees it assumed.  And it

15  simply ignores the line of cases that I've just cited, that

16  say there is a per se rule that liens given for antecedent

17  debt aren't constructive, fraudulent transfers.  In sum, it

18  doesn't dispute any of the points we make, fact and law in

19  our view, and on this ground, the most (indiscernible).

20          THE COURT:  But it says -- but they say that the

21  difference here is that there was a merger.

22          MOSES SILVERMAN:  Mm hmm.

23          THE COURT:  And that what you're suggesting is

24  what we talked about, about fifteen minutes ago, is that in

25  effect, a merger is the ultimate -- your theory is correct,

Page 35

1   you apply the per se rule, sure, but in a merger context,

2   it's a different entity, so therefore, they -- what you're

3   suggesting is that, in any merger where there's this kind of

4   a structure, you can have a fraudulent conveyance but --

5          MOSES SILVERMAN:  But it's not a fraudulent

6   conveyance, Your Honor.  It may have been a bad merger.  The

7   merger may have hurt the Creditors of Forest Oil.  I don't

8   know.  You know, they cite the Allegheny case.  What we --

9   what happened in the Allegheny case is they sued the company

10  that sold the disputed merged entity.  That was the

11  fraudulent conveyance.

12         In fact, some of the language, for example, on

13  page -- oh, I forget the page of their brief, but they talk

14  about how they didn't get a good deal in the merger.  Well,

15  maybe they didn't get a good deal in the merger.  Maybe they

16  have a fiduciary duty claim against the people who were

17  responsible for doing this.  I don't wish it on them.

18         Maybe they have a claim against the officers and

19  directors who took -- or people who took money out of this

20  system.  We had a discussion among ourselves as to whether

21  or not they have a claim against the Sabine parent.  It's

22  kind of an interesting question.  Mr. Herman tells me he

23  doesn't think they do, and he knows more than I do, because

24  the transfer was of stock in an allegedly insolvent company,

25  so they gave nothing and got nothing.  But theoretically, if

1   there is -- you know, if as in the Allegheny suit, if Forest

2   had paid good cash for Sabine, and gotten an entity that was

3   insolvent, it would have a fraudulent transfer claim, but it

4   would be against the seller.  It wouldn't be against the

5   Creditors who were given liens after, or at worst,

6   simultaneously with the transaction, as was required by law,

7   (indiscernible) and the contract.

8          So the fact that the legacy Forest Oil people may

9   not be happy with this deal does not mean that giving us the

10  liens is a fraudulent transfer, particularly when the law is

11  absolutely clear on these facts, which are uncontested,

12  which is that when you give a lien to support an antecedent

13  debt, that is not a fraudulent transfer.

14         Now, they say we look at it through the wrong lens

15  and I guess that's what we're just talking about.

16         THE COURT:  Right.

17         MOSES SILVERMAN:  You know, I'm an empathetic guy,

18  I can look at it through the Forest Oil people's lens, I can

19  see why they might not be happy.  But that doesn't change

20  the fact that it was the new company, the combined company,

21  that assumed the obligation as it had to as a matter of law,

22  and gave liens of its assets.  You know, I think I'll give

23  my colleagues credit for talking about legacy Forest Oil as

24  a nostalgic concept.  At the time this happened, it's a

25  nostalgic concept, because it is the new company, not legacy

Page 37

1    Forest Oil that gave the liens.

2         Now look, if legacy Forest Oil had entered into a

3    transaction pre-merger that was a fraudulent transfer, the

4    merger wouldn't wipe that out.  That would be a good claim.

5    So their whole concept that we somehow cleansed old

6    fraudulent transfers doesn't make sense to me.  The question

7    is why is something that the Courts have clearly said is not

8    a fraudulent transfer, why does it become a fraudulent

9    transfer simply because one group of Creditors are unhappy

10   about the consequence of a merger?  The merger is a fact.

11   That the company is combined is a fact.  It has to be,

12   because otherwise, we have no Debtor if somehow Sabine

13   doesn't exist anymore.

14         So I think you know, we talked about the

15   transactions being collapsed.  They spend a lot of time on

16   that.  We really don't see the point because it's still

17   giving liens on account of antecedent (indiscernible) debt

18   whether the transaction is there or not.  They say ha, you

19   know, the Debtors overlook the fact that there can be

20   fraudulent conveyance claims after a merger.  Yeah, I mean,

21   they cite the Allegheny case and the Heckinger case and they

22   were.  They have nothing to do with the kind of fraudulent

23   conveyance claim that's being asserted here.  Allegheny is,

24   as we've just described, is a case against the parent of the

25   transferred entity, or the seller, in effect.  Heckinger is

Page 38

1    against the directors, private equity sponsors and the

2    acquisition lender for money taken out of the transaction.

3    We're not saying they can't be a fraudulent conveyance claim

4    when there's a merger.  There certainly can and those are

5    good examples.  They say we have no case that supports the

6    proposition that antecedent debt principles are constructive

7    fraud claims in a merger.

8            Well first, let me turn that around and say they

9    haven't come up with any case that supports their position.

10   But actually, and we didn't address this in our brief and we

11   should have, the Allegheny case is such a case dealing not

12   with antecedent debt but with satisfaction.  I will spend a

13   minute or two on that because we did not get into this in

14   our reply papers.  But it stands for the proposition that

15   satisfaction of an antecedent debt owed by the non-surviving

16   company, assumed in a merger, constitutes value.  This is

17   how it happened.

18           As you know, satisfaction and giving liens are

19   part of the same definition of value.  As I understand

20   Allegheny, and I've read it a lot of times - it's not an

21   easy case to get through.  But what happened is that PHCT,

22   the parent, like --

23           THE COURT:  I had the same reaction when I was

24   reading it again yesterday.

25           MOSES SILVERMAN:  Okay, well, I confess to have

1    really struggled with it.  But I want to direct you to

2    Section 2(e) of the opinion at Page 171 and 172.  I don't

3    know if you want to read it now, but let me tell you what

4    that one section deals with --

5              THE COURT:  Okay.

6              MOSES SILVERMAN:  Because what happened in the

7    case is PHCT has hospital subsidiaries, which it transferred

8    to Centennial, in exchange for various considerations.  The

9    Centennial Trustee writes a fraudulent conveyance action --

10             THE COURT:  Right.

11             MOSES SILVERMAN:  -- and the Court, after first

12   determining some interesting questions as to whether there

13   was a Creditor of the Debtor and so forth --

14             THE COURT:  Right.

15             MOSES SILVERMAN:  -- goes on to analysis each

16   element of consideration, and Section 2(e), which I believe

17   starts at Page 171 --

18             THE COURT:  Right.

19             MOSES SILVERMAN:  -- it considers the effect of

20   pre-petition, intercompany debts between PHCT and the

21   hospital subsidiaries.  And it says that the parent owed $52

22   million dollars to the subsidiaries, and that's what the

23   Trustee was focusing on, but the subsidiaries owed $3- or

24   (indiscernible) million more, I think it was $55.4 million

25   dollars, more to the parent.  The Trustee wanted to ignore

Page 40

1   that and said, "We have a fraudulent transfer action for the

2   $52 million that the parent owed the subsidiary because we

3   got nothing for it."  And you know, I'm not sure if I said

4   this, but both of those debts were wiped out, eliminated, as

5   part of the transaction.

6          The Court held that, as a matter of law,

7   Centennial had received value for extinguishing the $52

8   million dollar debt owed to it.  What was the value?  It was

9   the satisfaction of the obligation that the subsidiaries had

10  to the parent, and since it was higher in value, that was

11  reasonably equivalent value.  Now, this is not a carbon copy

12  of our case, it's not the same case --

13          THE COURT:  But what was -- I'm waiting for you to

14  tie it in though.  So what is that -- how does that tie to

15  our facts?

16          MOSES SILVERMAN:  It's simply, and I didn't want

17  to overstate this, but it simply rebuts their assumption

18  that there is no case that has applied antecedent debt

19  principles to bar constructive fraud in a merger.  I mean,

20  it's not exactly the same case and it deals with

21  satisfaction of the debt rather than giving a lien, but it

22  straddles the merger and applies the antecedent debt to its

23  (indiscernible).

24          THE COURT:  See, I thought you were going to -- I

25  thought you were going to go to the fact that, pre-merger,

Page 41

1    and this might be a frolic and a detour, but pre-merger, at

2    Forest, there was a credit facility that was secured and it

3    gets --

4              MOSES SILVERMAN:  It was RBL.

5              THE COURT:  No, well, you know we have a

6    terminology problem.  I don't think the terminology of the

7    RBL comes into play until post-combination.

8              MOSES SILVERMAN:  Okay.

9              THE COURT:  Okay?  But pre-merger, there was --

10   when it was Forest over here, old Forest --

11             MOSES SILVERMAN:  Right.

12             THE COURT:  -- there was a credit facility,

13   secured, $105 million dollars.  And the total outstanding

14   debt at Forest was about $900 million dollars.  Most if it

15   were the 19 and the 20 notes.  When the merger happens, that

16   debt essentially gets retired with money that's now part of

17   the amount outstanding at the RBL.

18             MOSES SILVERMAN:  Right.

19             THE COURT:  New Sabine.  So where I thought you

20   were going was, in fact, if you're looking at it from the

21   perspective of the Forest, the nostalgic Forest unsecured

22   Creditors, what happened was that this 100 million pound

23   gorilla that they used to have in their capital structure,

24   secured, went away, so it's all --

25             MOSES SILVERMAN:  You're saying that's a benefit

1    to -- yeah, maybe but --

2              THE COURT:  I mean, we're on a Motion to Dismiss,

3    so we're not running numbers, but --

4              MOSES SILVERMAN:  Yeah, maybe they did.  You know,

5    I'm accepting, as I must for purposes of a Motion to Dismiss

6    --

7              THE COURT:  Right.

8              MOSES SILVERMAN:  -- their characterization of the

9    facts.  I am blessed by the fact that they agreed with all

10   the facts that we think are dispositive of our motion.  I'm

11   not here to say that the legacy Forest Oil people, unsecured

12   Creditors were improved or hurt by the merger.  I'm willing

13   to accept, for purposes of this, that they're not happy with

14   the merger, and -- but that doesn't make this a fraudulent

15   transfer.  It makes people unhappy with the merger.  The

16   merger has certain consequences, there are all sorts of

17   consequences.  You know, you merger with another company,

18   that other company turns out to be an asbestos nightmare.  I

19   mean, that really hurts you, but can you get rid of the

20   asbestos liability?  Of course not.

21             I mean, the problem, if they have one, and maybe

22   they don't, but I'm willing to assume for this motion, and I

23   have to assume for this motion that they do, is not with

24   these liens, it's with the fact that there was a merger and

25   that this debt and the obligations of the debt were assumed

Page 43

1    by New Sabine.  Basically, Your Honor, they admit the basic

2    facts but - and I say this with all respect to my friends -

3    they obscure it slightly with using names that are somewhat

4    confusing as we pointed out in our brief, talking in the

5    passive tense to sort of not acknowledge any more than they

6    have to the basic simple facts that New Sabine became the

7    obligor as a matter of law and contract, and issued liens in

8    support of its antecedent debt.

9              (Indiscernible) the second related point that the

10   Debtors do not respond to that I would like to make as well,

11   which is related, because a second reason why reasonably

12   equivalent value was given is because by giving the liens,

13   they avoided a default.  If they had not given the liens,

14   they would have been in default under the conditional

15   collateral provision of the loan.  That would have caused an

16   immediate acceleration, and it would have caused a cross-

17   default on many other (indiscernible).

18              THE COURT:  But the answer to that is you know,

19   well that's a bootstrap argument.  You engage in a merger --

20              MOSES SILVERMAN:  Right.

21              THE COURT:  -- that then, as you say, under the

22   operative documents, and the BCL, requires you to assume the

23   agreements, and then, lo and behold, you have to post this

24   collateral.

25              MOSES SILVERMAN:  Right.

Page 44

1          THE COURT:  Right?  So it's a bootstrap.  You've

2     voluntarily gotten yourself into a situation, I'm making

3     their argument --

4          MOSES SILVERMAN:  Yeah.

5          THE COURT:  -- you've gotten yourself into a

6     situation where you have to pledge these assets, to the

7     detriment of folks who previously enjoyed the benefit of

8     their value.  So good for you, but it's a bootstrap.

9          MOSES SILVERMAN:  Well, no, Your Honor --

10         THE COURT:  Do you under --

11         MOSES SILVERMAN:  I think I unders -- we've been

12    wrestling a lot trying to understand what their argument is,

13    too.  I don't think it's a bootstrap because again, it's

14    saying that we're not happy with this merger.  There are

15    certain consequences of any merger.  There are obligations

16    you have to assume, and one of the obligations they have to

17    assume, you know, they had to pay employees, they had to pay

18    trade creditors, maybe they had some (indiscernible)

19    asbestos, I don't -- you know, whatever.  Whatever the

20    liabilities were of the company they merged with, they had

21    to assume.  That may have been a terrible decision, but it

22    was a decision that their Board and their management made,

23    okay?

24         When you make that decision, you've got an

25    obligation, and when they performed in accordance with that

```
 1    obligation, they avoided a default and cross-defaults, and a

 2    series of cases in this District, which we cite, say that

 3    when the Debtor does something to avoid defaults, and gives

 4    itself breathing room, that is reasonably equivalent value.

 5    It's the M. Silverman -- that's not me, by the way, the M.

 6    Silverman.  That's the laces case.  These guys asked me.  My

 7    family were woodworkers, we were not lace makers, but the M.

 8    Silverman laces case, the Pfeiffer case, the AppliedTheory

 9    case, and there is absolute silence in their brief on this

10    point.  They simply ignore it.

11              So, Your Honor, let me turn to the Safe Harbor, if

12    I might?

13              THE COURT:  Sure.

14              MOSES SILVERMAN:  And it's helpful, or at least

15    it's --

16              THE COURT:  You don't really think Congress

17    intended to Safe Harbor mergers, do you?  This is this whole

18    philosoph --

19              MOSES SILVERMAN:  I don't think we're arguing --

20              THE COURT:  -- this whole philosophical discussion

21    we could have about --

22              MOSES SILVERMAN:  Yeah, yeah.

23              THE COURT:  -- what the Safe Harbors are intended

24    to do.

25              MOSES SILVERMAN:  Well, it wasn't to Safe Harbor
```

1   mergers, that's true.  It was, though, to Safe Harbor

2   transactions in connection with a securities contract, and

3   the Second Circuit has told us in Mayo, it's kind of awful

4   to say Mayo teachings or the Mayo holding but okay.  The

5   Second Circuit has taught us in Mayo and Quebecor and Enron

6   that we have to look at what the statute says, and it has to

7   be read broadly.  You know, and in Enron --

8           THE COURT:  Even applied to a fake securities

9   contract.

10          MOSES SILVERMAN:  Even applied to a Ponzi scheme.

11  That's exactly what the Second Circuit did in Mayo.  I mean,

12  you know, the Trustee argued, "What securities contract?

13  This was a fraud."  And the Second Circuit said, "Well,

14  there was something that was a securities contract, the

15  original thing opening up the account, and this was related

16  to that, and that's enough."  Did Congress intend that?  I

17  don't know.

18          THE COURT:  I hope not.

19          MOSES SILVERMAN:  And I hate to sound like Justice

20  Scalia, but look at what Congress said, and if what Congress

21  said is clear, then you apply it.  And that's exactly the

22  position the Second Circuit has taken in the three cases

23  that it has looked into it.  So the task here is to look at

24  what the statute says and see, are we in it, or are we not

25  in it?

Page 47

```
 1              Now, I thought it helpful that if the
 2   (indiscernible).
 3              THE COURT:  So is there ever a time that -- so
 4   suppose there is a constructive fraudulent conveyance.
 5   Okay?  Suppose there is.
 6              MOSES SILVERMAN:  Then I lose. (Indiscernible).
 7              THE COURT:  Well, no, but I mean for the purposes
 8   of this point --
 9              MOSES SILVERMAN:  Okay.
10              THE COURT:  Right?
11              MOSES SILVERMAN:  Yeah.
12              THE COURT:  And so the granting of a lien in the
13   con -- and the granting of a lien, which is a, we'll
14   stipulate, is a fraudulent conveyance, it's Safe Harbored.
15   No merger, forget the merger.  Stand-alone --
16              MOSES SILVERMAN:  I'm sorry, can you say that
17   again?
18              THE COURT:  We have an outstanding credit
19   agreement, and all parties agree that there's a -- and
20   there's a lien granted and it's a fraudulent conveyance,
21   that can't be undone.
22              MOSES SILVERMAN:  If there is a lien granted, why
23   would the fraudulent conveyance (indiscernible)?
24              THE COURT:  I'm trying to -- I'm not doing a good
25   job of making up facts.  The point that I'm trying to make
```

1   is, if you take the merger context out, does the expansive

2   construction of 546(e) operate to always preclude --

3                  MOSES SILVERMAN:  You take the merger out of it,

4   there's no securities contract.

5                  THE COURT:  If you take the -- that's my point.

6   Is that -- the securities contract that you're focusing on

7   is the merger agreement, not the loan documents.

8                  MOSES SILVERMAN:  It's the merger agreement and

9   the deed of trust.

10                 THE COURT:  Okay.

11                 MOSES SILVERMAN:  It's both.  And the fact is,

12  what they're trying to do is they're trying to unwind one

13  small part of a multibillion dollar merger.  I mean, as had

14  been suggested --

15                 THE COURT:  But in a normal -- in a non-merger

16  context, just a loan agreement, loan agreement, deed of

17  trust, it can't be that --

18                 MOSES SILVERMAN:  That's right.

19                 THE COURT:  Right, okay.

20                 MOSES SILVERMAN:  That's right.  The only reason

21  that we have this argument --

22                 THE COURT:  Is because of the merger.

23                 MOSES SILVERMAN:  -- is because this was, to use

24  the word, interrelated with the merger, and the Courts have

25  said, we're talking about related to, related to,

1    interrelated, they seem to acknowledge it.  So, we need a

2    transfer, we need it to be to a financial institution, we

3    need it to be in connection with a securities contract.

4          The first two elements, I think, are easy and

5    they're not disputed.  A lien is a transfer, and the agent

6    originally, Bank of America, then Wilmington Trust is the

7    financial institution.  I don't think we have any

8    disagreement.  Our disagreement is whether it was in

9    connection with the securities contract.

10         You know, Your Honor is familiar, obviously, with

11   the relevant cases here.  Madoff says, at 422: "Section

12   546(e) sets a low bar for the required relationship between

13   the securities contract and the transfer sought to be

14   avoided."  And at 421: "In the context of Section 546(e) a

15   transfer is in connection with a securities contract if it

16   is related to or associated with a securities contract."

17         And Judge Peck in Lehman said: "The words 'in

18   connection with' are to be interpreted liberally.  It's

19   proper to construe the phrase 'in connection with' broadly

20   to mean related to."

21         Now, as I mentioned, there are two reasons why the

22   "in connection with" requirement is met in our submission:

23   first is the merger agreement and second is the deed of

24   trust.  So, let me take them one at a time.

25         First, I don't know if you remember Jay

1   Greenfield, who used to say, who told me when I was a young

2   lawyer, "Pick up the easy sticks first."  "Life is like

3   pickup sticks, you pick up the easy sticks first," so let me

4   pick up the easy stick first.

5         The merger agreement is a securities contract.

6   They acknowledge that, Page 16 of their opposition, and it

7   obviously is because it was the exchange of securities, and

8   that's spelled out in Paragraphs 98 and 102 of the

9   complaint.  The liens were in connection with the merger for

10  two reasons.

11        One, they were required by the secured loan

12  agreement under the additional collateral provision, and

13  they had to do it because of the merger.  Their brief says

14  at Page 19 and carried over to 20, "It's therefore true

15  that, but for the merger agreement, Forest Oil would not

16  have pledged its assets to secure the deficiency of the

17  legacy O&G term loans."  Let me just digress for a moment.

18  That's a good example of using names a little confusingly.

19  Because it wasn't legacy Forest Oil's assets and it wasn't

20  Legacy S and --

21        THE COURT:  It was the combined company.

22        MOSES SILVERMAN:  It was the combined company's

23  assets, to support what became the combine company's debt.

24        But in any event, end of digression, I don't know

25  how you can say it's not related if it was only given, but

Page 51

1   for, and then to go back to some of the things we discussed

2   earlier, Your Honor, the complaint says the granting of the

3   liens was, "one of the integrated series of transactions."

4   That's Paragraph 95, 125, 126, 129 of the complaint, and in

5   the opposition Page 7 to 8 when they made the point about,

6   this should all be collapsed, they called this the -- and

7   they're trying to collapse the liens into the merger

8   agreement, but they say it's interrelated, integrated, and

9   should be collapsed into a single transaction.

10          I don't know how they can say it should be

11   collapsed into a single, integrated transaction, but the

12   liens were not given in connection with the merger, and are

13   not associated with them.

14          Let me move to the deeds of trust.  Your Honor, I

15   have to pronounce my words carefully to get security and

16   securities clear.  741(7)(a)(xi), which is the definition of

17   "securities contract" or part of the definition, defines a

18   securities contract, I guess part, sub i defines it simply

19   as: "a contract for the purchase, sale or loan of a

20   security," and that's what the merger agreement is.  But

21   sub-paragraph xi of the definition, says securities contract

22   means "any security agreement or arrangement... related to

23   any agreement or transaction referred to in this paragraph,"

24   which means, and a security, obviously the deeds of trust

25   are a security agreement, any security agreement given in

1   connection with a securities transaction is a securities

2   contract for purposes of the Safe Harbor proposal.

3        For all the same reasons, which I don't need to

4   repeat, the deeds of trust specifically recite the history

5   of why they're being given, specifically mention the merger

6   agreement, specifically mention the fact that as a result of

7   the merger agreement, they -- the new company has this

8   obligation and this is being given in fulfillment of it.

9   That meets the definition of "related to."

10       So let me talk briefly about my friend's response.

11  Again, I think they admit the key points that we believe

12  makes our case here.  The merger agreement is a securities

13  contract, the lien and the merger agreement are

14  interrelated, part of an integrated transaction, and the

15  only reason the liens were given was because of the merger.

16  That is "related to" in any meaning of the word that I can

17  think of, and certainly the broad meaning that the Courts

18  have told us to apply.

19       So, what are their arguments?  First, they say

20  this was given in support of a loan agreement.  That's true,

21  and Your Honor made that point as well.  It was.  But the

22  Second Circuit in Madoff at Page 422, said, quote, "a

23  transfer can be connected to and can be made in relation to

24  multiple documents for purposes simultaneously," and that's

25  what happened here.  It was given both because it was

1    required under the security agreement, which it had to

2    assume as part of the merger agreement.  They also argue

3    about "in connection with," I think we've covered these

4    points.  They say in Page 4 of their opposition that these

5    transactions and liens are interrelated, but then they say

6    they're not related.  It makes no sense.

7            They distinguish the facts, which are the Safe

8    Harbor cases, we acknowledge the facts are different.  They

9    say the deeds of trust are not related to the merger, flatly

10   contradicting the point at the beginning of the brief that

11   these should be collapsed into one transaction.

12           And then they conclude with the point Your Honor

13   asked me about, which is the purpose of the statute.  In

14   Enron, the Second Circuit in Page 339 said, quote, "Of

15   course we reach this conclusion by looking at the statute's

16   plain language.  We decline to address Enron's argument

17   regarding legislative history."  If we meet the statutory

18   language test, the Second Circuit has told us, that's it.

19           But just looking for a moment at the purpose and

20   what we're talking about here, when Your Honor was trying to

21   make a hypothetical to show why this shouldn't apply to a

22   loan transaction, what you did was to create a hypothetical

23   that had nothing to do with a merger.

24           THE COURT:  Right.

25           MOSES SILVERMAN:  And absolutely, if it had

1   nothing to do with a merger, there wouldn't be a Safe

2   Harbor.  What the Second Circuit said about legislative

3   history in Madoff is that the statute was to ensure, quote,

4   "a very broad range of securities, related transfers," and

5   what happened here was there was a multibillion dollar

6   merger that had certain factual consequences, and they are

7   trying to undo, they're trying to cherry pick and undo part

8   of it.  And I think that fits within the legislative purpose

9   of the statute.

10          Your Honor, in conclusion, I would just mention

11   the points that we really already discussed, which is, we

12   understand, based on the facts alleged, why the Forest Oil

13   Creditors might be unhappy with the merger.  But that's what

14   they're unhappy with.  There are things that are

15   consequences of the merger.  Assuming liabilities and having

16   to give liens was a consequence of the merger.  They may

17   have bought dry wells, too, that may be a consequence of the

18   merger.  They may have picked up all sorts of other

19   liabilities.  They say they bought an insolvent company.  I

20   don't wish lawsuits against anybody, but they're looking at

21   the wrong people if they think they have a claim for

22   unhappiness of the lawsuit -- unhappiness of the merger.

23   There are other potential claims, I'm not assessing their

24   quality, but theoretically, these -- if they're right, there

25   are remedies, but it's not to attack the bystander, second

Page 55

```
 1    lien Creditors, who did nothing wrong, and as a matter of

 2    contract and law, have a right to the liens that were given

 3    to them.

 4              So, Your Honor, we appreciate being heard so

 5    promptly.  Obviously, the way you choose to deal with this

 6    motion and everything else going around is Your Honor's

 7    discretion.  We believe that it will help this proceeding

 8    get resolved if Your Honor agrees with us and promptly rules

 9    that there is no fraudulent conveyance here.  This

10    proceeding, as Your Honor said at the first date hearing,

11    you do not want to see it get bogged down in a quagmire of

12    litigation.  It's already burned through a ton of money.  By

13    our calculation, through August 15th, there have been $26

14    million dollars of professionals (indiscernible) through

15    August 15, and it's got to be a lot more now.  I think it's

16    --

17              THE COURT:  Well, hold that thought because we're

18    going to talk about the quagmire of discovery that we seem

19    to be in.

20              MOSES SILVERMAN:  But maybe -- if I may, a prompt

21    rule -- if the Court sends a message that sure, you're

22    allowed to look for claims, but the Court will not -- will

23    give short shrift to claims that don't have merit, it will

24    help get this proceeding where it needs to go.

25              Thank you very much, Your Honor.
```

1          THE COURT:  All right, thank you.

2          MR. BALASSA:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. BALASSA:  Gabor Balassa for the Debtors.  Your

5     Honor, I do have some materials to hand up, including a

6     condensed table that I think may be helpful in reviewing

7     some of the facts.

8          THE COURT:  Okay.  Does Mr. Silverman have a copy?

9          MR. BALASSA:  May I approach, Your Honor?

10          THE COURT:  Sure.

11          MR. BALASSA:  (Indiscernible) the same.

12          THE COURT:  Okay, very good.  Thank you.

13          MR. BALASSA:  Before I start, Your Honor, to

14     orient the Court, there are some slides that appear at the

15     beginning of this (indiscernible) set and what's behind the

16     slides are some of the cases that Mr. Silverman referred to

17     that appear in the parties' briefs, in case the Court has

18     questions about those, those cases are highlighted for easy

19     reference.

20          May I begin, Your Honor?  May I begin?

21          THE COURT:  Sure, just hold on one second.  I'm

22     trying to decide if I want to ask you a question that's been

23     bothering me.

24          I guess, at the risk of knocking you a little off-

25     course, it's going to seem like a random question, but the

1    company's complaint, and it's emphasized repeatedly in the

2    briefing, is that we should be looking at this from the

3    perspective of the -- Forest, the old Forest unsecured

4    Creditors, right?

5            MR. BALASSA:  Correct.

6            THE COURT:  All right.  So -- and those include

7    the 19s and the 20s, right?

8            MR. BALASSA:  Yes, Your Honor.

9            THE COURT:  Okay.  And forgive me if I get the

10   terminology inconsistent, but in the post-combination

11   company, you also have the 17s, I'll call them, group that I

12   believe is represented by the Akin Gump firm.

13           MR. BALASSA:  Legacy Sabine bondholders.

14           THE COURT:  Legacy Sabine bondholders, right.  So,

15   aren't they unhappy as well?  And why -- I guess, why isn't

16   the complaint also from their perspective?  Because before

17   the merger, they were -- Sabine, old Sabine, legacy Sabine,

18   had $1.62 billion in debt, and they sat behind the firsts

19   and the seconds, and now, combined or new Sabine has $2.6

20   million in debt, the RBL was, I think, as of petition date

21   was -- I'm sorry, it's more than that.  As of the petition

22   date, the RBL was 927, the second liens were up to 700

23   because the additional 50, and then their old bonds.  So why

24   aren't they also unhappy?  Because now, all of a sudden,

25   yes, these new assets came into the company, but the overall

1    outstanding debt is that much greater, and -- so I guess, it

2    might be a wrong-headed question and if it is, feel free to

3    tell me, but I just am wondering why it's from the -- as the

4    company being the Plaintiff, it's not also alleging

5    something bad -- that something bad occurred, vis-à-vis the

6    interests of the legacy Sabine unsecured Creditors.  Does

7    that question make sense?

8              MR. BALASSA:  It does make sense, Your Honor, and

9    I think it's a question that probably the Akin lawyers would

10   like an opportunity to answer.  They certainly will have

11   their position on this issue.  And this is --

12             THE COURT:  But you chose not to assert it.

13             MR. BALASSA:  That's right.  Your Honor, what we

14   did is, in the investigation, which of course has continued,

15   but as of the petition date, we had looked at the relative

16   position --

17             THE COURT:  The relative position.

18             MR. BALASSA:  -- of the various Creditor groups

19   immediately prior to the transaction and immediately after

20   the transaction.  And what we concluded was that the

21   transaction -- and by transaction I don't just mean the

22   business combination, the merger --

23             THE COURT:  You mean the whole thing.

24             MR. BALASSA:  I mean that --

25             THE COURT:  The whole thing.

1          MR. BALASSA:  -- and the other financing --

2          THE COURT:  Right.

3          MR. BALASSA:  -- transactions that occurred

4    simultaneously.  That those transactions impaired the Forest

5    bondholders.  That is, the Forest bondholders, pre-

6    transaction, had access to very substantial, unencumbered

7    assets, and it was by virtue of the September -- excuse me,

8    the December 16th transactions that those unencumbered

9    assets were effectively transferred away from them.  That

10   is, they were pledged to the second lien lenders so that the

11   Forest bondholders no longer had access to the value

12   associated --

13         THE COURT:  Right.

14         MR. BALASSA:  -- with those assets.  That was not

15   -- that impairment doesn't affect the legacy Sabine

16   bondholders, the 2017s.  There were not additional assets

17   that were pledged on the Sabine side in the course of the

18   business combination.  And so, the legacy Sabine bondholders

19   didn't suffer the same impairment.  They weren't deprived of

20   access to unencumbered assets by virtue of the December 16th

21   transactions in the way that the Forest bondholders were.

22         So when we looked at the transaction, we concluded

23   relatively quickly that there was impairment of the

24   bondholders on the Forest side by virtue of being denied the

25   value associated with Forest, legacy Forest, unencumbered

1    assets, and didn't see the same fact pattern on the Sabine

2    side.

3            THE COURT:  Okay.  All right.

4            MR. BALASSA:  Is that response -- like, I can

5    address -- there are more angles, there are more pieces to

6    it --

7            THE COURT:  Sure.

8            MR. BALASSA:  -- but we did look at rate --

9    reasonably equivalent value and our initial assessment was,

10   clearly a lack of reasonable equivalent value with respect

11   to the Forest unsecured Creditors and we didn't see the same

12   impairment, apparent lack of reasonable equivalent value,

13   when taking account of the entire set of transactions on the

14   legacy Sabine side.

15           THE COURT:  Okay.  All right, why don't I let you

16   get started?  Thank you.

17           MR. BALASSA:  May it please the Court, the

18   Debtor's claim here concerns, as Your Honor knows, a set of

19   transactions that occurred on December 16th, 2014.  Before

20   those transactions occurred, Forest Oil and Sabine O&G,

21   which we're referring to as legacy Forest and legacy Sabine,

22   were separate companies with separate capital structures and

23   separate groups of Creditors.  At the time of these

24   transactions, Forest Oil, legacy Forest, was insolvent.

25   Legacy Forest was also insolvent immediately after these

Page 61

1    transactions.

2            So the Debtor's claim here is that the December 16

3    --

4            THE COURT:  There was no legacy Forest immediately

5    after the transaction, right?

6            MR. BALASSA:  In fact, Your Honor, let me clarify

7    that because Forest continued to exist through the

8    transaction.  The only entity that was eliminated by the

9    transaction was Sabine.  So pre-transaction, there was

10   legacy Forest and then Forest continues on and assumes

11   obligations --

12           THE COURT:  Right, but this is the name -- this is

13   kind of the name game issue.  I mean, at the moment of the

14   merger, the legacy entities don't exist.  I mean, then

15   there's a series of corporate things that happen in terms of

16   the assumptions of the debt, right?

17           MR. BALASSA:  I think Mr. Silverman suggested

18   that, but that's not exactly right.

19           THE COURT:  Okay.

20           MR. BALASSA:  Sabine -- legacy Sabine merges in to

21   legacy Forest.

22           THE COURT:  Right.

23           MR. BALASSA:  But that legacy Forest entity

24   continues to exist.  That is the surviving entity of the

25   transaction, and so it may actually be a misnomer to call it

Page 62

1    legacy Forest.  It may be more accurate just to call it

2    Forest all the way across.  Forest enters into a business

3    combination where another company, Sabine, merges into it.

4    Forest assumes a lot of liabilities, but Forest then

5    continues to exist.  And so, it's that post-transaction,

6    Forest entity, that Mr. Silverman's referred to as New

7    Sabine, that we refer to as the combined company, but it may

8    actually be relevant here that Forest doesn't go anywhere.

9    Forest exists pre-transaction, Forest takes on obligations

10   in the transaction and Forest continues to exist post-

11   transaction.  It's Sabine that is merged out of existence.

12           Your Honor, the Debtor's claim is that, through

13   the December 16th transactions, hundreds of millions of

14   dollars of value were transferred from the pre-transaction

15   Forest entity, impairing the legacy Forest unsecured

16   Creditors, and that transfer of value directly benefitted

17   the legacy Sabine second lien lenders.

18           Because Forest Oil and its Creditors did not

19   receive reasonable equivalent value in the December 16th

20   transactions, the transfer value represents a constructive

21   fraudulent transfer, and I'd like to turn Your Honor to the

22   graphic that's the first of the slides that I handed up.  I

23   think it's important to understand where and how the shift

24   in value occurred on December 16th.  And this slide shows on

25   the left-hand side, the pre-transaction entities, and this

1    is the instant before the transactions occurred.  This is

2    not a few months or a few weeks.  The instant before the

3    transaction occurred, we have on the left-hand side, and

4    then we have the post-transaction capital structure on the

5    right-hand side, what we've called here the combined

6    company, which, as I pointed out a moment ago, really it's

7    Forest Oil, continuing its existence.

8         And on the left-hand side under Forest Oil, the

9    critical element for our claim is the $800 million dollars

10   of bonds.  And here it's important to note that, although

11   Forest Oil was insolvent, pre-transaction, Forest had

12   sufficient unencumbered assets to provide the Forest

13   bondholders and other Forest unsecured Creditors with

14   significant recovery pre-transaction.

15        If you look down, Your Honor, to the Sabine O&G,

16   the green text, pre-transaction, the central element there

17   is the $650 million second lien debt, and there's another

18   important fact, and it relates to the second lien debt.

19   It's -- that debt was under-secured by hundreds of millions

20   of dollars, pre-transaction.  So there was a substantial

21   deficiency, pre-transaction, at Sabine's second lien level.

22        Now, in the middle column, we have the set of

23   simultaneous December 16th transactions, and the first

24   bullet there is the merger of legacy Sabine into Forest Oil,

25   leaving Forest Oil as the surviving company.  Now,

Page 64

1    simultaneously with that merger, of Sabine into Forest,

2    there were a number -- numerous financing transactions that

3    included the refinancing, that included guarantees, that

4    included an assumption of debt, that included upsizing of

5    loans, and that included the pledging of certain assets.

6           And it's the pledging of assets, the fourth bullet

7    down in the middle column, that's what's really at play

8    here.  The pledge of assets consisted of Forest Oil pledging

9    hundreds of millions of dollars of value, that is hundreds

10   of millions of dollars of unencumbered legacy Forest Oil

11   assets that had been available, up to that moment, had been

12   available to Forest Oil's unsecured Creditors, including its

13   2019 and 2020 bondholders.  And those assets were pledged,

14   as Your Honor has now heard, to secure the legacy Sabine

15   pre-existing second lien deficiency.

16          Post-transaction, moving to the right-hand side,

17   the essential element here, with -- first with respect to

18   the second lien debt, the December 16 transactions directly

19   benefitted those legacy Sabine Creditors.  They obtained the

20   hundreds -- benefitted the hundreds of millions of dollars

21   of additional security, which substantially reduced the

22   deficiency on that facility.

23          THE COURT:  So, the -- the -- as I keep talking

24   about, though, the $102.5 million dollar of the first lien

25   debt that was of Forest is now gone, or becomes part of

1    combined company first lien debt, right?

2              MR. BALASSA:  It is gone.  There is a refinancing

3    --

4              THE COURT:  There's a refi, right.  And --

5              MR. BALASSA:  -- and that's paid out and that'll

6    be $800 million dollar legacy Forest bonds --

7              THE COURT:  Yep.

8              MR. BALASSA:  -- instead of having $105 million of

9    first lien debt sitting on top of them as they did an

10   instant before the transaction, an instant after the

11   transaction, they now have almost $1.5 billion of secured

12   debt sitting on top of them.

13             THE COURT:  Right.

14             MR. BALASSA:  Okay.  Now, so, Your Honor, post-

15   transaction, the Forest Oil bonds are impaired.  They and

16   the other Forest -- legacy Forest unsecured Creditors have

17   essentially lost the value that they had -- the access that

18   they had pre-transaction to the significant legacy Forest

19   unsecured -- unencumbered assets.

20             So, I think from this table, it's important that I

21   try to address an issue that's -- really underlies the

22   analysis of the second lien's Motion to Dismiss antecedent

23   debt argument, at least.  And it's --

24             THE COURT:  Is it the granting of the lien or is

25   it the assumption of the debt that is the critical component

1      of the fraudulent conveyance?  Because it feels -- you know,

2      the man who used to sit here used to talk about things that

3      walked and talked and quacked like ducks, may he rest in

4      peace, but it -- because this walks and talks and quacks

5      like a preference, not like a fraudulent conveyance.  It

6      feels preference-y to me.

7              MR. BALASSA:  Your Honor, I think that it would be

8      preference-y if -- if Forest Oil had not stood on the

9      precipice of a transaction where Forest Oil is insolvent,

10     Forest Oil has no obligations on the second lien debt.

11     Forest Oil proceeds with the December 16th transactions, and

12     as a result of proceeding with those transactions, has now

13     transferred value away from its Creditors, and has

14     transferred value to what, at the time it stood on the

15     precipice, were the Creditors of another entity.  That is

16     not a preference, that is a fraudulent transfer.  And that's

17     -- in fact, I think I can address that another way with this

18     next -- with this next topic.

19              What I'd like to address with the Court is, who

20     transferred the value here, right?  Is it the post-

21     combination company or is it the pre-combination company?

22     And to answer that, as in any fraudulent transfer analysis,

23     we look to see who held the transferred assets the moment

24     before the transactions occurred.

25              Well, before the simultaneous transactions at

1   issue here occurred, Forest Oil held those assets.  Before

2   these simultaneous transactions at issue here occurred,

3   those assets were available, provided value to the legacy

4   Forest unsecured Creditors, including the $800 million

5   dollar bondholders.

6           And it was only by virtue of proceeding with the

7   December 16th, 2014 transactions that the value associated

8   with those assets was transferred away from Forest Oil's own

9   Creditors to the Creditors of what had been another company.

10  Had Forest Oil not proceeded with these December 16

11  transactions, there would have been no transfer of value

12  away from the Forest Oil Creditors.

13          With that in mind, I think we can -- and we'll get

14  to the antecedent debt argument in just a moment, but we do,

15  in the complaint, more than check the box with respect to

16  the elements of a constructive fraudulent transfer claim.  I

17  think there's no dispute here, at least as pled in the

18  complaint, Paragraphs 120 and 122, that Forest Oil

19  immediately before engaging in these December 16th

20  transactions, was insolvent, and also it's flat that,

21  immediately after the transaction, the combined company,

22  which was still Forest Oil, was also insolvent.

23          So that's the first element of constructive

24  fraudulent transfers.  To the second, reasonably equivalent

25  value, we alleged throughout the complaint, and I think it

1   may be clearest in Paragraph 126, that in these business --

2   in the December 16 transactions, the legacy Forest Creditors

3   and legacy Forest did not receive reasonably equivalent

4   value.  They gave up more than they received in the December

5   16th transactions.  And so, the elements of constructive

6   fraudulent transfer are satisfied.

7           Now, the defendant says that the antecedent debt

8   rule applies to bar that claim.  They say there was one

9   company, and that one company is pledging its assets to

10  secure its antecedent debt.

11          THE COURT:  That is -- at the moment that that

12  occurred, that is unquestionably true.  If -- at the moment

13  that it occurred, it is the combined company.  You know, we

14  can talk about Forest, Sabine, whatever it is, but you have

15  to agree with Mr. Silverman that by virtue of the merger

16  agreement, and then the assumption agreement and also by

17  operation of the BCL, those were then obligations of the

18  combined company, and that as of that moment, to the extent

19  that there is debt, it's debt of the combined company, that

20  as of that moment is not -- the second liens don't have the

21  additional collateral.  And then there's the going from 90

22  to 80 and then there's the lien-ing up, admittedly with what

23  we now can -- what we "know," quote unquote, were the

24  unencumbered Forest assets that are now owned by the

25  combined company.  So that's where -- so now we're at, as

1    Yogi Berra would say, a fork in the road, right?

2              So now we're at a fork in the road, and you say --

3              MR. BALASSA:  And I'll take it.

4              THE COURT:  And you'll take it, right.  So, and

5    you'll say, yes, that's exactly right, and it's not -- it's

6    the antecedent debt of that other company, it's not the

7    antecedent debt of this company, but that's -- I mean that's

8    kind of the -- this is a point at which we have to decide,

9    you know, which way we're going to go, right?  It is at the

10   moment, the debt of the combined company, and that's -- when

11   I say it feels like a preference, because at that moment,

12   then it gets more secure.

13             MR. BALASSA:  The assets -- let me take it in two

14   pieces, Your Honor.  First, the assets that got pledged,

15   those were certainly Forest Oil assets before the

16   transaction, during the transaction, it's Forest was the

17   surviving company in the business combination, but those are

18   Forest assets throughout.

19             THE COURT:  But you see, I think that that's --

20   that's a little too imprecise.  Because Forest is -- because

21   of the topsy-turvy nature of the way this was structured, a

22   topic for another day, because you can say that it was

23   Forest, it's the combined company.  It's not the same entity

24   pre-combination.

25             MR. BALASSA:  It has additional obligations and it

Page 70

1   has additional assets post-combination, that's certainly

2   true.

3          THE COURT:  Okay.

4          MR. BALASSA:  And -- but it is Forest Oil and it

5   changes its name several days later, but that doesn't change

6   what the entity is.  That's a name change, and these were

7   Forest Oil assets before, during and after the transaction.

8   What changes, is that Forest Oil takes on additional

9   liabilities by virtue of the merger and also as Mr.

10  Silverman pointed out, by virtue of executing an assumption

11  agreement.

12         And in deciding to go forth with the December 16

13  transactions, which transferred value, Forest Oil was not

14  securing its antecedent debt.  And Your Honor, what I mean

15  there is that this was debt that Forest Oil was assuming for

16  the first time in these transactions.  It was only through

17  the December 16 transactions that Forest Oil became

18  obligated on the debt to the second lien lenders.  This was

19  new debt to Forest, this was not antecedent debt for Forest.

20         The fact that Forest Oil assumed the debt through

21  -- whether you look to the merger, an operation of law or

22  you look to the assumption agreement as became effective

23  simultaneous with these transactions, let's call it the

24  transactions, doesn't change the fact that this was still

25  new debt to Forest.

1           In the December 16 transactions, and in deciding

2    to go forward with those transactions -- let me pause there.

3    We may have an issue with the -- a moment in time, because

4    we are looking with respect to constructive fraudulent

5    transfer, at a stand alone entity and a decision that entity

6    makes to go forward with a set of transactions.  And so we

7    can't ignore the circumstances that that insolvent company

8    was in, and the rights that that insolvent company's

9    unsecured Creditors had the moment before the transaction,

10   and the rights that they had, in the event that the company

11   proceeded with the transaction, whether it's a merger or any

12   other transaction, that deprived them of value without

13   providing them with something reasonably equivalent in

14   return.

15          And so, Your Honor, the antecedent debt rule, of

16   course, exists because fraudulent conveyance law is not

17   intended, as Your Honor has alluded to, to take sides among

18   a company's Creditors, right?  There's no fraudulent

19   transfer claim if a company's assets are used to satisfy

20   obligations to one of its Creditors over another group of

21   its Creditors.  That may be as Your Honor said,

22   preferencing.  But here, in going forward with the December

23   16 transactions, legacy Forest did not use its assets to

24   satisfy debts to one of its own pre-transaction Creditors.

25   Instead, in electing to proceed with the December 16

1   transactions, Forest Oil used its assets to secure the debts

2   of what at that time were obligations by another company to

3   that other company's Creditors.

4          And Your Honor, I think Mr. Silverman may have

5   said this once, I may have missed it if he said it more than

6   once, but I think that the defendants recognize that this

7   was not antecedent debt of Forest Oil, and it wasn't debt of

8   Forest Oil at all.  It wasn't present debt of Forest Oil at

9   the moment that Forest Oil elects to close the December 16

10  transactions.  And so we're --

11         THE COURT:  No, I think that's right but I think

12  that that -- the point was that we're looking at the wrong

13  moment in time, and that the moment in time when the

14  additional security is granted, Forest, the Forest that

15  you're talking about, is no longer in existence, it's the

16  combined company.  It's all -- the debt is all now that of

17  the combined company, irrespective of, you know, where it

18  was born or where it used to be, and that therefore, it is

19  now antecedent debt of the combined company and the

20  additional collateral is given to secure the antecedent

21  debt, ergo the per se rule comes into play.  And I mean,

22  this is the fundamental question of whether or not you say,

23  "Yes, that's correct, they win," or you say, "That's the

24  wrong moment in time to look at it, you have to look at it

25  from the perspective of the fact, unquestionably, that the

Page 73

1   old Sabine debt was not the old Forest debt.  It just

2   wasn't."  Right?

3            MR. BALASSA:  That's right.  In fact, I had a note

4   in the margin of my notes that says: "This is where things

5   get complicated," right?  Things get complicated because

6   what the defendant has to be right about is that, because

7   it's a merger, not only does Forest assume, by operation of

8   law or by contract, the obligations of Sabine, but that

9   Forest is deemed, for purposes of a fraudulent transfer

10  claim, to have assumed the Sabine obligations not on

11  December 16th, but to have become obligated on those before

12  December 16th.  I think what they say is they became

13  obligated at the same moment that Sabine became obligated.

14           So, Sabine became obligated on this debt back in

15  December 2012, January 2013, and what I hear the defense --

16           THE COURT:  Well, they're saying that by operation

17  of the law, they become obligated as of the time that the

18  debt was originally incurred.  I think that that was the

19  point, right?

20           MR. BALASSA:  So, going back two years, two years

21  before the business combination, and that is a legal

22  fiction, and the law -- but I don't say that disparagingly,

23  really, because the law accepts legal fictions in some

24  contexts, of course, and so for instance, they cite some

25  cases that deal with worker's compensation in a New York

Page 74

1    Appellate Court decision, they cite a case from this Court

2    dealing with obligations post-merger of a union, a union

3    that merged, and when those obligations are deemed to have

4    been incurred by the post-merger company.  But with all due

5    respect to Mr. Silverman, Courts have never applied that

6    reach-back concept on a fraudulent transfer claim.

7            And the defendant's reach-back argument would

8    amount to a magic wand, to use Your Honor's term.  It would

9    mean that Creditors of an insolvent company could not bring

10   fraudulent transfer claims based on obligations they

11   incurred in a merger or simultaneous with a merger.  Because

12   over the defendant's reasoning, you can't look back.  You

13   don't look back.

14           If we use the graphic as a reference, you don't

15   look back pre-transaction on a fraudulent transfer claim,

16   once companies have merged, to evaluate whose debt was

17   whose.  You don't consider that debt separately on a

18   fraudulent transfer claim.  You have to consider them

19   together.  And so that, according to the defendant's

20   reasoning, on any fraudulent transfer claim, by Creditors of

21   an insolvent company, that they were hurt in a merger

22   because they took on more debt or liabilities, than benefits

23   they received from the merger, those claims would all fail.

24   Because you would treat the liability that that company took

25   on as being -- as having been occurred previously and you

```
 1    wouldn't distinguish, in that fraudulent transfer claim,

 2    between --

 3             THE COURT:  But I think -- I don't think that's

 4    exactly it because I think that here, I think that there's a

 5    difference between a fraudulent transfer claim in the

 6    absence of the granting of additional liens.  I mean, here,

 7    there's two things that happen that are causing distress.

 8    One was the incurrence of the additional debt and by

 9    operation of the documents and the law, that required the

10    giving of additional security.  So, if you -- right?

11             So, it's the giving -- here, we're not -- it's not

12    just kind of the bare assumption of the liability, it's also

13    the giving -- it's the giving of the security that's what is

14    kind of at the heart of the complaint.  From the standpoint,

15    though, of the -- if you for a moment are a second lien

16    lender, right, and you've lent this money and you've

17    protected yourself with these covenants and this transaction

18    permissibly happens all around you, I mean, they weren't the

19    architects of it.  There's no allegation that they were the

20    architects of it, right?  So this transaction happens around

21    them, and as a result of that, their credit risk also gets

22    altered and just the way the documents operate, they are

23    entitled to additional collateral, otherwise they would be

24    hurt.  Right?

25             MR. BALASSA:  Certainly, it's true, Your Honor,
```

1    that there are beneficiaries of transfers that turn out to

2    be fraudulent transfers who are innocent.  There's not a

3    scienter requirement but if we look at a different group of

4    Creditors though, the Forest -- legacy Forest Creditors,

5    unsecured Creditors, and for example use the 2019 and the

6    2020 bondholders, from their perspective, they were going

7    along and they have access to these unencumbered assets --

8    while the company is insolvent, there (indiscernible) to

9    make substantial recovery.

10            And then a transaction occurs, and whether it's a

11   merger transaction or any other transaction, if that

12   transaction or in this case, series of transactions, impairs

13   that and (indiscernible) of value --

14            THE COURT:  The gentleman on the phone who's

15   coughing and sneezing, either stop coughing and sneezing --

16   please, three strikes you're out.  Put your phone on mute or

17   I'm going to disconnect you.  Thank you.

18            MR. BALASSA:  So Your Honor, from the perspective

19   of Forest Oil Creditors, unsecured Creditors, pre-

20   transaction, while the company's insolvent, they stand to

21   recover a lot and the question is, from their standpoint,

22   did they receive reasonably equivalent value in Forest Oil

23   proceeding with these transactions, and if the transactions

24   were a purchase of some new asset, they'd (indiscernible).

25            THE COURT:  Maybe it's like Mr. Silverman says.

1    Maybe it was just a bad transaction.  Maybe it was just a

2    bad transaction.

3              MR. BALASSA:  So that brings us back to some of

4    the case law, and because Mr. Silverman talked about

5    Allegheny, I think it may be worth a moment looking at at

6    least that case.

7              THE COURT:  Sure.

8              MR. BALASSA:  So, that's Tab 1 of what we've

9    handed out, and I'd like to turn to the page that Mr.

10   Silverman referred to, it's in this hand-up, the page

11   numbered 5, bottom right-hand corner.  And I'd like to turn

12   to the same headnotes that he directed the Court to, so

13   that's headnotes 1 and 2 on the bottom left-hand corner of

14   that page number 5, and for the record, that's pin slate

15   162.  And there's some -- is Your Honor there?

16             THE COURT:  Yes.

17             MR. BALASSA:  There's some highlighting at the

18   bottom of the page and it said, "In particular, the trustee

19   appears to attack as a fraudulent conveyance," and that list

20   A through E and Mr. Silverman focused on E.

21             But what we've cited, and I think where this case

22   is most on point, cited A.  Centennial is the surviving

23   company in the merger.  Centennial, or the trustee for

24   Centennial, which is a bankruptcy, wants to assert a

25   constructive fraudulent transfer claim and the first

1      conveyance that they want to attack is the surviving

2      company's absorption of liabilities of the PHCT

3      subsidiaries, so those are the entities that merged into

4      Centennial as of October 31, 1996.

5              And they say at least to the extent those

6      liabilities exceeded the value of the assets of the PHCT

7      subsidiaries as of the same date, so that's a constructive -

8      - that's a recently equivalent value concept.  Of course,

9      did the surviving company take on more liabilities than the

10     valuer receive from the assets?  It's a simplified version.

11             And the Court then says in a limited discussion,

12     but there's not a lot of cases on this because apparently

13     there aren't a lot of insolvent companies that merge with

14     companies that are in better shape, actually in worse shape.

15             At Page 8 of the opinion, the bottom right-hand

16     corner, there's a section that starts with the heading

17     "Centennial's absorption of the liabilities," so this is

18     that first theory, "Of PHCT subsidiaries as of October 31,

19     1996 at least to the extent that that amount of said

20     liabilities exceeded the value of the assets of the

21     subsidiaries as of the same date."

22             So it raises this question, Your Honor, well,

23     maybe this was just a bad deal for Centennial.  Maybe

24     Centennial and its creditors took on a bunch more

25     liabilities than value they got and that's just too bad.

1           But that's not where the Court comes out and the

2    Court doesn't come out there for good reason of course

3    because in the insolvency context there is recourse that

4    creditors have if there is a bad deal.

5           There may be bad deals that companies enter into,

6    insolvent companies, and if those bad deals impair the

7    unsecured creditors, then the unsecured creditors do have

8    recourse.  It's not just a too bad, so sad world when it

9    comes to insolvent companies making decisions that impair

10   their unsecured creditors.

11          THE COURT:  But look at the -- but exactly where

12   you are, it talks about recoverable from PHCT, right?  So

13   PHCT -- well, tough going to figure it out.

14          MR. BALASSA:  Was the parent.

15          THE COURT:  Was the parent, right?  So it's

16   recoverable from PHCT, right?

17          MR. BALASSA:  I'll come back to it, Your Honor.

18   They say essentially as long as PHCT received the benefit in

19   this transaction, this is a reasonable theory for fraudulent

20   transfer.

21          And the Court went on to say that PHCT didn't

22   benefit.  It was the parent and, therefore, there is no

23   liable fraudulent transfer claim.  That is where Allegany,

24   if we take the principle that the theory's a good one, but

25   then apply it to the facts here, the defendant here did

Page 80

1   receive a benefit.  They received a direct benefit in the

2   transaction.

3           So the trustee was suing the wrong defendant in

4   this case, in Allegany.  Allegany is not saying that you

5   should sue the equity holder or the parent of the party to

6   the transaction.  In fact, Allegany is saying that's the

7   wrong defendant because they didn't benefit from this

8   merger.

9           And our case -- in our case, as pled in the

10  complaint and as we will be able to demonstrate if given the

11  opportunity, the second lien lenders did benefit here from

12  the transaction that impaired the legacy Forest bondholders

13  who did not receive reasonably equivalent value when this

14  set of transaction proceeded.

15          I won't dwell on the Heckinger case, Your Honor,

16  but I will just -- which is behind Tab 2 -- but it's a

17  similar principle and there the liquidation trust, again, of

18  the successor company in a merger could sue for fraudulent

19  transfer and could bring a claim that the successor of

20  surviving company did not receive reasonably equivalent

21  value in exchange for the assets that it contributed in the

22  merger.

23          And there the Court went through -- and since I

24  think Your Honor may have it open but it's actually at the

25  page numbered 11 -- the Court there goes through a

Page 81

1    constructive fraudulent conveyance analysis and ultimately

2    enters summary judgment for the defendant.  But the reason

3    they entered summary judgment is they said that, in fact,

4    the debtor, the surviving company in the merger did receive

5    -- well, let me put it differently -- could not show, could

6    not establish that it didn't receive reasonably equivalent

7    value.  So they couldn't check the reasonably equivalent

8    value box under the facts of this case.

9            But, again, we can take a legal principle.  We

10   apply it to the facts like here and here we do please

11   repeatedly and we would be able to show, if given the

12   opportunity, that Forest Oil and the Forest Oil unsecured

13   creditors did not receive reasonably equivalent value in

14   this transaction.

15           So Your Honor, we respectfully submit that it's

16   not just a matter of, hey, maybe this was a bad deal.  It's

17   a question whether Forest Oil proceeded with a series of

18   transactions that was a bad deal insofar as it resulted in

19   an impairment of value to its own unsecured creditors who

20   did not receive reasonably equivalent value in return.

21           I'll move on, Your Honor.  Mr. Silverman, the same

22   -- I think the other arguments that the defendant makes

23   really are addressed by the same reasoning and so I agree

24   when Your Honor identified what the correlation is here.

25   It's not just the core issue for one part of the antecedent

Page 82

1    debt argument.  It's for the whole argument.

2             They say that the combined company received

3    reasonably equivalent value by granting the lien because by

4    granting liens they avoided defaults and Your Honor

5    questions whether that was bootstrapping.

6             We certainly would take issues with the argument

7    because Forest Oil didn't have any obligation on which it

8    was -- had the potential for defaulting pre-transaction.  It

9    had not obligation to the second lien lenders.  It only

10   assumed that obligation by virtue of the transactions that

11   are the subject of this claim.

12            And then the defendant also, with respect to

13   collapsing, said that if the -- it's a collapsed

14   transaction, and they cite a case in their brief, and the

15   proceeds are used for a legitimate purpose like antecedent

16   debt, then there is no constructive fall from transfer and,

17   again, response is the same.  This was not used for

18   inappropriate purpose.  This was not antecedent debt.

19            Your Honor, I'll sum up on the antecedent debt

20   argument by saying that as with any fraudulent transfer

21   claim, we look at the position of the transferor and its

22   creditors the moment before the transaction or transactions

23   that issue occurred.  And we also looked and compared that

24   to the positions immediately after.

25            And looking at the position of Forest Oil the

Page 83

1    moment before these December 16, 2014 transactions occurred,

2    while Forest was on the precipice of proceeding or not with

3    this transaction, the obligations to the second lien

4    facility were not Forest obligations.

5            That only became Forest obligations by virtue of

6    going forward with the transactions that effectuated the

7    constructed fraudulent transfer, the transfer of value and

8    impairment of the Forest bondholders.

9            This was new debt to Forest.  This was not

10   antecedent debt and defendant's antecedent debt argument, we

11   respectfully submit, should, therefore be rejected.

12           THE COURT:  Okay.  Do you want to spend any time

13   on Prop 46E?  You can rest on your papers if you like.

14           MR. BALASSA:  I will take -- I will follow advice

15   that I received long ago and rest of the papers.  Thank you,

16   Your Honor.

17           THE COURT:  Thank you.  Yes, Mr. Wofford, your

18   standing.

19           MR. WOFFORD:  Your Honor, may I be heard briefly?

20           THE COURT:  I think I'm going to let Mr. Silverman

21   come back up while his points are fresh in his mind and then

22   I think we might take a short break, all right?  And even

23   though I didn't permit the filing of any papers, I'll hear -

24   - I'm willing to hear from you, all right?  Okay, Mr.

25   Silverman, why isn't your opponent completely wrong?

1           MR. SILVERMAN:  Why is he completely wrong?

2           THE COURT:  Why is he completely wrong?

3           MR. SILVERMAN:  Well, he's right about a lot of

4    things, all the things he admits.  Let me very brief, Your

5    Honor, and start with the claim that this is not an

6    antecedent debt.

7           Looks like there's no case on what actually,

8    believe it or not, Allegany is.  This is one point where

9    it's clear.  It says that in a merger when you merge with a

10   company that has a debt, you look at the date of the debt.

11   Now, it was doing that for another purpose.  It was doing

12   that to see if there's a (indiscernible) credit and so

13   forth.

14          But that is at least the only case that I know of

15   that deals with antecedent debt.  But what was missing from

16   my friend's description was the word present because the

17   statute talks about present or antecedent debt.

18          Now, these liens were not given when new Sabine

19   had no obligation.  These liens were only given -- and the

20   deed of trust says it and it's obvious -- because they

21   acquired the obligation.

22          So you could look at it one of two ways I think.

23   You could either accept the Allegany (indiscernible), which

24   is that when they acquired the company and acquired the debt

25   they acquired the debt as of the original debt, so it was

1    antecedent debt, or when they acquired the debt it became

2    present debt and that's just as good and was missing from my

3    friend's --

4          THE COURT:  But the point was that it was -- it is

5    the acquisition of the debt that is itself the fraudulent

6    conveyance.  It's at that moment life is good for the

7    unsecured creditors at Forest and then they go out and they

8    bring in this huge amount of debt and then life is bad for

9    them.

10         MR. SILVERMAN:  Look, Your Honor, every time a

11   company acquires an insolvent company or works with an

12   insolvent company, which is the obligation we're dealing

13   with here contrary to all the other representation, but

14   that's the allegation we're dealing with here, it is going

15   to hurt the creditors of the acquired company or the

16   company, the surviving company.  That could be because of a

17   debt obligation.  It could be because of environmental

18   problems.  It could be because of asbestos problems.

19         But when you acquire a company and merge into it

20   and merge it into yourself, you are getting it all, the good

21   stuff and the bad stuff.  If my friend's argument were

22   right, you could just avoid every bad thing that you don't

23   like when you acquire companies and obviously -- and the

24   creditors would have nobody to sue because the company that

25   was their obligor is good.  So that obviously can't be the

Page 86

1    law.

2            The only reason they gave the liens was because

3    they acquired the company and by acquiring the company they

4    accepted the obligations of the company.  So it was either

5    antecedent debt or present debt, and we're talking about the

6    liens here.  They've conceded the claims.  We're just

7    talking about the liens.

8            It was antecedent debt that -- of a company that's

9    now them because they merged or, at the very least, it's

10   present.  It couldn't not be present.  They didn't give the

11   liens before they got the debt.  I mean, that just didn't

12   happen.

13           So the idea -- so it seems to me it's antecedent

14   debt.  If it's not antecedent debt, it's present debt.

15           Now focusing about a moment before the deal is

16   kind of interesting because a moment before the deal, there

17   was no merger.  There was no acquisition and that focuses

18   what it is they're complaining about.

19           They're complaining about the merger.  And the

20   Allegany case is a case, as we've discussed and as Your

21   Honor pointed out, which was against the company sort of

22   seller, the equivalent of ultimate parent Sabine.  Now --

23           THE COURT:  Well, that's because in that, the

24   allegation was that that was the party in that case that

25   benefitted, so now they're saying --

1          MR. SILVERMAN:  But that's the company -- that's

2     the part that got the consideration.

3          THE COURT:  Right.

4          MR. SILVERMAN:  But when the Court held --

5          THE COURT:  Which is the comparison to your group

6     is that you got the consideration.  You got the liens.  I

7     think that's what the argument is, unless I'm

8     misunderstanding it.  You got the benefit.  You got the

9     additional collateral.

10          MR. SILVERMAN:  We got what we were contractually

11     and legally entitled to, which obligation they determined to

12     assume as a consequence of this merger.

13          THE COURT:  Right but this goes to the innocent

14     bystander.

15          MR. SILVERMAN:  But the consideration was given to

16     the seller, not to us.  Now, you know, their chart is kind

17     of interesting because when you look at their chart -- and

18     I'm not going to look at the details of it -- what they're

19     doing is they're attacking the transaction and they are just

20     taking one little item and saying let's try to set that one

21     aside.

22          But their problem is that they are attacking the

23     transaction and they may or may not have a fraudulent

24     transfer claim because they gave worth to the securities

25     they tell you because they say for Legacy Forest was

1      insolvent at the time.

2             You know, we obviously agree with Your Honor's

3      perception that if there's an issue here it's a preferencing

4      type issue but, of course, we're beyond the preference

5      period, so they can't bring a preference.

6             And the cases we cite, Page 11 of our client

7      brief, talk about the fact that there are things that

8      preferences are made to cure, but that does not create a

9      fraudulent conveyance case and it comes from Ultramar and

10     the cases that are cited.

11            THE COURT:  Can I ask you talk about -- and if

12     you're not prepared to do so, that's fine and we can just

13     take a break -- about Heckinger at all?  Is there anything

14     that you wanted to --

15            MR. SILVERMAN:  Well, the point of Heckinger is

16     that the case was against people who took money out of the

17     deal, the directors and the bank lender.  If you look at

18     Footnote 224 on the last page, it explains what the claim

19     was about the bank lender.

20            The claim wasn't against our previous -- about a

21     previous loan.  It was about the fees that were taken out as

22     part of the transaction and I think that's Footnote 24.

23     It's at the end of the statement.

24            In Allegany, my friend pointed out correctly that

25     the Court rejected the fraudulent conveyance theory on the

1   point he mentioned because the seller hadn't gotten the

2   benefit.  But I don't believe it says that there was a valid

3   fraudulent conveyance theory against someone else.  That's

4   not what the opinion -- that's not what the opinion says.

5              THE COURT:  Okay.

6              MR. SILVERMAN:  Does Your Honor have any further

7   questions?

8              THE COURT:  Very good.  Thank you very, very much.

9   It's five minutes after.  Let's take a break until 12:15.

10  To the extent that folks who are going to want to be heard

11  with respect to the discovery matters, if there's anything

12  that you might want to say to each other in the break, you

13  can do that.  And Mr. Wofford, I'll hear from you at 12:15.

14             MR. DUBLIN:  Your Honor, can I answer your

15  questions for the 2017s that you had before debtor's counsel

16  (indiscernible)?

17             THE COURT:  Sure.  I don't want to be here all

18  day.  You can go after Mr. Wofford when we come back, all

19  right?  Thank you, Mr. Dublin.

20             Okay, please have a seat, everyone.  Okay, I

21  promised Mr. Wofford a chance.

22             MR. WOFFORD:  Your Honor, thank you.  For the

23  record, Keith Wofford from the firm of Ropes & Gray on

24  behalf of the official committee of unsecured creditors.

25             I rise today, Your Honor, notwithstanding the

1    prior -- I'll call them admonitions in the chambers

2    conference, because we took to heart something that the

3    Court said which was that this proceeding and this argument

4    may not be used in a way to prejudice the unsecured

5    creditors.

6           We understand that that was the Court's

7    pronouncement.  We encourage the Court to follow through

8    upon that.  But the argument here raises two issues that are

9    of great import not only to this motion but to the

10   investigation claims more generally and I think Your Honor

11   is beginning to take that into account as you go through

12   your own thinking.

13          The first of these issues is on claim avoidance

14   with respect to the second liens and perhaps other clams

15   incurred in connection with the merger.  And second with

16   respect to second Prop 46C and E, Safe Harbor.

17          First, on claims avoidance, Your Honor, they're

18   both a substantive concern as well as a procedural one and

19   the substantive issues that the committee has always been

20   concerned about is that it's not easy to separate the issue

21   of claim incurrence with the merger from the issue of lien

22   avoidance.

23          And the complaint purports to do that.  It doesn't

24   include account with respect to the claims of the second

25   liens, only with respect to the liens and the committee, as

1    we said from the outset as you've seen in our papers

2    previously, it is not sure that that is a distinction that

3    makes legal sense, nor do we think that it's a distinction

4    that serves judicial economy or economy more generally.

5           The claim occurrence that you've been talking

6    about at length with counsel --

7           THE COURT:  When you say claim incurrence, you

8    mean -- I talk about it as assumption of liabilities.

9           MR. WOFFORD:  That's correct.

10          THE COURT:  Right?

11          MR. WOFFORD:  That's correct.  And this whole

12   debate about the avoidance of the lien leaves open is the

13   question of whether the asserted antecedent debt is a

14   legitimate non-avoidable claim in the first place.

15          If this account or this suit had gone forward

16   after full investigation by the debtors or the committee or

17   both, there would have been a determination as to whether

18   not only is lien avoidance appropriate but also claim

19   avoidance.  And we have not --

20          THE COURT:  But, you know, and I don't want to get

21   too far afield because I do want to stick to my

22   pronouncement about not prejudicing folks.  So I'm going to

23   just take the point of your statements here as reminding me

24   that, you know, there's a bigger picture here and that a lot

25   of people are doing a lot of work, which I totally agree

Page 92

1    with.

2            But in response to what you're saying, I mean,

3    there is no question that the money was loaned.  I mean, so

4    you know, the second lien lenders are out the money.  They

5    lent the money to the company I'll say.

6            MR. WOFFORD:  That's right.  But the issue is that

7    the consideration of whether the claim should be avoided may

8    well be considered, as you have raised the context

9    (indiscernible), and the context with the lenders of Forest

10   creditors or the Legacy Sabine unsecured creditors.  And

11   vis-à-vis those creditors, in fact, there was no money

12   loaned with respect to the second lien debt with the

13   exception of the $50 million that was mentioned.

14           And the question as Mr. Balassa put it is in the

15   context of claim avoidance, do you follow the heed of

16   Allegany with respect to the import of an incurrence and is

17   that considered an incurrence that's separately avoidable?

18           Now, I agree, Your Honor, that there's an issue to

19   be discussed.  Where we don't want to go is have it date

20   back to determination on that issue with respect to claims

21   and to the import of claims incurrence and the context of a

22   back door implication from a decision on the lien avoidance.

23   And given the --

24           THE COURT:  But I'm going to say again -- I won't

25   say it again.  I won't hear from everybody today.  We're

Page 93

1    going to now -- when you and Mr. Dublin are done speaking,

2    we're going to have conversation about discovery and where

3    things stand.  So I'm not going to -- I do what I said what

4    I'm going to do.  I'm not ruling and, you know, if you folks

5    know what my thinking is, that's great because I'm telling

6    you I don't.  So there are no tea leaves to read at the

7    moment other than being very focused on trying to get

8    smarter on all these issues.

9            So I hear nervousness in your voice that I'm about

10   to do something that's going to, you know, shift the playing

11   field.  I'm not, okay?  I'm not.  So I don't want to also

12   react to what you're saying a way that shifts the playing

13   field, so.

14           MR. WOFFORD:  I understand.

15           THE COURT:  So please, nobody take my reaction or

16   non-reaction as an indication of what my thinking is.

17           MR. WOFFORD:  The committee, as it's said before,

18   would prefer that there be frankly no independent decision

19   on this action at all because, again, all of the debate here

20   has been about the first day rule must be respected because

21   they're antecedent debt. If there's still a challenge of

22   that debt, we're going to be back to the beginning.  So

23   that's really the import of what we're saying.

24           We're just trying to struggle with how you can do

25   anything on this given the tenor of the debate today without

Page 94

1   leaking over into those other still open issues.

2           So Your Honor, with respect to 546(e), which is

3   the other elephant in the room, again, in terms of

4   implications, the presence of the per se rule discussion I

5   think is potentially clouding the discussion of 456E.  And

6   the breadth and power of applying the Safe Harbor to the

7   merger here does not just go to the incurrence of liens

8   here.

9           But given the extent of the Safe Harbor, were you

10  to rule on 546(e) that the relatively permissive

11  interpretation of connection with, which is to reinterpret

12  it as related to, if you were to adopt that interpretation,

13  I suspect, Your Honor, that we'd be hearing 546(e) evoked in

14  connection with whatever is the potential outcome in terms

15  of litigation of asserted claims with respect to other

16  (indiscernible) that may be later asserted by the creditors

17  committee or other parties in interest of these estates.

18          And so, you know, look, we agree with the debtor's

19  arguments in respect to the per se.  But the 546(e) argument

20  here is something that we say -- we would remind the Court

21  that it will have potential effect in terms of precedent far

22  beyond what is merely at issue here which is the incurrence

23  of the liens that, as you know, it extends preference

24  claims, it extends potentially to constructive cross on the

25  conveyance claims and so that would, in fact, potentially

1     bleed over into the incurrence issue which is being left

2     open.

3           With respect to the substance of the 546(e), Your

4     Honor, I would refer to pronouncements of Judge Posner in

5     the 7th Circuit in talking about related to jurisdiction.

6           At some point, everything is related to everything

7     else and we would suggest that at some point, Your Honor,

8     that there has to be some distinction draw, even in the

9     context of a text such as related to or an interpretation

10    related to that allow you to distinguish between things that

11    actually are connected with what Congress intended to do and

12    what the language talks about, which is securities

13    transactions and whether it is not in connection with such

14    Securities actions like securing antecedent debt that the

15    defendants themselves they have incurred years before the

16    merger was signed.

17          THE COURT:  Okay.  All right.  Thank you very

18    much.  Mr. Dublin?

19          MR. DUBLIN:  Good afternoon, Your Honor. Phil

20    Dublin, Akin Gump on behalf of Bank of New York as the 2017

21    notes trustee, otherwise known as the Legacy Sabine notes.

22          Your Honor, I've taken today's hearing for what I

23    understood to be as an education process for Your Honor, so

24    fully appreciate nothing that I have to say is going to

25    prejudice anybody, whether it be the debtors, any of the

1    unsecured creditors, the first liens or second liens.

2            As it relates to the question that you asked of

3    debtor's counsel as to what about the 2017 notes, okay.

4    Well, as we stand today, the 2017 notes are situated exactly

5    the same.  We can (indiscernible) come up with the same

6    thing, Page 1 of the debtor's presentation, though I'm sure

7    it's also in the charts that you have.

8            The 2017 notes and the Legacy Forest notes are

9    exactly the same.  We all have the same obligors --

10           THE COURT:  Right.

11           MR. DUBLIN:  -- and so we are pari passu

12   creditors.

13           THE COURT:  Right.

14           MR. DUBLIN:  So comments as to or how that impacts

15   the 2019 notes or 2020 notes, i.e. the Legacy Forest notes,

16   the way they preface it, it impacts us exactly the same way.

17   So what happened --

18           THE COURT:  But in terms of -- my question really

19   was in terms of impairment, right, before and the after.

20           MR. DUBLIN:  Right, so --

21           THE COURT:  That's what I was trying to figure

22   out.

23           MR. DUBLIN:  Right.  So if we look at it the way I

24   under fraudulent conveyance law generally works, which is

25   what happened to the legal entities, and not necessarily

1    their creditors, so when we're looking at a fraudulent

2    conveyance is what did this entity incur and what did they

3    get to determine reasonable equivalent value, we can start

4    on the Forest side.  We can see that we know they had $905

5    million in liabilities.

6              THE COURT:  Yup.

7              MR. DUBLIN:  And after the transaction, they had

8    $2.6 billion.  Seems like there might be an issue there that

9    they occurred more liabilities and value received as far as

10   that estate goes.

11             On the Sabine side of the house, we had a

12   different type of structure because Forest was a single

13   entity.  On the Sabine side of the house, we had a Sabine

14   parent --

15             THE COURT:  Right.

16             MR. DUBLIN:  so Legacy Sabine parent and Legacy

17   Sabine subsidiaries.  So both the Legacy Sabine parent and

18   the Legacy Sabine subsidiaries started out with about $1.6

19   billion in debt and ended up with say $2.6 billion.

20             And the arguments that we heard today from Paul

21   Weiss focusing on, well, if you do a merger transaction,

22   well, then liabilities start the date they incur and the

23   like.  I don't agree with that.

24             I think there are avoidance issues as Mr. Wofford

25   mentioned as it relates to the liabilities even at the new

Page 98

1   parent company with respect to what was incurred in

2   connection with the merger.

3            But if we look at the Legacy Sabine subsidiaries,

4   they're not situated the same way.  The Legacy Sabine

5   subsidiaries did upstream guarantees in connection with the

6   merger transaction.  So what they incurred was an additional

7   $140 million in change or so of additional first lien debt

8   that they never had, an additional $150 million of second

9   lien debt they never had and an additional $800 million of

10  unsecured debt.

11           THE COURT:  Right, and that was in connection with

12  what I keep harping on that little bit is because the RBL

13  facility was topped up and it paid off the old Forest credit

14  facility.

15           MR. DUBLIN:  Correct.

16           THE COURT:  Right?  And then those guarantees came

17  into place.

18           MR. DUBLIN:  They did.

19           THE COURT:  So that's where your constituency was

20  -- I don't know what the actual numbers are.  I'm just

21  talking in terms of, you know, as a matter of paper, right?

22           MR. DUBLIN:  Right, the Sabine subsidiaries --

23           THE COURT:  Right.

24           MR. DUBLIN:  -- incurred the additional first --

25           THE COURT:  Yes.

```
 1              MR. DUBLIN:  -- lien liability, the additional $50

 2     million of the second lien liability and the additional $800

 3     million of Forest liability that they argue did not receive

 4     any value for because I don't think there's much dispute

 5     that -- well, maybe there is a little bit -- as to solvency.

 6              THE COURT:  So the answer to my question of why

 7     the debtors haven't pursued it is --

 8              MR. DUBLIN:  My answer is I don't know.

 9              THE COURT:  You don't know.  That's the answer.

10              MR. DUBLIN:  There are plenty of pre-petition

11     discussions that we don't need to get into today.  We'll

12     talk about those another day as to --

13              THE COURT:  I mean, it's a different -- it's all

14     putting aside, you know, related, connected, et cetera.

15     It's all part of this thing that occurred, right, and as a

16     result of this thing that occurred you just articulated the

17     way in which your group was "impaired" without looking at

18     the numbers and actual value and solvency and all of that.

19     Your position changed not to the good.

20              MR. DUBLIN:  Right, those -- our debtors incurred

21     --

22              THE COURT:  Right.

23              MR. DUBLIN:  -- a lot more value, a lot more

24     liability --

25              THE COURT:  And a lot more liability.
```

Page 100

1          MR. DUBLIN:  -- through assumption of liability

2     and incurrence of additional debt --

3          THE COURT:  Right.

4          MR. DUBLIN:  -- for which we believe our debtors

5     did not receive (indiscernible) value.  And we echo Mr.

6     Wofford's comments that all of this should be done at the

7     same time.  The discovery that's ongoing that ultimately

8     come out in this litigation is going to be the same whether

9     it's with respect to ongoing second lien litigation --

10         THE COURT:  And whether or not folks agree with

11    all that is analytically separate from, I believe, different

12    from the analytics that Mr. Silverman went through.

13         MR. DUBLIN:  Yes.

14         THE COURT:  It's different.

15         MR. DUBLIN:  They are.  Completely different, yes.

16    But it doesn't mean that shouldn't all be taken up at the

17    same time to preserver your time, Your Honor.

18         THE COURT:  Got it.  Okay.  That was helpful.

19    Thank you.  Okay.  All right.  Thank you very much.  So

20    discovery, I have a letter from Mr. Martin.  I have a letter

21    from Mr. Friedman of the O'Melveny firm.  I have a letter

22    from Mr. Balassa from Kirkland on behalf of the independent

23    directors.  I have a letter from Ms. Schonholtz, Willkie

24    Farr on behalf of Wells Fargo.  And I have a letter from

25    Quinn Emanuel on behalf of First Reserve which also

Page 101

1    indicates that they are unable to attend the hearing today.

2           So I don't know if anyone's here, if anyone's on

3    the phone.  Is anyone on the phone from the Quinn Emanuel

4    firm?

5           Okay.  Well, the problem is that this wasn't

6    officially noticed as a discovery conference and I have a

7    great deal of difficulty in terms of fairness talking about

8    it in any detailed or dispositive way having been told

9    specifically by the Quinn Emanuel folks that they are not

10   here.  And they're not here.

11          But here's the practical issue.  It's October

12   15th.  The challenge deadline is looming.  There are various

13   deadlines looming.  The thing that perhaps got me most

14   concerned in all of the paper was the indication from

15   Kirkland that the independent directors approached the

16   committee and suggested that there be a joint modest

17   extension of the challenge deadline.

18          So just in terms of the practicalities of it,

19   selfishly, I'm going to be out of the country beginning on

20   the evening of the 20th, not returning until late in the day

21   on the 28th.  And no offense, but I don't want to talk to

22   you on the way let alone, you know, try to negotiate

23   extensions and who's delivering what documents to whom.

24          So I think we ought to figure out a way -- and,

25   again, I'm not going to do this in any way that prejudices

Page 102

1    First Reserve.  We need to figure out what we're doing and

2    we need to be rational and to the point that many of you

3    have made and notwithstanding Mr. Silverman's arguments to,

4    you know, that there be a quick exit to, you know, to the

5    complaint that's now filed, we have to figure out what we're

6    going to do, how we're going to sensibly move this case

7    forward.

8             I actually don't believe that there's a purposeful

9    effort going on to delay because, you know, no one's going

10   to get away with that.  I mean, you know, when push comes to

11   shove, I'll find out who produced what documents to whom and

12   when and if there's been a failure to move forward

13   reasonably, I'm going to extend deadlines.

14            So it's probably in the category of this is a

15   massive amount of stuff.  It takes a long time to do even

16   when the best firms, which you all are, throw a lot of

17   resources at it.  So how can we sensibly move this case

18   forward mindful of the burn rate?

19            I'm really struggling with striking a reasonable

20   balance.  And I'm going to say something that's going to

21   make you so unhappy but I'm going to say it anyway.  What

22   troubles me most is the multiple parties doing the same

23   thing, that the specter of the death by a thousand cuts.

24            One could observe, I'm not saying that it should

25   happen, one could observe that this might have been a good

1    case for an examiner for one person to be looking at all of

2    this.  Instead I have the committee and I have the 19s and

3    the 20s and I have the 17s and I've got the independent

4    directors who at the moment are still being represented by

5    Kirkland, et cetera, et cetera.  You all know -- I know you

6    all know what I mean.

7            So how do we do this in a reasonable fashion,

8    expeditiously?  Don't want the case to last forever, don't

9    want death by a thousand cuts.  Is -- help me out here.  Do

10   you have an answer?

11           MR. WOFFORD:  I -- getting away from the granular

12   discovery back and forths, a discussion on the framework of

13   that very question, Your Honor, so that's why I was so

14   quickly to speak.

15           Look, we were concerned that this was the last

16   omnibus date Friday to extend end of the challenge period

17   and we didn't know what your schedule would be.  And we just

18   wanted to put Your Honor on notice to some of the competing

19   concerns that the committee is facing with respect to

20   precisely that issue, which is we've got two timelines to

21   balance.

22           One is the challenge deadline itself and the other

23   is getting to a recovery and an outcome and the rest of the

24   case, including the expiration of the cash collateral order

25   in January and the path to a reorganization plan.

Page 104

1          So look, we want to move along the investigation

2    swiftly because of that second timeline.  We're very

3    sensitive to the resource burn and with respect to, you

4    know, the general burn of cash potentially in the cases.

5    But we don't want to be told when the investigation

6    concludes that we have to abandon cause of action at a

7    discount because, you know, the investigation either isn't

8    where it should be or because we're just out of time.

9          We want a transparent investigation.  We don't

10   want, you know, a non-transparent investigation followed by

11   a 9019 motion that we can't get our arms around and properly

12   evaluate or that gives away value.

13         So look, the deadline in our view is not a

14   monolithic deadline because we have a number of disputes to

15   deal with in connection with that deadline.  We have to deal

16   with five different settlements by our record.  The initial

17   perfection of the bank's liens, the potential avoidability

18   of liens perfected during the preference period, the

19   challenges to the swaps and the application proceeds,

20   challenges to the lien on dispute of cash, which you've

21   heard referred to earlier and then finally, and not

22   insignificantly, all of the disputes related to the 2014

23   merger and the related issues.

24         So, one of the things that the committee is trying

25   to weigh in the context of this discussion -- and, by the

Page 105

1    way, we didn't ask for an extension of the deadline.  We're

2    considering to what degree the deadline should be extended

3    and whether we can move some issues rather than the others

4    without extending the deadline.

5            You know, but what we need to do is we need to

6    have a discussion and the protocol foreshadows this with a

7    requirement of the debtor to give a report on where they are

8    on causes of action and the reason for that is we'd like to

9    know where we agree with the debtors, where we disagree with

10   the debtors and where they think causes are viable, not

11   viable or somewhere in between are undetermined because of

12   the continuing investigation.

13           If we have that report, Your Honor, and can kick

14   off that dialogue as called for by the protocol, then we

15   think there is a way to talk about whether we, you know,

16   whether there should be an extension of all of the challenge

17   deadline, whether there should be a partial extension or

18   whether we should try to get some issues off the table

19   moving forward, particularly because cash collateral is

20   coming again in January.

21           So I guess our thought on this was to be able to

22   have a coherent discussion about the buckets.  Number one,

23   we need to have that preliminary discussion from the debtors

24   and, number two, we're going to -- I agree with Your Honor,

25   it's a bit of a tension of trying to figure out what we do

Page 106

```
 1   to the extent that there are items where you're not going to

 2   have completion.

 3              We've been trying to live within the concept of

 4   complete for everything but we have a November 10th deadline

 5   fostered by our lenders that the lenders now themselves say

 6   in various guises that some or all of them will not be able

 7   to complete everything we ask for within that deadline.  I'm

 8   not placing blame.

 9              I'm not going to get into the, you know, sort of

10   blamestorming or mudslinging game on it but the fact of the

11   matter is, whether it is reasonable for those institutions

12   to do something under a certain timeline or not, we do have

13   these other two timelines we're worried about in terms of

14   the challenges deadline, timeline and the case timeline.

15              And so we do believe we may be back and forth Your

16   Honor and we'd like not to have to be back and forth, Your

17   Honor, but.

18              THE COURT:  Mr. Balassa, am I talk to you or am I

19   talking to Mr. Marcus?

20              MR. BALASSA:  To me, Your Honor.

21              THE COURT:  Okay.  So is your idea that -- are you

22   going to hit your deadline?  Are the independent directors

23   going to hit their deadline of the 26th?

24              MR. BALASSA:  Your Honor, given the case of the

25   third-party discovery, we're not.
```

Page 107

1              THE COURT:  You're not.

2              MR. BALASSA:  We were counting on the same third-

3      party discovery, to see third-party discovery that the

4      committee is counting on seeing.  And so we need to see

5      that.  And what we have in mind, what we propose to the

6      Court, is what we've set forth in the letter and what we've

7      already attempted to do with the committee and that is to

8      get with them and talk to them about what a reasonable

9      extension of the challenge period is.

10             When do we expect these third parties to have

11     their documents in?  And then we would approach the other

12     constituents.  We'd certainly approach the first lien

13     lenders, among others, and try to negotiate an extension of

14     the challenge period.

15             And I would suggest that we start those

16     conversations today or tomorrow and that we try to report

17     back to the Court before Your Honor goes out of town so that

18     we have a realistic schedule in place and there is not a

19     barrage of papers in the last few days before --

20             THE COURT:  Yeah, I mean, look.  It's really, you

21     know, almost every discovery dispute like this is the same.

22     You read one letter and the world's coming to an end and you

23     read the next letter and, you know, everybody's a boy scout.

24     So, you know, the truth lies somewhere in between.

25             In this particular case, I do find it difficult to

Page 108

1    believe that parties are purposefully being dilatory because

2    I'm just going to find out.  So I don't believe that.  But I

3    do believe that things tend to take longer than people think

4    that they're going to take.

5              So I'm interested in hearing from Ms. Schonholtz

6    and I'd like to come up with it before I let you all go.

7    I'd like to come up with a game plan for discussions and

8    when, you know, a timeframe for you to figure something out

9    on your own and then in the absence of that coming back and

10   having a supervised discussion with me and also at a time

11   when -- I mean, nothing that we're saying now affects in any

12   way First Reserve, so that's why I feel comfortable

13   continuing to have the discussion.  So let me hear from you.

14             MR. BALASSA:  Your Honor, may I say one last thing

15   before I sit down?  I think it hopefully came through loud

16   and clear in my letter from last night but we don't have a

17   perception that people are being intentionally dilatory.

18             THE COURT:  Yes, right.

19             MR. BALASSA:  It's our perception folks are

20   working very hard.  That includes the committee.  We're on

21   the phone with them all the time, hours and hours every day.

22   But also --

23             THE COURT:  Maybe if you talk to each other less

24   you could get more done.

25             MR. BALASSA:  It's not just us.  It's also with

Page 109

1    the third parties.

2            THE COURT:  Right.  Stop meeting and conferring

3    and actually just --

4            MR. BALASSA:  -- significant resources, so it is

5    our impression that folks on all sides are working very hard

6    to get these materials collected.  As Your Honor pointed

7    out, these things just take time.

8            THE COURT:  Yeah, I mean, we can disagree around

9    the edges on search terms and custodians and things like

10   that.  But for the most part, you know, I think people are

11   focusing on the lion's share of the documents.  So let's

12   hear from Ms. Schonholtz.  Maybe she has a solution to the

13   quandary.

14           MS. SCHONHOLTZ:  Margot Schonholtz for Wells

15   Fargo, the first lien agent.  Thank you, Your Honor, for

16   permitting me to be heard.  And let me just give you very

17   briefly background as to where we know we are, despite what

18   the letters say.

19           Wells has moved as expeditiously as I have ever

20   seen a major financial institution move with respect to

21   trying to respond to the joint request.  So frankly, we were

22   stunned yesterday when we saw Mr. Martin's letter that was

23   filed, not served but filed, on the eve of this hearing.

24           It was actually filed during a meet and confer

25   when we were telling the committee that Wells' document

Page 110

1  production would be starting this week and completed by

2  October the 30th and that is for 12 custodians on the list

3  of documents which was attached to our letter, Your Honor,

4  and you see it's not a small list.

5          We voluntarily gave the committee, without them

6  even asking, in early August, all of our lien and loan

7  documents.  So hopefully they're making some progress on

8  that.  And we got the voluntary request on September 21st.

9  And doing the math, Your Honor, we will have completed our

10 voluntary production three weeks from the time that we

11 agreed on the custodians, the searches, et cetera.

12         The protocol anticipated that we would need more

13 time. We (indiscernible) major financial institutions and

14 we've heard no complaints from the committee or the debtor

15 at all until that letter was filed yesterday.

16         So we will proceed as we have told them we will

17 proceed and we will continue as we have on regular meet and

18 confers to keep them apprised of our progress.  We can't

19 speak for the other lenders here.  We are aware of what's

20 happening.  Barclays and Wells Fargo stepped up voluntarily

21 to submit themselves to massive document requests in a very

22 short period of time.

23         We did it, as Your Honor will recall, on the 2004

24 request in order for the other lenders to perhaps get

25 targeted discovery on discrete issues like their hedges.

Page 111

1    That has not unfortunately come to pass and the debtors and

2    the committee have served massive document requests on

3    several other lenders in the group and we believe, frankly,

4    as a constructive suggestion, that since Barclays and Wells

5    were the lead on this transaction that the document requests

6    for the other lenders be narrowed to issues that pertain to

7    their particular hedges, et cetera, at least on the

8    voluntary basis.

9              We have also requested, as most financial

10   institutions require a protective order for the disclosure

11   of our documents.  We have yet to receive even a draft of

12   that from the debtors or from the committee.

13             During the first 48 days of this case, Your Honor,

14   the estate professionals billed over $8 million.  It is our

15   position that the first lien lenders are picking up the tab

16   for this.  And so the suggestion that we are being dilatory

17   and moving the case along, frankly, is offensive.

18             I have told Your Honor, you have known me for

19   decades, we will not be ridiculous and stubborn if there is

20   an appropriate, tailored request for an extension of the

21   deadlines.  What we don't want is for parties who have3 had

22   information for months to come in and say, oh sorry, not

23   done.  We need an extension of everything.

24             This will be the first time, frankly, that a

25   client that I work with said no to any request, reasonable

Page 112

 1    request for an extension and it's not going to happen.  But

 2    on the other hand, we are not willing to let this go on at

 3    the burn rate, which is ridiculous, as Your Honor noted,

 4    because there's so many people doing the same thing in an

 5    unlimited way for an unlimited amount of time.

 6          So I would suggest that we narrow the request to

 7    the other lenders, let Barclays and Wells do their work,

 8    which they have said will be done in record time, let these

 9    people look at what they've got before they decide, frankly,

10    that they haven't gotten enough or they -- which is what I'm

11    hearing today -- and then sit with Your Honor and figure out

12    how we proceed on what timeline, on what specific issues.

13          THE COURT:  All right.

14          MS. SCHONHOLTZ:  Thank you.

15          THE COURT:  Thank you.

16          MR. HERMANN:  Your Honor, may I be heard briefly?

17          THE COURT:  Sure.

18          MR. HERMANN:  Good afternoon, Your Honor, Brian

19    Hermann from Paul Weiss for Wilmington Trust.

20          We did not send in a letter.  Frankly, I didn't

21    think we were targets of the committee's letter.  We've been

22    cooperating with the committee to voluntarily produce

23    documents because we think it's best to just get on with

24    this as quickly as possible.  And that's largely because we

25    can't have a conversation with anybody in this case, most

1   importantly the debtors, until the circle of litigation or

2   the uncertainty surrounding this litigation can be

3   clarified.  And so we really need to move this forward.

4          One suggestion that I might offer just thinking as

5   I'm listening to the argument, is if I go through Mr.

6   Wofford's five categories of things that he needs more time

7   to investigate, some of them, to me, seem like things that

8   can be done relatively quickly.

9          So if there was a prioritization, maybe there

10  doesn't need to be an extension of the challenge period for

11  everything or maybe if there is an extension, there is an

12  extension to get certain things done and then maybe another

13  extension to get other things.

14         So for instance, he mentioned avoidable liens that

15  were granted during the preference period.

16         We know that there were some liens given during

17  the preference period.  We alluded to them in our papers in

18  the motion to dismiss.  We can easily help him figure that

19  out.  It's not that complicated.  And, frankly, the value is

20  pretty small.  So that should be an issue that can get

21  resolved pretty quickly.

22         With respect to challenges to the merger, I don't

23  know everything that he has in mind, but we've heard a lot

24  about the merger today and one of the reasons that we move

25  to dismiss and one of the reasons I mentioned to you on the

Page 114

1    first day of the case when we were moving to dismiss is I

2    think that is a gating issue that we need to get out of the

3    way.

4            We need to understand whether it's the liens or

5    the incurrence of the obligations that Mr. Wofford alluded

6    to.  What is the legal effect of the merger on those claims

7    and liens, because I think once that's decided -- and I

8    recognize it's not going to get decided today and today it

9    was about education, which I think was useful.

10           But once that gets decided, a lot of litigation in

11   this case, I think even remains or goes away depending on

12   how Your Honor rules and I think that will help clarify

13   things tremendously.

14           So I think in sum, there are things that I think

15   can get taken care of sooner rather than later and then

16   other things if there's a need for more discovery or

17   additional time to investigate, certainly we can have a

18   discussion around extending the challenge period but not

19   everything requires a massive extension of the challenge

20   period and not everything requires massive discovery of, you

21   know, 20 plus custodians and all the documents.  Thank you,

22   Your Honor.

23           THE COURT:  Thank you.  I'm most interested in

24   hearing really from the debtor.  I really am.  I just -- I'm

25   just scratching my head.  Ms. Schonholtz made a good point

1    about Wells and Barclays and it seems that the largest focus

2    of the committee's complaints is B of A, JPM, Citi Bank and

3    yet, you know, looming over this whole thing is the question

4    of what is the independent committee going to say with

5    respect to causes of action, you know, overall relating to

6    the merger and the transactions?

7            So, you know, I always look in the first instance

8    to the debtor and here to the independent directors.  So I

9    guess I'm just asking you for, you know, some leadership

10   here.

11           MR. BALASSA:  Appreciate that, Your Honor.  We

12   have analyzed our documents.  We have analyzed our documents

13   some time ago.  What we are attempting to do here is to

14   complete the investigation by getting materials from third

15   parties.  That's why we've been working arm in arm on these

16   issues with the committee.

17           And we think that we have made great progress with

18   the committee in terms of getting commitments from third

19   parties and our understanding is those documents will be

20   produced for most of the essential third parties in the next

21   couple of weeks.

22           Now, we don't have firm commitments other than to

23   start rolling out productions and firm commitments about

24   what they're doing.  We don't have deadlines that either we

25   have posed or could impose in this voluntary process.  And I

Page 116

1    would need a few minutes with my colleague whose spoken to

2    more of the third parties than I have about when we'll have

3    -- when we expect to have the bulk of materials.

4            THE COURT:  So you wouldn't be in a position today

5    -- putting to one side the committee's deadline, okay, we

6    have the 26th looming, right?  There's no way you're hitting

7    that deadline, right?

8            MR. BALASSA:  Without the materials, we can't,

9    Your Honor.

10           MR. BALASSA:  There's no way, right?  Mr. Wofford,

11   give yourself a rest for a few minutes.  You know I'll

12   always come back to you.  So you're not even in a position

13   today to know what to ask for, right, in terms of an

14   extension because you don't know when you're going to get

15   what you need to do your work.  I'm not blaming you.  I'm

16   just characterizing what you're telling me.

17           MR. BALASSA:  I think that we could confer and

18   then propose to the committee a reasonable extension based

19   on the information --

20           THE COURT:  See, but for this purpose I don't care

21   about the committee, right, because, you know, that's two

22   weeks afterwards.  I care about when you're going to be able

23   to complete your work, when you're going to have the

24   documents you need to complete your work.  So that's kind of

25   the first step because then you produce your thing and the

Page 117

1   committee could say this is great.  There are 50 causes of

2   action here, you know.  Our work is done.  Or they could say

3   you guys did a lousy job, you know, here are the 16 things

4   you didn't do and we've got to keep going.

5            So how do I figure out -- you're alluding to a

6   request but you're not making a request.  So what do we do

7   today?  Do we do nothing?  Do I let you have the room?  You

8   know, everybody's here, not the third party discovery

9   parties, but what do I do today in terms of the deadline on

10  the 26th?

11           MR. BALASSA:  I propose, Your Honor, that if you

12  gave us the room, we confer with --

13           THE COURT:  Okay, I'm getting some nods.

14           MR. BALASSA:  -- who are closer to where we stand

15  with respect to the long list of third parties, get that

16  information and then confer with the other interested

17  parties here and then make a proposal to Your Honor, either

18  we make a consensus or we don't but we stake out a position

19  for the Court.

20           THE COURT:  All right.  Do you want -- I'm trying

21  to be sensible.  It's 1:00.  You've been here for a long

22  time.  Do you want to, you know, as you wish, go and have

23  lunch and talk to each other and we can come back at 2:00?

24  Do you want to just go talk and let me know when you're

25  ready?  I have something at -- I do have something at 2:00?

Page 118

1    Yeah, I kind of have a TRO at 2:00.  But I can see you at

2    2:30.  I just -- I want to help you in any way that I can in

3    terms of my availability.

4           MR. BALASSA:  If it's not an inconvenience to the

5    Court, what I would --

6           THE COURT:  I mean, I don't know what other

7    commitments people have here today.

8           MR. BALASSA:  If it suits the Court, what I would

9    propose is that we simply take advantage of having people in

10   the room.

11          THE COURT:  Sure.

12          MR. BALASSA:  That we not set aside an hour for

13   lunch and we plow on, have conversations and then we

14   indicate through your clerks when we're ready to talk.

15   Hopefully that's sufficiently advanced to 2:00 that we can

16   get back --

17          THE COURT:  Why don't you give that a shot and

18   we'll see what happens?  Yes, Mr. Wofford.

19          MR. WOFFORD:  Yeah.  I'd like to propose one small

20   addendum to that.  It seems like a wordy one, which is we

21   don't want to throw out the baby with the third-party

22   discovery bath water, so to speak, in that given the pending

23   October 26th deadline, part of the discussion should focus

24   upon to what degree there are causes of action that can be

25   disaggregated in terms of discussion from the third party

1    discovery for purposes of reporting back.

2            That is the debtors have a longstanding

3    investigation.  They've had a massive head start in doing

4    this.  They, as we heard in the argument earlier, reached at

5    least some preliminary conclusions about things like the

6    legal impact and attackability, if you will, of claim

7    incurrence.

8            We would like the report and the discussion on

9    those, you know, those items to go forward so that we know

10   whether we're on the same page or not even fully independent

11   of the third-party discovery.  That is, in terms of moving

12   the case forward, Your Honor, unlike many other cases, we

13   are firmly at the belief that there are unencumbered assets

14   here and our constituents are very loud and clear that they

15   would like to have some focusing in the reduction of the

16   burden as well.  And to the extent that we can get some

17   clarify on the non-third party discovery independent things,

18   I think that would really speed along this process.

19           So I'd like to make sure that that -- that we

20   don't just have a big anchor for everything from the third-

21   party discovery discussion to the extent that we can start

22   focusing submissions, particularly on things like

23   constructive fraudulent conveyance.

24           THE COURT:  To be honest, I'm not sure I

25   understood what you just said.

1          MR. BALASSA:  Your Honor, we're certainly talk to

2     Mr. Wofford.

3          THE COURT:  So why don't you folks talk and that's

4     commentary on me, not you.  I'm just not sure I followed,

5     you know, what you said.  But why don't you folks talk?

6     I'll standby.  Knock on the door when you're ready.  You can

7     use all the rooms back there for separate discussions.

8     You're welcomed to stay here.  We'll leave the phone line

9     open for the time being.  All right?  Thank you.

10         [BREAK]

11         THE COURT:  Okay.  Thank you all for sticking in

12    here.  It's 20 minutes to 3:00.  You must be quite hungry,

13    so I appreciate your obviously working hard to accomplish

14    something.

15         MR. MARCUS:  Yeah, I think there's some stuff

16    around the edges but I think generally everybody's okay with

17    what I'm going to suggest now.

18         THE COURT:  Okay.

19         MR. MARCUS:  We certainly heard Your Honor loud

20    and clear and we're going to tell you what the debtors need

21    and how the debtors are going to drive this forward.

22         THE COURT:  Okay.

23         MR. MARCUS:  I would break the investigation and

24    claims buckets into three tiers.

25         THE COURT:  Okay.

1           MR. MARCUS:  The first one is constructive

2    fraudulent transfer, which is really the kind of sum and

3    substance of the report that is sort of ongoing and ready to

4    be issued and approved by the October 26th date.

5           The second bucket of garden variety lender

6    challenges, we have initial perfection of the liens,

7    availability of liens granted during the preference period,

8    the swaps and then there's the lien on disputed cash.  I'm

9    going to set that one aside, Your Honor.

10           Everybody knows what our view is and our rights to

11    challenge are preserved in the final cash collateral order

12    and our view is we will do so when it becomes appropriate if

13    it becomes appropriate for the committee to resolve this

14    part of the greater case.  Obviously that would be a better

15    outcome for them.

16           And then the last bucket and the one where we're

17    relying on the third-party discovery effort, really the

18    intentional fraudulent transfer and insubordination type

19    other claims related to a kind of business combination.

20           THE COURT:  Okay.  So the third category includes

21    claims that Mr. Silverman was talking about today generally

22    in the category of this was a bad merger.

23           MR. MARCUS:  Correct.

24           THE COURT:  Fiduciary duty claims, all of those

25    are in the third category.

Page 122

1         MR. MARCUS:  Correct.

2         THE COURT:  So those are not -- those are not in

3    the purview of what the independent directors had been

4    seeking to accomplish by the 26th.

5         MR. MARCUS:  I think they were within what we had

6    originally intended to be as part of the 26th.  I think the

7    process is --

8         THE COURT:  Has bogged down.

9         MR. MARCUS:  -- taken a little bit longer to get

10   third-party discovery.

11        THE COURT:  Okay.  So it's not that that wasn't

12   part of their mission.  It's just that that's not going to

13   be accomplished by the 26th.

14        MR. MARCUS:  Yes, Your Honor.

15        THE COURT:  Okay.  All right.  I understand.

16        MR. MARCUS:  So with respect to the first one,

17   which is the constructive fraudulent transfer, we will be

18   done on time on the 26th.  We're going to get that done.

19        THE COURT:  Okay.

20        MR. MARCUS:  We're going to give the report to the

21   creditors committee as we set forth in the protocol and we

22   will not need any additional time.  I think that's to

23   deliver the report and then technically the challenge period

24   would end on November 10th.  But we're not going to need --

25   we are not going to need any more time.

Page 123

1          For the second bucket, the garden variety stuff,

2    we are not going to need any more time than November 10th.

3    Our goal is to get -- just to take a step back, we have this

4    special committee of these two sort of independent board

5    members because the other board members were on the Forest

6    and Sabine side at the time of the merger and those board

7    members we believe are independent as we're shown that

8    transaction.

9          Garden variety lien challenges, we don't think the

10    current board is conflicted in any way, so that's going to

11    be dealt with on the full board level.  And so what we need

12    to do with respect to those is just complete our analysis.

13    Obviously that is very far along, get a board meeting in

14    front of the board and then look back to parties about, you

15    know, what we're doing with respect to any claims in that

16    second tier.

17          We're going to try and do that as far in advance

18    of November 10th as we can because it's the sort of internal

19    deadline, but we will not be asking for an additional period

20    of time after November 10th with respect to that.

21          THE COURT:  Okay.

22          MR. MARCUS:  And then with respect to the

23    intentional fraud kind of third bucket, I'm going to defer a

24    little bit to Mr. Balassa because Mr. Balassa and Ms. Jakola

25    have been the direct interface --

Page 124

1           THE COURT:  Sure.

2           MR. MARCUS:  -- with the third parties on

3    discovery and how hard they're working.  But that one we

4    would like to be done by the latest December 1st and I think

5    -- and that's a little bit dependent on how quickly things

6    are processed.

7           We are actually far along in that analysis but

8    there is a couple things out of our control there.  But we

9    hear Your Honor kind of loud and clear on we don't need to

10   see every single last document to get a very good idea from

11   the stuff we have already and what we do expect other third

12   parties to be delivering to us (indiscernible).

13          THE COURT:  Okay.  So what does that December 1st

14   date mean for the overall -- the challenge period visa vie

15   the committee, et cetera?

16          MR. MARCUS:  What we talked about a little bit was

17   -- this is Paragraph 30 -- this paragraph in the protocol

18   that suggested that we would deliver to the committee at

19   least 15 days before the challenge deadline, whatever it is

20   we're going to do a report, a claim, a letter, something to

21   describe to them how they're coming out on these issues.

22          We, of course, as Your Honor has asked, this is

23   when we will be ready, December 1st.  It seems to make sense

24   to just kind of keep that in place and have a challenge

25   deadline of December 15th to give -- to keep that same

Page 125

1    buffer.  Again, I don't think we need it but we're not

2    against complying with the spirit of protocol as it was kind

3    of originally drafted.  And then obviously if we're done --

4            THE COURT:  So are the lenders onboard with this?

5            MR. MARCUS:  I can't speak for them but.

6            MS. SCHONHOLTZ:  I heard about the discovery first

7    date in the other room.  I'm hearing about December 15th for

8    the first time.  I'm certainly willing, if it works for Your

9    Honor and works for everybody else, to consider just moving

10   the date for this third bucket of claims.  It makes sense

11   and I would recommend that.

12           I will say, however, that with respect to the

13   constructive fraudulent transfer claims and to what I call

14   the garden variety number two, I think it would be very

15   helpful to keep the dates that we have and that would help

16   me frankly be able to push the last date with my clients.

17   That's a long answer but I'll recommend that other dates at

18   least for now hold.

19           THE COURT:  Okay.

20           MR. MARCUS:  As I said, that's -- the debtor's not

21   asking to move those dates, so that's when we're going to

22   get done in those first two.

23           THE COURT:  Okay.  So then let's hear from the

24   committee then.  Thank you very much.

25           MR. MARCUS:  Thank you, Your Honor.

Page 126

1             MR. WOFFORD:  Your Honor, the committee believes

2     that this does mark progress, but I think that the key issue

3     that is on the table is the one that was remarked upon by

4     Mr. Marcus.

5             He is correct that Paragraph 30 of the challenge

6     period has a procedure by which the committee has -- and

7     this is really, again, an efficiency issues -- that the

8     committee is to receive or report whatever form the debtors

9     have arrived upon 15 days in advance of any complaint they

10    brought or the challenge deadline so they can confer and

11    coordinate, figure out what's in and what's out and, to the

12    extent things are out, the committee has to figure out what

13    to do with it.  And to the extent that things are in, if the

14    committee disagree with them or wanted to (indiscernible)

15    with that opportunity to discuss.

16            So in terms of the first bucket, which is

17    constructive thought, having the October 26th deadline and

18    the ultimate November 10th deadline, there's no change in

19    the time of that.

20            THE COURT:  Okay.

21            MR. WOFFORD:  With respect to the second bucket of

22    garden variety challenges where we have been coordinating

23    with the debtors, their proposal, to be clear, says that

24    their challenge deadline remains the 10th but because of a

25    misinterpreting -- Mr. Marcus can correct me -- because of

Page 127

1   the additional burden associated with getting ready for

2   October 26th with respect to the constructive fraud issues,

3   they may need some or all of the time between then and

4   November 10th to finish on the garden variety issues.

5           And so what happens is there is a compression of

6   potential loss of that ability to coordinate on the garden

7   variety challenges.  So we just didn't have time to get to

8   this with the secured lenders or to resolve with the

9   debtors.

10          The committee believes that there should be some

11  date or day extension on the garden variety in the

12  unexpected even that we do disagree that we have the

13  opportunity to make sure that the cause of action to

14  preserve that the debtors would not choose to bring if they,

15  you know, bring those causes of action between the 26th and

16  the 10th.

17          THE COURT:  So, Mr. Marcus, what was the date

18  around when you would go live with the category two claims?

19          MR. MARCUS:  We didn't put a date on it only

20  because I didn't have a specific date yet to get in front of

21  the full board, as I suggested.

22          THE COURT:  Right.

23          MR. MARCUS:  So the conversation that I've had

24  with Ms. Schonholtz and Mr. Hermann before is we would

25  really endeavor to do that as soon as possible and if we can

Page 128

1    do it before the 26th -- it's not part of what's going on on

2    the 26th.  That's for independent committee and these are

3    claims that are -- that don't fall within that report.  So

4    it's a little different.

5            THE COURT:  So as you stand here today, you're

6    going to try to hit the 26th deadline with respect to

7    category two claims.

8            MR. MARCUS:  I'm going to try and beat the 26th

9    deadline with respect to the category of claims.  I just --

10   I'm not 100% up to speed on where we are --

11           THE COURT:  So let's not worry about it today.

12   Let's assume that you're going to do what you set out to do,

13   in which case the committee -- the November 10th date can

14   stand with respect to the category two claims.

15           MR. MARCUS:  That works for me.

16           THE COURT:  All right?

17           MR. MARCUS:  Yep.

18           THE COURT:  Okay?  And then we'll cross that

19   bridge if we come to it if for some reason they don't hit

20   that mark and I will -- and you'll know it.  I'll be back on

21   the 28th.  You'll know it, you know, we're either hit it or

22   you won't and we can have a conversation on the 29th or the

23   30th in the absence of an agreement to, you know, if there's

24   not hitting the date, no agreement on pushing the 10th

25   deadline visa vie the category two claims and you need to

1     talk to me.  So we have a safe zone there on the category

2     two claims.

3              On the category three claims, I mean, I think

4     it's, you know, it's your lucky day because even if, you

5     know, even if everything that was said with respect to how

6     terrible everybody's behaving is true, you know, you were

7     going to pick up -- you pick up three weeks.

8              MR. WOFFORD:  Right.  And so effectively, if I

9     understand the proposal, Your Honor, the debtor's deadline

10    would be to report on reports of Paragraph 30 December 1st

11    and then the revised challenge period expiration will be --

12    had been 15 days later but I think what the proposal is 14

13    days later on December 15th or --

14             THE COURT:  Right.  Yes.

15             MR. WOFFORD:  I just wanted to check between the

16    15th or the 16th or --

17             THE COURT:  Yeah, 14 days later on the 15th,

18    right, right.  And that, you know, that has the added

19    benefit of you don't have to work over the holidays.

20             MR. WOFFORD:  We have a couple of small

21    housekeeping matters just to foster the things that are

22    already going on, Your Honor.

23             Number one is we are still discussing trying to

24    adjust or I think the lender would say truncate the scope of

25    discovery for the remaining third-party lenders.  Part of

1  that discussion is a full understanding of what we're going

2  to be getting from Wells and Barclays because the production

3  hasn't started.  So pending that discussion, we're going to

4  continue to meet and confer on adjusting the scope of that

5  discovery.

6              THE COURT:  Okay.

7              MR. WOFFORD:  With respect to the outstanding

8  third-party discovery targets, JP Morgan we have heard as a

9  matter of institutional procedure only likes to respond if

10 they receive a subpoena because I guess this informal

11 process isn't, as an institutional matter, formal enough for

12 them to respond and start the discovery apparatus.  So I

13 think we and the debtors consensually are of the view that

14 we'd like the Court to authorize authority to issue a

15 subpoena.

16             THE COURT:  Go right ahead.

17             MR. WOFFORD:  That way we can get them to get the

18 ball rolling.  And I think it's anticipated the committee

19 would issue that subpoena.  Okay.

20             Similarly with respect to the present and former

21 directors, there are some insurance coverage aspects with

22 respect to them being issued a subpoena.  That is it is

23 again fostering of the process in terms of their ability to

24 respond if we were to be able to formalize our process with

25 respect to those records who are current discovery targets

Page 131

1   by means of the subpoenas.  We'd also like immediate

2   authority to do that, Your Honor.

3              THE COURT:  Does anybody have anything to say

4   about that?  All right.  Let's do that.

5              MR. WOFFORD:  Your Honor, I think that's all we

6   have on this.

7              THE COURT:  Okay.  Thank you.  Ms. Schonholtz, I

8   appreciate you're willing to work with everybody and

9   recommend this to your client.

10             MS. SCHONHOLTZ:  Thank you, Your Honor.  Just for

11  the record, JP Morgan is not part of our bank group, so

12  that's a whole separate issue.

13             THE COURT:  Okay.

14             MS. SCHONHOLTZ:  And then with respect to the

15  outstanding voluminous request to Natixis, Citi and B of A

16  which are part of the bank group, we've asked and Mr.

17  Wofford has referred to it, the voluntary discovery from

18  them be limited to the only thing that's specific to them,

19  frankly, which are the hedges and with the November 10th

20  date still in place we would suggest that that would be a

21  way to streamline and expedite the discovery of those three

22  banks.

23             THE COURT:  Okay.

24             MS. SCHONHOLTZ:  Thank you.

25             THE COURT:  All right.

Page 132

1          MR. BALASSA:  Your Honor, follow-up on that last

2     point.

3          THE COURT:  Yeah.

4          MR. BALASSA:  We think not only that it's feasible

5     but that it's necessary to try to limit some of the third-

6     party discovery that's out there.  There's some discovery

7     that we went along with in the spirit of cooperation but

8     with the schedule we have we are going to be seeking to

9     narrow some of the discovery.  We've talked to the committee

10    about that.  So we do take it very seriously.

11         THE COURT:  And will that potentially resolve some

12    of the issues that were raised with respect to Reserve?  I

13    just can't tell.

14         MR. BALASSA:  I don't know that it would with

15    respect to First Reserve?  It may.  For instance, the number

16    of custodians, we may have a difference of opinion on how

17    many custodians we need to collect documents from.  So we'll

18    be reviewing all of our third-party discovery requests,

19    especially with respect to the other lenders.

20         THE COURT:  Okay.  I prefer not to have to get in

21    the weeds of numbers of hits and search terms and

22    custodians.  I much prefer that you work that out.  If you

23    can't, I will.  But you're better at that than I am.

24         MR. BALASSA:  We hear you loud and clear, Your

25    Honor.  And then I also wanted to alert the Court that we --

1    the debtor expects to file a motion in relatively short

2    order seeking authority to advance legal fees for current

3    and former directors.  But I won't present the substance of

4    that here.  I just wanted the alert the Court.

5            We've been in coordination with the other groups

6    and I don't think we're going to be able to reach complete

7    agreement, which is going to require the Court to --

8            THE COURT:  Okay.  All right.  All right.  So do

9    we need -- can I just so order the record or do we need to

10   enter an amended something or another visa vie the protocol

11   and the dates?  I'll give you -- whatever level of comfort

12   and clarity you want I'll do.

13           MR. MARCUS:  I think you can so order the record.

14   We're certainly willing to -- we are going to stand by the

15   dates that we just announced.  I don't think you --

16           THE COURT:  Okay.

17           MR. MARCUS:  I don't think we're asking for a

18   modification of the protocol at least as it relates to

19   bucket two.  That's, as we said before, that's probably in

20   our dates.

21           THE COURT:  Right.  Just with respect to bucket

22   three and the challenge period, right?

23           MR. WOFFORD:  Yeah, Your Honor, the committee's

24   preference is also to so order the record.  I think the

25   diversion of resources that would be --

Page 134

```
 1              THE COURT:  That's fine with me.

 2              MR. WOFFORD:  -- such an order is not

 3     (indiscernible).

 4              THE COURT:  That's fine.  Record is so ordered

 5     with respect to the dates and the undertakings that all the

 6     parties put on the record.

 7              MS. SCHONHOLTZ:  I would like the opportunity,

 8     though, however, Your Honor, to talk to my clients about

 9     changing a date in the cash collateral order.

10              THE COURT:  Understood.

11              MS. SCHONHOLTZ:  Thank you.

12              MR. WOFFORD:  Similarly, Your Honor, with respect

13     to the adjustment of the scope of the third-party discovery,

14     we'll want to discuss, you know, the nexus of that in the

15     bridge loan as part of a continuing --

16              THE COURT:  Well, that's an ongoing, evolving

17     discussion.  Okay.  I think I'm going to let you leave.

18     You've been here long enough.  Thank you very much and as of

19     now the next time I'm going to see you is November 10th

20     still, all right?  But if you need to come in at the end of

21     October, we'll see you then.  Thank you all very, very much.

22

23

24                        * * * * *

25
```

1                          I N D E X

2

3                         RULINGS

4    DESCRIPTION                              PAGE        LINE

5    HEARING re Doc #216 Application to        14          9

6    Employ Blackstone Advisory Partners

7    L.P. as Investment Banker

8

9    HEARING re Doc #369 Debtors' Supplemental  8         16

10   Motion for Entry of an Amended Final Order

11   Authorizing Payment of (I) Operating

12   Expenses, (II) Joint Interest Billings,

13   (III) Shipper and Warehousemen Claims,

14   and (IV) Section 503(b)(9) Claims

15

16   HEARING re Doc #341 Application to Employ  10          4

17   Deloitte & Touche LLP as Independent

18   Auditor and Accounting Services Provider

19

20   HEARING re Doc #370 Application to Employ  15          9

21   Porter Hedges LLP as Texas and Oil and Gas

22   Counsel

23

24   HEARING re Doc #373 Application to Employ  15          9

25   BB Genesis Land & Mineral Resources,

1    L.P., D/B/A Genesis Land & Mineral

2    Resources as Land Due Diligence Contractor

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 137

1                    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya

7    Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2016.01.12 14:18:22 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 16, 2015