Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Lead Case No. 15-11835-scc; Adv. Proc. No. 15-00126-scc

4   - - - - - - - - - - - - - - - - - - - -x

5   In the Matters of:

6   SABINE GAS & OIL CORPORATION, et al.,

7

8                Debtors.

9   - - - - - - - - - - - - - - - - - - - -x

10   SABINE GAS & OIL CORPORATION, et al.,

11                Plaintiff,

12   v.

13   WILMINGTON TRUST, N.A.,

14                Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16                United States Bankruptcy Court

17                One Bowling Green

18                New York, New York

19

20                July 16, 2015

21                10:58 AM

22

23   B E F O R E:

24   HON. SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1

2   15-11835-scc Sabrine Oil & Gas Corporation, et al.

3   Ch 11

4

5   HEARING re Debtors' Motion for Entry of an Order Directing

6   Joint Administration of Chapter 11 Cases

7

8   Debtors' Motion for the Entry of Interim and Final Orders

9   Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507,

10  Bankruptcy Rule 2002, 4001, and 9014, and Local Bankruptcy Rule

11  4001-(2) (I) Authorizing Debtors' Limited Use of Cash

12  Collateral, (II) Granting Adequate Protection to the

13  Prepetition Secured Parties, (III) Modifying the Automatic

14  Stay, and (IV) Scheduling a Final Hearing

15

16  Debtors' Motion for Entry of Interim and Final Orders (I)

17  Authorizing the Debtors to (A) Continue Using the Cash

18  Management System, (B) Maintain Existing Bank Accounts and

19  Business Forms, (C) Continue Intercompany Transactions, and

20  (II) Granting Superpriority Administrative Expense Status to

21  Postpetition Intercompany Transactions

22

23  Debtors' Motion for Entry of Interim and Final Orders

24  Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries,

25

1    Other Compensation, and Reimbursable Expenses, and (II)

2    Continue Employee Benefits Programs

3

4    Debtors' Motion for Entry of Interim and Final Orders

5    Authorizing Payment of (I) Working Interest Disbursements and

6    (II) Royalty Payments in the Ordinary Course of Business

7    Debtors' Motion for Entry of Interim and Final Orders

8    Authorizing Payment of (I) Operating Expenses, (II) Joint

9    Interest Billings, (III) Shipper and Warehousemen Claims, and

10   (IV) Section 503(b)(9) Claims

11

12   Debtors' Motion for Entry of Interim and Final Orders

13   Authorizing the Payment of Certain Prepetition Taxes and Fees

14   Debtors' Motion for Entry of Interim and Final Orders Approving

15   Notification and Hearing Procedures for Certain Transfers of

16   and Declarations of Worthlessness with Respect to Common Stock

17   and Preferred Stock

18

19   Debtors' Motion for Entry of an Order (I) Authorizing the

20   Debtors to (A) Prepare a List of Creditors in Lieu of

21   Submitting a Formatted Mailing Matrix and (B) File a

22   Consolidated List of the Debtors' 50 Largest Unsecured

23   Creditors and (II) Approving the Form and Manner of Notifying

24   Creditors of Commencement of These Chapter 11 Cases

25

1   Debtors' Motion for Entry of an Order Extending Time to File

2   Schedules of Assets and Liabilities, Schedules of Current

3   Income and Expenditures, Schedules of Executory Contracts and

4   Unexpired Leases, and Statements of Financial Affairs

5

6   Debtors' Application for Entry of an Order Authorizing and

7   Approving Employment and Retention of Prime Clerk LLC as Claims

8   and Noticing Agent for the Debtors and Debtors in Possession

9

10  Debtors' Motion for Entry of an Order Establishing Certain

11  Notice, Case Management, and Administrative Procedures

12

13  Adv. Proc. 15-00126 (SCC)

14  Complaint, Sabine Oil & Gas Corporation v. Wilmington

15  Trust, N.A.

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Beck and Sherri Breach

```
 1    A P P E A R A N C E S :

 2    KIRKLAND & ELLIS LLP

 3         Proposed Counsel for Debtors and Debtors-in-Possession

 4         601 Lexington Avenue

 5         New York, NY 10022

 6

 7    BY:  PAUL M. BASTA, ESQ.

 8         JONATHAN S. HENES, ESQ.

 9         CHRISTOPHER MARCUS, ESQ.

10         ANDREW RALPH, ESQ. (TELEPHONICALLY)

11         ALEXANDRA SCHWARZMAN, ESQ. (TELEPHONICALLY)

12

13    KIRKLAND & ELLIS LLP

14         Proposed Counsel for Debtors and Debtors-in-Possession

15         300 North LaSalle Street

16         Chicago, IL 60654

17

18    BY:  RYAN B. BENNETT, ESQ.

19         GABOR BALASSA, ESQ.

20         A. KATRINE JAKOLA, ESQ.

21

22

23

24

25
```

Pg 6 of 128

Page 6

```
 1   U.S. DEPARTMENT OF JUSTICE

 2        Office of the United States Trustee

 3        U.S. Federal Office Building

 4        201 Varick Street

 5        Suite 1006

 6        New York, NY 10014

 7

 8   BY:  PAUL SCHWARTZBERG, ESQ.

 9

10   AKIN GUMP STRAUSS HAUER & FELD LLP

11        Attorneys for Bank of New York as Indenture Trustee

12        One Bryant Park

13        New York, NY 10036

14

15   BY:  MICHAEL S. STAMER, ESQ.

16        ABID QURESHI, ESQ.

17        PHILIP C. DUBLIN, ESQ.

18

19   BROWN RUDNICK

20        Attorneys for Ad Hoc Committee of Unsecured Noteholders

21

22

23

24   BY:  ROBERT J. STARK, ESQ.

25        SIGMUND S. WISSNER-GROSS, ESQ.
```

```
 1

 2    HOGAN LOVELLS US LLP

 3         Attorneys for Wilmington Savings Fund Society Indenture

 4          Trustee of 7.25% Notes Due 2019 and Delaware Trust

 5          Company Indenture Trustee of 7.5% Notes Due 2020

 6         875 Third Avenue

 7         New York, NY 10022

 8

 9    BY:  RONALD J. SILVERMAN, ESQ.

10

11    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12         Attorneys for Wilmington Trust

13         1265 Avenue of the Americas

14         New York, NY 10019

15

16    BY:  BRIAN S. HERMAN, ESQ.

17

18

19

20

21

22

23

24

25
```

```
 1    WILLKIE FARR & GALLAGHER LLP

 2         Attorneys for Wells Fargo Bank, National Association,

 3          as Administrative Agent under First Lien Credit Agreement

 4         787 Seventh Avenue

 5         New York, NY 10019

 6

 7    BY:  MARGOT SCHONHOLTZ, ESQ.

 8         ANA M. ALFONSO, ESQ.

 9         PENELOPE J. JENSEN, ESQ.

10

11    GARDERE WYNNE SEWELL LLP

12         Attorneys for Hartz Capital

13

14    BY:  JOHN P. MELKO, ESQ.

15         (TELEPHONICALLY)

16

17    SNOW SPENCE GREEN, LLP

18         Attorneys for Creditor, Baker Hughs

19

20    BY:  PHIL SNOW, ESQ.

21         (TELEPHONICALLY)

22

23

24

25
```

1                    P R O C E E D I N G S

2            THE COURT:  How's everyone today?  Good morning.

3            MR. BENNETT:  Good morning, Judge.

4            THE COURT:  All right.  I'm ready when you are.

5            MR. BENNETT:  Your Honor, Ryan Bennett on behalf of

6    the debtors.

7            THE COURT:  All right.

8            MR. BENNETT:  My colleagues, I think, are still out in

9    the hallway.  Here they come right now.

10            THE COURT:  All right.  We'll wait till everyone gets

11   in the room.

12            MR. BENNETT:  Great.  Thank you, Your Honor.

13            THE COURT:  There is some extra room in the overflow

14   room if anyone feels crowded or uncomfortable.

15        (Pause)

16            MR. HENES:  Good morning, Your Honor.

17            THE COURT:  Good morning.

18            MR. HENES:  John Henes, Kirkland & Ellis, on behalf of

19   Sabine and its affiliated debtors.

20            Your Honor, just as a starting point, I think we were

21   hopeful that there wouldn't be anything contested today but

22   with respect to cash collateral, there will be one party make

23   an objection, Akin Gump, on behalf of the trustee for the 2017

24   notes.

25            THE COURT:  Okay.

1          MR. HENES:  So you will hear some arguments.  And my

2    partner, by way of introduction, Chris Marcus, will be handling

3    the cash collateral motion.  And if it pleases the Court, I'd

4    also like to make some other introductions, Your Honor --

5          THE COURT:  That would be wonderful.

6          MR. HENES:  -- as we start.

7          THE COURT:  Thank you.

8          MR. HENES:  At counsel table also is Ryan Bennett --

9          THE COURT:  Okay.

10          MR. HENES:  -- one of my partners.  And Mr. Bennett

11    will be handling all of the other motions today.  Sitting --

12          THE COURT:  Just to be clear, because we've been

13    checking the docket religiously and I didn't see anything on

14    the docket in terms of any objection.

15          MR. HENES:  There was no official objection.

16          THE COURT:  There's nothing filed.

17          MR. HENES:  But to be fair to Akin Gump --

18          THE COURT:  Sure.

19          MR. HENES:  -- while we've been keeping them in the

20    loop on everything --

21          THE COURT:  That's fine.

22          MR. HENES:  -- they saw the cash collateral when it

23    was filed.

24          THE COURT:  Okay.

25          MR. HENES:  Sitting in the front row is Michael

1    Magilton.

2             THE COURT:  Okay.

3             MR. HENES:  Mr. Magilton is the chief financial

4    officer of Sabine.

5             THE COURT:  All right.

6             MR. HENES:  He's also our first day declarant and he

7    is here today to -- if there is any need for cross-examination

8    or questions, he's here.  I'd like to move his declaration into

9    evidence if people don't have an objection --

10            THE COURT:  Okay.

11            MR. HENES:  -- if it pleases the Court.

12            THE COURT:  All right.  Any objection to the admission

13   into evidence of Mr. Magilton's first-day affidavit.

14            MR. QURESHI:  No objection, Your Honor.  We will have

15   some cross-examination in connection with cash collateral.

16            THE COURT:  All right.  Thank you very much.

17        (Declaration of Michael Magilton was hereby received into

18   evidence)

19            THE COURT:  It's going to be helpful to me at least

20   for today for you to remind me who you are and who you

21   represent because the one thing that's clear is there are a lot

22   of different constituencies.  All right.

23            MR. HENES:  And I'll go around the room, too, Your

24   Honor, to try to be helpful there.

25            THE COURT:  Okay.

1              MR. HENES:  In addition, I'm just looking at

2      (indiscernible) sitting right here is Jonathan Mitchell of

3      Zolfo Cooper.  Mr. Mitchell is also the CRO of the company.  We

4      filed a motion for approval of Mr. Mitchell as CRO.  It's not

5      for today --

6              THE COURT:  Right.  Okay.

7              MR. HENES:  -- but it's been filed.  In addition,

8      Lazard is the proposed financial advisor and back there is

9      Brandon (indiscernible) --

10             THE COURT:  Okay.

11             MR. HENES:  -- and who's been working very hard on

12     this.

13             I also want to point out we did provide last week

14     first day motions to the United States trustee's office and Mr.

15     Schwartzberg worked very hard with us.

16             THE COURT:  Is Mr. Schwartzberg?

17             MR. SCHWARTZBERG:  Your Honor, I'm in back.

18             THE COURT:  Hello, Mr. Schwartzberg.

19             MR. HENES:  How are you?

20             THE COURT:  How are you?  Thank you.

21             MR. HENES:  But we want to thank Mr. Schwartzberg for

22     working with us --

23             THE COURT:  Okay.

24             MR. HENES:  -- in resolving all issues that the United

25     States trustee's office --

1              THE COURT:  Excellent.

2              MR. HENES:  --

3              THE COURT:  Okay.

4              MR. HENES:  -- had for today.

5         Then there's a whole cast of characters in the room

6    and I'll -- Margo Schonholtz is here to name a character

7    partner.  But --

8              THE COURT:  Hello, Ms. Schonholtz.  How are you?

9              MS. SCHONHOLTZ:  Good morning, Judge Chapman.

10             MR. HENES:  -- with Willkie Farr & Gallagher,

11   represents our first lien lenders.  We've been working very

12   hard with Ms. Schonholtz and her team both on the cash

13   collateral order as well as all of the other motions and just

14   talking about the case --

15             THE COURT:  Okay.

16             MR. HENES:  -- and for the last few months.

17        Also, we have Brian Herman from Paul Weiss.

18             THE COURT:  Good morning.

19             MR. HENES:  Represents the second lien trustee, the

20   official second lien trustee.

21             MR. HERMAN:  The agent.

22             MR. HENES:  The agent.  I apologize.

23             THE COURT:  The second lien agent.

24             MR. HENES:  Agent, yes.  Apologize for that.

25             THE COURT:  Okay.

1          MR. HENES:  And Mr. Herman and Alan Kornberg have been

2     very involved as we've moving forward --

3          THE COURT:  Yes.

4          MR. HENES:  -- over the last few months.

5          We also have Robert Stark from Brown Rudnick.

6          THE COURT:  Hello, Mr. Stark.  How are you?

7          MR. HENES:  Mr. Stark represents the 2019 and 2020

8     noteholders.  Those are the -- and I'll go through this in a

9     minute but those are the legacy Forest notes.  And then you've

10    already seen a few people from Akin Gump but we have Phil

11    Dublin, Mike Stamer and Abid Qureshi of Akin Gump on behalf of

12    the 2017 note trustee.

13         MR. STARK:  Correct.

14         MR. HENES:  Thank you.

15         THE COURT:  2017 trustee.

16         MR. HENES:  Yes.

17         THE COURT:  Okay.

18         MR. HENES:  Your Honor, as I was thinking about how to

19    do this, I definitely don't want to go through the whole first

20    day declaration.  Obviously, I think it was very detailed.  And

21    I think he did a pretty --

22         THE COURT:  And very well done.

23         MR. HENES:  Thank you very much, Your Honor.

24         THE COURT:  I found the historical and the technical

25    explanations were very helpful and very well written.

1    Appreciate it.

2          MR. HENES:  And I should say to point out, since we've

3    been making introductions to everybody, just for the record, I

4    think it's important to note that all of the associates and

5    paralegals, both at Kirkland and all the other firms, have

6    worked unbelievably hard to help us get here and I think that

7    they should be recognized for that.

8          THE COURT:  It shows and I appreciate it.  Thank you.

9    I hope you have your summer associates here as well.

10         MR. HENES:  We do have summer associates here.

11         THE COURT:  Excellent.

12         MR. HENES:  Mr. Marcus told me I should mention that.

13    I forgot.

14         What I think makes sense is to do a couple things.

15    One, very briefly, just make a couple of, I think, important

16    points about the company and it really goes for this company

17    and all oil and gas companies.  Second, to kind of take you

18    through the merger a little bit --

19         THE COURT:  Sure.

20         MR. HENES:  -- because it's been very helpful to us to

21    go through it --

22         THE COURT:  Right.

23         MR. HENES:  -- the way that I'll take you through it.

24    And then to let you know what our goal is here.  Obviously,

25    it's to restructure but it's also to make sure that this case

Page 16

1   does not devolve into litigation because that would be bad for,

2   we believe, everybody.

3            THE COURT:  I did -- as I hope you would expect, I did

4   read the papers.

5            MR. HENES:  Yes.

6            THE COURT:  And I did read the adversary complaint

7   which does lay out --

8            MR. HENES:  It lays --

9            THE COURT:  -- the history but I think it would be

10   helpful to go through it here today and talk.

11            MR. HENES:  Thank you, Your Honor.

12            So very briefly on the companies, the company is

13   incredibly capital intensive.  So all of these companies that

14   engage in the expiration and drilling of oil and natural gas,

15   it takes a lot of money to go do that.

16            The second thing is, this company is highly

17   dependent -- impacted by commodity prices.  And right now,

18   we're clearly in a -- and to say the least, a very challenging

19   commodity price situation.

20            So you have the need for a lot of cash, right.  Where

21   commodity prices impacts the profitability of the company and

22   here, we have a company that's just significantly over-levered

23   as well.  And so we need to reduce that debt, get ourselves in

24   a position where we can then go out, get the capital that we

25   need to continue our expiration and production and navigate

1  this troubled or challenged commodity price environment.  So at

2  the end of the day, that's our goal is to reduce the debt.

3  This is a pure de-leveraging.

4       But we do have this merger and we have a lot of

5  issues.  And that's what I'd like to go through now.  And I

6  have some demonstratives that I think would be helpful.  We can

7  pass them out --

8            THE COURT:  Sure.

9            MR. HENES:  -- to the Court.  Thank you, Your Honor.

10      (Pause)

11            MR. HENES:  Okay.  So, Your Honor, we turn to -- and

12  I'm sorry.  I forgot to number them.  But the one on top, it

13  says "Pre-Combination Capital Structure".  And what I'm going

14  to be very careful to do here because I -- this is really just

15  for -- to explain things not to --

16            THE COURT:  Characterize.

17            MR. HENES:  -- characterize things.

18            THE COURT:  Right.

19            MR. HENES:  I'm not going to talk about cash and

20  assets in general.

21            THE COURT:  Okay.

22            MR. HENES:  I may point out a couple of issues that

23  are out there but I'm not going to make any arguments.

24            THE COURT:  Fair enough.

25            MR. HENES:  If you look to your left, what you have is

1   Legacy Forest Oil.  And it was a public company and -- well,

2   you'll notice it has four subsidiaries.  Those subsidiaries are

3   really shells.  They still exist.  We didn't file them.  They

4   don't have anything in them.  All of the assets in operations

5   in Forest was in that one entity which is somewhat unusual,

6   could come up in some of the issues that arise during the case.

7          And if you look at the capital structure, what you had

8   was 105 million dollars of first lien debt and then you had two

9   tranches of notes, the 2019s and the 2020s, which Mr. Stark

10  represents, that's about 800 -- that is 800 million dollars of

11  unsecured notes.

12         On the right hand side, you have Sabine.  And Sabine

13  is a privately held -- was a privately held company.  It was

14  owned -- majority owned by First Reserve, which is a private

15  equity fund down in Houston that focuses on the energy sector.

16  This is a much more typical structure holding company with

17  operating subsidiaries.  And the debt -- the capital structure

18  of Sabine, pre-combination, was 619 million dollars of first

19  lien debt, 650 million dollars in second lien debt and 350

20  million of the 2017 notes and those are the notes that Akin

21  Gump is representing.  Okay.  So that's pretty simple.

22         If you go to the sheet that says post-combination

23  capital structure as of December 16th.  So the first page we're

24  looking at, I was kind of let's call it May of 2014 when the

25  company -- the two companies entered into a merger agreement.

Page 19

1    From the time they entered into the merger agreement until

2    December, the commodity prices started to tumble, at first

3    slowly and then precipitously as we all are aware.  And that

4    created a lot of challenges for getting the merger done.  And

5    there were a number of changes as you read in the complaint to

6    get it to where the companies did actually merge despite Sabine

7    having a lot of second thoughts about a merger.

8         When the company merged, what you'll see is the first

9    lien, the RBL credit facility as we call it, now is 750 million

10   dollars.  And that was due to a refinancing of the 105 million

11   dollars of Legacy Forest first lien and 619 million dollars of

12   Sabine first lien as well as some additional funds that went to

13   pay transaction costs.

14        The second lien which was 650 million is now at the --

15   when it's combined it's 700 million because the second liens

16   put in an additional 50 million dollars of funding.  And then

17   the unsecured notes were made as they were.

18        Another thing to point out with the RBL credit

19   facility is there was a two billion dollar credit facility.  We

20   had a billion dollars of borrowing base and we had 750 million

21   outstanding.

22        If you jump to the third page, which is capital

23   structure as of today, what you'll see as the only difference

24   is there's now 927 million dollars approximately outstanding

25   under the RBL credit facility.  And I want to talk about that.

Page 20

1            In, I think, March, the company made the decision to

2    draw down on the entire amount of the facilities so an entire

3    billion dollars.  The reason it's not a billion dollars

4    outstanding is because to the petition date, we had a number of

5    swaps that were unwound and then set off by the banks.  So

6    that's why we're at 927.

7            In addition, when we borrowed and drew down on that

8    revolver, we had the -- we did not have an obligation to put

9    those monies into control accounts.  So we put them outside of

10   the banks.  And the company's view was that was unencumbered

11   cash.  The company did that for purposes of flexibility,

12   optionality, all the things that you can imagine.

13           The first lienholders dispute that that cash is

14   unencumbered.  They have a number of arguments about why they

15   believe that it's encumbered.  And those are arguments that at

16   least the company and the first lienholders and the second

17   lienholders as a -- they did not want to fight.  We wanted to

18   kind of push that off and reserve everybody's rights to fight

19   that at a later date if it even had to be -- has to be fought.

20   But that is going to be part of what you're going to hear about

21   today from --

22           THE COURT:  Right.  But as far as the first liens and

23   second liens are concerned, it's agreed as of -- usage is

24   agreed as of now.

25           MR. HENES:  Yes.

Page 21

1          THE COURT:  Okay.

2          MR. HENES:  Yes.  The cash collateral order that you

3    have in front of you today is fully consensual between the

4    companies --

5          THE COURT:  Company, firsts and seconds.

6          MR. HENES:  -- the first liens and the second liens.

7          THE COURT:  Okay.

8          MR. HENES:  So we drew down on that money.

9          Another interesting thing in the oil and gas world is

10   there is these redetermination periods of the borrowing base.

11   It happens in April and October.  So in April, there was a

12   redetermination and the banks redetermined the borrowing base

13   from a billion dollars to 750 million dollars.  So as a result

14   of that, because we have borrowed everything down, the company

15   now owed 250 million dollars to the bank, the two forbearance

16   agreements and other things, we did not make those payments and

17   those payments are still outstanding which is why we have the

18   927.

19          The last thing to note in this case is -- or not the

20   last thing but important thing is also in the oil and gas

21   world, rather than taking a lien on substantially all of the

22   company's assets, generally banks take a lien on 80 or 90

23   percent of the assets.  And the reason for that is, they get a

24   lien on the mineral rights.  If you get that lien, you have to

25   have a properly filed mortgage.  And because there is property

1   all over, it's very time intensive and expensive to go get

2   mortgages, so they'll take a mortgage on the most valuable

3   properties at the time, the ones that are producing, the ones

4   that they know are going to be producing, but they'll leave

5   some.  So there are unencumbered assets here and everybody

6   agrees they're unencumbered.  So no matter what, there's going

7   to be some value for unsecured creditors in these cases.

8           Okay.  The other thing to note about this is

9   because -- and I think -- I don't know if this is unique but

10  it's definitely unusual for a merger to close in December and

11  have Kirkland & Ellis hired in February as restructuring

12  counsel and Lazard and Zolfo come in.  Because of that, what

13  we've been hearing and we've been looking at, basically since

14  day 1 since we got involved was about potential claims that

15  could be brought against all sorts of parties for fraudulent

16  transfer, breach of fiduciary duty.  You name it, people have a

17  theory on a claim.  What the board of directors and company

18  decided and Kirkland & Ellis advised was that we should dive

19  into these claims and look at them but that it should be

20  directed by what we'll call independent directors.  So

21  directors who had nothing to do with the merger, nothing to do

22  with Sabine or Forest pre-combination.

23          THE COURT:  So before you get to the special committee

24  and the investigation, it's a board of directors that you have

25  depicted, nothing on the pre-combination.  Is the board

Page 23

1    comprised of directors from each side of the -- from each of

2    the merger parties?

3    A.   Uh-huh, it is.  Now you have -- on the board of directors,

4    you have board members from -- and for pre-Sabine --

5           THE COURT:  Forest.  Pre-Forest.

6           MR. HENES:  -- pre-Forest --

7           THE COURT:  Okay.

8           MR. HENES:  -- and First Reserve.  There was one

9    director, though, a Thomas Chewning who was put on when the

10   companies were combined so he was not involved prior to the

11   combination.  Had nothing to do with the merger, nothing to do

12   with Sabine, nothing to do with Forest.  So we spoke to him

13   first.  And in terms of a special committee or -- you are

14   independent.  And he was willing to take on the role of looking

15   at these claims.  We made the decision that we thought bringing

16   somebody else on would make sense, too, so we had more than one

17   person on the committee.  And we brought John Foster on -- and

18   we have him listed on the capital structure as of the petition

19   date.  And Mr. Foster has a lot of experience and restructuring

20   to being on boards so he's part of that committee as well.  And

21   we have been reviewing all of those claims.  We're not

22   completely done with our analysis of everything but we think we

23   have a very good process in place.  And one of the reasons we

24   want that is to keep control, as much control as we can here

25   because, again, if this develops into litigation, this is not

1   the type of company that can sit through a long drawn out

2   litigation case.  We need to get this company out as quickly as

3   we can.

4           And so, whether it's claims that we brought, like the

5   first complaint that we filed, whether it's a new claim that we

6   bring later or whether it's defending against people seeking

7   standing or even agreeing that somebody else should bring a

8   claim, it's going to be well thought out by this independent

9   committee and we will have reports before you to review and

10  look at.

11          Okay.  So that's kind of where we are.  So before I --

12  and then I'm going to sit down and turn it over to Mr. Marcus

13  now.  But at the end of the day, and I know I've said this but

14  just I want to be crystal clear from the company's perspective,

15  we get that there's a lot of issues.  We know there's a lot of

16  parties looking at them.  We are looking at them very carefully

17  as well.  We're hopeful that everybody here, even if they can -

18  - we can all agree to disagree but if we do disagree and need

19  to have litigation, we're hopeful that everybody will agree on.

20  Let's make that as -- that litigation as efficient and

21  expeditious as possible and be able to bride Your Honor with

22  the easiest way to resolve those so then we can move on t the

23  main event which is really how do we get this company out and

24  who's going to own the company.

25          THE COURT:  So in many cases, there aren't significant

```
 1    creditors beyond the noteholders.  In this case, it appears,

 2    based on my review, that there is a substantial body of

 3    ordinary creditors.

 4            MR. HENES:  There are.

 5            THE COURT:  Is there anything that you can say about

 6    that, their involvement, how they're situated, just generally,

 7    the company's perspective and the constituencies' perspective

 8    on that.

 9            MR. HENES:  Sure.  The other creditors, and there are

10    some larger creditors as you saw on the top 50 list, I mean,

11    those are much more operational creditors.

12            THE COURT:  Yes.

13            MR. HENES:  We deal with them on a day-to-day basis.

14            THE COURT:  Right.

15            MR. HENES:  And I think some of them will want to sit

16    on the creditors' committee but they have not yet been involved

17    in any restructuring discussions and I don't see them on an

18    individual basis being involved.  So other than sitting on a

19    committee, I don't see much involvement.

20            THE COURT:  All right.

21            MR. HENES:  Okay?

22            THE COURT:  Okay.  What would you like to do next?

23            MR. HENES:  I would like to turn it over to Mr. Marcus

24    --

25            THE COURT:  Okay.
```

Page 26

```
1            MR. HENES:  -- let him continue on.  Thank you, Your

2    Honor.

3            MR. MARCUS:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5            MR. MARCUS:  For the record, Christopher Marcus from

6    Kirkland & Ellis, proposed counsel for the debtors.

7            Your Honor, let me first start with just the joint

8    administration motion.

9            THE COURT:  Okay.

10           MR. MARCUS:  I think we come -- people typically come

11   and do that first.  We have ten debtor entities here.  We're

12   going to procedurally consolidate them under the caption for

13   Sabine Oil & Gas Corporation.  Very standard joint

14   administration.  We showed it to -- we've shown it to everybody

15   including the Office of the United States Trustee.  And I

16   believe that there are no issues with that motion, Your Honor.

17           THE COURT:  Doe anyone wish to be heard with respect

18   to the debtors' motion for joint administration of these

19   Chapter 11 cases?  All right.  Very good.  That'll be entered.

20           MR. MARCUS:  Thank you, Your Honor.  We will just

21   deliver --

22           THE COURT:  I think at the conclusion --

23           MR. MARCUS:  Yeah.

24           THE COURT:  -- e-mail everything that we arrive at

25   today.  You can e-mail it to chambers.
```

1          MR. MARCUS:  Terrific.  Thank you.

2          THE COURT:  Or discs if you have them, whichever is

3     easiest for you.

4          MR. MARCUS:  Thank you.  Your Honor, I want to turn to

5     the cash collateral motion and order.

6          THE COURT:  Okay.

7          MR. MARCUS:  Mr. Henes mentioned the affidavit of Mr.

8     Magilton, the company's chief financial officer which was

9     submitted in connection with all of the first day motions

10    including cash collateral, a cash collateral specific -- a lot

11    of -- obviously, the background and working capital needs are

12    scattered throughout but the cash collateral specific

13    paragraphs can be found at pages 34 to 37.  I should also note,

14    Your Honor, that at docket number 45 is the affidavit of Jordan

15    Searles from Prime Clerk which walks through who -- all the

16    first day pleadings including, obviously, most importantly, the

17    cash collateral motion have been served on.  And so, that

18    supports the notice paragraphs

19         THE COURT:  Okay.

20         MR. MARCUS:  -- within the proposed interim order.  I

21    would just like to note, Your Honor, on page 3 of the inter --

22    Your Honor has a copy of the interim order, correct, as well as

23    the budget?

24         THE COURT:  Give me a second.  Let me get there.  All

25    right.  I'm there.  I think at docket 9, it's page 37 of 80.

Page 28

1          MR. MARCUS:  And does Your Honor have the -- I don't

2    know if I'm going to be relying on the budget, but just in

3    case, I wanted to make sure you do have a copy.  It should be

4    attached to the motion itself.

5          THE COURT:  Budget is attached, right?

6          MR. MARCUS:  Great.  Yes.  No changes to that since it

7    was filed as well.

8          Your Honor, on page 3 of the interim order at the very

9    top, it actually says that the debtor served the 30 largest

10   unsecured creditors.  We will fix that in the order we served

11   the 50 largest unsecured creditors.

12         THE COURT:  That's --

13         MR. MARCUS:  That was really the only typo that I

14   believe that we have.

15         Your Honor, what I'd like to do is, I'd like to talk a

16   little bit about the I would say somewhat unusual paragraphs

17   that we were able to negotiate or provisions --

18         THE COURT:  Okay.

19         MR. MARCUS:  -- that we were able to negotiate as part

20   of this interim order.  And then I'd like to walk through some

21   of the other, I think, important things that local Rule 4001-2

22   would require us to call out.  Otherwise, just to give Your

23   Honor a kind of full understanding of how the cash collateral

24   order works.

25         THE COURT:  Okay.

Page 29

1              MR. MARCUS:  As Mr. Magilton states in his

2     declaration, this was a good faith, arm's length, hard-fought

3     long negotiation with the pre-petition lenders.  You can

4     imagine that the pre-petition lenders were not happy with the

5     fact that we believe that all of our substantially -- all of

6     the cash that's sitting in the debtors' operating count right

7     now is not part of their collateral package.  You can also

8     imagine that they weren't happy with the fact that the debtors

9     were not -- had not yet completed their review with respect to

10    many of the lien rights that the lenders have, both the first

11    lien and the second lien lenders.  You know, as even Mr. Henes

12    discussed, we've already commenced an adversary proceeding with

13    respect to the second lien lenders.  And so, as part of this

14    negotiation, the debtors were very keen on reserving rights

15    with respect to stipulations that I think you'd normally see.

16    The cash is their collateral.  The liens are all good.  So we

17    stipulated to the validity of their claims and the priority of

18    their liens and all that.  What we did, in paragraph 11 and

19    paragraph 23(a) and (b), Your Honor, reserved some very

20    important rights for the estate.  11 relates to the debtors'

21    right to argue that a cash in the operating account is not cash

22    collateral.  And we've called that -- because it's not

23    unencumbered yet, we've called it disputed.  As the case

24    progresses, there undoubtedly will be cash collateral.  Your

25    Honor can see from the budget in the first two weeks, I think

1   there's about 46 million dollars of proceeds that come in that

2   we think is largely or all cash collateral, proceeds to the

3   (indiscernible) collateral.  So there is cash -- even if we're

4   successful on the disputed cash, there is cash collateral usage

5   necessary here.  And so the order itself governs the use of all

6   that cash, Your Honor.

7        Paragraph 11 provides that we will have the

8   opportunity to contest that the liens extend to the cash.  It

9   also sets forth a number of uses for the disputed cash.  And

10  then between paragraph 11, 12 and 13, it kind of sets up a

11  mechanism for segregating cash collateral from the disputed

12  cash.  And we'll use some of the disputed cash for certain

13  items and some of the cash collateral for other items.

14        I want to come back to that in a little bit when we

15  talk about adequate protection, the package itself.  But I

16  wanted to kind of give you the overview of paragraph 11 which

17  was an extremely important paragraph for us.

18        Your Honor, and then, as I foreshadowed --

19        THE COURT:  Can I ask a question that --

20        MR. MARCUS:  Of course.

21        THE COURT:  So specifically, in paragraph 11, now that

22  you've focused me on this reservation of rights, and disputed

23  cash -- and the defined term, "disputed cash", the penultimate

24  sentence in paragraph 11 says "The Debtors and the First Lien

25  Agent (on behalf of the First Lien Secured Parties) reserve

1   their respective rights to assert claims or seek any other

2   relief with respect to the Disputed Cash."

3           MR. MARCUS:  Yes.

4           THE COURT:  So is that specifically and purposefully

5   to the exclusion of other parties?

6           MR. MARCUS:  It is --

7           THE COURT:  -- having those rights or is it that the

8   only conceivable party that could have a right that could be

9   asserted with respect to the disputed cash is the first lien

10  agent?

11          MR. MARCUS:  It is not intended to be read that other

12  parties do not have any rights.  They have whatever rights they

13  have.

14          THE COURT:  They have whatever rights they have.

15          MR. MARCUS:  Whatever rights they have.  They believe

16  they can go and get standing to bring an action against the

17  lenders, they can -- there's nothing in here that says people

18  can't file STN motions or try to get standing.  This is

19  merely -- because typically debtors stipulate to this stuff.

20          THE COURT:  Sure.

21          MR. MARCUS:  And we wanted to make sure that we --

22  that it's clear that we're reserving our rights and obviously

23  Ms. Schonholtz wanted to make sure as well that she was

24  reserving her rights as well.

25          THE COURT:  Okay.

1             MR. MARCUS:  This is not intended to be read --

2     nothing in this order is intended to be read that people can't

3     file standing motions.

4             THE COURT:  Okay.

5             MR. MARCUS:  I think I was going to paragraph 23.

6             THE COURT:  I'm sorry.  I interrupted.  I interrupted

7     you.

8             MR. MARCUS:  No, no.  That's okay.  Please.  I'm happy

9     to answer the questions.

10            Paragraph 23.  23(a) relates to the post-merger first

11    liens.  And paragraph 23(b) relates to the post-merger second

12    liens.  You've seen the adversary proceeding commenced in

13    connection with 23(b) but a similar investigation continues

14    with respect to the first liens.  There are some different

15    facts and circumstances that make the claims different and so

16    we continue to do that investigation, Judge.

17            Let me talk a little bit about some of the other kind

18    of 4001 type provisions to be called out.  And let me start

19    with the adequate protection itself.  This begins on page 18 of

20    the interim order, Judge.  Adequate protection liens, they're

21    senior to all other liens save the carve-out.  Other than

22    existing liens 'cause obviously we're not priming -- there's no

23    lien priming.  Adequate protection claims, superpriority claims

24    again, subject only to the carve-out.  Adequate protection

25    payments will be made in an amount equal to what would be

Page 33

1    interest at the applicable rate.  No one's reserving their

2    rights on default interest.

3         Covenants to maintain the cash management system, pay

4    the fees and expenses.  I would kind of just jump ahead real

5    quick.  For the second liens, we're giving them replacement

6    liens as well as paying fees and expenses as well and they get

7    to piggyback on the reporting requirements and they get to --

8    for the first liens.

9         The -- as I said, fees and expenses.  The reporting

10   requirements are set forth in paragraph (f) that the company

11   found was reasonable and with Zolfo Cooper's help, we will

12   comply.

13        (g) is the application of swap proceeds.  Most of the

14   swap agreements, a lot of these hedge agreements have already

15   been terminated.  There are a few left.  To the extent that

16   those remain in place in the ordinary course and payments are

17   made -- or actually, we get to keep those and use those as cash

18   collateral.  To the extent that they roll off to pay down to

19   the lenders.  And then the asset sale provision, in paragraph

20   (f) -- I'm sorry paragraph (h) on page 23 -- this is -- kind of

21   parallels 363(f)(2) with respect to consent rights.  We

22   actually thought this is good because sometimes lenders will

23   come in and say we want a paydown if you go out and sell it.

24   And here, we get to kind of keep it.  It's cash collateral but

25   we get to kind of keep it.  And so it kind of transfers a lien

Page 34

1     to the proceeds of the sale so that was a good resolution.

2              And then, I think when we were talking about payments,

3     we should go back to paragraph 11 and paragraph 12 and 13.  13

4     just talks about the use of the segregated cash collateral.

5              And so here, Your Honor, there's really sort of four

6     buckets of cash that we're going to use.  By the way, not all

7     of which will even be used in the interim period.  So another

8     kind of checkmark in parties' rights are kind of reserved.

9              There are restructuring fees to be paid for the

10    administration of the case.  This form of order has them being

11    paid from the disputed cash; however it will be no

12    restructuring fees paid in the first -- in the interim period.

13    We probably won't even be filing fee applications in the

14    interim period.

15             There is an adequate -- one adequate protection

16    payment that will be made.  Your Honor can see that in week 2

17    of the budget, about 3.7 million dollars which will come out of

18    the disputed cash.

19             THE COURT:  Hold on.  It's struggling with the font.

20             MR. MARCUS:  Yes.  It's finding -- you know, these are

21    a little bit better.  I have color copies if you'd like.  It

22    actually shows up a little bit better than the photocopies.

23             THE COURT:  Just help me zero in on the line.

24             MR. MARCUS:  So across the top, "Week 2" --

25             THE COURT:  Yes.

1              MR. MARCUS:  -- and then work your way down to nearly

2     to the bottom.  You see -- well, actually, the row is titled

3     "Interest payments and fees" --

4              THE COURT:  Got it.

5              MR. MARCUS:  -- "3.780" --

6              THE COURT:  Okay.

7              MR. MARCUS:  -- and change.  I understand that there

8     may be some kind of stub amount of fees of person first lien

9     lender counsel to be paid as well.  Perhaps second lien counsel

10    as well.  I'm not sure that that's material but that's really

11    what we're talking about in terms of those adequate protection

12    payments.

13             The third bucket is G&A expenses, proper any business

14    wages.  Actually, what we have in here was -- there's no

15    perfect way to allocate, to be honest.  There isn't a perfect

16    way to allocate the GMA.  And so what we agreed in here we

17    thought was great for reserving people's rights is it's going

18    to kind of disputed cash but there's a reservation of rights --

19             THE COURT:  Sure.

20             MR. MARCUS:  -- with respect to further negotiations

21    so we can hopefully come up with a consensual way to allocate

22    that across.  Obviously, if it's all cash collateral then this

23    becomes moot.  And if we resolve it some other way, this

24    probably becomes moot as well.  But if we have a fight there's

25    sort of a mechanism to argue later on.

Page 36

1          THE COURT:  Okay.

2          MR. MARCUS:  And then, of course, there's operating

3    expense -- capital expense -- sorry -- capital expenses and

4    lease operating expenses related to the operation of the

5    business and the expenses related to the pre-petition lender's

6    collateral will come out of cash and the expenses related to

7    operating the unencumbered collateral will come out of the

8    disputed cash.  So the lenders have agreed to that.  We thought

9    that that was about as fair as you can get with respect to the

10   operation of the business and trying not to have 506(c) fights

11   later on.

12         So -- paragraph 12 talks about the debtors segregating

13   into a separate account.  The cash collateral -- I'm going to

14   do this very quickly, Your Honor, so as not to get bogged down

15   in the accounting.  But effectively, the way we're going to

16   figure out how much cash was used -- how much cash collateral

17   was used to operate the encumbered assets, it's effectively

18   going to be an accounting exercise.  So for example, for July,

19   the monthly financials would be produced in August.  By mid-

20   September, we will have kind of on a well-by-well income

21   statement basis figured out how much should be allocated.  And

22   then retroactively to the petition date kind of separated.  So

23   it's going to be done later but will be tracked from day 1 of

24   the case.

25         THE COURT:  Okay.

1          MR. MARCUS:  The next paragraph I just wanted to point

2     out, Judge, is paragraph 15 on page 34.  That is the 506(c)

3     waiver paragraph.  Obviously very important and it was very

4     important to the U.S. trustee when we spoke to Mr. Schwartzberg

5     as well.  This is subject to entry of a final order.  So there

6     is no 506(c) waiver being given under this order.

7          I think I have one more.  Yes.  One more which is

8     paragraph 29, Your Honor, on -- well, I guess I should point

9     out just to be -- trying to be consistent with 4001.  This

10    paragraph 10 on page 28 is the termination paragraph.  There

11    are 15 different termination rights.  There are certain ones

12    that require cash collateral terminated immediately and certain

13    ones that require lenders to give us notice with a five-day

14    grace period to either cure or come in and move for Your Honor

15    to be allowed to continue to use that.  We obviously felt

16    comfortable with these -- the ones that are immediate are

17    largely ones where we'll have some notice or are in the

18    debtors' control.  So we thought it was -- this was typical and

19    we were comfortable with it.

20          THE COURT:  Okay.

21          MR. MARCUS:  And then, Your Honor, back to paragraph

22    29 on page 41.  This is the equities of the case waiver under

23    Section 552(b).  Again, I really wanted to point out that there

24    is no 552 waiver under this order.  It is subject to the entry

25    of the final order.  So status quo for the interim period.

1          Your Honor, I mentioned Mr. Schwartzberg.  We did

2    provide this order --

3          THE COURT:  Okay.

4          MR. MARCUS:  -- to the Office of the United States

5    Trustee.  He had maybe six or eight comments.  We resolved all

6    of those consensually.

7          THE COURT:  Okay.

8          MR. MARCUS:  I don't believe that he has any

9    objections to the form --

10         THE COURT:  All right.

11         MR. MARCUS:  -- of the order.  Obviously, we have the

12   consent of the first and the second lien lenders as well.  We

13   did receive an informal -- not objection but an informal

14   request for a clarification from one party.  And I have the e-

15   mail.  I thought I had it with me.  Give me just one second.

16      (Pause)

17         MR. MARCUS:  From Mr. Melko who represents Hartz

18   Capital.  They're a non-operating working interest owner and

19   they just wanted a clarification effectively that if there's

20   cash it's not property of the estates.  They're not allowed to

21   put a lien on it which is, of course, true.  So let me just

22   read the clarification for Mr. Melko's benefit.  And it -- as

23   set forth in the working interest/royalty motion, the debtors'

24   position is that the proceeds of third parties' working

25   interest/royalty interests are not property of the estate even

Page 39

1   though those funds may be temporarily held in the operating

2   account.  To the extent those funds were received pre-petition,

3   they may fall within the term of "disputed cash" as currently

4   defined.  The debtors do not intend to use third party-owned

5   cash in the debtors' operations nor grant a lien to the lenders

6   on those funds as working interest disbursements and royalty

7   payments are received post-petition.

8           THE COURT:  Okay.  I should have also noted at the

9   outset that I do have four pages of parties who are on the

10  phone with us here.  The great majority of them are in listen

11  only mode but there are a number of parties who are listed in

12  live mode.  I'm not going to take the time to go through and

13  identify everybody who has appeared.  We did grant across the

14  board permission to hear telephonically for this hearing.

15          MR. MARCUS:  Great.

16          THE COURT:  So you filled up with suspense as to what

17  it is that Mr. Qureshi is going to tell me when he stands up to

18  object.

19          MR. MARCUS:  I think he's good with the order.  I

20  think he told me he was good with the order, no?

21          Let me just very quick -- I don't know if anybody else

22  wants to speak in favor.  We have a ton of people in favor of

23  this order, Your Honor, who might want to speak as well.  Not

24  sure but the important point in closing here, Your Honor, is

25  that we have uncontested access to funds which may be cash

1    collateral.  We think we have some arguments.  And lenders

2    certainly believe that they have some arguments.  But those are

3    not, thankfully, those are not arguments for today.  It is,

4    obviously, critical that the company has for all the other

5    motions as well, for employees, for vendors, for, you know, the

6    public to know that we have access to the cash and that this

7    business is going to continue to operate.  It pushes off

8    fights.  It preserves rights.  We don't think that we're

9    prejudicing anybody's rights in here as I've walked through.

10   And so, you know, as Mr. Magilton testified in his first-day

11   declaration, Your Honor, that the entry of this order is in the

12   best interest of the estate and I would ask Your Honor to --

13            THE COURT:  All right.  Thank you, Mr. Marcus.

14            MR. MARCUS:  Thank you.

15            THE COURT:  All right.  I'll hear from those who want

16   to add anything in support of the entry of the cash collateral

17   order.

18            MS. SCHONHOLTZ:  Good morning, Your Honor.

19            THE COURT:  Good morning, Ms. Schonholtz.

20            MS. SCHONHOLTZ:  Margot Schonholtz, Willkie Farr &

21   Gallagher, on behalf of Wells Fargo, the agent for the first

22   lien RBL lenders.  And I'm joined here today by Ana Alfonso and

23   Penny Jenson.

24            And you heard the lender group is owed as of today 927

25   million dollars, 900 in loans and is it 26 or so million dollar

Page 41

1    LC also outstanding.  This is a reserved base loan secured by

2    substantially all of the debtors' Wells sides and leases

3    together with other personal and real property.

4         Now in connection with the merger in December of 2014,

5    Wells and this lender group actually refinanced in full the

6    existing first lien debtor both at Sabine and at Forest with a

7    new two billion dollar revolving -- an RBL facility.  The

8    initial draw under that new facility at the closing date was

9    751 million dollars.  Subsequently, there was a partial

10   paydown.  But as you referred earlier, on February 25th, the

11   debtors drew the balance of the RBL which is a 356 million

12   dollar draw.

13        Importantly, Your Honor, all of the proceeds of that

14   draw were placed in the debtors' main operating account where

15   they were comingled with the proceeds of the first lien

16   collateral -- undisputed proceeds of the first lien collateral.

17   Proceeds of the first lien collateral from the operating

18   assets, if you will, flow into that account every day.  And the

19   draw was not placed in a segregated account; it was all

20   comingled.

21        The new RBL was and is secured by, among other things,

22   mortgages, on Sabine properties that were granted in connection

23   with Sabine's pre-merger facility.  And liens and mortgages

24   placed on Forest's assets from the closing date through about

25   February 17th, as is customary, there was a 60-day post-closing

Page 42

1    period to enable the new liens to be put on.

2          Within approximately a week of the liens being put on

3    the bulk of the Forest assets, the debtors drew down the 356

4    million dollars.

5          The credit agreement, as you heard, also provides for

6    scheduled borrowing base redeterminations twice annually, once

7    in April and one in October.  And as of April 27, 2015, the

8    borrowing base supporting this loan was 750 million dollars.

9    So upon the redetermination, the company was required to repay

10   250 million of the billion dollars outstanding which it did not

11   do.

12         The first lien lenders entered into an agreement to

13   forbear with respect to that default and other existing

14   defaults through July 15th which brings us here today.  And

15   subject to being granted the adequate protection provided for

16   in this interim order, the first lien lenders are willing to

17   let their collateral which we assert, of course, includes the

18   disputed collateral, finance the debtors' ongoing businesses

19   and to finance its case.  As the debtors' counsel noted, we

20   contend that virtually all of the cash in the operating account

21   as of the petition date, which is about 250 million dollars, is

22   cash collateral and/or proceeds of the pre-petition collateral

23   in which the first lien agent has a valid perfected security

24   interest on behalf of its lending group.

25         In addition, the funds may be subject to a constructed

Page 43

1   trust for a variety of reasons we don't need to get into today.

2   And we also believe that the lowest intermediate balance test

3   will need to be applied here because of the comingling and

4   we'll demonstrate when we get to that issue, if we need to,

5   that substantially all of the cash belongs to this lender

6   group.

7         The debtors and the first lien lenders have reserved

8   all their rights.  We obviously concur with the debtors that a

9   massive battle of that nature would not be helpful to this case

10  at the outset.  And so, we have all reserved rights with

11  respect to the disputed cash.  But I wanted to be clear to Your

12  Honor that we have valid and serious arguments as to why that's

13  our cash collateral.  This is not a frivolous grap.

14        Pursuant to paragraph 11, 12 and 13, as Mr. Marcus

15  pointed out and importantly subject to the budget which has

16  been agreed and is attached to the cash collateral order, the

17  lenders have agreed to let the debtors use both disputed cash

18  and segregated cash to fund their businesses and this case.

19  All of the expenditures are subject to the budget no matter

20  where they're sourced.  And just a quick clarification, the

21  adequate protection payments is -- for the lender is at the

22  contract rate which is ABR plus 150 basis points at this point

23  in time.  We are reserving on the default spread.

24        There is also going to be a small stub advisor fee

25  piece payable during the interim period which were our pre-

1    petition fees.  It's built into the order here.  And other than

2    the adequate protection payment and that small stub, we don't

3    believe there will be other payments made during the interim

4    period other than to operate the business which is, of course,

5    necessary.

6            From our perspective, what's important also about this

7    agreement is, as you will hear later, the debtor seeks to make

8    significant payment to royalty owners, working interest owners,

9    other people at the outset of the case which, frankly, is

10   somewhat unusual in terms of the magnitude during interim

11   period.  We are willing to accept that.  Obviously, our

12   position is that our cash is being used to do it whether it's

13   in the disputed cash or segregated cash.  But, of course, we

14   would need adequate protection and the entry of this order.

15           It is fair to say I could not agree more with my

16   colleagues at Kirkland that this was a very hard fought long

17   negotiation with respect to a cash collateral order.  It

18   lasted, frankly, six weeks.  We are thrilled to have a

19   consensual order.  We appreciate Mr. Schwartzberg's efforts to

20   sign on as well.  And we would respectfully request Your Honor

21   enter the order as we've requested.

22           THE COURT:  All right.  Thank you very much.

23           MS. SCHONHOLTZ:  Thank you.

24           THE COURT:  Good morning.

25           MR. HERMAN:  Good morning, Your Honor.  Brian Herman

Page 45

1   from Paul, Weiss, Rifkind, Wharton & Garrison on behalf of

2   Wilmington Trust, the second lien agent.

3           Your Honor, we're supportive of the cash collateral

4   order although we weren't as intimately involved as Ms.

5   Schonholtz over the last six weeks, we did get drafts and did

6   have an opportunity to comment on it.  And I think the

7   resolution that's been reached is apparently an elegant one and

8   I think worthy of being approved today.

9           Like the RBL lenders, Your Honor, we also entered into

10  forbearance agreements prior to the petition date and worked

11  with the debtors on trying to put together what we would like

12  to say which is a consensual restructuring outcome here.  We

13  actually agree with Mr. Henes that this is not the kind of

14  company that can sustain a prolonged Chapter 11 case.  And we

15  were very proactive in terms of putting forth a restructuring

16  proposal to the debtor.  So I'm very hopeful that we can move

17  this case forward in a constructive way.

18          I suppose under the heading of no good deed goes

19  unpunished, we did receive a complaint.  That complaint was

20  given to us slightly in advance of the filing on the evening of

21  the 14th.  I don't believe we've been formally served with the

22  complaint but we do look forward to receiving it.  We have been

23  in touch with Mr. Henes about scheduling -- a scheduling order

24  that would move that litigation ahead expeditiously.  To be

25  perfectly frank, Your Honor, we think that the litigation has

1   absolutely no merit.  So we welcome the opportunity to move it

2   forward and that will likely be through a prompt filing of a

3   motion to dismiss because we think that we have very good bases

4   upon which to get the claim dismissed.  We don't have to go

5   into that today but I did want to make you aware of that.

6           THE COURT:  All right.  We're going -- first we're

7   going to focus on what we're going to focus on today which is

8   cash collateral, keeping the business running.  But before you

9   will leave, I do want to have a conversation about exactly that

10  topic.  Following up on what everybody has said, I'm going to

11  need to hear your collective thoughts about what happens next

12  because there are alternatives that, you know, seemed obvious

13  to me from immediately gearing up, if you will, and scheduling

14  a litigation whose outside the context of getting -- at least

15  my getting an understanding of what the case is going to look

16  like.  So obviously, everyone has the rights that they have but

17  I want to have that conversation and hear your preliminary

18  thoughts today.

19          MR. HERMAN:  That would be great, Your Honor.  Thank

20  you.  So in terms of cash collateral, we are supportive.

21          THE COURT:  Okay.

22          MR. HERMAN:  Thank you, Your Honor.

23          THE COURT:  Very good.  Thank you.

24          MR. QURESHI:  Good morning, Your Honor.

25          THE COURT:  Good morning.  How are you, Mr. Qureshi?

1          MR. QURESHI:  For the record, Abid Qureshi, Akin,

2   Gump, Strauss, Hauer & Feld here with my partners, Mike Stamer

3   and Phil Dublin.  And, Your Honor, we represent the Bank of New

4   York in its capacity as trustee for the 2017 notes.  Those are

5   the legacy Sabine notes.

6          Your Honor, the way I would propose, subject, of

7   course, to Your Honor having a different view, proceeding is to

8   conduct some very limited cross-examination of Mr. Magilton as

9   it relates to cash collateral.  And then turn it over to my

10  partner, Mr. Stamer, who will make the argument.

11         THE COURT:  Okay.  Can you give me a --

12         MR. QURESHI:  A preview.

13         THE COURT:  -- Highlights for Children --

14         MR. QURESHI:  Sure.

15         THE COURT:  Are we talking about --

16         MR. QURESHI:  That's --

17         THE COURT:  Are we talking about particular uses of

18  cash or are you talking more about the overall of restructure

19  that by all accounts seem to have been highly negotiated?

20         MR. QURESHI:  I'm happy to give Your Honor a preview.

21  I think it comes in two parts.  Fundamentally, our position is

22  that we don't need to be having this hearing today.  And the

23  reason that is our position is that there are plenty of

24  unencumbered assets available, first of all, to get the debtors

25  through the next 30 days of this case in an ordinary course

Page 48

1    way, and to provide adequate protection to the extent of any

2    diminution in value of any assets that might be the collateral

3    of the secured lender.  There are a ton of provisions in this

4    order, Your Honor, that we don't think are appropriate for an

5    interim order at all.  And, frankly, Your Honor shouldn't have

6    to deal with today.  So our argument is put it off.  We don't

7    need it.  There's a way to protect the secured lenders if, in

8    fact, they are secured with respect to the cash and to get the

9    lenders through -- the company, rather -- through the next 30

10   days and we can then have this argument in a more reasonable

11   context when everybody has the chance to prepare.  We have the

12   chance to take discovery and hopefully we have the chance to

13   have some constructive discussions to try to resolve it.  To

14   the extent --

15              THE COURT:  What's the -- given the way that the cash

16   collateral order, at least preliminarily, to me reads and the

17   way it's been described by those who spoke before you, what's

18   the harm in entering the cash collateral order which, in great

19   measure, simply seeks to maintain the status quo with respect

20   to the parties' rights and grant maximum stability to the

21   operations.  You know, I always how somebody's being hurt.

22              MR. QURESHI:  Of course.  And Mr. Stamer will go

23   through the details of the order that are particularly

24   problematic.  But at a high level, Your Honor, first of all, it

25   flips the burden.  You heard from Mr. Henes the debtors' view

1    that the entire balance in the operational account, 250 million

2    dollars, is not cash collateral, that it is, in fact,

3    unencumbered cash.  And yet, the entire structure of this

4    order -- it reads, frankly, more like a DIP order.  It reads as

5    though in return for new money coming in for lenders, they're

6    given a bunch of protections.  And we think those protections

7    in this case are fundamentally inappropriate because, in fact,

8    the cash is unencumbered.  And what should happen here is there

9    should not be, as this structure sets up, a reversal of the

10   burden, that, in effect, starts with an acknowledgment by the

11   debtors that this is properly perfected collateral of the

12   secured lenders and then leaves for 30 days later a fight where

13   the debtors -- yes, they reserved their right to object and

14   establish otherwise, in other words, shift the burden, and puts

15   other parties in the same position.  So fundamentally, we just

16   don't think that it's appropriate to go forward now.  And there

17   is some very real prejudice.  And if Your Honor prefers, Mr.

18   Stamer can get up now and walk Your Honor through many of the

19   details of the order that are particularly problematic.  We can

20   proceed how ever Your Honor prefers.

21            THE COURT:  Well, maybe it makes sense to do it in the

22   order that you suggested.

23            MR. QURESHI:  Sure.  And I think the cross will be

24   quite limited.

25            THE COURT:  All right.

1              MR. QURESHI:  Okay.

2              MR. MARCUS:  Your Honor, first of all, I'll introduce

3     my partners, Gabor Balassa who is --

4              MR. BALASSA:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. MARCUS:  -- who would do (indiscernible).  I think

7     we would ask Your Honor if we could just take a two minute

8     break.  I think he'd like to then -- if we're actually going to

9     do this, I'd like to call Mr. Magilton on the stand and have

10    him do just a couple of statements in direct.

11             THE COURT:  Okay.

12             MR. MARCUS:  And then --

13             THE COURT:  All right.  We have the declaration in but

14    I think it would be helpful to hear briefly.  So if you want --

15             MR. MARCUS:  Sure.

16             THE COURT:  -- to take a -- it's minutes before 12.

17    Why don't we try to resume at 12:00?

18             MR. MARCUS:  Perfect, Your Honor.

19             THE COURT:  All right?

20             MR. MARCUS:  Thank you.

21             THE COURT:  Okay.  Thank you.

22             (Recess from 11:53 a.m. until 12:07 p.m.)

23             THE COURT:  So I think I know the answer to this

24    question but I'll ask the question anyway.  Would there be any

25    benefit to affording you an opportunity to talk to one another?

1    Mr. Stamer?

2           MR. STAMER:  Your Honor, we're -- again, for the

3    record, Mike Stamer from Akin Gump for Bank of New York.  Your

4    Honor, we're always happy to talk.  As you heard a preview from

5    Mr. Qureshi and as you'll hear from me in more detail, there

6    are very significant fundamental issues with the cash

7    collateral order, the biggest of which is why are we here.  Why

8    are we going forward with this.

9           THE COURT:  Because -- we're here because Ms.

10   Schonholtz is going to stand up and is going to say the exact

11   opposite of what you are saying.

12          MS. SCHONHOLTZ:  You are correct, Your Honor.

13          THE COURT:  So I'm not trying -- I'm not trying to be

14   funny.  But I think that we're here because it appears that

15   there is an attempt to achieve stability, a level playing field

16   and not prejudice anybody's rights.  And if Mr. Qureshi's

17   characterizations were undisputed, you know, I would agree with

18   you.  But I think that it's not.  And therefore, in order to

19   avoid a context as we just begin this, it at least appears to

20   me that an attempt has been made to reserve everyone's rights,

21   get some stability and provide a platform for there to be

22   further discussions.  And that where you're going seems to

23   require me to have to resolve some, if not many, of the

24   significant issues that we're going to face down the road two

25   hours into the case.  So that's what I'm struggling with.

1          MR. STAMER:  Your Honor, and I get it.  And we're not

2     looking to burden the Court or take more time for the parties

3     than we need to.  This is the first day of what will likely be

4     a very contentious Chapter 11 case.  I'm sorry to say that

5     upfront.  Maybe it won't be.  And you, frankly, heard one side

6     of the story.  And counsel for the company and the lenders did

7     an eloquent job of describing kind of from their perspective

8     what happened here and what's going to  happen on a go-forward

9     basis.  And I don't want to -- if I might.

10         THE COURT:  Sure.

11         MR. STAMER:  The bottom line is this company, over the

12    next 30 days, is going to spend 12 million dollars.  They're

13    going to burn 12 million dollars of cash which the debtors

14    believe and we agree is all unencumbered.  If you do not make

15    the -- if you don't approve the adequate protection payment,

16    they will make eight million dollars.  They will burn eight

17    million dollars in cash.  So, Your Honor -- and I can spend a

18    fair amount of time going into the specifics.

19         The bottom line is we are here before the Court for

20    two reasons.  One is, the significant decline in commodity

21    pricing and the disastrous merger in 2014.  The debtors have

22    already admitted -- they filed a suit against the second liens

23    that the parties were insolvent at the time.  And the debtors'

24    view is, and they've set up an independent committee 'cause

25    they think they're the right ones.  We'll figure out whether

Page 53

1   they are -- that it was a fraudulent conveyance to grant liens

2   to the second liens.  Our view, Your Honor, is you do not look

3   at this transaction in isolation.  We believe that the

4   beneficiaries of the cash collateral order, the secured

5   lenders, they are going to be defendants.  Full stop.  They're

6   going to be defendants.  And what this cash collateral order

7   does, in addition to clarifying or having the company waive

8   some rights to argue certain comingling stuff, it puts a finger

9   on the scale very significantly in favor of the secured lenders

10  to the detriment of the debtors and to the debtors' unsecured

11  creditors.  This is not a --

12            THE COURT:  On an interim basis?

13            MR. STAMER:  Your Honor --

14            THE COURT:  On a day 1 interim basis?

15            MR. STAMER:  This is not your typical -- this is not

16  your typical Chapter 11 case.  This is not your typical cash

17  collateral order.  And with due respect, these are not your

18  typical first and second lien lenders.

19            This case -- the company -- again, maybe it's because

20  they wanted to have a smooth first day hearing.  And I get

21  that.  I -- smooth is better than not smooth.  But at what

22  price?  So if Your Honor would like, even before Mr. Qureshi

23  calls a witness, I can walk you through kind of our overall

24  concerns.  I can point out to you kind of what the salient

25  facts are that the Court should, at the very least, be aware of

Page 54

1    before Your Honor comes to a conclusion that this is the way to

2    preserve a status quo or there's a better way to preserve the

3    status quo.  Our view:  there's a better way.  And the better

4    way is, again, don't approve the cash collateral order, the

5    motion.  Give the banks -- what you'll hear in terms of

6    testimony is there's -- the debtors believe, and we agree, that

7    there's 250 million dollars of unencumbered cash.  Okay?

8    Counsel for the first lien lender articulated a number of

9    arguments.  We believe those are meritless and we think that

10   there's 250 million dollars of unencumbered cash.  In addition,

11   I believe you'll hear testimony that there's an additional 100

12   million dollars of unencumbered reserves.  So 350 million

13   dollars at the most, I think.  And at the very least, the

14   debtors want -- the debtors think it's 350 but there's no

15   dispute with respect to there's at least a hundred because, as

16   I think you heard, the banks only get a percentage of the

17   reserve as their collateral.

18           So if you do not approve cash collateral today but you

19   give the banks replacement liens and 507(b) superpriority

20   claims and we spend 30 days -- we don't spend 24 hours because

21   that's all we had with respect to talking about the cash

22   collateral.  We spend 30 days.  No one can make a straight fact

23   argument that at least the 100 million dollars in unencumbered

24   reserves and most likely all or substantially all the 350, they

25   will have a replacement lien to the extent their collateral

1   diminishes in value during the 30 day period.

2          There's no reason for the banks, even on an interim

3   basis, to be given the kind of protections that they're given

4   here.  This is not a DIP loan.  This is -- it's ironic.  It

5   is -- it's the use of cash collateral.  Right?  Allegedly, the

6   use of cash collateral.  The vast majority of it, the debtors

7   believe and we agree is unencumbered.  But if you look at the

8   pleadings, if you look at the cash collateral order, you will

9   see that notwithstanding there is a big slug of what we think

10  is unencumbered cash, the overwhelming majority of cash that's

11  being utilized to fund this case is coming out of that disputed

12  cash.  So other than Capex and Opex directly related to their

13  collateral, their hard assets collateral, everything else --

14  everything else is coming out of what we believe, what the

15  debtors believe is unencumbered cash.  At the same time --

16          THE COURT:  But -- but --

17          MR. STAMER:  Sure.

18          THE COURT:  But hold on.  I'd like to understand --

19  and I'm going to ask, Mr. Henes and Mr. Marcus, for your view

20  on how we do this.  Net net, what do you believe is the cost --

21  the cost of entering the cash collateral for the interim

22  period, the cash money cost to the harm to you.  Not the costs,

23  not the outlay of the money.  But I'm trying to understand how

24  are you harmed.  What's the cost?

25          MR. STAMER:  Your Honor, it's a very good question.

Page 56

1    We can --

2              THE COURT:  But don't you think that -- but don't you

3    think it's a question that needs to be answered?  Because if we

4    are at the start of a multi-billion dollar and before you

5    characterize it as such difficult and complicated case although

6    I would say it necessarily needs to go that way, and we're

7    talking about funding -- and again, that's why I asked the

8    question of whether you were going to be poking at particular

9    expenditures or taking issue with, generally speaking, the

10   structures because the debtors have explained in their papers

11   in the motion to pay the pre-petition wages, the working

12   interest disbursements and the operating expenses

13   (indiscernible) et cetera, they have explained in a great deal

14   of detail what the level of expenditures are, what the basis

15   for doing it is, all seemingly to me, subject to anyone's

16   rights to be heard in service of keeping things going.  So I

17   don't want to cut you off.  I'm happy to hear you.  I'm happy

18   to hear the cross-examination but I'm still trying very hard to

19   understand specifically and in what order of magnitude you are

20   hurt by this order.

21             I understand your position that you think that it's

22   unencumbered cash.  They don't.

23             MR. STAMER:  Your Honor, we may need to actually talk

24   to the witness to answer this in greater detail.  There's kind

25   of two or three costs.  There's the hard cost of cash to the

Page 57

1    extent that actually unencumbered cash is going out the door

2    for the benefit of the secured lenders that were allocating any

3    type of use of unencumbered cash to pay for the cost of these

4    estates which the first liens are a very significant

5    beneficiary of.  So there's got to be -- over the next 30 days,

6    there's got to be a dollar and cents.  On a net/net basis, the

7    cash, as we understand it, is going to depreciate.  It's going

8    to go down by about eight million dollars.  So eight million

9    dollars -- but again, there may be additional things that would

10   go out of unencumbered cash and come in as restricted cash.  So

11   that number could be much bigger.  Do you follow that point?

12         THE COURT:  No.

13         MR. STAMER:  So if you're utilizing -- if you're

14   utilizing unencumbered cash --

15         THE COURT:  Yes.

16         MR. STAMER:  -- to pay expenses --

17         THE COURT: Right.

18         MR. STAMER:  -- that reduces the amounts that are

19   available to unsecured creditors.  The cash collateral order

20   also says --

21         THE COURT:  It depends.

22         MR. STAMER:  Your Honor, it -- the cash collateral

23   order also says that the money that comes in --

24         THE COURT:  Yes.

25         MR. STAMER:  -- is not going to replace the money

1   that was spent out of the unsecured -- out of the unencumbered

2   cash.  It will be in a segregated account for the benefit of --

3   of the secured lenders.  So it's effectively, you get hurt

4   twice.

5         THE COURT:  Well, but I'm not so sure about that

6   second part.  I mean, the way I heard that second part being

7   described was -- and I think it -- the way it was -- the way I

8   heard it was that the debtor quite properly is going to be very

9   carefully mapping and tracking all cash that comes in and we're

10   going to know.  But to the extent that it needs to be

11   allocated, reallocated, what have you, we're going to have the

12   ability to do that because we're going to be tracking it so

13   well.  I love that.

14         MR. STAMER:  Yes.

15         THE COURT:  Right.

16         MR. STAMER:  We love that, too.

17         THE COURT:  I love that.

18         MR. STAMER:  We love that, too.

19         THE COURT:  So that's a good thing for you and it

20   seems to me that to the extent that you have harm that you've

21   suffered because later on at the end of the litigation as

22   opposed to a negotiated resolution it turns out that, in fact,

23   you were right that the cash was unencumbered, there is a way

24   of taking all of those nice piles of money and adjusting it so

25   that, in fact, you will not have been harmed.

1          So I'm getting nods behind me, which you can't see,

2     but it seems to me -- here comes Mr. Dublin to tell you why I'm

3     getting it wrong.

4          MR. STAMER:  Actually, he was just saying hello.  I

5     haven't seen --

6          (Laughter)

7          MR. STAMER:  It -- Your Honor, there are two other

8     ways in which we're harmed.  And if this is truly an interim

9     order meaning it -- meaning notwithstanding that money went

10    out, notwithstanding that X and Y.  If it's truly interim so

11    that we say on the record anything is fair play, anything in

12    there is fair play at the final hearing when the committee is

13    appointed, with a couple of minor exceptions I don't think -- I

14    don't think I'm too troubled by that.

15         Here are the two exceptions.  The one is what they're

16    doing with respect to the future litigation and the negotiating

17    posture and the leverage is what they're doing is they're

18    tilting the scale in favor of the secured lenders.  Again --

19         THE COURT:  That you have to explain to me because I

20    don't understand how a cash collateral order can -- can operate

21    to do that because I certainly don't want it to be operating to

22    do that.

23         MR. STAMER:  Here's how.  Again, out of unencumbered

24    cash -- and, again, we're going to -- unencumbered, not

25    unencumbered, we'll be able to put that pie back together at

1    the end, the cash collateral order says very clearly, you, the

2    unsecured creditors and actually the debtor, you can spend

3    $50,000 of cash -- that includes unencumbered cash -- on

4    investigating these claims.  $50,000.  You have -- you, only

5    you the debtor, and maybe they want to clarify this, but only

6    you the debtor -- you asked this question, Your Honor -- only

7    you can pursue these claims.  I think they'll clarify that can

8    be anybody.  And they utilize -- and there's a limit in the

9    amount of time during which you can pursue claims.  I think

10   it's 75 days after the petition date or 60 days, which I know

11   we may revisit.

12          But if we come back in 30 days and for whatever

13   reason, Your Honor, you say, no, the time table is okay, we not

14   only have to finish our analysis --

15          THE COURT:  But that -- but this is classic -- that

16   is interim.  That is interim.

17          MR. STAMER:  Your Honor, I get it.  It's interim, but

18   that --

19          THE COURT:  I don't even -- I don't have a committee

20   yet.  I --

21          MR. STAMER:  No.  No.

22          THE COURT:  -- mean, how could that not be truly

23   interim?

24          MR. STAMER:  I completely agree.  What we would ask

25   is you take it out.  There's no reason for it to be there.

1   There's absolutely -- if it's interim, if it's not going to

2   last, otherwise there's a tremendous amount of pressure for the

3   committee when they start.  They have to operate under the

4   assumption that for whatever reason they've got a deadline.

5   And if they don't actually do the work, then it's going to be

6   one of the biggest causes of action or the -- one of the big

7   claims in the case.

8           So again from --

9           THE COURT:  So why don't you pause for a moment --

10          MR. STAMER:  Sure.

11          THE COURT:  -- and why don't I let Mr. Marcus --

12          MR. STAMER:  Can I -- can I raise --

13          THE COURT:  -- react to that one?

14          MR. STAMER:  Your Honor, may I raise one -- one last

15   issue before --

16          THE COURT:  Sure.

17          MR. STAMER:  -- and then I'll stop.

18          There are things in the cash collateral order that

19   are not interim and that are actually very prejudicial.  And

20   what I would refer you to is paragraph 12.

21          THE COURT:  Okay.

22          MR. STAMER:  And, again, Your Honor, it's I think the

23   last two sentences on page 33 of the order.

24          THE COURT:  The avoidance of doubt?

25          MR. STAMER:  No.  The prepetition --

1          THE COURT:  The prepetition secured parties.

2          MR. STAMER:  -- secured parties.

3          So what -- and, again, we haven't had a ton of time

4   with these documents, but here's just one example.

5          THE COURT:  Okay.

6          MR. STAMER:  So the secured lenders may argue that

7   it's all ours.  It's -- you know, the fact that the revolver

8   proceeds were unencumbered --

9          THE COURT:  Right.

10          MR. STAMER:  -- we can trace money that went into

11   that account.  Therefore, you know, this is how much went in.

12   It's all ours.  And we say, wait, no, we think you're wrong for

13   15 reasons, one of which is it's all been comingled.  It's been

14   comingled prepetition, post-petition, and then we figure out

15   who's right and who's wrong.

16          But the company can't be waiving its arguments in an

17   interim cash collateral order to say that because something is

18   comingled you can't argue that there's not a -- that banks

19   don't have a lien.

20          So stuff like that.

21          THE COURT:  Okay.  So let's start there and then work

22   backwards.

23          On this one I need someone to tell me if the words

24   mean what they say they mean because that's not what I thought

25   we were doing.

1              MS. SCHONHOLTZ:  Your Honor, if I may --

2              THE COURT:   Ms. Schonholtz.

3              MS. SCHONHOLTZ:  -- Margo Schonholtz.  That is not

4    what they mean.  The point of this is simply to say because

5    everything's coming into one operating account and our

6    segregated cash is not moving out for some period of time, so

7    that the accounting and tracing can be done and the netting of

8    expenses can be done, all this says is that while it's sitting

9    in there, we are not waiving our rights to say that it's --

10             THE COURT:  Okay.

11             MS. SCHONHOLTZ:  -- our --

12             THE COURT:  But that's not what these words say.

13             MS. SCHONHOLTZ:  No.  No.  It's while they're sit --

14   while it's post-petition, while the money --

15             THE COURT:  Yes.

16             MS. SCHONHOLTZ:  -- is coming in there, okay.

17             THE COURT:  Right.

18             MS. SCHONHOLTZ:  It's all coming into one account.

19   We could have said, and we did not, the money hits the

20   operating account.  It goes into a segregated account for us

21   and we'll settle up later.

22             Instead, the construct, at the request of the debtor

23   because it works better for the debtor to account for what is

24   attributable to our undisputed collateral and what is not is it

25   sits in one account.  This is all coming in after the petition

Page 64

1    date.

2           THE COURT:  Right.

3           MS. SCHONHOLTZ:  It sits in one account.  It gets

4    accounted for over essentially six weeks.  The expenses

5    attributable to it get deducted from it and then the net moves

6    out

7           THE COURT:  Okay.  I hear you.

8           MS. SCHONHOLTZ:  And it's just --

9           THE COURT:  And I --

10          MS. SCHONHOLTZ:  -- protecting us.

11          THE COURT:  -- have no problem with that, but that's

12   not what these words say.

13          MR. STAMER:  That's not what it says.

14          THE COURT:  That's not what these words say.  So if

15   what Ms. Schonholtz is saying is the deal, then we ought to

16   write those words down instead of these words.

17          MR. MARCUS:  Okay.  No problem, Your Honor.  We will

18   fix that.

19          MS. SCHONHOLTZ:  And the other thing it covers, and

20   we'll fix it.  But the other thing it covers is the argument we

21   started with, although my colleague here keeps saying that it

22   is all unencumbered.  This is also just to reserve our rights

23   where we have in other places that because of the comingling

24   prepetition we are not waiving our rights to say it's our

25   collateral.

```
 1              THE COURT:  Right.  But, again, that's not what those
 2    -- that's not what the words say.
 3              MR. STAMER:  Correct, Your Honor.
 4              THE COURT:  What -- Ms. Schonholtz, what you just
 5    said, I'm fine with.  I think they're fine with.  So I think
 6    the order -- if that seems to be the hottest of the hot buttons
 7    that have been identified --
 8              MR. STAMER:  There's a few other if -- and I don't
 9    mean to be --
10              THE COURT:  Okay.
11              MR. STAMER:  -- a podium hog, but I'll --
12              THE COURT:  You're being a podium hog, but that's
13    okay.
14              MR. STAMER:  I know.  And I hate doing that.
15              THE COURT:  Okay.  But, wait, but this is progress
16    and this is progress and maybe -- I know everybody was up all
17    night.  That's fine.  But let's keep going because we can
18    narrow the issues --
19              MR. STAMER:  Okay.
20              THE COURT:  -- and maybe get through this.
21              MR. STAMER:  I appreciate your indulgence, Your
22    Honor.
23              THE COURT:  All right.  So --
24              MR. STAMER:  So --
25              THE COURT:  So let's go back to the one before -- the
```

1    point before it, which was the litigation funding and the

2    period of time.  Okay.  It is certainly usual and customary to

3    start somewhere with the complete understanding that it's

4    absolutely interim and when the committee comes in, that's not

5    going to stand as a high water mark, a bar you have to get over

6    or a presumptive period or limitation.

7            To me, it's obvious in a case like this where this

8    could be the whole ball of wax that we're not going to cause

9    people to have to, you know, spend a dollar and a half over a

10   period of two weeks to figure the whole thing out.

11           But it's truly interim.  You haven't had a chance --

12   I mean, the more you negotiate it now, the more it becomes

13   something that somebody could later argue ought to be

14   reflective of what the final ought to be.  I would rather it be

15   this is what got put in now.

16           I'm saying it out loud six times that it's interim.

17   When a committee comes in there will be a negotiation.  We will

18   have had an opportunity to have the conversation, you among

19   yourselves and then with me, about what this case is going to

20   look like because somebody already started talking about

21   motions to dismiss and I may have some different ideas.  So --

22           MR. STAMER:  Your Honor --

23           THE COURT:  -- I think on that one --

24           MR. STAMER:  -- we hear you.  We would --

25           THE COURT:  -- you've got to believe me that --

Page 67

1           MR. STAMER:  -- we would prefer it out and we --

2           THE COURT:  -- it's interim.

3           MR. STAMER:  -- believe you.

4           THE COURT:  Okay.

5           MR. STAMER:  We believe you.  That's fine.

6           THE COURT:  Ms. Schonholtz.

7           MS. SCHONHOLTZ:  May I be heard briefly on that one?

8           THE COURT:  Sure.

9           MS. SCHONHOLTZ:  We started out with a shorter

10   challenge period for the committee.  At the request of Mr.

11   Schwartzberg we changed it to 60 days from the entry of the

12   final order.  And, obviously, the final order is way out there.

13          THE COURT:  At least 20 days out from now.

14          MS. SCHONHOLTZ:  At least 20 plus days out there.  So

15   we went farther than we usually do.

16          THE COURT:  But it -- it -- that's great, but, again,

17   it may not -- at the end of the day when we get to the final in

18   the absence of something that's wholly consensual, you might

19   take a position that it's not enough and we can just deal with

20   it then.

21          MR. STAMER:  Your Honor, we're fine with that.

22          THE COURT:  Okay.

23          MR. STAMER:  We're fine with that.

24          THE COURT:  All right.  So I'm on a roll here.

25          MR. STAMER:  Your Honor --

Page 68

1          (Laughter)

2               MR. STAMER:  You're on a roll.  I think we've -- we

3     clarified my number 3, which is we all know the debtors have

4     the initial standing to pursue avoidance claims subject to you

5     letting somebody else do it.  So the -- whether we change the

6     words or clarify on the record, it's not expecting or it's not

7     --

8               THE COURT:  Right.

9               MR. STAMER:  -- to be exclusive.

10              We talked about the funding of the litigation.  If

11    that's completely open when we come back for the final, we'll

12    come back with a final.  This is one that I find particularly

13    troubling.

14              This is a contested cash collateral.  I'm sorry.

15    This is a consensual cash collateral order.  Where I come from,

16    if you violate the consensual cash collateral order, people

17    retreat to their neutral corners and then you fight about the

18    use of cash collateral.

19              My reading of this order, and they can correct me if

20    I'm wrong, if there's a bust with respect to the use of cash

21    collateral, including when it terminates, I think in January,

22    the automatic stay is vacated and they can extend  -- they can

23    pursue remedies.  That can't be appropriate for any cash

24    collateral, but particularly an interim cash collateral order.

25              THE COURT:  Ms. Schonholtz.

1        MS. SCHONHOLTZ:  I'm certainly hopeful we'll have a

2    final cash collateral order before January.

3        THE COURT:  So that's -- so -- but that -- see, that

4    cuts both ways, right.  So you're absolutely correct in your

5    observation.  So is Ms. Schonholtz.  So that gets to this --

6    you know, to the then -- then why are we doing this because

7    obviously we'll have a final cash collateral order before

8    January.  Maybe there will be a miracle and we'll even have a

9    confirmed case before January.

10       But --

11       MR. STAMER:  Your Honor --

12       THE COURT:  So given that, why do you care?

13       MR. STAMER:  I -- I actually don't think that I

14   explained that.

15       So I'm not saying just the deadline by when you need

16   a final cash collateral entered.  That's the only bust.  If the

17   company -- again, and I haven't spent that much time with the

18   document.  If the company violates, if there's a termination

19   event, whatever it is, the company violates the budget, it's

20   not about, okay, we're terminating and, therefore, let's go to

21   the judge and see if we can use your cash.  It's we're going to

22   start sweeping your cash because the automatic stay has been

23   violated.  That should be removed.

24       THE COURT:  I want to hear from the debtor on this

25   one, actually.  I mean, I could understand why Ms. Schonholtz

1   is in favor of that provision.  But -- but I guess the question

2   is it would certainly seem somewhat more usual when there's a

3   trip that you have to come back instead of things beginning to

4   devolve automatically.

5          MR. MARCUS:  Yes, Your Honor.  And, quite frankly, we

6   would want the -- this was -- this was a negotiated paragraph.

7   We would want notice no matter what.  But the automatic

8   termination that Mr. Stamer is referring to, I think there's a

9   -- kind of a whole list.  So --

10         THE COURT:  Can you show -- point me specifically,

11   Mr. Marcus.

12         MR. MARCUS:  Of course.

13         So, Your -- the termination paragraph begins on page

14   28.  It's paragraph 10, begins on page 28.  And right at the

15   bottom of 28, Your Honor, it says, The occurrence of the events

16   set forth in A, B, C, D, I, J, K, L, M, N and O those are

17   immediate occurrences.  And then with respect to the other

18   four, I think that's E, F, G and H there's a five-day notice

19   period.

20         THE COURT:  So -- so A, B, C, D are immediates?

21         MR. MARCUS:  A, B, C -- A, B, C, D are immediates.

22   E, F, G, H we get five days' notice, and then --

23         THE COURT:  So let's look at A, B, C, D.

24         MR. MARCUS:  Okay.

25         THE COURT:  Okay.

1          MR. MARCUS:  Uh-huh.

2          THE COURT:  The dismissal or conversion.  Right.

3     That's not going to happen without an order from me, right?

4          MR. MARCUS:  That's correct.

5          THE COURT:  So that's an easy one, right?  I'm

6     looking at both of you at the same time.  That's an easy one

7     because we're going to know because you're not going to dismiss

8     or convert without coming here.

9          MR. MARCUS:  Correct.

10          THE COURT:  Right?

11          MR. MARCUS:  That's why --

12          THE COURT:  Okay.

13          MR. MARCUS:  That's why --

14          THE COURT:  That's why --

15          MR. MARCUS:  -- five days' notice --

16          THE COURT:  -- that one doesn't bother me.

17          MR. MARCUS:  -- is -- we're okay with that.

18          THE COURT:  Okay.

19          MR. MARCUS:  Correct.  Okay.

20          THE COURT:  The entry of an order by this Court

21     granting relief from the automatic stay, okay, again, that's

22     going to require an order from me.  So we're going to know

23     about that.  So that's not -- that's not a -- the way you

24     presented this one to me is something's going to happen in the

25     dark of night and --

1          MR. STAMER:  Your Honor --

2          THE COURT:  -- the cash is going to begun --

3          MR. STAMER:  -- it's not --

4          THE COURT:  -- begun to be swept and --

5          MR. STAMER:  I'm sorry.  That -- that's not how I

6    meant to portray it.

7          THE COURT:  Okay.

8          MR. STAMER:  The -- from the unsecured, from the

9    2017's perspective --

10         THE COURT:  Sure.

11         MR. STAMER:  -- if, in fact --

12         THE COURT:  Stay.

13         MR. STAMER:  -- if, in fact --

14         THE COURT:  I didn't -- I didn't mean to --

15      (Laughter)

16         THE COURT:  I did not mean it that way.

17         MR. MARCUS:  It was funny, though.  My wife says the

18   same thing to me.

19      (Laughter)

20         MR. STAMER:  Your Honor, the reason we want the stay

21   vacation to be taken out is because we're -- we know that

22   things are going to go really badly and we're going to have to

23   come to the --

24         THE COURT:  The Court.

25         MR. STAMER:  -- to the Court, and we're going to  --

1    and the company is going to say, Judge, let us use cash

2    collateral involuntarily.  And if you say yes, then you don't

3    have to worry about, you know, the automatic stay and all that

4    stuff.  If you say no, it's done.  It's done.

5            So what we want to do is take out the automatic stay

6    stuff and that automatically, no matter which trigger it is, it

7    brings us back to you if there's actually hope where the

8    debtors can -- can utilize cash collateral.  That's why it's

9    not --

10           THE COURT:  Okay.

11           MR. STAMER:  -- again, it's not a DIP order.

12           THE COURT:  I understand.  I -- what I'm struggling

13   with, though, is the scenario in which somebody makes a motion

14   for relief from the automatic stay and I don't have the ability

15   at that moment to figure out whether and on what circumstances

16   the debtor can use cash collateral.

17           So now I'm going to ask -- again, I'll look at Ms.

18   Schonholtz.  Don't -- do you agree with that?  I mean --

19           MS. SCHONHOLTZ:  Your Honor, if I can just focus us

20   all for two seconds on the words.  It actually says that on and

21   after the termination date the debtors shall immediately cease

22   using cash collateral and the first lien agent may, in

23   accordance with the terms of this interim order, absent further

24   order of the court, do all these things.

25           THE COURT:  Right.  So --

1                MS. SCHONHOLTZ:  So the presumption is notice, not

2    notice.  There's always an opportunity to come back --

3                THE COURT:  To come in --

4                MS. SCHONHOLTZ:  -- but what we are --

5                THE COURT:  Right.

6                MS. SCHONHOLTZ:  -- saying is until we're back and

7    that's resolved --

8                THE COURT:  Right.

9                MS. SCHONHOLTZ:  -- you can't force --

10                THE COURT:  So what I care --

11                MS. SCHONHOLTZ:  -- the use of cash collateral.

12                THE COURT:  -- what I care about is the dark of night

13    scenario.  As there is nothing --

14                MS. SCHONHOLTZ:  There is no --

15                THE COURT:  -- in here --

16                MS. SCHONHOLTZ:  There's not one.

17                THE COURT:  -- that allows you unilaterally and

18    without anybody in the case having recourse to -- the ability

19    to come to court and say, we need to fix this, then everybody's

20    rights are protected.

21                MS. SCHONHOLTZ:  Your Honor --

22                THE COURT:  And --

23                MS. SCHONHOLTZ:  Your Honor --

24                MR. STAMER:  Can I just -- when we --

25                MS. SCHONHOLTZ:  The only thing we're saying which is

Page 75

1    standard is if there's a termination event, if it's automatic

2    or if it requires notice and the notice is given, we can't be

3    forced to continue to provide cash collateral.  But we're

4    always back here.

5           THE COURT:  But then you -- so you can't be forced

6    to, but you can come back here and I can force you to.

7           MS. SCHONHOLTZ:  Correct.  I hope not, but, yes.

8           MR. STAMER:  Your Honor, I think we're -- I'm not

9    sure the words say that, but we're okay with not forcing them

10   to have to let us use -- let the company use cash collateral if

11   there's a termination letter.  That's not what I'm worried

12   about.

13          THE COURT:  Okay.

14          MR. STAMER:  What I'm worried about is them actually

15   pursuing remedies --

16          THE COURT:  But, again, I'm going to -- something bad

17   happens.  There's a termination event.  But it's not in the

18   dark of night, so all of you know and someone has the ability

19   in the next moment to file an emergency motion for use of cash

20   collateral.  Ms. Schonholtz has said, I don't agree to it, and

21   you all have said, we don't care.  We're going to court.  And

22   then you get to come in.

23          So it is -- it's -- if it's not a cure mechanism,

24   it's the opportunity to come in and get an order of court that

25   allows the company, that authorizes the company to use cash

Page 76

```
 1    collateral with or without their consent.  And that's --

 2              MR. STAMER:  I think that's -- that would satisfy us.

 3    But, again, -- it's --

 4              MR. MARCUS:  That's okay.

 5              MR. STAMER:  -- as long as there's an opportunity for

 6    people to run into court.

 7              MR. MARCUS:  Your Honor, when I was kind of going

 8    through these before, I -- maybe I didn't articulate it well.

 9    That's exactly why I said we got comfortable with the automatic

10    terminations because we would know they were going to happen --

11              THE COURT:  Right.

12              MR. MARCUS:  -- before they happened.  And the one --

13    so, for example, look at E, the failure by the debtors to make

14    a payment required pursuant to this interim order.

15              THE COURT:  Right.  I mean --

16              MR. MARCUS:  If we just forget --

17              THE COURT:  -- even in --

18              MR. MARCUS:  -- I don't know --

19              THE COURT:  -- even in a DIP --

20              MR. MARCUS:  -- Ms. Schonholtz has to --

21              THE COURT:  Right.

22              MR. MARCUS:  -- give me five days' notice --

23              THE COURT:  Even in a DIP --

24              MR. MARCUS:  -- of that.

25              THE COURT:  -- right, it's not usual, at least as far
```

1    as I'm concerned, for there to be a provision that let's you

2    pick up your toys and go home without coming back to court to

3    keep the company running.

4              So I --

5              MR. MARCUS:  I actually think --

6              THE COURT:  I feel like I'm three for three here.

7              MR. STAMER:  I think we're on a roll.

8              MR. MARCUS:  Yeah.

9              THE COURT:  Okay.

10             MR. STAMER:  Shall we -- shall we proceed?

11             THE COURT:  If we can keep it up, then --

12             MR. STAMER:  I've got --

13             THE COURT:  -- then we don't have to have a witness

14   and I can let you folks, you know, try to write the words that

15   describe all this.  But so far we have obviated the prejudice

16   that I -- we have explained away, I think, the prejudice that

17   you were concerned about.

18             MR. STAMER:  With the modifications Your Honor has --

19   has discussed.

20             THE COURT:  Well, I --

21             MR. STAMER:  Yes.

22             THE COURT:  Let's call them clarifications.

23             MR. STAMER:  Even better.  I've got a few more if I

24   may be so bold.

25             THE COURT:  Okay.

1          MR. STAMER:  Again, running the risk of being --

2          MR. MARCUS:  Yeah.  I like Mr. Stamer.  I'm happy to

3    stand -- continue to stand right here, but if you --

4          THE COURT:  You can have a seat.

5          MR. MARCUS:  He really should have the podium.

6          THE COURT:  You can have the seat, Mr. Marcus.

7          MR. MARCUS:  Okay.  Thank you.

8          THE COURT:  Thank you.

9          All right.  What else?

10          MR. STAMER:  Okay.  They're waiving marshalling in

11    the interim cash collateral.  They are forcing the company and

12    all the parties to waive marshalling.  It's not appropriate.

13    It's not appropriate here.  It's not appropriate in the final.

14    It's not appropriate.  That should come out.  Whether --

15          THE COURT:  Where -- show me.  Show me the language.

16          MR. STAMER:  Paragraph 30.  Paragraph 30.  It's very

17    simple.  You waive marshalling.

18      (Pause)

19          THE COURT:  Ms. Schonholtz, you want to explain why

20    you need this?

21          MS. SCHONHOLTZ:  Yeah.  It's one company.  The cash

22    is all comingled in one collateral pool, and I don't know why

23    we would, given all the other reservations of rights, we would

24    be subject to the doctrine of marshalling.

25          MR. STAMER:  Judge --

Page 79

1           THE COURT:  Go ahead.

2           MR. STAMER:  Are you done?  I'm sorry.  I didn't mean

3    to interrupt.

4           MS. SCHONHOLTZ:  Yes.

5           MR. STAMER:  Okay.

6           We have no idea how this is going to play out, what

7    claims can or cannot be avoided in what buckets.  So to

8    actually waive marshalling on the first day, you just -- you do

9    it in a vacuum.  And, again, I'm sorry to beat the drum over

10   and over again.  This is a cash collateral order.  They're

11   entitled to be protected for the diminution of the value of

12   their collateral, which is all over this document.  This is --

13   this is completely excessive and unnecessary.  Why would they

14   take that away from the estate?  It's because they can.  They -

15   - the secured lenders put it in DIP loans all the time.

16          MS. SCHONHOLTZ:  It's my understanding, Your Honor,

17   that unsecured creditors do not, by law, benefit from

18   marshalling.  And so it is part of a negotiated, highly

19   negotiated cash collateral order and this is one of the

20   protections that we virtually always require even giving up

21   many in here that we usually require to get a deal done.

22          MR. STAMER:  I don't -- I don't really understand

23   that last part or the first part, which is we don't --

24          THE COURT:  I don't understand this --

25          MR. STAMER:  -- we don't --

1            THE COURT:  -- entire thing, frankly, in the sense of

2       that this is an interim order.  The great purpose of it is to

3       maintain the status quo.  I think it's meaningless in an

4       interim order.  And to the extent that it's something that

5       folks wants to talk about on the final, Ms. Schonholtz, I would

6       suggest that that might be a way to go.

7            MS. SCHONHOLTZ:  I understand, Your Honor.

8            THE COURT:  All right.  So we're going to take out

9       paragraph 30.

10           MR. STAMER:  Okay.

11           MS. SCHONHOLTZ:  Can I -- may I ask that it stay in,

12      but subject to the final order?

13           MR. STAMER:  Your Honor, I'll -- I'm going to speak

14      to that in a second with respect to 552 and 506(c).

15           THE COURT:  Okay.  Hold on.  I -- I just want to keep

16      things -- I don't see how it could come in effect -- come into

17      effect in the interim period.  I'm just in -- in a real life

18      sense.

19           MS. SCHONHOLTZ:  Well, there's a lot in here.

20      There's -- the attention of this is -- obviously, there's a

21      motion for approval of an interim and obviously a final.

22           THE COURT:  Right.

23           MS. SCHONHOLTZ:  I certainly would -- would be

24      agreeable to having, like many other provisions in here, the no

25      marshalling subject to the final order.  I really do not want

1   to take it out because it is -- it is meant to --

2           THE COURT:  So the --

3           MS. SCHONHOLTZ:  -- be the subject for discussion --

4           THE COURT:  Right.

5           MS. SCHONHOLTZ:  -- between now and the final.

6           MR. STAMER:  Your Honor --

7           THE COURT:  So that --

8           MR. STAMER:  -- I have a problem with it.  Again, I'm

9   about simple.  I'm about simple and clean.  To the extent there

10  is a provision, you need an operative provision in an order.

11  You need it there.  Okay.  Let's fight about it.  By its words

12  it's not subject to the final order.  During the interim period

13  you're not marshalling.  You -- we're not waiving marshalling.

14  We're not waiving 506(c) and 552.  It should come out.  We will

15  all agree we'll talk about it.  They can put it in their

16  proposed final order and we can say take it out, take it out,

17  if that's what's bothering her.  But it should not be in the

18  interim order.

19          THE COURT:  I don't like to have something in an

20  order where I can't envision a circumstance in which it has any

21  relevance.  So I -- and I don't mean to, you know, be

22  negotiating with the parties, but I guess I am.

23          Perhaps we could have an indication that everyone's

24  rights are reserved, including the rights to include this

25  provision in the final order.  So you stake it out, but we've

Page 82

1    acknowledge that it can't -- there's nothing that can happen in

2    the interim period one way or the other with respect to

3    marshalling.

4              MR. STAMER:  We have no issue -- I'm sorry, Your

5    Honor.

6              MS. SCHONHOLTZ:  Let me think about how we could

7    draft it to accommodate the -- Your Honor's request.  There is

8    no intent to make this happen today, but just like many other

9    things in here that I -- I do want it to be --

10             THE COURT:  Okay.  To be redrafted --

11             MS. SCHONHOLTZ:  -- there like a placeholder.

12             THE COURT:  If it could be redrafted to reserve

13   rights instead of to appear to actually effect rights, I think

14   it would be a better fit.

15             MS. SCHONHOLTZ:  Understood.

16             MR. STAMER:  No issue with that, Your Honor.

17             THE COURT:  Okay.  All right.

18             MR. STAMER:  Okay.  I think I have one and a half

19   more.  That's it.  That's it.  And then we can actually sit

20   down.

21             THE COURT:  And then we could actually be done.

22             MR. STAMER:  I think we're -- yeah.

23             THE COURT:  Great.

24             MR. STAMER:  Okay.  The -- as I said before the

25   secured lenders, we believe, are going to be targets of

Page 83

1   avoidance litigation, both with respect to the merger and what,

2   I don't think, what was apparent.  Our understanding is there

3   was -- there were additional collateral grants within the 90

4   day of the bankruptcy case, of the filing of the case, in

5   connection with forbearance which we think are likely -- we can

6   claw back -- just filling out the picture.  That's all.

7            THE COURT:  Okay.

8            MR. STAMER:  Filling out the picture.

9            What they've done here, Your Honor, is as Your Honor

10  knows when the estate avoids a lien or claim they avoid it for

11  the benefit of the estate.

12           THE COURT:  Right.

13           MR. STAMER:  Right.  So I avoid a first lien claim.

14  The estate holds that first lien claim pari with other first

15  lien creditors.

16           What they've done is, and I think it's designed to

17  insulate them from an avoidance attack, is they are effectively

18  subordinating the 551 lien, the lien avoided for the benefit to

19  their adequate protection claims.

20           THE COURT:  Okay.  Show me.

21           MR. STAMER:  Okay.  Let's go to the videotape.

22       (Pause)

23           THE COURT:  It's a good sign if you can't find it.

24           MR. STAMER:  Yeah.  I'm not making it up.  Scout's

25  honor.

1         (Pause)

2              MR. STAMER:  Paragraph 6.

3              UNIDENTIFIED SPEAKER:  Is that right?

4              MR. STAMER:  Yeah.  I think so.

5              THE COURT:  Okay.  Let's look.

6         (Pause)

7              MR. STAMER:  First sentence in paragraph 6.

8              THE COURT:  So this is similar to the --

9              MR. STAMER:  I'm sorry, Your Honor.

10             THE COURT:  So I'll just make the first observation

11   that this is some -- similar to the point where we started when

12   we were talking about termination events because nothing's

13   going to be avoided between now and the final hearing.

14             So, once again, that cuts both ways, right?  I can

15   say, why does this bother you because nothing's going to

16   avoided before then, and then I turn to Ms. Schonholtz and say,

17   nothing is going to be avoided before then, why do we have to

18   have this in here at all.  You can have that fight/discussion,

19   hopefully agreement on the point at the final hearing.  This is

20   -- described an event that is not going to occur between now

21   and the final.

22             So can we -- can we -- go ahead.

23             MS. SCHONHOLTZ:  if the question is, can we take it

24   out, the answer is no because there will be use of cash

25   collateral and possible adequate protection claims between now

1    and the final.

2              THE COURT:  Right.

3              MS. SCHONHOLTZ:  And you are correct that nothing

4    will be avoided between now and then, but I don't see any --

5    this basically says we're senior to ourselves, too, if

6    anything's avoided.  So I don't understand the premise that if

7    it's -- if it's a cash collateral order that's giving us

8    adequate protection for our cash, why we're not entitled to

9    this over everybody, frankly, including ourselves.  This is

10   pretty standard.

11             I mean, I'm not going to subordinate adequate

12   protection, liens and claims.  That kind of defeats the purpose

13   of this order.

14             MR. STAMER:  The adequate protection liens and claims

15   are subordinated to their first lien to begin with.

16             Let's -- again, I'm -- we haven't had a lot of time

17   with the document so --

18             THE COURT:  Right.

19             MR. STAMER:  -- let's just make sure we're clear.

20             THE COURT:  Right.

21             MR. STAMER:  So I've got a first lien claim, right,

22   and I've got adequate protection --

23             THE COURT:  Right.

24             MR. STAMER:  -- adequate protection liens.

25             THE COURT:  And part of it's avoided.

Page 86

```
 1                   MR. STAMER:  No.  No.  Before you even do, let's  --

 2                   THE COURT:  Right.

 3                   MR. STAMER:  -- assume there's no avoidance.  The

 4      adequate protection liens --

 5                   THE COURT:  Right.

 6                   MR. STAMER:  -- that you give them are junior -- it's

 7      -- they're not priming lien.  They're junior to the first lien.

 8                   THE COURT:  Let's --

 9                   MR. STAMER:  They're senior to the second lien, but

10      they're junior to the first --

11                   THE COURT:  Let's make sure everyone's on the same

12      page.

13                   Do you --

14                   MS. SCHONHOLTZ:  I don't understand it to work that

15      way.  I understand it to be senior to everybody to the extent

16      that adequate protection --

17                   THE COURT:  Adequate protection liens are first.

18                   MS. SCHONHOLTZ:  Right.

19                   THE COURT:  First liens are second.

20                   MS. SCHONHOLTZ:  Correct.

21                   MR. STAMER:  Right.

22                   THE COURT:  Right?

23                   MS. SCHONHOLTZ:  Yeah.

24                   THE COURT:  Avoided liens are --

25                   MS. SCHONHOLTZ:  Avoided.
```

```
 1                THE COURT:  -- avoided.

 2                MR. MARCUS:  Avoided liens have whatever priority

 3     they have --

 4                MS. SCHONHOLTZ:  Right.

 5                THE COURT:  Have whatever --

 6                MR. MARCUS:  -- before they were avoided.

 7                MS. SCHONHOLTZ:  Right.

 8                THE COURT:  -- priority they have.

 9                MS. SCHONHOLTZ:  Right.

10                MR. STAMER:  Avoided liens have whatever priority

11     they have and those liens are entitled to the adequate

12     protection claims and liens that --

13                THE COURT:  No.  Adequate -- no.  No.  Adequate

14     protection is first --

15                MS. SCHONHOLTZ:  Right.

16                THE COURT:  -- no matter what.

17                MR. STAMER:  So adequate protection --

18                THE COURT:  Then --

19                MR. STAMER:  I --

20                THE COURT:  Okay.  Ms. Schonholtz, do you want to put

21     it into your words?

22                MS. SCHONHOLTZ:  Adequate protection is at the top of

23     the heap --

24                THE COURT:  Right.

25                MS. SCHONHOLTZ:  -- and that is, in part,
```

Page 88

1  particularly in this case where the collateral is a depleting

2  asset.  We're not -- the wells don't regenerate themselves.

3              THE COURT:  Right.

4              MS. SCHONHOLTZ:  And so we are entitled to adequate -

5  -

6              THE COURT:  That's classic --

7              MS. SCHONHOLTZ:  -- protection.

8              THE COURT:  -- adequate protection.

9              MS. SCHONHOLTZ:  It is classic adequate protection.

10 It is at the top of the heap.  Second would be first liens that

11 are not avoided, which is what we expect here, second liens to

12 the extent they're still there, and then everything else.

13             MR. MARCUS:  I agree with that, Your Honor, and

14 obviously the lien only exists with respect to the diminution

15 in the value and their interest in the --

16             THE COURT:  Right.

17             MR. MARCUS:  -- collateral.

18             THE COURT:  So that one -- that sounds correct.

19             MR. STAMER:  I -- Your Honor, I didn't appreciate

20 that's how it -- that's how it worked.

21             THE COURT:  Okay.

22             MR. STAMER:  I think the only clarification is -- and

23 maybe I'm missing this as well.  But to the extent you avoid

24 $100 million of a first lien claim, you -- I believe the estate

25 gets the benefit of not only that claim, but also the adequate

1    protection liens and claims that would be protecting that $100

2    million claim.

3             THE COURT:  I don't think that that's right.

4             MS. SCHONHOLTZ:  That doesn't work that way.

5             THE COURT:  I don't think that that's right.

6             MR. STAMER:  Okay.

7             THE COURT:  So -- and I think on this one that I

8    think the language actually comports with what has been further

9    described here today.  So I think this one is going to stick.

10            MR. STAMER:  That's fine.  We'll take another look,

11   Your Honor, but --

12            THE COURT:  You can take --

13            MR. STAMER:  -- that's fine.

14            THE COURT:  -- another look at it --

15            MR. STAMER:  Yeah.

16            THE COURT:  -- and re-raise it at the final if that's

17   something that you then believe needs fixing.  But I think on

18   this one we're going to stick with it.

19            MR. STAMER:  Okay.

20            THE COURT:  All right.

21            MR. STAMER:  My last one, Your Honor --

22            THE COURT:  Yes.

23            MR. STAMER:  -- is --

24            THE COURT:  The half, we're down to the half?

25            MR. STAMER:  We're down to the half.

Page 90

1              THE COURT:  Okay.

2              MR. STAMER:  We're down to the half.  And that is to

3     truly preserve the status quo we don't think any adequate

4     protection payments should go out to third parties until the

5     final hearing, until the committee has been formed and had the

6     ability to weigh in on this.  And we wait until the entry of

7     the final order.

8              THE COURT:  Ms. Schonholtz.

9              MS. SCHONHOLTZ:  We --

10             THE COURT:  You're talking to -- you're talking about

11    professional fees?

12             MR. STAMER:  Correct, and -- and anything else.

13             THE COURT:  And anything else.

14             MS. SCHONHOLTZ:  And interest.

15             MR. STAMER:  Prepetition professional fees --

16             THE COURT:  And interest?

17             MS. SCHONHOLTZ:  Yeah.

18             MR. STAMER:  Yeah.  And interest and professional

19    fees for undersecured -- one or more undersecured creditor

20    groups.

21             THE COURT:  All right.  Go ahead, Ms. Schonholtz.

22             MS. SCHONHOLTZ:  As you will hear later, Your Honor,

23    the debtors' seeking authority to pay a lot of money to

24    prepetition creditors and I mean a lot of money in order to

25    keep this business stable and going.

1        My clients took a hard look, frankly, at the amounts

2     that were in those motions and they, as part of a consensual

3     agreement, took a deep breath and said, okay.  we can let, you

4     know, 25 plus million dollars go out between the interim and

5     the final.  Okay.

6        Part of the requirement  -- part of the requirement

7     is, as has been the case since the first forbearance agreement

8     was entered, monthly interest, the equivalent of monthly

9     interest, which is a whopping $3.7 or 8 million before assuming

10    the interim obviously happens within 20 plus days, and a little

11    sub-period.  So that one would firm up.

12        MR. STAMER:  My only question is where --

13        MS. SCHONHOLTZ:  Was that a half one by the way?

14        MR. STAMER:  That was a half.  That was a half.

15        THE COURT:  That was a half.

16        MR. STAMER:  The only question is where's that money

17    coming from.

18        THE COURT:  Right.

19        MR. STAMER:  So the money that she's saying is going

20    out the door, I assume that it's being pushed out from -- well,

21    the adequate protection is clearly coming out of --

22        THE COURT:  Disputed --

23        MR. STAMER:  -- disputed cash.  How about the $25

24    million that she -- that was referenced with respect to going

25    to prepetition creditors?

Page 92

1           MS. SCHONHOLTZ:  It depends.

2           THE COURT:  It depends, right, Mr. Marcus?

3           MR. MARCUS:  Yeah.  The --

4           THE COURT:  I think it depends.

5           MS. SCHONHOLTZ:  Yes.

6           MR. MARCUS:  It depends.  There's going to be this

7    reconciliation and there's a --

8           THE COURT:  And there's --

9           MR. MARCUS:  -- full reservation of rights with

10   respect --

11          THE COURT:  That's the point.

12          MR. MARCUS:  -- to the G&S.

13          THE COURT:  There's going to be -- we've identified

14   monies that need to be paid in order to get us off the group.

15   Every dollar that goes out we're going to know from whence it

16   came.  Every dollar that comes in we're going to know from

17   whence it came.  And at the end of the day in the absence of a

18   consensual resolution, everybody's going to know and everybody

19   can make arguments about how things should be reallocated.

20          MR. STAMER:  And if our rights are truly reserved,

21   then, Your Honor, we're fine.

22          MS. SCHONHOLTZ:  Your Honor, this order also contains

23   a provision, which I hate, but the debtors convinced me I had

24   to put it in that says, to the extent that any of this is

25   recharacterized, interest or fees, it gets applied to reduce

Page 93

1    principal.  So I'm not seeing the --

2           MR. STAMER:  We'll --

3           MS. SCHONHOLTZ:  -- harm here.

4           MR. STAMER:  We'll ask for the further clarification

5    that it's reduced principal or disgorged to the extent --

6           MS. SCHONHOLTZ:  It -- we are not willing to say it's

7    disgorged.  We have a lot  -- we have 900 plus million dollars

8    in loans.  So applying things to the principal to reduce it

9    should satisfy all constituencies.

10          MR. STAMER:  Well, again, so we're clear -- and maybe

11   we'll revisit --

12          THE COURT:  This is --

13          MR. STAMER:  -- that at the final --

14          THE COURT:  This is an interim hearing.

15          MR. STAMER:  I get it.  When they say principal

16   they're talking about principal of the secured claim, to the

17   extent people are undersecured.  I'm not sure that's clear on

18   the order.

19          So the fact that they have $900 million of loans or

20   whoever has loans, to the -- it's not to reduce the unsecured

21   portion of their --

22          THE COURT:  Right.

23          MR. STAMER:  -- of the --

24          THE COURT:  Correct.  Correct.

25          MR. STAMER:  Your Honor, thank you for the

1    indulgence.

2           THE COURT:  All right.  So I think we've now resolved

3    the objections with those clarifications, without the need for

4    the witness to testify.

5           I'm going to so order the record with respect to

6    everything that we just put on the record relating to the

7    objections that have been raised.  You're going to have to

8    reduce it to an order, though.  But I want to so -- I'm going

9    to so order the record so it's clear that on the basis of what

10   we've talked about here and the resolutions and clarifications

11   that we've put on the record, the company has authority to use

12   cash collateral --

13          MR. STAMER:  Thank you, Your Honor.

14          THE COURT:  -- subject to the record.  Not that I

15   don't have confidence in your ability, but you now have more

16   folks who are going to have to look at this and I'm just not

17   sure how quickly that's going to be accomplished and I want it

18   to be clear that authority has been granted.

19          Are you okay with that, Ms. Schonholtz?

20          MS. SCHONHOLTZ:  I am, Your Honor.  As I -- as I

21   listened very carefully I only hear one revision that needed

22   redrafting, and that was, I believe, the first one.

23          Of court -- coming back to course is already in

24   there.

25          THE COURT:  The coming back to court was clarified on

1    the record.  It was the --

2            MS. SCHONHOLTZ:  And the marshalling we need to

3    basically say everybody reserves their rights.

4            MR. MARCUS:  Right.

5            THE COURT:  Right.  And then it was paragraph 12 was

6    the major one.

7            MS. SCHONHOLTZ:  Right.

8            MR. STAMER:  It's marshalling and 552 and -- 506(c)

9    and 552.

10           THE COURT:  We didn't do a 506(c).

11           MS. SCHONHOLTZ:  No.  No.  We --

12           MR. STAMER:  I'm sorry, Your Honor.  I --

13           MR. MARCUS:  Is this the other half?

14       (Laughter)

15           THE COURT:  We did it --

16           MR. STAMER:  Your Honor, the revision -- the lender's

17   counsel requested that we have the marshalling mirror the

18   provision relating to 552 and 506(c).  And if I wasn't clear, I

19   apologize.  It says, subject to the final order the debtors

20   waive 506(c) and --

21           THE COURT:  On paragraph --

22           MR. STAMER:  -- 552.

23           THE COURT:  -- 30, Ms. Schonholtz, you were going to

24   take that back and figure out what language it is that you

25   could --

1          MS. SCHONHOLTZ:  Correct.

2          THE COURT:  -- work with.

3          MS. SCHONHOLTZ:  Correct.

4          THE COURT:  There was the end of paragraph 12, the

5     two sentences that begin with prepositioned secured parties and

6     for the avoidance of doubt.  That --

7          MS. SCHONHOLTZ:  Correct.

8          THE COURT:  -- was the language that needed to be

9     changed.

10          MS. SCHONHOLTZ:  Correct.  For those two --

11          THE COURT:  And --

12          MS. SCHONHOLTZ:  --  my understanding is those two

13     require a little bit of drafting --

14          THE COURT:  Right.

15          MS. SCHONHOLTZ:  -- but the rest does not.

16          THE COURT:  And that was it, right?

17          MR. STAMER:  Again, I -- I didn't follow the order.

18     My impression was we were going to keep the order in a way that

19     if it wasn't an operative provision we would reserve the

20     rights, whether it's marshalling, 552 or 506(c).  Your Honor,

21     it's the same concept.

22          THE COURT:  There's -- I'm sorry.

23          MR. STAMER:  We think it --

24          THE COURT:  I just -- we went through a series of

25     paragraphs.  I -- we came to either clarifications because

Page 97

1    people hadn't really understood how they worked --

2              MR. MARCUS:  So --

3              THE COURT:  -- and then we come out with these two

4    drafting exercises.

5              MS. SCHONHOLTZ:  That --

6              THE COURT:  Those are the only two.

7              MR. MARCUS:  I think the --

8              MS. SCHONHOLTZ:  That is my understanding, Your

9    Honor.

10             MR. MARCUS:  Yeah.  I think Mr. Stamer, when he was

11   talking about the marshalling paragraph, he did, I think, I

12   heard him say at the beginning, also, paragraph 15 which

13   relates to 506(c) and paragraph 29 --

14             THE COURT:  I missed that.

15             MR. MARCUS:  -- which relates to 552.  Both of those

16   are drafted differently than the marshalling paragraph.  They

17   both say, subject to entry of the final order, and so they're

18   not operative in the interim period.  But I think what Mr.

19   Stamer was asking was can we redraft those the way we're

20   redrafting the marshalling paragraph.

21             THE COURT:  Hold on.  I -- now you're -- now you're -

22   - now we're getting a little bit out of control.  That -- I

23   didn't hear that.  I missed that entirely.

24             MS. SCHONHOLTZ:  So did I, Your Honor.

25             THE COURT:  Okay.  I thought that those were --

Page 98

1    paragraphs were shown as an example of something, but that we

2    weren't revisiting them.

3            MR. STAMER:  Your Honor, I sincerely apologize.  If

4    it wasn't -- it's on my issues list.  It's -- I referenced it

5    for that reason.

6            THE COURT:  What -- you want paragraph 15 changed?

7            MR. STAMER:  I want the paragraph that talks in terms

8    of -- yes.  I want paragraph -- I would request that paragraph

9    15 be changed.  Again, this is a provision that says, subject

10   to the entry of the final order --

11           THE COURT:  Right.

12           MR. STAMER:  -- which means there -- which means

13   there's no reason for this to be -- for this to be in the

14   order.  It's not operative during the period.  And much like

15   the request counsel for the secured lenders' made before, it --

16           THE COURT:  Well, this is one in which the U.S.

17   Trustee is traditionally all over it.  This language works for

18   me.  We're done on this one.  We're not changing this

19   paragraph.

20           MR. STAMER:  Okay.  Thank you, Your Honor.

21           THE COURT:  All right.

22           So once again the homework is the end of paragraph 12

23   and paragraph 13.  That's the only drafting.  Everything else

24   has been clarified to the extent it needed to be clarified on

25   the record.

1          MS. SCHONHOLTZ:  Thank you, Your Honor.

2          THE COURT:  All right.

3          MR. MARCUS:  Thank you, Your Honor.  That's very

4    helpful, actually.

5          THE COURT:  Okay.

6          MR. MARCUS:  The only other thing is a final hearing

7    date, but we don't have to do that now.  We have a whole host

8    of other motions.  Maybe it's better to do it at the end,

9    but --

10          THE COURT:  I'll --

11          MR. MARCUS:  -- there is another blank --

12          THE COURT:  -- do whichever one you want.  We can --

13          MR. MARCUS:  -- that needs to be filled.

14          THE COURT:  We can keep going and then we can pick

15    dates in a little bit.

16          MR. MARCUS:  Thank you very much, Your Honor.

17          THE COURT:  All right.  Thank you.

18          Thank you.  That was very -- that was very

19    productive.

20          MR. STAMER:  Thank you, Your Honor.

21          THE COURT:  I appreciate your willingness to work

22    through it.  You, too, Ms. Schonholtz.

23          MS. SCHONHOLTZ:  Thank you, Your Honor.

24          THE COURT:  All right.  What can we turn to next?

25          MR. BENNETT:  Good afternoon, Your Honor.  Ryan

Page 100

1    Bennett again on behalf of the debtors.  I'll try to move

2    through the rest of the agenda and -- so we can just focus on

3    any questions that you may have.

4              THE COURT:  Okay.

5              MR. BENNETT:  The first item up is the debtors'

6    motion to maintain its cash management system.  It's a

7    relatively simple cash management system as far as big Chapter

8    11 cases go.  There's one operating account that holds a lot --

9    holds the cash that everybody's been talking about this

10   morning.  And then that cash is split out to the various

11   payable type of account -- disbursement accounts that are

12   mostly zero balance --

13             THE COURT:  But no money is moving out of the system,

14   correct?

15             MR. BENNETT:  We have some non-debtor subsidiaries,

16   but none of them are operating.  Okay.  So it's --

17             THE COURT:  Right.  So --

18             MR. BENNETT:  -- not like NII where they sent it to

19   Mexico or something like that.  Right.  It's -- you know, it's

20   a scenario here where everything stays within the debtors'

21   system except for maybe a couple -- like very de minimis

22   corporate like filing costs and stuff just to maintain those

23   entities in good standing.

24             THE COURT:  Okay.  All right.  Does anyone wish to be

25   heard or have any questions or commentary with respect to the

Page 101

1    debtors' request to maintain this existing cash management

2    system?

3              All right.  Very good.  That will be approved on  --

4              MR. BENNETT:  Thank you, Judge.  And I should have

5    noted out the outset that with respect to all of these motions

6    that we're going to talk about, they were all vetted with the

7    United States Trustee's Office with each of the represented

8    creditor or bondholder groups, with the RBL counsel, and second

9    lien counsel, and the orders that were filed incorporate all

10   the comments received from those folks.

11             THE COURT:  Okay.  Very good.

12             MR. BENNETT:  So the next one is the motion for the

13   debtors' wage and benefit programs.  This is an interim order.

14   It includes -- it picks up unpaid wages, the traditional

15   expense reimbursements, et cetera.  Per an agreement with the

16   United States Trustee, two key points:

17             Payments made to any single employee will be subject

18   to the priority cap during the interim period;

19             Second point, there were not any 503 -- 503(c) type

20   payments to insiders.

21             THE COURT:  And with respect to the cap, it's a

22   combination of wages and expenses?

23             MR. BENNETT:  Yes, ma'am.

24             THE COURT:  It's a --

25             MR. BENNETT:  That's correct.  It's not --

```
 1              THE COURT:  -- cap.  It's just a cap.

 2              MR. BENNETT:  one and one.  It's the whole thing.

 3              THE COURT:  Okay.

 4              MR. BENNETT:  Yes.

 5              THE COURT:  All right.  That's the way I read it.  I

 6    thought that it was a very well prepared motion.  It had

 7    significant detail with respect to each of the categories.

 8              Does anyone wish to be heard with respect to the

 9    debtors' motion for entry of an interim order to pay wages and

10    related relief?

11              Mr. Schwartzberg.

12              MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg for

13    the U.S. Trustee --

14              THE COURT:  Come up, so -- come up to a microphone so

15    we can get you recorded.

16              MR. SCHWARTZBERG:  Paul Schwartzberg for the U.S.

17    Trustee's Office.

18              Your Honor, I have not standing to object.  I'm

19    standing to clarify something that I just think is -- because

20    of what's gone on Mr. Bennett probably just forgot to indicate.

21              There is a host of programs in the motion --

22              THE COURT:  Yes.

23              MR. SCHWARTZBERG:  -- that are not on for today and

24    they're all being kicked to the final.

25              THE COURT:  Okay.
```

1            MR. SCHWARTZBERG:  In discussions with debtors'

2    counsel, and they include severance motion, something called

3    combination motion, which if I recall there's so many of them

4    it may have been a sort of a bonus or retention motion.  Those

5    are not going to actually go forward in this motion, and

6    between now and the second day hearing the debtor is going to

7    file a separate motion and to break those out from our typical

8    wage motion and do it on separate notice --

9            THE COURT:  Okay.

10            MR. SCHWARTZBERG:  -- just most -- one reason is so

11    that creditors -- it doesn't get buried in a wage motion

12    because these things are other than typical wages and we --

13            THE COURT:  Okay.

14            MR. SCHWARTZBERG:  -- wanted that out.

15            THE COURT:  All right.  Very good.  Does that -- does

16    that effect the interim order?

17            MR. SCHWARTZBERG:  It does not, Your Honor.  And I

18    hesitated to speak.  I just --

19            THE COURT:  No.  That's fine.

20            MR. SCHWARTZBERG:  -- think --

21            THE COURT:  That's fine.  Okay.

22            MR. SCHWARTZBERG:  Thank you, Your Honor.

23            THE COURT:  Thank you very much.

24            MR. BENNETT:  Thank you.

25            THE COURT:  All right.

Page 104

1            MR. BENNETT:  All right.  So --

2            THE COURT:  So --

3            MR. BENNETT:  Okay.  Go ahead, Your Honor.  I'm

4    sorry.

5            THE COURT:  So now we've done cash collateral, cash

6    management, wages.  That brings us to the royalty and working

7    interest motion.  Is that --

8            MR. BENNETT:  That's correct.  That's correct, Judge.

9            THE COURT:  -- correct?

10            MR. BENNETT:  All right.  So this motion, it's

11    particular to this industry in the sense that the debtors own

12    or own lease-hold interest in approximately 1,800 wells, oil

13    and gas wells.  And as part of how it works in the industry,

14    these leases are, most of them at least are jointly held.  So

15    the debtors have an interest in the lease, but there are other

16    folks that have interest:  The original landowner, you know,

17    Mr. and Mrs. Smith who have the ranch and allow the debtors to

18    exploit the mineral assets of that ranch, other investors,

19    other companies who have interests in there.

20            And so they -- they're held and the value extracted

21    from the land is shared in a joint -- under a joint operating

22    agreement and that value is distributed by the operator.  In

23    many cases, almost 90 percent of our cases we are the operator

24    so we're responsible for taking in the revenue, for paying out

25    the expenses.  And so -- and then distributing the profits

1   essentially to the various interest holders.

2          So this motion is really to focus on the cash that

3   comes in on account of production and that we hold for these --

4   for other folks who have an ownership interest in the well.  So

5   we'll take the money in and then we'll hold it and then we'll

6   blow it out, you know, on a regular schedule --

7          THE COURT:  Distribute it.

8          MR. BENNETT:  -- to folks.  Distribute it.  Exactly.

9   Exactly.  Yes.

10      (Laughter)

11         MR. BENNETT:  And we -- and to that point this is a

12  well-accounted for process which the creditor groups have

13  access to our book entries and can opine on how we're handling

14  it.

15         So the point being here is it's not property of the

16  estate.  Under applicable state law it says that working

17  interests, payments, you know, payments that we receive that we

18  hold for working interest parties as well as royalty payments

19  which are the parties for the original landowner, those are not

20  property of the estate.

21         THE COURT:  Or it's not property of the estate under

22  the Bankruptcy Code.

23         MR. BENNETT:  And that's correct.  So it's both,

24  state law and 541 --

25         THE COURT:  541(b)(4) --

1          MR. BENNETT:  That's correct.

2          THE COURT:  --(b)(i).

3          MR. BENNETT:  That's right.  There we go.  And so to

4    that end we're asking permission to or the Court's blessing in

5    our ability just to continue to make those payments and --

6          THE COURT:  All right.

7          MR. BENNETT:  -- avoid disruption of the business.

8          THE COURT:  And not to turn this into a quiz, but do

9    you know that -- roughly the amount of money that will be paid

10   pursuant to this order on an interim basis?

11         MR. BENNETT:  Yes, Judge.  So what we're going to

12   seek on the interim basis is -- on working interest there will

13   be 10.5 million on the interim.

14         THE COURT:  And on the --

15         MR. BENNETT:  And --

16         THE COURT:  -- royalties?

17         MR. BENNETT:  -- 18.5 million on the royalty.

18         THE COURT:  All right.  Does anyone wish to be heard

19   with respect to the debtors' request for authority on the

20   interim basis to make payments on account of the working

21   interest disbursements on the royalty payments?

22         MR. MELKO:  Your Honor --

23         THE COURT:  Yes, sir.

24         MR. MELKO:  -- hi.  Thank you.  This is John Melko in

25   Houston.  I -- actually, debtors' counsel can handle this.

Page 107

1    There was a second agreement in addition to cash collateral for

2    clarification on this point, I believe.

3         THE COURT:  I'm sorry, sir.  I'm having a difficult

4    time understanding you.

5         MR. MELKO:  I'm sorry, Your Honor.  There -- we had

6    an agreement with counsel for the debtor on behalf of Hartz

7    (ph) Capital --

8         THE COURT:  Yes.

9         MR. MELKO:  -- to make a clarification with respect

10   to cash collateral.  The Court's already heard that

11   clarification.

12        THE COURT:  Yes.

13        MR. MELKO:  There was -- there was a counterpart

14   agreement with respect to this motion and it's probably easier

15   if debtors' counsel does it if you're having trouble hearing

16   me.

17        THE COURT:  Yes.  He's about to do so.

18        MR. BENNETT:  Right.

19        MR. MELKO:  Thank you.

20        THE COURT:  All right.

21        MR. BENNETT:  I've got it right here --

22        THE COURT:  All right.  Thank you.

23        MR. BENNETT:  -- Your Honor.

24        All right.  The agreement was to read the following

25   into the record on behalf of the debtors.

Page 108

```
 1              "For the avoidance of doubt it's the debtors'
 2        position that working interest owned by third parties
 3        similar to royalty interests are separate, real   property
 4    interests, and neither of those property    interests nor the
 5    proceeds of the minerals as they are    produced are property
 6    of the estate."
 7              THE COURT:  All right.
 8              MR. HERMAN:  Thank you, Your Honor.
 9              THE COURT:  Yes.
10              MR. HERMAN:  Brian Herman from --
11              THE COURT:  Yes.
12              MR. HERMAN:  -- Paul Weiss again --
13              THE COURT:  Yes, Mr. Herman.
14              MR. HERMAN:  -- on behalf of Wilmington Trust.
15              We don't have an objection on an interim basis.  I
16    only rise to make the point that at least in my experience with
17    these kinds of motions, companies take a very sweeping view as
18    to what is lienable, what is not -- is or is not property of
19    the estate.  And we've been working with the debtors to try to
20    understand exactly who is being paid, not just for odd
21    categories, but actual creditors, who is being paid, do they
22    have lien rights, would it be property of the estate.
23              We're going to continue to do that analysis.  The
24    debtors have been very cooperative in giving us that
25    information, but I would like to reserve rights as we continue
```

1    to get the information and look at it at a final hearing to

2    take issue if we have any.

3            THE COURT:  Understood.

4            MR. HERMAN:  And that's also, Your Honor, with

5    respect to the next motion as well.

6            THE COURT:  Okay.

7            MR. HERMAN:  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            All right.  So that brings us to the

10           MR. BENNETT:  Operating --

11           THE COURT:  -- operating expenses and other

12   categories of relief.

13           MR. BENNETT:  That's right, Your Honor.

14           So this motion also is tied to the nature of how

15   these oil and gas leases are managed and revenues are shared.

16   The -- and it goes to Mr. Herman's point in the sense that what

17   we've been help -- you know, the debtors performed a pretty

18   diligent -- very diligent process in analyzing the landscape of

19   vendors who have claims as of the filing and who have rights

20   under various state laws to assert liens, and identified the

21   group of claims and claimants that the debtors do believe have

22   the -- have viable lien claims and could be and likely would be

23   secured and earmark those for special treatment to be requested

24   today.

25           This is not traditional critical vendor type relief,

1    right, and these are -- these are parties with special property

2    rights, elevated property rights.  Yes, just like in a

3    traditional critical vendor motion these people are very

4    important to our production, our supply chain.  If they did

5    walk off it would cause significant damage.  But in addition

6    they also have these elevated rights that bring them, you know,

7    to Your Honor today.

8            THE COURT:  All right.

9            MR. BENNETT:  So --

10           THE COURT:  So why don't we walk through each of the

11   categories and make sure we have a clear understanding of what

12   the expected payment is in the interim period.

13           So first with respect to the operating expenses.

14           MR. BENNETT:  Right.  So on the operating expenses we

15   are anticipating during the interim period a --

16           THE COURT:  $20 million --

17           MR. BENNETT:  -- $20.5.

18           THE COURT:  Right.  That's --

19           MR. BENNETT:  That's correct.

20           THE COURT:  -- on page 7 of the motion.

21           All right.  And on the joint interest billings?

22           MR. BENNETT:  All right.  Joint interest billings

23   appear to be 800,000, Your Honor.

24           THE COURT:  Right.  So in the motion those are

25   referred to as the non-operating working interest obligations.

Page 111

1    Same thing?  If you look at page 7 of the motion?

2              MR. BENNETT:  Yeah.  Sure.  Let me look here.  Okay.

3    So I'm sorry.  That amount during the interim period, Your

4    Honor, is 485,000 for the joint interest billings.

5              THE COURT:  Right.

6              MR. BENNETT:  And so this -- these would be

7    situations where we are not an operator of the well.

8              THE COURT:  Right.

9              MR. BENNETT:  It's the unusual situation, the ten

10   percent outsider.  And so, yeah, where we would be -- we would

11   owe on account of whatever the costs are that --

12             THE COURT:  Someone else operates --

13             MR. BENNETT:  Exactly.  They send us the bill.  We

14   pay it.

15             THE COURT:  That 485 on that.

16             MR. BENNETT:  During the interim period.  That's

17   correct, Your Honor.

18             THE COURT:  Okay.  And with respect to the shipper

19   and warehouseman --

20             MR. BENNETT:  Right.  We believe that --

21             THE COURT:  -- claims?

22             MR. BENNETT:  -- we believe that to be 2.3 million.

23             THE COURT:  Okay.

24             MR. BENNETT:  And these are -- I think we will adhere

25   to these as caps for purposes of the order.

Page 112

1          THE COURT:  Right.

2          MR. BENNETT:  And then 503(b)(9) there's 1.1 million.

3          THE COURT:  Okay.  All right.  I think that's all the

4  categories.  Does anyone wish to be heard with respect to what

5  I'll call by way of shorthand the lienholder  motion?

6          All right.  So those amounts will be authorized and

7  the motion approved on its submission.

8          MR. BENNETT:  Thank you, Your Honor.

9          All right.  Next on the list is the --

10          THE COURT:  The taxes.

11          MR. BENNETT:  We'll call it the taxes motion.  Right.

12  It's a pretty traditional tax motion.  It seeks treatment --

13  seeks the authority to pay certain prepetition taxes that come

14  due during the interim period.  We've got sales and use tax of

15  about 930,000 that come due during the interim period;

16  franchise tax of 10,000; and then severance tax of 1.79

17  million.  Severance tax is particular to the industry.  It's

18  where you cease or sever the extraction process --

19          THE COURT:  Okay.

20          MR. BENNETT:  -- and it's a tax that's often placed

21  on --

22          THE COURT:  You skipped over the big one, the

23  property taxes.

24          MR. BENNETT:  Oh, that -- because none of it's due

25  during the interim period.

Page 113

1          THE COURT:  Okay.  All right.  Does anyone wish to be

2    heard with respect to the debtors' motion for an interim order

3    authorizing the payment of certain prepetition taxes and fees?

4          All right.  That will be approved as well.

5          MR. BENNETT:  Thank you, Your Honor.

6          Next we've got the -- what we'll call the equity

7    trading motion.  Again, it's just a -- just equity.  We're not

8    looking to inhibit debt trading.  So this is just intended to

9    preserve the debtors' tax attributes.  They've got about a

10   billion dollars worth of NOLs that could be utilized to realize

11   about $360 million of cash savings or of tax savings.  And so

12   we want to make sure that if there's movement in the equity for

13   some reason that we're able to get notice of that and try to

14   protect -- preserve estate assets.

15         THE COURT:  All right.  Does anyone wish to be heard

16   with respect to the debtors' motion regarding preservation of

17   NOLs and active trading?

18         All right.  That will be approved.

19         MR. BENNETT:  Thank you, Your Honor.

20         Next up is your traditional creditor matrix --

21         THE COURT:  Creditor matrix.

22         MR. BENNETT:  -- motion.  No objections.  We're

23   seeking to just file a consolidated list of 50 largest and then

24   keep a list on with the tax agent.

25         THE COURT:  Same goes with respect to the schedules'

Page 114

1    extension I take it?  No objections to that?

2          MR. BENNETT:  No objection.  Looking for a 30 day

3    extension to the statutory 14 day period.

4          THE COURT:  All right.  Anyone wish to be heard

5    either with respect to the creditor matrix motion or the

6    schedules extension motion?

7          All right.  Those will be approved as well.

8          MR. BENNETT:  Thank you, Your Honor.

9          Next up is the notice of claims agent retention

10   motion.  We're seeking to retain Prime Clerk for purposes of

11   the notice and claims duties.  We've shared a copy of the

12   motion with the clerk's office.  The clerk has approved it.

13   And we did go through the protocol where we took and solicited

14   bids from three separate outfits and they -- the debtors

15   selected based on pricing.

16          THE COURT:  All right.  You've articulated all the

17   important elements.  Does anyone wish to be heard with respect

18   to the debtors' application to retain Prime Clerk as noticing

19   agent?

20          All right.  Very well.  That will be approved.

21          MR. BENNETT:  Thank you, Your Honor.

22          THE COURT:  And I think that leaves us with case

23   management.

24          MR. BENNETT:  Just case management, right.

25          THE COURT:  Okay.

Page 115

1          MR. BENNETT:  And so with respect to hearing dates if

2     Your Honor will --

3          THE COURT:  Sure.

4          MR. BENNETT:  So we have the utility deadline, right,

5     the 30 days --

6          THE COURT:  Right.

7          MR. BENNETT:  -- for 366.  So we've got to -- we've

8     got to get something on the calendar hopefully around I guess

9     the week of August 12th I think we were thinking.  Does that

10    work for you?

11         MR. HENES:  Sure.

12         MR. BENNETT:  Was it --

13         THE COURT:  All right.  I would like to give you

14    August 10th.  Does that work?

15         MR. BENNETT:  Yeah.  That works.

16         THE COURT:  Does August 10th work for a final hearing

17    as well on the other motions?

18         MR. HENES:  Yes.

19         THE COURT:  Today is the 16th, so 14 plus 10.  Does

20    Monday, the 10th work for folks?

21         MR. HENES: Yes, Your Honor.

22         MS. SCHONHOLTZ:  Yes, Your Honor.

23         THE COURT:  All right.  And I understand that it is

24    the summertime and people have plans.  I'm willing to relax the

25    rules with respect to telephonic appearances, you know, to the

1    extent that that facilitates everyone's ability to live their

2    lives.

3            MR. HENES:  Thank you.

4            MS. SCHONHOLTZ:  Thank you, Your Honor.

5            MR. BENNETT:  Thank you, Your Honor.

6            THE COURT:  All right.  So August 10th.  Let's do

7    10:00.  I would -- I'll be hopeful that everything will be

8    consensual.  To the extent that it's not, it would be nice to

9    know in advance so that we can plan and we can do -- go from

10   there.  But for the moment I'll be hopeful.

11           MR. BENNETT:  We'll definitely work toward --

12           THE COURT:  Mr. --

13           MR. BENNETT:  -- that end, Your Honor.

14           THE COURT:  Mr. Schwartzberg, do you have -- are you

15   going to immediately begin solicitation for a committee?

16           MR. SCHWARTZBERG:  I thought of making one, Your

17   Honor, yes.  Yes.

18       (Laughter)

19           MR. SCHWARTZBERG:  Your Honor, we set July 28th,

20   that's Tuesday, at 10 a.m.  I understand the debtors have

21   reserved a room at the Waldorf and I believe it's on the fourth

22   floor.

23           THE COURT:  Okay.  So that's excellent because that

24   will give, I won't say ample, but a good amount of time for the

25   organization --

 1          MR. SCHWARTZBERG:  And -- oh, and my understanding is

 2   Prime Clerk will today, at the latest tomorrow, send out the

 3   notice to the top 50 creditors.

 4          THE COURT:  All right.  Excellent.  Thank you very

 5   much.

 6          MR. SCHWARTZBERG:  Thank you.

 7          THE COURT:  Okay.

 8          MR. BENNETT:  Your Honor, do you have any -- should

 9   we -- do you want to schedule any future omnibus hearings now

10   or is that something we --

11          THE COURT:  Well --

12          MR. BENNETT:  -- coordinate with chambers or --

13          THE COURT:  -- I think that --

14          MR. BENNETT:  We don't need to.

15          THE COURT:  We -- I think it would be best to talk to

16   chambers because my calendar has a remarkable way of filling

17   up, but we will give you omnibus dates.  September gets you

18   into Jewish holidays, NCBJ and other good things.  But we'll

19   get you --

20          MR. BENNETT:  Okay.  Great.

21          THE COURT:  -- some dates.  We'll get you some dates.

22          MR. BENNETT:  All right.  Thank you.

23          THE COURT:  All right.  Is there anything else that

24   we need to accomplish today?

25          I think -- before I let you go I would like to spend

1  a few minutes talking about kind of the overall game plan

2  because there was a suggestion that immediately we were going

3  to have litigation schedules, and I just wanted to hear the

4  debtors' --

5          MR. HENES:  Sure.

6          THE COURT:  -- perspective on all of that.

7          MR. HENES:  Yes.  Our perspective on that, Your

8  Honor, is as we filed our complaint and we will work with Paul

9  Weiss and the other parties in terms of trying to set a

10  schedule.

11          THE COURT:  I'm sorry.  I'm listening to this --

12          MR. HENES:  I know.  The music is very distracting.

13      (Laughter)

14          MR. HENES:  So we will work with them on a schedule

15  that would work for both -- all the parties and of course the

16  Court.

17          THE COURT:  Okay.

18          MR. HENES:  There is -- there -- as you can tell

19  there's going to be -- there's a lot to look at --

20          THE COURT:  Yes.

21          MR. HENES:  -- around the merger.  Parties are going

22  to have a lot of different views on it depending on where they

23  sit.  And we're going to have to figure out how to best deal

24  with that in the most expeditious way.  We've been talking a

25  lot about different ways to do that.  We don't have an answer

Page 119

1    yet --

2              THE COURT:  Okay.

3              MR. HENES:  -- and I think once a committee gets

4    formed we need to sit down and we may need to come back to you

5    to talk about some ways to expedite that.

6              THE COURT:  Okay.  Well, if things begin to feel as

7    if they're beginning to move around and head in  particular

8    directions and you would like to come back in before the August

9    10th date for a conference or what have you, just let us know

10   and --

11             MR. HENES:  Okay.

12             THE COURT:  -- we'll find a time to do that --

13             MR. HENES:  Great.

14             THE COURT:  -- in person/telephone.

15             MR. HENES:  That sounds great.

16             THE COURT:  All right.

17             Yes, Mr. Stark.

18             MR. STARK:  Thank you, Your Honor.  Robert Stark from

19   Brown Rudnick.

20             Just by way of introduction, and I tried not to do

21   this in the middle of the back and forth on cash collateral,

22   I've been representing institutions that hold 60 percent of the

23   800 million pre-merger forest bonds.

24             THE COURT:  Forest bonds.  Okay.

25             MR. STARK:  Right.  So we're a significant part of

Page 120

```
 1     that litigation and --

 2              THE COURT:  Okay.

 3              MR. STARK:  -- our interests are advanced in that

 4     litigation with major respect to this.

 5              THE COURT:  I'll be getting a 2019 statement from

 6     you?

 7              MR. STARK:  It's in the works, Your Honor.  I knew

 8     you were going to ask me.  Our engagement goes back to December

 9     17th, which is the day after the closing of that merger.  So

10     we've been working very, very hard for a very long period of

11     time thinking about this litigation, thinking about, among

12     other things, remedies about the litigation.  This is a very

13     difficult remedies modeling exercise as well.

14              Now there has been information shared.  It has not

15     been a lot yet.  It needs to be more.  Our view, we've

16     advocated it to many people, that DNA of this case -- that's a

17     phrase I've been using a lot.  The DNA of this case is that it

18     wants to litigate, but what we would need to do, I think, is

19     spend a lot of time thinking about the evidence, talking about

20     it, rationalizing it and getting to a conclusion because this

21     case will not be -- it won't persist the way that other cases

22     that have DNA of litigation persist for years on end with

23     litigation.  It won't work here.  It's just the nature of this

24     particular business.

25              So I rise in part because Your Honor made an
```

Page 121

1    invitation to the debtors about coming back if there were

2    thoughts about procedures and help that may be necessary.  And

3    what I would like to do besides just introducing what we've

4    been doing over the last seven plus months is to say if -- if

5    perhaps we would have a need for Your Honor, would you please

6    entertain creditors' views on that because, among other things,

7    getting the information to the people who can study it and

8    present it to the others we've spoken a lot.  There's been a

9    lot of conversations among creditors about how to move this

10   case forward.

11            THE COURT:  Sure.

12            MR. STARK:  And I want to keep that agenda going.

13   It's the best for the case.

14            THE COURT:  Understood.  And I don't disagree,

15   although certainly at the outset when it appears that the

16   debtors are working very hard to coordinate, handle, reconcile

17   competing claims and concerns in the first instance I'm looking

18   to the debtors to continue that --

19            MR. STARK:  Understood.

20            THE COURT:  -- process, to be honest brokers, and to

21   move things forward constructively.

22            MR. STARK:  Understood.

23            THE COURT:  So certainly to the extent that that

24   ceases to be your view of their conduct, I am here.  At the

25   moment it seems as if everybody is at least trying to work in

Page 122

1    that direction.

2              MR. STARK:  Thank you, Your Honor.

3              THE COURT:  We always answer.

4              Mr. Dublin.

5              MR. DUBLIN:  Good afternoon, Your Honor.  Phil

6    Dublin, Akin Gump for the Bank of New York.

7              I would first like to apologize for the shuttling

8    back and forth.  Mr. Stamer is really covering for me today.  I

9    wasn't able to review the documents before due to a death in

10   the family.  So --

11             THE COURT:  Sorry.

12             MR. DUBLIN:  -- he was handling that for me today so

13   I apologize for that.  Thank you.

14             I agree with much of what Mr. Stark said.  I also

15   would like to highlight that we believe that while the debtors

16   are taking a first step with one cause of action, we believe

17   that there are a number of causes of action that will need to

18   be investigated.  Many will likely be pursued.  That will rise

19   and fall on the same facts and a lot of the same law as what we

20   evaluated and analyzed in connection with the complaint the

21   debtors already filed.

22             I think it's important that the creditors' committee

23   be formed and that the respective parties be able to meet with

24   the creditors' committee, advise the creditors' committee of

25   their respective views in that process so that the scheduling

Page 123

1    takes place with their involvement as well.

2         THE COURT:  Sure.  Sure.  Well, the creditors'

3    committee and creditors' committee counsel is going to play a

4    vital role.

5         MR. DUBLIN:  Thank you, Your Honor.

6         THE COURT:  So we'll look forward to their being

7    engaged and brought up to speed.

8         MR. DUBLIN:  Thank you.

9         THE COURT:  Mr. Herman.

10        MR. HERMAN:  Your Honor, very briefly again.  Brian

11   Herman from Paul Weiss for Wilmington Trust.

12        I didn't mean by saying that we're going to file a

13   prompt motion to dismiss to be in any way antagonistic.  We

14   were --

15        THE COURT:  I didn't take it that way.

16        MR. HERMAN:  We were served with the complaint.  But

17   I do think that streamlining the case is important and I

18   actually think given that there are a couple of very discreet

19   simple legal issues that the complaint implicates it very well

20   lends itself to a motion to dismiss which, if we're right,

21   would get rid of this litigation very quickly.

22        THE COURT:  Well, not to unfairly prejudice you by

23   talking about a case which you didn't participate in actively,

24   I had heard that before in a case in which there were claims

25   that one party said were without merit and one party said were

Page 124

1    easily amenable to summary dismissal.  Sometimes it's true,

2    sometimes it's not.

3          I think the paramount goal here is proceeding in an

4    orderly fashion and we're just -- I, in particular, I am going

5    to have to get smarter.  It's only day two.  And you'll work

6    together and if it gets to the point where you believe that

7    that's something that you need to do, that's -- we'll talk

8    about doing it.

9          MR. HERMAN:  Great.  Thank you, Your Honor.

10          THE COURT:  All right.  Mr. Schwartzberg, you going -

11    - coming back?

12          MR. SCHWARTZBERG:  I'm coming back, Your Honor.

13          THE COURT:  We'll always make room for you up front.

14          MR. SCHWARTZBERG:  Your Honor, one thought that the

15    U.S. Trustee had, and I thought this would be a good time to

16    bring it out, since you have the debtor with its independent

17    committee, which I clearly think the other side of the table is

18    not going to trust, I --

19          THE COURT:  Well, let's not --

20       (Laughter)

21          THE COURT:  -- let's not -- let's not assume that.

22          MR. SCHWARTZBERG:  We thought perhaps to get an

23    independent party to come in and perhaps look at these claims

24    and -- rather than having different parties with discovery and

25    litigation and having an honest broker come in, perhaps the

Page 125

1    examiner come in and --

2            THE COURT:  Well, in the first instance the debtors'

3    in the driver's seat.  And until I have reason to believe on my

4    own or because of something that somebody's bringing to my

5    attention that the debtors not fulfilling its fiduciary duties

6    to the creditors and each of the creditors, that's what we're

7    going to do.

8            I know you're coming from an appropriate sentiment,

9    but right now I've got counsel for the debtors.  I've got an

10   independent committee.  I've got very well represented

11   antagonists, antagonistic parties.  So that's what we're --

12   that's where we're going to go and I would request that the

13   debtor be given that runway and leeway to try to do what it's

14   setting out to accomplish.

15           MR. SCHWARTZBERG:  Thank you, Your Honor.

16           THE COURT:  But I appreciate your thought.

17           MR. HENES:  Your Honor --

18           THE COURT:  I think that's it.

19           MR. HENES:  -- I was just going to say if there's --

20   yeah.  If there's nothing else, thank you, Your Honor.

21           THE COURT:  I think we're adjourned.  I appreciate

22   all of your attention and your patience.  We will need to get

23   all the orders from you, and just keep us apprised as to the

24   timing and whereabouts of the cash collateral order.

25           MR. HENES:  Thank you.

Page 126

1                THE COURT:   Okay.   Have a good day.

2                (A chorus of thank you)

3        (Whereupon, these proceedings were concluded at 1:28 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 127

1

2                            I N D E X

3

4                         E X H I B I T S

5    NO.        DESCRIPTION                    PAGE      LINE

6    ---        Declaration of Michael Magilton    13        17

7               in support of first day motions

8

9                         R U L I N G S

10   DESCRIPTION                               PAGE      LINE

11   Joint administration motion granted        20        18

12   Cash management motion granted            103         3

13   Wages motion granted                      105        21

14   Royalty and working interest motion granted  111       3

15   Lienholder motion granted                 114         6

16   Taxes and fees motion granted             115         4

17   Equity trading motion granted             115        18

18   Creditor matrix motion granted            116         7

19   Schedules extension motion granted        116         7

20   Noticing agent application approved       116        20

21

22

23

24

25

Page 128

1                    C E R T I F I C A T I O N

2

3    We, Lisa Beck and Sherri Lyn Breach, certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    **Lisa Beck**          Digitally signed by Lisa Beck
                            DN: cn=Lisa Beck, o=Veritext, ou,
                            email=digital@veritext.com, c=US
6    _____ Date: 2015.07.17 14:35:44 -04'00'

7    Lisa Beck (CET**D 486)

8    AAERT Certified Electronic Transcriber

9    **Sherri Breach**      Digitally signed by Sherri Breach
                            DN: cn=Sherri Breach, o=Veritext, ou,
                            email=digital@veritext.com, c=US
10   _____ Date: 2015.07.17 14:36:46 -04'00'

11   Sherri Lyn Breach (CET**D 397)

12   AAERT Certified Electronic Transcriber

13

14   Veritext Legal Solutions

15   330 Old Country Road

16   Suite 300

17   Mineola, NY 11501

18

19

20   Date:  July 16, 2015

21

22

23

24

25