Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3

4   In re:                          :
                                    :   Chapter 11
5                                   :

    SABINE OIL & GAS CORPORATION   :   Case No. 15-11835

6                                   :

              Debtors.             :

7   ─────────────────────────      :

                                    :

8                                   :

    SABINE OIL & GAS CORPORATION, :

9                                   :

              Plaintiff,           :

10                                  :

       v.                          :   Adv. Proc. No.

11                                  :   15-01126-scc

    WILMINGTON TRUST, N.A.          :

12                                  :

              Defendants.          :

13  ──────────────────────────────:

14

15                                  United States Bankruptcy Court

16                                  One Bowling Green

17                                  New York, NY 10004

18                                  January 12, 2016

19                                  10:01 AM - 11:40 AM

20

21  B E F O R E :

22  HON SHELLEY C. CHAPMAN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO OPERATOR:  JEANELLE DAWES

1    HEARING re Adversary proceeding: 15-01126-scc Sabine Oil &

2    Gas Corporation v. Wilmington Trust, N.A. Argument on Motion

3    to Dismiss (Continued from 10/15/15).

4

5    HEARING re Doc #625 Application of the Official Committee of

6    Unsecured Creditors of Sabine Oil & Gas Corporation, et al.,

7    for Entry of an Order Expanding the Scope of the Committee's

8    Employment and Retention of Porter Hedges LLP.

9

10   HEARING re Doc #603 First Interim Fee Application of

11   Deloitte & Touche LLP for Compensation for Services Rendered

12   and Reimbursement of Expenses Incurred as Independent

13   Auditor and Accounting Services Provider to the Debtors.

14

15   HEARING re Doc #605 First Interim Fee Application of

16   Kirkland & Ellis LLP and Kirkland & Ellis International LLP,

17   Attorneys for the Debtors.

18

19   HEARING re Doc #604 First Interim Fee Application of Lazard

20   Freres and Co. LLC, as Investment Banker to the Debtors for

21   Allowance of Compensation and Reimbursement of Expenses.

22

23   HEARING re Doc #628 First Interim Application of

24   PricewaterhouseCoopers LLP, Tax Consultants to the Debtors,

25   for Compensation for Services Rendered and Reimbursement of

1   Expenses.
2
    HEARING re #607 First Interim Fee Application of Prime
3
    Clerk, LLC, Administrative Agent to the Debtors, for
4
    Services Rendered and Reimbursement of Expenses.
5
6
    HEARING re Doc #618 First Interim Application of Berkeley
7
    Research Group, LLC for Compensation for Services Rendered
8
    and Reimbursement of Expenses as Financial Advisor to the
9
    Official Committee of Unsecured Creditors.
10
11
    HEARING re Doc #624 First Application of Porter Hedges, LLP,
12
    as Texas and Oil and Gas Counsel for the Official Committee
13
    of Unsecured Creditors, for Allowance of Compensation and
14
    for the Reimbursement of Expenses.
15
16
    HEARING re Doc #606 First Application of Ropes & Gray LLP,
17
    as Counsel for the Official Committee of Unsecured
18
    Creditors, for Allowance of Compensation and for the
19
    Reimbursement of Expenses
20
21
22
23
24
    Transcribed by:  Sonya Ledanski Hyde
25

Page 4

1    A P P E A R A N C E S :

2

3    KIRKLAND & ELLIS, LLP

4         Attorney for the Debtors

5         300 North LaSalle

6         Chicago, IL 60654

7

8    BY:   JONATHAN S. HENES, P.C.

9         GABOR BALASSA

10

11   ROPES & GRAY

12        Attorney for the Official Committee of Unsecured

13        Creditors

14        1211 Avenue of the Americas

15        New York, NY 10036-8704

16

17   BY:   KRISTINA K. ALEXANDER

18        D. ROSS MARTIN

19        ANDREW G. DEVORE

20

21

22

23

24

25

```
 1   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
 2         Attorneys for Wilmington Trust, N.A.
 3         1285 Avenue of the Americas
 4         New York, NY 10019
 5
 6   BY:  KELLIE A. CAIRNS
 7         MOSES SILVERMAN
 8         KYLE KIMPLER
 9
10   AKIN GUMP STRAUSS HAUER & FELD LLP
11         Attorney for the Bank of New York
12         One Bryant Park
13         New York, NY 10036-6745
14
15   BY:  DANIEL H. GOLDEN
16
17   LINKLATERS LLP
18         Attorneys for Wells Fargo
19         1345 Avenue of the Americas
20         New York, NY 10105
21
22   BY:  MARGOT B. SCHONHOLTZ
23
24
25
```

1   BROWN RUDNICK

2         Attorney for the Ad Hoc Committee of Forest Oil

3         Noteholders & Forest Oil Noteholders Trustees

4         7 Times Square

5         New York, NY 10036

6

7   BY:  DANIEL J. SAVAL

8

9   ALSO PRESENT TELEPHONICALLY:

10   ZELIJKA BOSNER

11   TRENT BRENDON

12   JOEL BRIGHTON

13   HAL CANDLAND

14   SCHUYLER CARROLL

15   JILL DINERMAN

16   DAVID M. DUNN

17   SHARI DWOSKIN

18   DAVID M. EPSTEIN

19   JOSEPH FEIL

20   ANNELYSE GIBBONS

21   STEPHANIE HARRELL

22   BRIAN HERMANN

23   JOHN F. HIGGINS

24   JASON HOMLER

25   SANDI HORWITZ

Page 7

1    DAVID KOENIG

2    AARON M. KRIEGER

3    LUIS J. LANDAS

4    BRENDAN J. LANE

5    DAVID LUKKES

6    MICHAEL MARCZAK

7    DIANE MEYERS

8    JEFFREY S. MUNOZ

9    MATTHEW OCKWOOD

10   IAN T. PECK

11   DEBORAH M. PERRY

12   JEFFREY ROTHELDER

13   MATTHEW S. RYDER

14   JONATHAN SATRAN

15   JASON B. SANJANA

16   WARD SAVAGE

17   SAM STRINGER

18   JOSEPH TAEID

19   ANDREW M. THAU

20   RAY WALLANDER

21

22

23

24

25

Page 8

1                    P R O C E E D I N G S

2              THE COURT:  Have a seat.  How are you, Mr. Henes?

3              MR. HENES:  I'm good, Your Honor.  How are you?

4              THE COURT:  Okay.

5              MR. HENES:  Good morning, Your Honor.  Jon Henes,

6     Kirkland & Ellis on behalf of Sabine Oil & Gas.  Your Honor,

7     we only have two items on the agenda for today.

8              THE COURT:  Right.

9              MR. HENES:  One related to the motion to dismiss

10    with respect to the claim brought by the company against the

11    second lienholders.  And the second being the fee

12    applications.

13             THE COURT:  Right.

14             MR. HENES:  I'm actually confident that we called

15    and I unfortunately have to leave at 11:00 today, and

16    hopefully we'll be done by then, but I was hoping we could

17    take the fee apps first --

18             THE COURT:  Sure.

19             MR. HENES:  -- which are -- there's no objections.

20             THE COURT:  Right.  So, a couple of things.  So I

21    understand that there -- all of the applications of the

22    committee's professionals have been adjourned.

23             MR. HENES:  That's correct.

24             THE COURT:  And there were an exchange of letters

25    or pleadings between Wells Fargo and the committee, right?

Page 9

1    There was limited objection and then there was a preliminary

2    response and to be continued?

3              MR. HENES:  To be continued.

4              THE COURT:  Okay.  To be continued.  All right.

5    So we're not going to do that.  Then there was also -- there

6    was committee's application to expand the scope of Porter

7    Hedges --

8              MR. HENES:  Correct.

9              THE COURT:  -- right?  That's on for today?

10             MR. HENES:  Yes, Your Honor

11             THE COURT:  All right.  So -- and no one has an

12   objection to that?

13             MR. HENES:  No.

14             THE COURT:  Right?

15             MR. HENES:  Yes.

16             THE COURT:  Does anyone wish to be heard with

17   respect to the committee's application to extend -- expand

18   the scope of the committee's employment and retention of

19   Porter Hedges?  Okay.  So that's going to be entered.

20             Then with respect to Kirkland's application, is

21   anyone here from the Office of the U.S. Trustee?

22             MR. HENES:  Mr. Schwartzberg.

23             THE COURT:  Mr. Schwartzberg in his customary

24   seat.

25             MR. SWARTZBERG:  I think I moved up one, Your

 1    Honor.

 2             THE COURT:  You moved up one?  Great.  Well by the

 3    end of the game you'll be in the front row.

 4             MR. HENES:  He's welcome any time.

 5             THE COURT:  He is welcome any time.

 6             MR. HENES:  He is welcome.

 7             THE COURT:  Right.  So there was this curious

 8    thing, you filed a supplemental application.

 9             MR. HENES:  We did.

10             THE COURT:  Could you give me a little bit more

11    color about this Q&A thing?

12             MR. HENES:  Sure.  The -- Mr. Schwartzberg reached

13    out to us with a number of questions --

14             THE COURT:  Right.

15             MR. HENES:  -- and had asked us if we would work

16    with him and work with the U.S. Trustee's Office to get them

17    answers and to file a supplement.  With respect to the Q&A

18    specifically, we had said that we had already answered those

19    questions, just in a different place in my declaration.  But

20    the U.S. Trustee's Office requested that we do it in Q&A

21    form, and so we decided that it was not -- that we would do

22    that.  That's as simple as it is.

23             THE COURT:  Mr. Schwartzberg, why don't you come a

24    little closer.  How are you?

25             MR. SWARTZBERG:  Good.

Page 11

1          THE COURT:  Happy New Year.

2          MR. SWARTZBERG:  Thank you.

3          THE COURT:  Can you shed any light on why this was

4    necessary?

5          MR. SWARTZBERG:  What -- the entire supplement or

6    the Q&A one?

7          THE COURT:  The Q&A format.  I mean I don't want

8    to make a mountain out of a mole hill, but --

9          MR. SWARTZBERG:  I guess I have two responses, one

10   I had trouble finding those answers so I said, are they

11   there.  And then I -- without looking, could you just do the

12   -- answer the question -- put the question and the answer,

13   just to make it easier to find, rather than parse through

14   the application in different areas, just for ease.

15          And second, which sort of just a format that we've

16   used in numerous other cases in the Southern District.  We

17   thought it would be easier to continue with that format.

18          THE COURT:  Okay.  I'm just not a big fan of extra

19   work for no real benefit.  So to the extent that as Mr.

20   Henes indicates, that the same information was contained in

21   his declaration --

22          MR. SWARTZBERG:  The only thing I could supplement

23   to that, Your Honor, is because we had some other questions

24   that we asked for the declaration, that's why we asked, oh,

25   can you -- while you're doing it, could you put it in this

1    format.

2              For instance, in Sbarro, the firm filed a fee

3    application, did not use the Q&A format, but we had no other

4    questions.  Didn't make them just change it for the Q&A, I

5    figured while they were filing a supplement, if we could do

6    something that conforms to what we sort of wanted, and they

7    were not hesitant to do that, that was fine.  But it wasn't

8    just solely for that, it was primarily for the other parts

9    of the supplement that happened to be the first thing in the

10   supplement.

11             THE COURT:  Okay.  Well we can let it go, but I'm

12   just not a big fan of extra work for no benefit to the

13   estate, so we'll leave it at that.

14             MR. SWARTZBERG:  Well, as I said, Your Honor, I

15   would not have brought it up had it not been together.  It's

16   just that --

17             THE COURT:  Okay.  Is there anything else that

18   your office has to say about the fee application?

19             MR. SWARTZBERG:  Nothing, Your Honor.

20             THE COURT:  Okay.  All right.  Thank you, Mr.

21   Schwartzberg.

22             All right.  Back to you, Mr. Henes.

23             MR. HENES:  Yes.  So Your Honor, the -- other than

24   the committee's fee application that's being adjourned,

25   there were no objection to any of the other fee

Page 13

1    applications.  Unless you have questions for Kirkland on

2    ours or anyone else's, we would just ask for them to be

3    approved.

4              THE COURT:  All right.  Does anyone else wish to

5    be heard with respect to the other fee applications that are

6    before the Court for interim approval today?

7              All right.  Very well.  So just have someone

8    submit an order to us, Mr. Henes.

9              MR. HENES:  Thank you, Your Honor.

10             THE COURT:  All right.  Thank you.

11             MR. HENES:  So Your Honor, the second item on the

12   agenda relates to the motion to dismiss.  As Your Honor

13   knows, we've made our substantive arguments already --

14             THE COURT:  Right.

15             MR. HENES:  -- and so we're not looking to make

16   any additional arguments.  And I think for us it's just a

17   simple matter of timing and whether the motion to dismiss

18   should be ruled on now or not.  And I can address that very

19   quickly and then sit down --

20             THE COURT:  Sure.

21             MR. HENES:  -- and let others speak.  You know, I

22   think that one of the questions, and we've heard this

23   question as we've been talking to all the different parties,

24   is since the debtors have stated, and we have said this,

25   that because of where gas prices have dropped, our view is

Page 14

1    that there is no value to those liens anymore, that the

2    second liens have on the collateral of the -- of legacy

3    Forest assets, why not just withdraw the complaint, even if

4    it's without prejudice.  And I think that we have a couple

5    of reasons for that.

6          One is we think a ruling would give us clarity.

7    What we are doing right now, we, the debtors, is while the

8    mediation is about to begin at the end of this month, and we

9    had our initial session, which I think was a very productive

10   session, with Judge Gropper, and while the STN motions are

11   pending, we are continuing to push forward with a plan and

12   we do intend to file a plan.  Because we think getting a

13   plan process moving forward will make sense, and we'll

14   discuss that as well in the mediation.

15         And having some clarity on this issue would be

16   helpful because, for instance, if you rule in our favor, and

17   as a result the lawsuit would move on, then we would be

18   sitting talking to the seconds about trying to settle it,

19   most likely, rather than continue to prosecute it, although

20   we would continue to move forward in prosecution.

21         Second, if you ruled against us, then that's a

22   claim that we would be releasing under our plan as the

23   debtor, because there would be no claim.  So we think

24   clarity is important.

25         Second, to the value perspective, when it comes to

1   remedies we've heard -- we've looked at a lot of different

2   remedies, we've heard from the creditor's committee and have

3   seen it and we think that even without the value today,

4   there are potential remedies against the second lienholders,

5   based on the lien they got at the time that they got it.  So

6   we don't think it's an irrelevant or moot point anymore.

7           But really, our view is we would like to get as

8   much clarity as possible as we move forward in the plan

9   process, and we think that this is part of it.

10          The last thing I would say is, both the creditors

11  committee and the ad hoc committee of Forest noteholders

12  have brought claims to avoid those same liens, at least they

13  put them in their STN motions, so clearly their view is that

14  those are real claims to be decided and we just think that

15  deciding it now would -- again, would be helpful as we move

16  forward in this process.  We think that each issue that

17  could be decided will help us.

18          That's all I have to say for right now, but we'll

19  reserve our right.

20          THE COURT:  Okay.

21          MR. HENES:  Thank you, Your Honor.

22          THE COURT:  All right.  And just before you step

23  down, just to be clear, we're having a pretrial conference

24  tomorrow?

25          MR. HENES:  Correct.

```
 1                THE COURT:  Correct?

 2                MR. HENES:  On the STNs.

 3                MR. SILVERMAN:  Correct.

 4                MR. HENES:  Yes, Your Honor.

 5                THE COURT:  On how we're going to conduct the

 6      STNs?

 7                MR. HENES:  Yes, we do.  Yes.

 8                THE COURT:  Okay.  All right.  And that's been

 9      noticed on the docket?

10                MR. SILVERMAN:  Yes.

11                THE COURT:  All right.  Thank you.

12                MR. HENES:  Thank you.

13                THE COURT:  Mr. Silverman, thank you for making --

14      reprising your earlier role.  I appreciate it.

15                MR. SILVERMAN:  Your Honor, we thought, though,

16      that it made sense for the --

17                THE COURT:  I think --

18                MR. SILVERMAN:  -- committee to go first because

19      --

20                THE COURT:  I agree.  Okay.  All right, Mr.

21      Martin.

22                MR. MARTIN:  Your Honor, for the record, Ross

23      Martin, Ropes & Gray for the official committee of unsecured

24      creditors.

25                THE COURT:  Well, also let me just take a moment
```

1      to note that I've got a couple dozen folks on the phone and

2      they're all listening, (indiscernible) can only identify --

3              MR. MARTIN:  Plaintiff intervener in this

4      adversary proceeding as well.  As Mr. Silverman noted, we

5      conferred before the hearing and we're happy to go first

6      since you heard from both him and the debtors several weeks

7      ago.  Given that this --

8              THE COURT:  Wait.  And just let me stop you.  We

9      did, I believe, enter the order on the intervention.

10             MR. MARTIN:  That's correct.

11             THE COURT:  Yes.

12             MR. MARTIN:  I checked that, Your Honor.

13             THE COURT:  Right.  Okay.

14             MR. MARTIN:  Yes.  The -- since the second lien

15     agent is being allowed to reply orally at the hearing, which

16     makes perfect sense given the time line, I might want to say

17     a few words, but I've, you know, reviewed the transcript and

18     I want to try to bring this to a close rather than have six

19     back and forths, and do this in a focused way, since there's

20     already been argument and we have the benefit of not only

21     the briefs, but as I said, that prior argument.

22             Obviously I'd be happy to answer questions the

23     Court has.  We filed a hopefully not too lengthy pleading

24     that gives us our take on this.

25             But where I'd like to start, Your Honor, is by

Page 18

1    observing that the committee believes, essentially, that the

2    debtors and the second lien agent are talking past each

3    other.

4            THE COURT:  You're all talking past each other.

5            MR. MARTIN:  Well, that may very well be on a

6    larger scale.  And that is a result of not focusing on what

7    we think is a critical fact and some of what we think is

8    very simple uncontested law.  And the fact is this.  That

9    the debtors keep talking, in this adversary proceeding,

10   about the liens, about the grant of the liens.  But they

11   also keep talking about the events of December 16th, 2014

12   when the transaction closed.

13           What causes the confusion, I -- in my view, is

14   that the liens weren't granted on December 16th, the liens

15   were granted, its undisputed, in February of 2015.  Later.

16   And what that does is it brings, as I was thinking about

17   this, into sharp relief why the two parties disagree.  The

18   debtors are arguing about the right date, but the wrong

19   thing.  I mean we've made this, I think, pretty clear in our

20   papers.  At the closing of the merger, what occurred from

21   the perspective of Forest Oil Corporation, sitting there,

22   and New York Corporation at that time, was that all of a

23   sudden it had many more obligations, including $700 million

24   of second lien debt. And it doesn't --

25           THE COURT:  Well, let me stop you, because this

```
 1   is, I believe, incredibly complex.  Okay?  And right away we

 2   get to one of the issues, which is "it."  You said "it had

 3   more obligations."  And one of the fundamental problems is,

 4   or issues is who is "it."

 5              MR. MARTIN:  Okay.  So that was exactly the --

 6              THE COURT:  Who is "it"?

 7              MR. MARTIN:  Okay.

 8              THE COURT:  Okay?

 9              MR. MARTIN:  So -- and I was -- my very next point

10   was that there was a lot of discussion at the prior hearing

11   about who is "it" --

12              THE COURT:  Right.

13              MR. MARTIN:  -- and the nomenclature issue.  And I

14   actually think that can be quite easily clarified, by

15   focusing on Forest Oil, as it sat there the moment before

16   the merger.  Okay?

17              The merger, when it happened, was an incurrence of

18   obligations, from the perspective of fraudulent conveyance

19   law.  I understand what it means as a matter of corporations

20   law.  Right?  But fraudulent conveyance law is a separate

21   body of law.  And so we don't have to talk about legacy

22   Forest combined company.  Forest Oil is the parent debtor

23   now.

24              THE COURT:  Well it's the --

25              MR. MARTIN:  So it has --
```

1          THE COURT:  -- for the purposes of fraudulent

2    conveyance law, isn't it -- does it lend clarity to say that

3    it's the transferor?

4          MR. MARTIN:  Yes.  Or the way I would put that is,

5    it's the party that incurred the obligation, same -- we're

6    saying the same thing.  Because you can either be -- you can

7    either make a transfer or incur an obligation.

8          THE COURT:  But let me try it this way, the way

9    some -- I always like to try to put it in the simplest

10   terms. So Forest sat down at the table, right?

11         MR. MARTIN:  Mh hmm.

12         THE COURT:  Pushed all of its assets and

13   liabilities into the middle.  Sabine sat down at the table,

14   pushed all of its assets and liabilities into the middle.

15   And then what did Forest get back?  It got back 26 percent

16   of the economic value of everything that was put on the

17   table.

18         MR. MARTIN:  We actually don't quite see it that

19   way, Your Honor.

20         THE COURT:  Okay.

21         MR. MARTIN:  I see it in a  simpler way.  Forest

22   is sitting there, and Sabine merges into it.  Forest Oil is

23   still the parent debtor.  That entity that merged in, we

24   should also make a distinction there's Sabine parent --

25         THE COURT:  Right.  Sabine --

1           MR. MARTIN:  -- and Sabine subsidiaries.

2           THE COURT:  Right.

3           MR. MARTIN:  And it's Sabine parent that merged

4    in, the subsidiaries are still hanging underneath.

5           When it merged in, there were -- there was a bunch

6    of existing debt on the Sabine parent.  And all of a sudden

7    Forest was liable for that debt.  That's, for fraudulent

8    conveyance purposes, not a transfer, it's an incurrence of

9    an obligation, which is just as avoidable as a transfer.

10   Okay?

11          I don't see there being, on December 14th, with

12   respect to the second liens, there's not a transfer, that's

13   my point about the liens were granted later.  They're also

14   avoidable, because the obligation's avoidable.  But from the

15   second liens, I'll be perfectly clear, the committee does

16   not think that there was a transfer.  There was a

17   fraudulent, avoidable incurrence of an obligation, because

18   Sabine -- when Sabine parent came, it was a holding company.

19   It had very few assets.  The assets that the Sabine business

20   had were -- the oil and gas fields rest at the subsidiaries,

21   it was insolvent.  The subsidiaries were insolvent, because

22   of the debt that already sat on Sabine.

23          So when you say 26 percent of the economic value,

24   the economic value that came in, as the Court was

25   indicating, two sets of things came together.  What came in?

1    A whole bunch of liabilities at Sabine parent, and the very

2    few assets, maybe a headquarters lease --

3            THE COURT:  Right.

4            MR. MARTIN:  -- maybe a few other things, nothing

5    close to 700 million plus the first lien that -- all of

6    which was assumed in -- as -- in the merger, as a matter of

7    fraudulent conveyance law.

8            And so that -- when you put the picture together

9    for constructive fraudulent conveyance, Forest, sitting

10   there, assumed the second lien debt, the first -- the old

11   Sabine first lien debt, but even the second lien debt by

12   itself, assumed $700 million of obligations and very, very

13   few assets came with it from Sabine, because the stock of

14   the subsidiaries was valueless.  It was insolvent.

15           And that -- and so it's an incurrence.  It's -- in

16   the first instance it's the avoidance of the incurrence of

17   an obligation, that's what you've heard people since the

18   first day of the case, I wasn't here but I read the

19   transcript, talk about claim avoidance in the first

20   instance, not a transfer.

21           And that's why I wanted to start where I started

22   because I think that the problem the committee has always

23   had with the debtor's approach is by focusing on the lien,

24   it focuses on, you know, what was the transfer and the

25   question the Court --

```
 1                THE COURT:  But let me ask you --

 2                MR. MARTIN:  -- had, but that's not the question

 3      in the first instance.

 4                THE COURT:  But let me try to come at it a

 5      different way.  You started by saying, let's focus on

 6      undisputed facts, right?

 7                MR. MARTIN:  Mh hmm.

 8                THE COURT:  There's no dispute that the second

 9      lien lenders provided value.  They made the loans, right?

10                MR. MARTIN:  To the old entity.

11                THE COURT:  Yes.  But they made the loans --

12                MR. MARTIN:  That's correct.

13                THE COURT:  -- right?  So you're saying claim

14      avoidance, you're saying no claim.  No claim.  But they lent

15      the money.

16                MR. MARTIN:  So --

17                THE COURT:  -- right?  And they, putting aside,

18      you know, intent on their part or co-conspiracy or et cetera

19      they lent the money to an entity, under, you know, various

20      credit liens and then low and behold, they get dragged along

21      into this transaction and now what you're saying is because,

22      under fraudulent conveyance law there was not reasonably

23      equivalent value, that's still what it --

24                MR. MARTIN:  At --

25                THE COURT:  -- comes back to, right?  On --
```

1            MR. MARTIN:  That's on --

2            THE COURT:  -- December 16th?

3            MR. MARTIN:  -- on the constructive claim, that's

4     correct.

5            THE COURT:  -- on the constructive claim, right--

6            MR. MARTIN:  Right.

7            THE COURT:  -- that the second lien lenders should

8     have no claim for the money that they lent.  Whereas I think

9     what the debtor is trying to say is put the parties back to

10    where they were before the liens were granted.

11           MR. MARTIN:  Let me answer the question this way,

12    because I don't characterize it that way.  I'll tell you --

13           THE COURT:  Okay.

14           MR. MARTIN:  -- exactly what recourse we think

15    they have.

16           THE COURT:  Okay.  Can I just ask Mr. Henes, if --

17           MR. HENES:  Yeah.

18           THE COURT:  -- fundamentally that's --

19           MR. HENES:  It is fundamentally right.  And I

20    think I -- and I don't want to put words in Mr. Ross's (sic)

21    mouth.  Anyway, but I think what's -- because we thought

22    about this a lot, too.  It's almost -- it's a two estate,

23    one estate thing almost.  Because I don't think what Mr.

24    Ross is saying is that the full second lien obligation

25    should go away against --

1              MR. MARTIN:  Correct.

2              MR. HENES:  -- everybody.  He's saying against the

3     Forest estate.  We don't look at the -- we look at one

4     combine company --

5              THE COURT:  Right.

6              MR. HENES:  -- that's how we're looking at it.  So

7     we're saying that that claim can't go away, because there's

8     one estate and they did loan the money and so they have that

9     claim.

10             I think what Mr. Martin is saying is, no, let's

11    look at it as two estates.  Against Forest -- no?  Okay.

12    Then I don't --

13             MR. MARTIN:  Let me --

14             THE COURT:  Okay.

15             MR. HENES:  -- then I don't understand.

16             MR. MARTIN:  I know exactly --

17             THE COURT:  All right.

18             MR. MARTIN:  -- how we -- we've thought long and

19    hard about this, and let me just answer the Court's question

20    directly.

21             THE COURT:  I mean you have to all admit, we can

22    agree on one thing, it is fascinating that --

23             MR. MARTIN:  Yes.  So let me start with this.

24             THE COURT:  -- that we're all having such trouble

25    with this.

1           MR. MARTIN:  No, but let me start with this. We

2     are not saying that the, at least the 650 million which had

3     been previously loaned, there was a $50 million bump up --

4           THE COURT:  Right.

5           MR. MARTIN:  -- set that aside.

6           THE COURT:  Right.

7           MR. MARTIN:  We are not saying that the 650

8     million, at the subsidiary level where the assets are, the

9     assets they loaned against, where -- that's not the cause of

10    action we're here talking about today.  The only action here

11    today is the one brought by the debtors by the parent

12    debtor.

13          So in terms of, are we just eliminating their

14    claim and they're gone from the case?  The answer is, no.

15    They actually have recourse, secured recourse to the assets

16    that they had, as the Court said, that they loaned on at the

17    subsidiary level.  So that's point one.

18          At the parent level, this is how I think the

19    statute works by its plain terms.  The obligation is

20    avoidable in the first instance, to the extent that value

21    came in, okay, in that merger, at the parent level.  So

22    let's talk about what miscellaneous assets there might have

23    been at the parent company.  Maybe there's a headquarters

24    building, headquarters lease, there were swaps that were in

25    the money to the company, not insignificant value, actually,

1    at the time, tens of millions of dollars, and there may be

2    other assets.  Those assets that came in in the merger, in

3    our view, as we set forth in STN papers, assuming everyone's

4    in good faith, get credited.

5         So if you think about it this way, prior to the

6    merger, what recourse would the second liens have had?  They

7    would have had recourse at the subsidiary level and they

8    would have had recourse at the Sabine parent level, the

9    assets of the Sabine parent.  And what 548(c) gives them is

10   exactly that recourse.

11        So we're not saying we're wiping out the claim at

12   the parent, we're saying it's claim avoidance and they get,

13   by virtue of 548(c), to keep for the value that came in that

14   they would have had recourse to.  That's how the statute

15   works.  It actually produces exactly the results of if you

16   pull them apart, but you can't.  The Court -- I don't --

17   doesn't have the power to create two estates.

18             THE COURT:  Right.

19             MR. MARTIN:  But it is not the case that --

20             THE COURT:  But doesn't what you just said reflect

21   that you and Mr. Henes are, in substance, saying the same

22   thing?  And I'm trying to bridge the difference,

23   intellectually, between your characterization of this as

24   claim avoidance and the debtor's characterization of this as

25   lien avoidance.  And I think that the clarification that you

```
 1    just made does that.

 2              MR. MARTIN:  Right.  Let me -- this is why I

 3    started where I did with the two different dates.  This is

 4    exactly why I started there.

 5              THE COURT:  Okay.

 6              MR. MARTIN:  Because if you don't deal with what

 7    happened on the 16th, with the claim avoidance, if you look

 8    at it as they have framed the complaint, a transfer of liens

 9    which occurred in February, later, in a sense the second

10    lien agent is correct.  Two months later, it's an obligation

11    of the combined entity, and they granted a lien.  It was

12    unsecured for two months, they granted a lien, there was

13    more than 90 days before the case filed.

14              THE COURT:  Right.

15              MR. MARTIN:  It feels, in the words of the Court,

16    in the transcript that I read --

17              THE COURT:  Preferency.  Preference.  Right.

18              MR. MARTIN:  What -- and that's where our

19    disagreement with the debtors lies, because to our mind, if

20    the complaint frankly is only brought the way its brought,

21    it may have a problem, upstairs, wherever, because what

22    makes the liens avoidable, whether the liens were granted

23    frankly two months later or on the 16th, what makes them

24    avoidable is that the lien -- because they're right about

25    the antecedent debt rule exists.  We're not -- we don't
```

1    dispute that.

2              THE COURT:  Right.

3              MR. MARTIN:  But it doesn't exist when the

4    underlying obligation is avoidable.  And that's why we start

5    the analysis.  We actually don't end up, I think, in a

6    different place, but it --

7              THE COURT:  That's what I --

8              MR. MARTIN:  -- matters --

9              THE COURT:  -- that's what I was trying to say.

10             MR. MARTIN:  -- for the justification of it.

11             THE COURT:  So you say that -- there's a lot of

12   talk about red herrings, but fundamentally you could also

13   get to where you want to go by collapsing, right?

14             MR. MARTIN:  I don't think so.  And that's why I

15   wrote that for a reason.  Because -- and we're not here

16   today on this.  We think the collapsing doctrine is relevant

17   to other causes of action that we've asserted and we'll be

18   talking about that in February.

19             But the collapsing doctrine does something

20   different.  The collapsing doctrine is very specific for

21   when you have a loan made, money coming in, lien going out.

22   So if you just look at that, it looks like reasonably

23   equivalent value.  But then the money goes somewhere else.

24   That's what the collapsing doctrine is about.  It's not a

25   generalized doctrine, and it's not -- I just think it's the

```
 1      wrong doctrine here.  And again --

 2              THE COURT:  But --

 3              MR. MARTIN:  -- there's a lot of money at stake

 4      and so we --

 5              THE COURT:  Right.

 6              MR. MARTIN:  -- want to make sure we have this

 7      right.

 8              THE COURT:  But the best authority that you've

 9      given me is Hechinger.

10              MR. MARTIN:  No, the best authority, I think is

11      Adelphia.  And I can point the Court to exactly where I'm

12      talking -- all right, excuse me, Allegheny.  And I can point

13      you exactly to where I'm talking about.

14              THE COURT:  Allegheny's a really bizarre case.  I

15      mean let's -- with all due respect, I mean --

16              MR. HENES:  I saw the Court's remarks on that and

17      I spent a bit of time -- and again, if the Court would

18      indulge me for a minute --

19              THE COURT:  Sure.

20              MR. HENES:  -- if I can try to simplify it?

21              THE COURT:  Sure.

22              MR. HENES:  Because I want to talk about two

23      pieces about Allegheny.  What makes Allegheny bizarre is

24      that it -- it was two things.  First of all, it analyzed six

25      different transfers, and thankfully it lays them out quite
```

1    crisply at Pages 161 to 162 of the opinion and then goes

2    through each one methodically.

3            What also is bizarre about it is that the

4    plaintiff in that case sued a separate entity for the

5    benefit of.

6            THE COURT:  Right.

7            MR. MARTIN:  Okay.

8            THE COURT:  Okay.

9            MR. MARTIN:  So the way I think about that case is

10    set aside all the stuff about for the benefit of and focus

11    on the Court's analysis with respect to what was and was not

12    an incurrence of an obligation or a transfer.  And I would

13    direct the Court very specifically to Page 167 of that

14    opinion, which is however the discussion of the very first

15    transaction that the Court examined.

16            The very first transaction the Court examined was

17    when the so-called PHCT subsidiaries merged into the debtor.

18            THE COURT:  Right.

19            MR. MARTIN:  Okay?  And the plaintiff sued PHCT

20    and there's a lengthy discussion about can you sue PHCT for

21    the benefit of.  But the very first thing that the Court

22    says in that discussion, in once -- one noncontroversial

23    sentence, is that the merger affected an incurrence of the

24    obligations.

25            THE COURT:  Right.  Because Centennial absorbed

Page 32

1    the pre-existing liabilities --

2            MR. MARTIN:  Right.

3            THE COURT:  -- of the PHCT subsidiaries, via the

4    merger there cannot be any doubt, and the Court does not

5    disagree with the trustee, that Centennial --

6            MR. MARTIN:  Right.

7            THE COURT:  -- thereby incurred the obligation.

8            MR. MARTIN:  That's the single sentence in that

9    whole section, and frankly that whole opinion, that is

10   relevant to this question.  And it says it in an

11   uncontroversial way.  I mean we can have an argument about

12   it's not -- you know, it's only another bankruptcy court and

13   we can all those arguments.  But the Court thought it so

14   noncontroversial that it moved on to a very difficult

15   question about for the benefit.

16           We don't have for the benefit here.  We just have

17   the first sentence.  And it stands squarely for the

18   proposition the way that I argued it here today.

19           Now, if I could --

20           THE COURT:  But now I'm confused, because what you

21   quoted to me is Footnote 7, which is that -- which is the

22   sorting of the creditors footnote.  PHCT appears to argue

23   that the pre-existing creditors of the PHCT subsidiaries,

24   blah, blah, blah.  In particular the Court, contrary to the

25   view of PHCT, concludes that if said creditors could have

1    reached PHCT prior to the merger, then the extinguishment of

2    PHCT's liability with respect to their claims would have

3    harmed said creditors by adversely affecting their financial

4    predicament, to wit, removing from said creditors an avenue

5    by which their claims could be satisfied.

6              MR. MARTIN:  That, to me is a separate question of

7    the recourse to PHCT.  I'm very -- I'm literally focused on

8    the first question.  I -- the Allegheny case is confusing

9    and got confused because they're suing PHCT.  The -- this --

10   and this is one of the reasons we've been very focused on,

11   what is the technically correct avenue under the statute.

12   It's relevant here and it's going to be relevant more in

13   February.

14             The question -- or the way the fraudulent

15   conveyance statutes, state and federal, get at this issue is

16   that for fraudulent conveyance purposes, that entity

17   incurred those obligations for the first time when that

18   happened.  I understand that for corporate purposes it looks

19   back, and I get all of that.  But just like an involuntary

20   transfer can be -- or an involuntary incurrence of

21   obligations can be a fraudulent transfer, just like

22   something that is permitted by contract can be a fraudulent

23   transfer, the purpose of fraudulent transfer law is to look

24   at it from the creditor perspective, and there's no question

25   that all of a sudden there were -- just looking at the

Page 34

1   second liens, there was at $700 million of additional

2   liability on that day.

3           Now if I could, Your Honor, I wanted to focus on,

4   again in the interest of not having to stand up too often.

5   One of the things that Mr. Silverman talked about in the

6   prior hearing was that there's a section of Allegheny that

7   does talk about the antecedent debt rule.  And he pointed to

8   that as -- I -- and I'm sure I won't exactly quote his

9   words, but as an example of where the antecedent debt rule

10  was recognized, you know, to span a merger or in connection

11  with a merger.

12          And this is where I think it's very important to

13  focus on the fact that Allegheny looked at five separate

14  transactions.  And the one he referred to there I believe is

15  the fifth, if I have it correctly.  And it's covered on

16  Pages 171 to 172.  And it's a very different transaction.

17          PHCT had subsidiaries and they had a bunch of

18  intercompany debt between them.  And what the trustee

19  attacked was the forgiveness of the intercompany debt by --

20  that was owed by the parent to the subs.  And the Court made

21  a very simple observation that there was at least as much if

22  in fact there was more, there was three and a half million

23  dollars or so in excess of debt that ran the other way.  And

24  so all that was happening was that when that intercompany

25  debt was released at the time of the merger, it was paying

1    off the debt that subsidiaries owed to PHCT.

2            The debt -- that debt was in between two companies

3    that already existed.  So there's a very simple analogy to

4    this case, to our case. If the analogous transaction in our

5    case would have been, if Sabine and its subsidiaries had had

6    a bunch of intercompanies between them, and they trued them

7    up, and then they merged, we couldn't cherry pick one side

8    of that; it would be payment of antecedent debt.  It's a

9    different transaction than the one that is discussed in the

10   -- the first transaction that's discussed and that the Court

11   had no problem concluding in one sentence, was avoidable

12   incurrence of obligations, before it turned to the more

13   difficult benefit point.

14           I wanted to address this because I knew Mr.

15   Silverman brought it up and I thought let's get it out on

16   the table.  There are two -- when he refers to that, the use

17   of the antecedent debt rule, to put it simply, in Allegheny,

18   is about a completely different transaction than the

19   incurrence of obligations in the merger.  It's about the

20   separate settling up between two other entities of

21   intercompany claim.

22           THE COURT:  Well -- okay, I don't know that that's

23   that controversial, but there's other stuff in this opinion

24   that is I think a little curious.

25           MR. MARTIN:  Okay.

1          THE COURT:  So if you look at -- it's in Roman I,

2     in the context of the issue of whether the trustee is

3     precluded from proceeding under the Pennsylvania statute for

4     lack of standing.  It says, the resolution of which turns

5     upon whether Centennial lacked creditors, prior to any of

6     the alleged conveyances.

7          And what this speaks to is all the arguments that

8     I've seen related to -- from the perspective of the

9     creditors.  It's been urged that I should look at the

10    fraudulent conveyance from the perspective of the creditors,

11    and I think there were a number of cases that were cited,

12    perhaps in the Third and Fourth Circuit --

13         MR. MARTIN:  Mh hmm.

14         THE COURT:  -- not in the Second Circuit.  But

15    then if you look at what the Allegheny court did, and this

16    is around Page 165, it declines to pin down the precise

17    dates of the alleged conveyances, given that the alleged

18    conveyances occurred prior to the date of the merger.  And

19    it says, concludes that the claims of the creditors of the

20    PHCT subsidiaries which were incurred prior to the date of

21    the merger, also constitute, because of the merger, claims

22    against Centennial which are deemed to have arisen against

23    Centennial prior to the date of the merger --

24         MR. MARTIN:  Mh hmm.

25         THE COURT:  -- and can thus conclude that

1       Centennial possessed creditors.

2               So how do you deem -- I mean that's --

3               MR. MARTIN:  It --

4               THE COURT:  -- really pretty cool, right?

5               MR. MARTIN:  Right.  In part, Your Honor, that's

6       dealing with a separate problem.  And it's dealing with the

7       problem --

8               THE COURT:  But you don't want to be deemed --

9               MR. MARTIN:  We --

10              THE COURT:  -- you don't want everybody to be

11      deemed creditors --

12              MR. MARTIN:  No.  And we don't have to.

13              THE COURT:  -- of everybody -- no, but if -- what

14      I'm saying is that I guess you're telling me that Allegheny

15      is my case --

16              MR. MARTIN:  Mh hmm.

17              THE COURT:  -- then you really don't want me to do

18      that.

19              MR. MARTIN:  No.  And --

20              THE COURT:  Because that doesn't do much for you.

21              MR. MARTIN:  -- and let me say --

22              THE COURT:  So --

23              MR. MARTIN:  -- well, but let me offer the

24      following, because I don't think the Court needs to do that,

25      and I can explain, for several reasons, why.  First --

1            THE COURT:  But I'm -- I mean if I'm going to be

2    intellectually consistent, right, then I'm either going to

3    follow a case or I'm not going to follow a case.

4            MR. MARTIN:  Oh, and I think you can be

5    intellectually consistent and do both.  So the purpose of

6    that --

7            THE COURT:  But then we're all -- but then there's

8    no Forest and there -- then you're all just creditors, and

9    from the perspective of the post-merger estate, you're all

10   just creditors.  Whereas what you're saying -- the essence

11   of what you're saying is that the legacy Forest creditors

12   are -- were worse off after the merger, and that's the

13   problem.

14           MR. MARTIN:  That --

15           THE COURT:  And so you don't want me to deem the

16   legacy Forest creditors --

17           MR. MARTIN:  The Legacy Sabines.

18           THE COURT:  Forest.

19           MR. MARTIN:  Okay.

20           THE COURT:  Because every -- it's all Forest.

21           MR. MARTIN:  Can I take a try at this?

22           THE COURT:  Sure.

23           MR. MARTIN:  Okay.  So what that section of the

24   Allegheny opinion is dealing with is a separate problem,

25   separate issue, separate requirement than the is there a

1    transfer for an incurrence of obligation and is there a

2    reasonably equivalent value.  Those are completely separate

3    things.  And it's dealing with the fact that the incurrence

4    of the obligation in Allegheny occurred more than, at that

5    time, well, more than one year prior to.  So they had to

6    prove, under 544, the existence of a creditor.  Okay?

7              THE COURT:  Mh hmm.

8              MR. MARTIN:  And so first of all, those are two

9    separate tests.  Okay.  The test of whether there's

10   reasonably equivalent value, which is the only -- there's

11   only two -- for the substantive liability, I think there's

12   -- let me say, first of all, there's two ways to look at

13   this.

14             First of all, for the substantive liability

15   there's only two tests, and this gets at your from the

16   creditor perspective.

17             THE COURT:  Mh hmm.

18             MR. MARTIN:  From the creditor perspective really

19   isn't part of those tests, it's one is it insolvent on any

20   one of three tests --

21             THE COURT:  Right.

22             MR. MARTIN:  -- and did the estate get reasonably

23   equivalent value and that's where the from the perspective

24   of creditors.  But all that is saying is, you know, were

25   there more liabilities or fewer assets, depending on whether

1    it's an obligation or a transfer case.

2         There's a separate requirement in 544, as we all

3    know, for an actual creditor and so the Allegheny court was

4    confronting the question of was there an actual creditor.

5    And it appears that they were suing on the grounds of

6    insolvency, not unreasonably small capital and the other

7    tests, which you can -- can use future creditors, right?

8         So they had to have a pre-transaction creditor.

9    Now remember, under the bankruptcy code, as soon as you find

10   one, under Moore v. Bay --

11         THE COURT:  Right, you're good.

12         MR. MARTIN:  -- you get the whole thing.

13         THE COURT:  Right.

14         MR. MARTIN:  So it's really the different test.

15   That's my first -- it's -- you can be completely

16   intellectually consistent, because they're being used for

17   different purposes.  But let me set that aside, because you

18   can -- in our case, you don't even have to get into that,

19   because it's a 548 case.  It's within two years, it would

20   have been -- within one year, even under the old statute, so

21   that issue doesn't even arise with respect to 548.  The

22   Court doesn't have to I think confront that, on the second.

23         I think it's intellectually consistent because I

24   think for one purpose it's just a question of is Moore v.

25   Bay triggers, in effect and that's a different question than

 1    the, is there reasonably equivalent value.  And Moore v. Bay

 2    itself demonstrates that, you don't do it on a creditor by

 3    creditor basis, but I don't think the Court has to confront

 4    that because this is a 548 case.

 5              THE COURT:  But you -- but the sentence that you

 6    directed my attention to, the incurred the obligations, are

 7    you backing away from the concept of transfer, because of

 8    the 546(e)?

 9              MR. MARTIN:  No.

10              THE COURT:  The specter of 546(e)?

11              MR. MARTIN:  No.

12              THE COURT:  Because under my hypothetical, the

13    everybody pushing all their stuff into the middle of the

14    table and then Forest taking back 26 percent of the economic

15    value, right --

16              MR. MARTIN:  Mh hmm.  Which was zero in the -- at

17    the parent level.

18              THE COURT:  Well, but that -- but then happy day

19    for your fraudulent conveyance --

20              MR. MARTIN:  Mh hmm.

21              THE COURT:  -- case, because if that's true then,

22    right, putting everything else aside, then it got zero for

23    what it pushed into the middle of the table, right?  Because

24    it -- right?  I mean yes, it incurred obligations but that's

25    baked into the value that it got.  It got some assets but it

1   incurred a lot of obligations, and that's what makes the

2   value be non-existent.

3            MR. MARTIN:  If this had been a -- Your Honor,

4   I'll be a little bit sort of brutally honest as a bankruptcy

5   lawyer.  If this all ends up on whatever formulation, happy

6   day for my fraudulent conveyance claim, that's fine with us.

7   But to be intellectually rigorous about it, in our view, if

8   you had these two entities, and they had merged into a

9   third, which you can do, as a matter of corporate law, that

10  would be the example you gave of pushing the chips and

11  liabilities all into one place.  But that's not what

12  occurred.  You have four sitting there, and as a matter of

13  corporate law, it's clear what happened.  Sabine parent

14  moved into it, and Forest Oil is the one that's still

15  sitting there.  And so to us, it has always seen that that's

16  conceptualized not as a transfer but as, in the first

17  instance, the incurrence of the obligation of Legacy Sabine,

18  did Legacy Sabine's parent reasonably equivalent value in

19  terms of its assets at the parent level to the table, and it

20  did not.

21            THE COURT:  Well, it's as if -- then you're saying

22  call it an acquisition, right?  Call it an acquisition that

23  Forest paid for, right?  And didn't get reasonably

24  equivalent value for, right?

25            MR. MARTIN:  In a sense, yes, but the pay for,

1    stills to me feels like a transfer.  And so I'm not meaning

2    to be difficult, but the -- we all start, whenever we talk

3    colloquially about the fraudulent conveyance law, we all

4    talk about if the physician committed malpractice, and they

5    go and they transfer the home, and we think about this

6    transfer, it's often called fraudulent transfer law, and I

7    think many of us have been trying to use fraudulent

8    conveyance law, precisely to not have that on it.

9            THE COURT: Sure.  Right.

10           MR. MARTIN:  And this really is, at its core,

11   again, solvent corporations don't merge all that often, so

12   it's true this doesn't come up.  But it really is, when we

13   thought about this, that's conceptualized as incurrence of

14   an obligation with those creditors who came in, if they

15   qualify, getting credit under 548(c).  So we're not trying

16   to wipe out their -- the recourse would stay the same, as

17   long as they qualify for 548(c).

18           And as I said, to the Court's point, we're just

19   trying to wipe out their claims for the money good, they'll

20   still have the claims down at the subsidiaries, where those

21   assets are.  So it's not a windfall-ish result, in that

22   respect.  And that seems to us to be the cleanest way,

23   straight under the statute, the way it works.  And it does

24   get to the economic result that people speak out

25   colloquially, that the Sabine side will have recourse to the

1    assets they had before, the Forest estate, a parent company

2    state, now Sabine Oil and Gas Corp will not have -- they'll

3    have a lien under 548(c), they'll have recourse to some

4    specific assets.  The remaining creditors will be those of

5    Forest with those assets, as they sat there.  And that

6    produces exactly the result under the statute that we think

7    is there.  I've been up here for a while, if I could just

8    say two more things very briefly.

9            THE COURT:  Sure.

10           MR. MARTIN:  Unless the Court wants to hear, I

11   won't go over 548(c).

12           THE COURT:  I don't want to hear it, yep.

13           MR. MARTIN:  That was the sense I had.  Lastly, as

14   to the precise procedural posture we're in, and I think we

15   covered this in our papers, our view is that -- and I think

16   the Second Circuit law that we found backs us up on this --

17   is the fact that the Debtors have pled it as only lien

18   avoidance doesn't make a difference, because we think that

19   there are sufficient allegations in the complaint,

20   specifically that the second lien existed, and that there

21   was a merger, and that to us pleads the occurrence, so that

22   the complaint could survive.

23           The committee, I think, hopefully made this clear.

24   I think that if the Court felt that a dismissal, without

25   prejudice, and then we decide what we're going to do after

1    the STN motion, that seems to us to be an equivalent result

2    of raising the issue, so either way, there's no question

3    that the Debtor didn't argue it particularly this way,

4    that's the colloquy we had this morning.  We do think under

5    Chief Judge Walker's opinion, and sign attended, you can do

6    this.  He went though, in that case, a number of alternative

7    theories, but I do understand -- we've pointed to very

8    specific allegations, and there aren't a lot.  All I'm

9    saying is I understand this, there are two paragraphs.

10            THE COURT:  I understand your point.  Right.

11   Saying allegations, but under different legal ruling, okay.

12            MR. MARTIN:  Under a different legal ruling.

13   That's all I have, Your Honor.

14            THE COURT:  All right.  Looks like Mr. Henes wants

15   to say something before he leaves.

16            MR. HENES:  Yeah, just very briefly, Your Honor,

17   because I think I understand what Mr. Martin's saying.  No,

18   I do, and I just want us to simplify this.  I think he is

19   saying, and it's what I stood up to say before is, so if you

20   look up at the holding company level, right?  And so you

21   say, "Okay, so the second lien holders do have some claim,

22   but it's a $650 million claim minus a lot, because the only

23   claim is the amount of value that Sabine transferred to

24   Forest.  So let's say that was her argument, say $20

25   million.  So they have a $20 million claim up against the

 1   parent, and a $650 claim against everybody else.  So it is

 2   looking at it as two estates, right, which is not what we

 3   were doing.  We were looking at it as, this is one merger,

 4   in my case, set in Allegheny, those creditors already

 5   existed at the time that they made the loans.  That's the

 6   way that we looked at it, and it's one estate.

 7           The reason that we said you can avoid the liens is

 8   because while that claim existed, and they did have liens on

 9   the assets of Sabine, when the companies came together, they

10   then got a lien because of the merger against assets they

11   didn't have.  So we're saying no, get rid of that lien.  So

12   I think that that's really the disagreement.  It doesn't

13   mean we couldn't ever formulate a plan where we do kind of

14   cerate claims against the Forest entity, and claims against

15   the Sabine entities.  I'm not sure whether that's going to -

16   -

17           THE COURT:  So then, in fact, in economic

18   substance, you are saying the same thing.

19           MR. HENES:  I think it's similar.

20           THE COURT:  You, meaning you and the committee are

21   saying the same thing?

22           MR. HENES:  In economic substance, I think it is

23   similar.  It's not going to be (indiscernible), where values

24   are now, it's definitely the same thing.

25           THE COURT:  Now, putting aside where values are

1    now issued, because --

2           MR. HENES:  Well, our view is that the second lien

3    holders have a $650 million -- I see what you're saying --

4    they have a $650 secured claim against the Legacy Sabine

5    assets, and they have a $650 million claim, but that claim

6    doesn't include a secure claim against any of those Forest

7    assets.  That's what we're saying.  So you're carving out

8    the Forest assets from the secure claim.  They still have a

9    $650 million claim against the whole entity.

10          THE COURT:  But the Forest noteholders are

11   restored to having recourse to the pre-merger Forest assets?

12   Or that the Forest unsecured creditors are restored to the

13   position they were in prior to the granting of the lien.

14          MR. HENES:  Well our view, yeah, sort of.  I mean,

15   now there's no lien on those assets.

16          THE COURT:  Right.

17          MR. HENES:  Other than the (indiscernible) lien,

18   right?  Let's put that aside.  There's no second lien

19   against those assets anymore, so the second lien holders, to

20   the extent that they -- their claim there would be

21   unsecured, that portion of their claim.

22          THE COURT:  Right.

23          MR. HENES:  That's what we're saying.  But we're

24   looking at it as one estate.  And so it may come out, the

25   math may come out the same way, but we're not looking at it

1    as two estates.  If we do it the way that, what Mr. Martin

2    is saying, is you're not going to have a $650 million claim

3    by the second lien holder, at the parent level, which is

4    where all of the legacy Forest assets reside, and continue

5    to reside.  So their claim would be smaller.  So you would

6    have a plan, it would say, "Okay, the Forest noteholders

7    have their full claim against the --"

8            THE COURT:  Now, how could you be advocating a

9    remedy that doesn't fully restore the Forest unsecureds to

10   where they were before the granting of the lien?

11           MR. HENES:  Well, okay.  Thank you, Danny.

12           THE COURT:  Was that Danny?  You're standing

13   square.  Unless you've purposely picked that seat so that I

14   couldn't see him.

15           MR. HENES:  When I walked in (indiscernible)

16           THE COURT:  Can I order him to move over?

17           MR. HENES:  I think that -- because our view is

18   this.  Our view is that the $650 million obligation, right,

19   was incurred when it was incurred.  There was a merger.  And

20   so as part of that merger, it's as if that $650 million

21   claim already existed against the full company, because we

22   look at this as one estate of value, right?  And what we

23   don't think was right was the lien that was granted onto the

24   Forest assets at that time, because that was something new.

25   So that's what we're trying to avoid, okay?  That Mr. Golden

```
 1    asks a good question, I think if we went the other way of

 2    restoring everybody, I'm not sure that that ends up being

 3    good for Mr. Golden's Sabine creditor clients.

 4             But we could, at the end of the day, depending on

 5    how you rule, we can construct the plan either way, to get

 6    that on file, and move it forward.  It's just this is what -

 7    - our view is that $650 million, (indiscernible) the merger,

 8    existed against all the entities.  You couldn't have claim

 9    avoidance, but you could have lien avoidance, and I think

10    that that's just the critical question.  And if Mr. Martin's

11    right, then you will have two estates.  You'll have a

12    holding company estate, and you have a subsidiary estate,

13    which we could do.

14             THE COURT:  What is -- and I know you have to

15    leave --

16             MR. HENES:  I apologize, Your Honor.

17             THE COURT:  What is -- I'm trying to remember the

18    end of the Williams Report.  He concludes that, may likely -

19    - said the Debtor in possession may likely not prevail on

20    any remedies seeking or resting on the reestablishment of

21    pro forma estates.

22             MR. HENES:  I'm sorry, I'm just laughing at the --

23    I'm listening to the whispers in the back.  Yes, if you want

24    --

25             THE COURT:  Okay.
```

1          MR. HENES:  Thank you, Your Honor.

2          THE COURT:  Sure.

3          MR. HENES:  I'm going to sit, and I'm going to

4    leave soon.

5          THE COURT:  That's fine, that's fine.  That's

6    fine.  I also neglected to note before that, Mr. Herman is

7    on the phone, on a live phone, in case Mr. Silverman wants

8    to use a, what did you used to call those things?

9          MAN:  When you call when you (indiscernible)

10          THE COURT:  A lifeline, a lifeline.  Right, right.

11          MAN 2:  I'm afraid my lifeline is almost over, but

12    he'll have to trust me.

13          THE COURT:  Does he have to go at 11:00 as well?

14          MR. HERMAN:  I do, Your Honor, thank you.

15          THE COURT:  At 11:00, Mr. Herman?

16          MR. HERMAN:  Yes.

17          MR. HENES:  We're not going to the same place.

18          MR. HERMAN:  I talked with Mr. Silver

19    (indiscernible) in court today.

20          MR. HENES:  Mr. Herman is out of town for an

21    unexpected hearing, and he can't throw pencils at my back

22    now, but I have other people who can, so if I mess it up.

23    Thank you, Your Honor.

24          THE COURT:  Alright, so who wants to talk now,

25    besides Mr. Golden?

```
 1              MAN:  I'm ready --
 2              THE COURT:  Mr. Silverman, I think you've been
 3      waiting patiently.
 4              MR. SILVERMAN:  Your Honor, sure, I'd rather
 5      respond to whoever is attacking my motion, but I'm happy to
 6      go now, if you'd like.
 7              THE COURT:  Okay, I confess, I'm confused.  Mr.
 8      Golden, you do indeed want to say something?
 9              MR. GOLDEN:  Yes, Your Honor.
10              THE COURT:  Okay.
11              MR. GOLDEN:  Thank you, Your Honor, Daniel Golden,
12      agent from Strauss, Huer & Feld, counsel for Bank of New
13      York.  I rise not so much to attack the motion, per se, but
14      to attack the process we find ourselves in right now in
15      connection with the Debtor's complaint and the second lien's
16      motion to dismiss.  Your Honor may recall that in previous
17      chamb -- we did not file a formal intervention motion, but
18      as Your Honor mentioned, formal intervention wasn't
19      necessary, and specifically the order authorizing the
20      intervention of the committee, and the Forest notes
21      indentured trustee had, as its last ordered paragraph, that
22      this order shall be without prejudice to the rights of Bank
23      of New York Mellon Trust Company, and A, defined as the
24      Sabine notes trustee, to be heard at the hearing, and so
25      I'll be heard at the hearing, briefly.  Your Honor, I think
```

1   you've gotten a little bit of the color this morning from

2   the bank and forth between Mr. Henes and Mr. Martin about

3   the procedural complexity that we find ourselves in.

4            THE COURT:  I just want -- I guess preemptively,

5   defend myself on the question of what we're doing here

6   today, which was in my mind, simply an attempt to allow -- I

7   didn't want to have the committee heard at the earlier

8   phase, but I did want to put the committee in the position

9   of having standing, if you will, or being fully part of the

10  process?

11           MR. GOLDEN:  Your Honor, I don't think you need to

12  defend yourself, because I think that was an entirely

13  appropriate viewpoint, especially given the posture we're

14  in.  The committee, as Your Honor well knows, has filed two

15  STN motions.  One of which, the constructive fraudulent

16  conveyance STN motion completely subsumes the relief that

17  the Debtor is seeking and more.

18           THE COURT:  Yes, you're absolutely right.

19           MR. GOLDEN:  Part of why I think this is the right

20  result at the conclusion of today is for the Court either to

21  defer ruling on the motion, pending the mediation, and

22  pending the hearing on the committee's two STN motions, or

23  alternatively, simply denying the motion without prejudice,

24  with the party's rights to reengage.  It is because this is

25  incomplete relief.  You've heard a lot of argument about the

1  Debtor says, "Well, we're only seeking to avoid the

2  (indiscernible) of the second lien lenders, with respect to

3  the Forest assets."

4          The committee says that's not the right approach.

5  The right approach would have been to avoid the claims, and

6  if successful, the liens would fall by themselves.  What's

7  so curious about this, given our current factual posture, it

8  that he relief that the Debtor is seeking in their adversary

9  proceeding has already occurred.  There are no liens, with

10  respect to -- the second lien lenders have no liens with

11  respect to the Forest asset, not because there's been an

12  adjudication of the Debtor's complaint, but because of

13  factual circumstances.  The Debtors concede that.  I don't

14  think the second lien lenders dispute that.  So if that's

15  the fact, why then go forward with this adversary

16  proceeding?  Because the only real effect of this adversary

17  proceeding is going to cloud the issues raised in the

18  committee's second STN motions.  The --

19          THE COURT:  When you say there are no liens, you

20  mean because of the merger?

21          MR. GOLDEN:  No, there are no liens because there

22  is no value to the collateral.  I'm sorry, I should have

23  been clear.  So the Debtors are seeking an adjudication to

24  avoid the liens, so that the second lien lenders have no

25  secured claims against the Forest --

1           THE COURT:  Rights to here are liens, but there

2    are no secured claims, is what you're saying, right?

3           MR. GOLDEN:  It has the same practical effect.

4           THE COURT:  Same practical effect, right.

5           MR. GOLDEN:  And give that we have the same

6    practical --

7           THE COURT:  I mean, I'm not agreeing that that's,

8    in fact, the economic realty.  Just the structure.

9           MR. GOLDEN:  Nobody here in this courtroom is

10   disputing that fact.

11          THE COURT:  Well, when Mr. Herman was here last

12   time, he put his two cents in that he wasn't conceding that,

13   so --

14          MR. GOLDEN:  I guess we'll find out whether the

15   second lien lenders are actually disputing the effect, as of

16   right now.

17          THE COURT:  Well, look.  I'm going to take you up

18   on that.  Because I've got other things I could be doing

19   than deciding something --

20          MR. GOLDEN:  And we wish you would be doing those

21   other things.

22          THE COURT:  But last time, I distinctly remember

23   Mr. Herman  was sitting over there, and he made it clear

24   that the second lien lenders were not conceding that they

25   were out of the money, so.

1           MR. GOLDEN:  Fair enough, Your Honor.  Your Honor,

2     in response to a question Mr. Henes has said, if I'm right -

3     - if I'm right, I'm not asking the second lien lenders to

4     concede that fact.  If I'm right, that there is not value to

5     those punitive liens, why are the Debtors persisting in

6     going forward with their adversary proceeding, in light of

7     the fact that the mediation is about to occur, and in light

8     of the fact that the STN motions are scheduled to occur on -

9     -

10          THE COURT:  February 8th.

11          MR. GOLDEN:  February 8th.  And part of the relief

12    that the committee's seeking is completely subsumed, as they

13    said, by their STN motions.  And Mr. Henes has said --

14    because we've asked Mr. Henes that question quite a few

15    times.  And Mr. Henes now tells the Court, "Well, it will

16    give us guidance.  If we win, we know --" Because they're

17    still trying to formulate a plan, presumably.  "It will give

18    us guidance, because if they win, and the second lien

19    lenders don't have liens, that will be appropriately

20    portrayed in the plan that they're trying to formulate."

21          THE COURT:  But this is just a motion to dismiss,

22    right?

23          MR. GOLDEN:  But the question I'm raising is, why

24    is the Debtor persisting in the relief they are seeking?

25    The second lien lenders, I know why they're moving to

1   dismiss the complaint, but I think the real question is, why

2   are the Debtors --

3              THE COURT:  Well, but let me try to do some of the

4   game theory here, right?  If I were to say today, motion to

5   dismiss denied, right?  And Mr. Henes takes that to

6   mediation and plan negotiations, saying that the Debtors get

7   to go forward with that claim.  So it gives them that piece

8   of leverage.  When combined with your observation about the

9   lack of value, would create a certain negotiating

10  environment.

11             MR. GOLDEN:  And all I'm saying is, I don't think

12  they need that leverage, in light of the fact that there is

13  not a value attended to those liens.  So there's something

14  else going on here, that's not exactly--

15             THE COURT:  What is going on?  Because I have

16  spent a lot of hours trying to figure out what that is.  So

17  maybe today's not the time or the place.  Maybe the

18  mediation is the time or the place, but I think part of the

19  difficulty here is my inability to understand what else, if

20  anything, is going on.  So feel free to not answer that

21  question.

22             MR. GOLDEN:  I typically don't feel restrained,

23  especially when the Court is asking a direct question, but

24  I'm trying to be --

25             THE COURT:  Constructive.

1          MR. GOLDEN:  Constructive here.  I think mediation

2     would be the place to answer that question, in the first

3     instance.  But suffice to say, we think there is more than

4     meets the eye, as to the rationale as to why the Debtors are

5     persisting with this adversary proceeding.

6          THE COURT:  I mean, it goes without saying, it's

7     in the order, and those of you who've been around here

8     hopefully know it to be true, but I'm very happy about the

9     participating of Judge Gropper in the process, and both in

10     terms of his incredible knowledge of the law in the area,

11     and also his understanding of these types of situations, and

12     frankly his understanding of all of you.  And you should be

13     absolutely assured that he will not even tell me what time

14     of day it is.  There will be an absolutely no-fly zone

15     between Judge Gropper and me, and I just want to -- I know

16     you all know that, but I just want to make that 1000 percent

17     crystal clear, to encourage as much candidness with him as

18     possible.

19          MR. GOLDEN:  And I don't think anyone

20     misapprehended that fact, Your Honor.

21          THE COURT:  So your ask of me today is, do

22     nothing?

23          MR. GOLDEN:  Do nothing, to either defer ruling on

24     the motion, pending the completion of the mediation and the

25     commencement of the STN motions.  It could be rehearsed or

1    scheduled for, concurrently with the STN motion.  Or if you

2    felt constrained to rule, we've asked the Court to deny the

3    motion without prejudice, to the rights of the second liens,

4    to bring that motion again.  We think any other action is

5    going to tilt the playing field right before we get to

6    mediation, right before the STN motions are to be heard.

7            It can't be lost on the Court that the relief

8    sought by the committee in their STN motions, when I say

9    subsumed, I mean it's the committee's theory, not

10   necessarily Bank of New York's theory, it's the committee's

11   theory that with respect to the second liens, as Mr. Martin

12   has explained, that both the claim and the lien must fall,

13   vis-a-vis the legacy Forest estate.  The relief sought by

14   the Debtors is a parcel of that, and I think in fairness, to

15   allow these issues to be fully explicated, any ruling should

16   await the mediation, because hope springs eternal.  Maybe

17   these issues can be resolved, and if not, the committee, we

18   think, of which BNY is a member, deserves their shot in

19   trying to convince the Court that it should have the

20   authority to prosecute these actions, one of which is

21   obviously implicated by their STN motions.  Thank you.

22           THE COURT:  Okay, thank you very much.  Okay,

23   anyone else on that side of things?  Okay, Mr. Silverman.

24           MR. SILVERMAN:  Moses Silverman, Paul, Weiss,

25   Rifkind, Wharton & Garrison, representing defendant

1    Wilmington Trust, a successor, administrative agent under

2    the second lien credit agreement.  Good morning, Your Honor.

3    I would like it, if I could, to address some of the

4    substantive issues first, and then talk about procedure, and

5    where we are.  And I'd like to start by going back to where

6    we are, and what Your Honor said was the purpose of today's,

7    the discussion other than requirements, or to read Allegany

8    again.  And that was to allow the creditor's committee to

9    express its views, and anyone else who chose to, on our

10   motion to dismiss the complaint.

11         The complaint does not challenge our claim, the

12   complaint just challenges our lien, as the Court knows.  And

13   the creditor's committee, and anyone else who has spoken

14   today has offered no argument in favor of the Debtor's

15   position, on our motion to dismiss the current complaint as

16   written.  In fact, the creditor's committee's brief begins

17   on Page 1 by saying that the Debtor's complaint, and this is

18   a quote, "Barely survives dismissal."  And then they offer

19   no reason why it survives dismissal at all, as written.  In

20   fact, they conceded in argument this morning that the liens

21   were issued after the debt, and if the debt and claim are

22   good, then the liens are good under the anteceding debt

23   rule.  So for purposes of the current record, the creditor's

24   committee actually is on our side, that the complaint, at

25   least as written, does not state a claim, and our motion

1    should be granted.  Where of course, their position

2    previously.

3              THE COURT:  Well, they hedged that position by

4    invoking the conform the pleadings to the proof kind of

5    concept.

6              MR. SILVERMAN:  Sure.  And of course they make

7    another argument, and of course, which is the heart of their

8    argument, which is that the claim is no good.  And of

9    course, if the claim is no good, then the liens are no good.

10   I get that.  The first point I want to make about that, is

11   that I think it's appropriate for the Court, should you

12   choose to do so, to rule on the complaint as the Debtor has

13   chosen to direct.  The Debtor did an extensive investigation

14   before this proceeding was filed, and before the lawsuit was

15   filed, and they determined independently that they had a

16   challenge to our lien, but not a challenge to a claim.

17   There was a report issue, which the Court referred to, which

18   although it said a number of different things, clearly

19   confirmed the conclusion of the Debtors to not challenge our

20   claim, and Your Honor read part of it, on Page 147 it says,

21   "However, I have uncovered no facts and circumstances at

22   this time that would support the conclusion that the second

23   lien debt deficiency claim is void, if the deficiency claim

24   is not void, nor is any part of our claim."

25             I think the Court should, should you choose to do

1   so, rule on the motion as it stands for two reasons.  First

2   of all, I think the Debtor's decision to draft the complain

3   the way they did after considerable investigation is

4   entitled to deference.  And secondly -- and I'll talk about

5   this in a little more detail, if the Court would like -- we

6   think the challenge to the claim itself makes no sense at

7   all.  And I think the Court can dismiss it based on the

8   pleadings you've gotten so far, which include the pleading -

9   -

10           THE COURT:  But then you're saying that I should -

11   - so if I were to grant the motion, you're saying do it with

12   prejudice, and not only do it with prejudice, but I should

13   deny the committee's STN motion to seek the claim avoidance.

14           MR. SILVERMAN:  I think you have enough before you

15   now to reach that decision.  Now in fact, we will be filing

16   another brief next week, in accordance to the schedule,

17   which will be getting into more detail.  And again, I don't

18   mean to presume to tell the Court in what order you should

19   do things.  What I'm saying is --

20           THE COURT:  But that would be pretty

21   extraordinary, right -- to upset the usual apple cart of --

22           MR. SILVERMAN:  I wasn't expecting a ruling from

23   the bench.  What I would like to explain -- why we think you

24   have enough matter to understand why this claim makes no

25   sense.  First of all, just let's step back for a minute and

1    think of what the claim is.

2            The claim isn't just about the second lien

3    debtholders.  The claim is about all creditors of Sabine,

4    pre-merger.  This hearing is that every creditors' claim no

5    longer exists.  We're not special under their theory.

6    Indeed, that includes all of the members and constituents of

7    the creditors' committee who are Sabine creditors.  All of

8    those claims are wiped out, they say.

9            Now as to us --

10           THE COURT:  Time-out.

11           MR. SILVERMAN:  Sure.

12           THE COURT:  You're saying that you believe that

13   the committee is seeking to avoid all of the claims

14   asserted, all of the Legacy Sabine claims?

15           MR. SILVERMAN:  I'm saying that is their theory.

16   What exactly -- which ones they want to choose to challenge,

17   I'm not speaking to.  But page 11 of their opposition, is

18   clear.  It says the relatively little value -- oh, I'm

19   sorry.  Thus relatively little value was provided to Legacy

20   Forest in combination in exchange, with the assumption of

21   Legacy Sabine's debt.  Their theory that whatever debt came

22   with Sabine, Forest didn't get --

23           THE COURT:  Fair value.

24           MR. SILVERMAN:  -- fair value for it, is relevant

25   to all of the claims.  It's not just the second lien

1    debtors' claims.  What they choose to bring an action for, I

2    don't know.  That's within their purview.  But understanding

3    their theory, nothing that Mr. Martin said was relevant

4    directly or limited -- I'm sorry, relevant, yes, but not

5    limited to the second lien lenders.  It is all claims.  The

6    same theory --

7              Now let me just give you an example.  I think Mr.

8    Herman is no longer on the phone, so he won't enjoy that I'm

9    quoting his example of how crazy that is.  A worker, works

10   for Legacy Sabine is paid once a month.  The merger takes

11   place in the middle of the pay period.  He continues

12   working.  At the end of the pay period, he asks for his

13   paycheck, and he's told, no, we're only paying for the time

14   you worked for the combined company because whatever debt

15   Legacy Sabine had to you, we Forest didn't get value.  You

16   don't get paid.  That is their claim.  And that makes no

17   sense.

18             As applied to us, Your Honor, as you pointed out,

19   it's undisputed that we lent $650 million back in 2012 and

20   early 2013, cash money.  There's no question that we gave

21   value.  The transaction was not a fraudulent conveyance at

22   the time.  No one claims it is.

23             THE COURT:  Wait, wait, wait -- you mean at that

24   time?

25             MR. SILVERMAN:  At that time.

1           THE COURT:  When you funded the loan.

2           MR. SILVERMAN:  That's exactly right.

3           THE COURT:  Got it, okay.

4           MR. SILVERMAN:  I would take (indiscernible).

5           THE COURT:  Okay.

6           MR. SILVERMAN:  They say that the merger created

7     the fraudulent conveyance.  But the merger was a merger of

8     two companies in which Legacy Sabine was subsumed in and

9     became part of Forest, which then they confused things was

10    called Sabine.

11          But it's exactly what Your Honor said.  The assets

12    and liabilities were put together and the new company -- the

13    company is both companies.  And that's clearly what the case

14    law says.  If it's not that, then since Legacy Sabine is

15    gone, there is no creditor -- I'm sorry, there is no debtor

16    that Legacy Sabine's debts could be paid by.

17          Now my friends talk about the subsidiaries.  The

18    purposes of the legal issue is irrelevant.  It may be that

19    some Legacy and Sabine creditors, including us, maybe not

20    the poor worker class, but including us, also have claims

21    against subsidiaries.  That may be, and they're not

22    challenging those.  Thank you.  But for purposes of -- what

23    was it?  Intellectual honesty? -- Understanding what the

24    legal issue is we're talking about, that is irrelevant.

25    Because we're talking about what the debts of Legacy Sabine

1    are.  When Legacy Sabine is merged into Forest, Legacy

2    Sabine ceases to exist.

3             And under my friend's theory, all of its

4    obligations to everyone disappeared.  Let me talk about a

5    few of the arguments they make in favor of that.

6             THE COURT:  Well, okay.  Well, maybe Mr. Martin

7    can address that.  Maybe that's his problem, right?  But I

8    still go back to my visual.

9             MR. SILVERMAN:  Mm hmm.

10             THE COURT:  Right?  I mean I'm not and never was a

11    corporate lawyer, but we're all kind of coalescing around, I

12    think, the view that although it's a combined company, it

13    was Forest that -- to the extent that there's a surviving

14    company, it's Forest.

15             MR. SILVERMAN:  That's correct.

16             THE COURT:  That was the whole MO, if you will, of

17    the transaction because --

18             MR. SILVERMAN:  That is correct.

19             THE COURT:  -- to avoid the change of control.

20    Right?

21             MR. SILVERMAN:  I believe that's correct, but in

22    any event, certainly Forest is the surviving company.

23             THE COURT:  Okay.  So then, I'm in Hechinger,

24    right?  Because if Forest is the surviving company, and now

25    the estate of Forest says it's fraudulent conveyance time

1   because when we sat down at that table, and we pushed

2   everything into the middle, right -- all of our assets and

3   all of our liabilities, and we took back 26 percent of the

4   combined company --

5               MR. SILVERMAN:  Right.

6               THE COURT:  -- of the new and improved Forest, the

7   way that you value that 26 percent is the assets and the

8   liabilities.  As a part of that, they incurred the

9   obligations that they got out of the pot.  So I think Mr.

10  Martin has to address your interesting observation that

11  basically it's all or nothing.  Right?

12              But I still don't understand why there can't be a

13  fraudulent conveyance, as a result of -- because that 26

14  percent does not reflect reasonably equivalent value for

15  what Legacy Forest put in.

16              MR. SILVERMAN:  It absolutely could be a

17  fraudulent conveyance action, but not against the Legacy

18  creditors.  The fraudulent conveyance action in Hechinger

19  wasn't against people who lent money to the merged company

20  two years earlier.  It was against the selling shareholders

21  and the directors, and the banks that took fees out of the

22  merger.  That's who they sued for fraudulent conveyance.

23              That's the same thing in Allegheny.  The lawsuit

24  was against PH --

25              THE COURT:  PT.

1          MR. SILVERMAN:  Philadelphia Hospital or

2     something.

3          THE COURT:  Health something, yeah.

4          MR. SILVERMAN:  It was the parent that sold its

5     four hospital subsidiaries to Centennial.  There can clearly

6     be a fraudulent conveyance action against the seller of an

7     insolvent company, or the people who took money out of the

8     transaction for failure to get fair value.

9          As we discussed last time, there's a little

10    complexity here because Forest didn't give cash.  If Forest

11    was giving cash, it would have a good fraudulent conveyance

12    action, at least in theory, against the seller.

13          Here they gave stock to Forest, another insolvent

14    company.  That adds a layer of difficulty for them in this

15    case.  But conceptually, there clearly is a possibility of a

16    fraudulent conveyance action against the party that gave you

17    less than fair value.  That's the seller of the company.

18    It's not the lender, who two years earlier, lent cash and

19    got cash.  And Your Honor made exactly the right point of

20    Allegheny when it talked about what time we look at.  And in

21    fact, there are a number of other cases you'll see in our

22    brief you'll get next week, in which the question of what is

23    the date of the claim for a company that's merged out of

24    existence is relevant.

25          For example, a case against a prominent law firm

1    for alleged malpractice is brought.  The firm had advised a

2    company, more than six years earlier, that was merged out of

3    existence.  The new company, the combined company, like the

4    combined company here says, ah, that obligation was just

5    made when we created -- when we took over, and so that's

6    when our statute of limitations runs -- the appellate

7    division says not at all.

8              THE COURT:  But let me go back.

9              MR. SILVERMAN:  Sure.

10             THE COURT:  Because I still like to look at things

11   simply and try to get to the essence.

12             MR. SILVERMAN:  Right.

13             THE COURT:  When the dust cleared, and this goes

14   to your point about well, how can you single us out?  You

15   have to -- Mr. Martin has to go after all Legacy Sabine

16   debt.  Right?  But the fact is, when the dust cleared, your

17   group was much better off than before, and --

18             MR. SILVERMAN:  It's true...

19             THE COURT:  So he's saying all good.  You lent the

20   money.  We don't dispute that.  You lent the money to the

21   subs.  You've got a good claim at the subs, but you just

22   can't have a claim at the parent.  Intellectually, that

23   doesn't have anything to do with other Legacy Sabine

24   creditors.

25             MR. SILVERMAN:  It may or it may not.  I think it

Page 69

1    is true for certain Legacy Sabine creditors, who have

2    guaranties and so forth.  And it may not be for the employee

3    of Legacy.  But we're trying to understand what the law is.

4    We have to answer the question -- not, do you have some

5    other remedies, so maybe you're okay.  So maybe it doesn't

6    matter.

7              The question is, is there a fraudulent conveyance

8    action as a matter of law because of the merger?  What they

9    focus on, Your Honor, is incurring an obligation.  But to do

10   that, we have to look at state law.  And let me quote from

11   Collier's on bankruptcy, Paragraph 548.034B.  "An obligation

12   is incurred when it becomes legally binding under applicable

13   non-bankruptcy law."

14             The obligation to us became legally binding back

15   when we gave the loans in 2012 and 2013.  You look to non-

16   bankruptcy law --

17             THE COURT:  Only to your borrowers.

18             MR. SILVERMAN:  And our borrower is now the new

19   combined company.  This isn't a matter of them buying a

20   contract.  This is a matter of a merger.  And as we

21   discussed last time, under New York law, the (indiscernible)

22   section --

23             THE COURT:  Under your construct then, to take a

24   totally extreme example, and I think we had this colloquy

25   last time.  That as long as it's in the context of a merger,

1   there can never be a fraudulent conveyance.

2            MR. SILVERMAN:  Absolutely not, Your Honor.  For

3   our loan, you look to when we gave the loan.  We gave value,

4   okay?

5            THE COURT:  Right.

6            MR. SILVERMAN:  Whether the transaction itself, by

7   which Forest acquired and merged Sabine into it, that could

8   be a fraudulent conveyance, but the transaction you'd be

9   looking at, is the sale of Sabine to Forest.

10            THE COURT:  Okay.

11            MR. SILVERMAN:  We had nothing to do with that.

12            THE COURT:  Okay.

13            MR. SILVERMAN:  We had nothing to do with that.

14            THE COURT:  But you benefited from it.  You

15   benefited by getting a lien, even though you had no one

16   suggesting intent.  You benefited from it.

17            MR. SILVERMAN:  And that's correct.

18            THE COURT:  And fraudulent conveyance law looks at

19   who benefits from a fraudulent conveyance.

20            MR. SILVERMAN:  Well, Your Honor, and the Ultr --

21            THE COURT:  You benefited from it.

22            MR. SILVERMAN:  In the Ultramar case the appellate

23   division said "A conveyance which satisfies the antecedent

24   date, made while the debtors are solvent, is neither

25   fraudulent, nor otherwise improper, even if its effect is to

1      prefer one creditor over another.  And that, as Your Honor

2      pointed out, is a preference issue.  It's not a fraudulent

3      transfer issue.

4           And Your Honor, merger law and you look to non-

5      bankruptcy law, makes clear that Legacy Sabine is the new

6      company, the same as Forest.  906(b)(3) of the New York BCL,

7      "The surviving or consolidated corporation shall assume and

8      be liable for all liabilities, obligations, and penalties of

9      each of the constituent entities."

10          And there's a legion of cases.  And we get into

11     this in more detail in the brief you're going to get next

12     week, which explained why that is.  This is not a matter of

13     trying -- they talk about us trying to cleanse a transaction

14     or cleanse a fraudulent conveyance.  We're not seeking to

15     cleanse a fraudulent -- there was no fraudulent conveyance

16     when the loans were made.  They say, well you could somehow

17     structure transactions to avoid fraudulent -- I don't know

18     what they're talking about.

19          What they're arguing is exactly that though.

20     They're arguing you can structure a merger to wipe out all

21     of the debt of the insolvent company that's merged into the

22     acquiring company.  And that is not what the law is.  That's

23     not what makes sense.

24          THE COURT:  You're indicating that, you know,

25     there are coming attractions.  So that argues or supports

```
 1    the notion that this should be deferred to another day.

 2               MR. SILVERMAN:  Your Honor, I didn't come here to

 3    tell you when to decide something.  That's not my job.  You

 4    will make your own decision on that.  Let me though address

 5    that question this way.

 6               First of all, I think you would be doing a

 7    tremendous service to every lawyer in this room, and lawyers

 8    around the country, if Your Honor wrote an opinion that

 9    could be looked to instead of Allegheny on the subject of

10    the interface between fraudulent conveyance law and merger

11    law.  That would be something to which legions would be very

12    grateful.

13               THE COURT:  I'm not feeling gratitude for all the

14    opinions that I wrote last year on Lehman and other things.

15    So I don't know if that's going to be a motivation.

16               MR. SILVERMAN:  Some people will like the results,

17    and some people will not like the results.

18               THE COURT:  Right.

19               MR. SILVERMAN:  But the world would be a better

20    place, if there was a clearer opinion than Allegheny.  But

21    as Mr. Golden pointed out, we have a mediation

22    (indiscernible) --

23               THE COURT:  Yes.

24               MR. SILVERMAN:  -- in two weeks we have the

25    hearing.  My view was exactly the opposite of his.  My view
```

1    is that if Your Honor were to decide some of these issues,

2    it would very much help the mediation and perhaps shorten,

3    or not the -- if a hearing is necessary on the standing

4    motion.  And help the parties and the Debtors understand

5    where they are, or where they might be in negotiating plans.

6    So I think -- again, I'm not here to tell the Court what to

7    do when.  But a decision would be very helpful in helping

8    the parties understand where they are.

9            And it's not simply the question of our liens.  I

10   mean, just applied to us, the ruling also would go to the

11   claims asserted against us under Section 550 with the

12   alleged diminution of the value of the lien property.  We

13   think that claim is no good at all, even under any

14   circumstances.  But, of course, if our liens are good, then

15   you don't get there.  There are issues about adequate

16   protection claims that relate to the liens.  And that's just

17   us.  With respect to other parties, a ruling here can help

18   influence everything, and can help get things resolved.

19           So we would ask the Court to rule on this motion,

20   as soon as the Court feels it's appropriate and is ready to

21   do so.

22           THE COURT:  Okay, thank you.

23           MR. SILVERMAN:  Thank you.

24           THE COURT:  All right, Mr. Martin, we'll wrap up

25   soon, but while I have you all here -- do you want to

1    address the -- and also Mr. Golden, if you would like to as

2    well, all Sabine claims must fall argument that Mr.

3    Silverman made or observation that he made?

4            MR. MARTIN:  That's exactly correct in the spirit

5    of not making us go back and forth too many times.  I think

6    that the point made is technically correct.  That when those

7    -- but it's going to be ameliorated by several factors.

8    That is, if Legacy Sabine parent had had no assets, the old

9    Sabine had no assets, and nothing happened other than

10   obligations were incurred on the way we view it, every

11   obligation, not just intellectually, but yes, they're all

12   avoidable.

13           Now that's ameliorated by a couple of things.

14   One, as I spoke earlier, Section 548(c) will get credit for

15   what the actual assets were that were coming in, to the

16   extent folks were in good faith.  And I suspect --

17           THE COURT:  And that's available pro-rata to

18   everybody?

19           MR. MARTIN:  It would be available pro-rata to

20   those who qualify in good faith.  And the employees, of

21   course, are not going to have -- at least most of the

22   employees are not going to have knowledge.

23           THE COURT:  Right, but what about the other Legacy

24   Sabine creditors?

25           MR. MARTIN:  The same -- if you had trade

1    creditors at the parent company, same situation, whatever

2    those assets were.  And we can test out the good faith, and

3    we can see what order those rank in, and that will shake out

4    into crediting that.

5           And that, by the way, leaves all of them in the

6    position they would have been in anyway, exercising request

7    to the assets that existed previously.

8           THE COURT:  That's kind of the parallel to the

9    fact the value was given at a point in time.

10          MR. MARTIN:  That's correct.  Second, there's a

11   practicality in the world, right?  Preferences can be sued

12   for a dollar, for ten dollars, for a hundred dollars, for a

13   thousand dollars, and estates do not bring all of those

14   claims for any number of reasons -- cost effectiveness, not

15   talking to Courts, not (indiscernible), all of those things.

16   And so the notion to say that, well this means that the

17   committee is coming after the employees next is not the

18   case.

19          But let me give an example, which I do not believe

20   is, at least to my knowledge, is the case here.

21          THE COURT:  I would like to leave the employees

22   out of it.

23          MR. MARTIN:  Correct.

24          THE COURT:  I mean, I think Mr. Silverman was

25   using that, not inappropriately for illustrative purposes.

1    Let's leave the employees out of it, and if you want to talk

2    about someone, you can talk about --

3              MR. MARTIN:  Trade creditor.

4              THE COURT:  Yeah.

5              MR. MARTIN:  Could I imagine that there's some

6    non-financial liability?

7              THE COURT:  Well, the Sabine creditors on your

8    committee, right?

9              MR. MARTIN:  Okay.  So let's discuss that.  So it

10   is absolutely the case, and we hear that, for example, folks

11   think that the assumption of the Legacy Sabine unsecured

12   debt is subject to the same principle.  And there's not any

13   secret that on the flip side, when this merger occurred, the

14   Legacy Sabine subsidiaries, which have assets and will have

15   recoveries, gave guaranties of the Forest (indiscernible),

16   when those subsidiaries were insolvent.

17             And so, in the spirit that Mr. Golden raised of

18   there being mediation, there is, and will be a discussion

19   about that.  We have equal numbers of both of those folks on

20   a committee, and there's not a particular reason to start

21   flinging around four more counts in what are already like

22   STN motions.  The fact that they're not there, doesn't mean

23   that we're not aware of them.  We have representation on the

24   committee about that.  We're happy to discuss it in

25   mediation.

1               THE COURT:  Right.  I mean the committee --

2               MR. MARTIN:  We're not trying to cherry pick in

3       that sense.

4               THE COURT:  Right, but the issue highlights yet

5       another one of the many tensions in the case.

6               MR. MARTIN:  That's correct.

7               THE COURT:  And the Debtor has its share of

8       tensions, and you have your share of tensions.

9               MR. MARTIN:  That's correct.  And one thing

10      happens many times in committee rooms.  People have talked

11      about ResCap before.  We sat on that committee.  There were

12      nine people, and everyone had a different view.  And it all

13      worked out at the end of the day in a mediation amongst

14      themselves.  Maybe that's right, but that was something that

15      we decided did not need to be brought now.  It's not

16      something to challenge period, those issues.  So there's

17      enough going on in this case, as is.  That's kind of our

18      take on that.  I don't really have any other points, Your

19      Honor --

20              THE COURT:  Okay.

21              MR. MARTIN:  -- that I feel the need to raise.

22      You've been more than generous with the Court's time

23      already.

24              THE COURT:  All right, let me ask for good order,

25      Mr. Golden, do you have anything that you want to --

1              MR. GOLDEN:  No, Your Honor.

2              THE COURT:  Okay.  Ms. Schonholtz?

3              MS. SCHONHOLTZ:  Margo Schonholtz, Linklaters for

4    Wells Fargo.  In the exercise of judgment, Your Honor, I'm

5    not going to wade into these waters today.  But I do need to

6    state for the record that we're not responding intentionally

7    today to a lot of the arguments.  Particularly, where they

8    were part of the RBL facility, or the ability to unscramble

9    these mistakes.  Suffice it to say that my silence on these

10   issues today is not assent or agreement with anything that's

11   been urged here.

12             But one thing is really clear.  And Your Honor

13   asked the question, what's going on here?  This case cannot

14   for much longer, be held hostage to the UCC or frankly

15   anybody else's litigation strategy.  We have to someway,

16   somehow soon find a path to start clearing some of this, so

17   that hopefully we'll get to a plan.  Thank you, Your Honor.

18             THE COURT:  Okay.  As I said to Mr. Golden, when

19   he initially started to speak, the primary purpose of today

20   was to level the procedural playing field, if you will, and

21   allow the committee its full opportunity to be heard with

22   respect to the Motion to Dismiss.

23             The secondary purpose of today was to give me

24   another opportunity to hear from all of you because with the

25   degree of difficulty of these issues, it did help me.

1          Third, I was predisposed, even before today's very

2     helpful discussions, to make clear that I intended to defer

3     ruling on the motion.  And what I would say -- and this is

4     mostly directed toward Mr. Silverman, since it's in

5     rejection of his view, is that this is a large contentious

6     bankruptcy case.  And I do believe that I need to take --

7     the best approach is a wholistic approach.  And I do believe

8     that it would unwisely -- well, let me put it this way.  I

9     don't believe there's a basis for granting a motion and

10    dismissing the complaint with prejudice.  Indeed, I don't

11    even know what that would mean, given how everybody has

12    pointed out the limits of the complaint.

13          So that would just get us to the STN motions which

14    are on for hearing in February.  So I feel that we're

15    getting to the same place anyway because I would not have a

16    basis to dismiss with prejudice and go the step further of

17    saying, you know, no claims in any way, shape, or form.  I

18    think that would be outside the bounds of the record that I

19    have before me.

20          Most importantly though, we have the mediation,

21    and we're going to have the full briefing on the STN

22    motions.  And I'm assuming that you'll have a very

23    productive week with Judge (indiscernible).  That we'll go

24    forward with the STN as scheduled or not.  I think the "not"

25    is only if everybody largely agrees that there's a high

Page 80

1    probability of a settlement.  But I believed -- I was

2    predisposed before today, and I'm convinced today, and I'm

3    telling you that I intend to defer ruling on the motion

4    until after the conduct of the STN trial.  So I'm giving you

5    clarity to that extent.

6            And that's where I'm going to leave it.  So I'm

7    going to have most of you, if not all of you, back again

8    tomorrow.  All right, thank you very much.

9

10

11                        * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 81

1                   C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Sonya Ledanski                Digitally signed by Sonya Ledanski Hyde
                                    DN: cn=Sonya Ledanski Hyde, o=Veritext,
                                    ou, email=digital@veritext.com, c=US
7    Hyde                          Date: 2016.01.13 15:36:23 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  January 12, 2016